1

2                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF FLORIDA**
3                        **TALLAHASSEE DIVISION**

                                        )
4    UNITED STATES OF AMERICA,           )
                                        )
5               Plaintiff,               ) Case No: 4:21cr10
                                        )
6          v.                            ) Tallahassee, Florida
                                        ) April 23, 2021
7    DANIEL ALAN BAKER,                  )
                                        ) 9:31 AM
8               Defendant.               )
     _____)

9

10                   **TRANSCRIPT OF MOTION HEARING**
                **BEFORE THE HONORABLE ALLEN C. WINSOR**
11                 **UNITED STATES DISTRICT JUDGE**
                      **(Pages 1 through 67)**

12   APPEARANCES:

13   For the Plaintiff:      United States Attorney's Office
                             By:  STEPHEN M KUNZ
14                                LAZARO FIELDS
                                  Asst. U.S. Attorneys
15                                Stephen.Kunz@usdoj.gov
                                  Lazaro.Fields@usdoj.gov
16                           111 N. Adams Street, Fourth Floor
                             Tallahassee, Florida 32301
17
     For the Defendant:      Federal Public Defender
18                           By:  RANDALL MURRELL
                                  Attorney at Law
19                                randolph_murrell@fd.org
                             227 N Bronough Street, Suite 4200
20                           Tallahassee, Florida 32301

21                   *LISA C. SNYDER, RPR, CRR*
                 **Official United States Court Reporter**
22         **111 North Adams Street, Tallahassee, FL 32301**
                **(850)567-1374 * lisasnydercr@gmail.com**

23

24           *Proceedings reported by stenotype reporter.*
          *Transcript produced by Computer-Aided Transcription*
25

```
 1                    P R O C E E D I N G S
 2        (Call to Order of the Court at 9:31 AM on Friday, April 23,
 3   2021.)
 4             THE COURT:  Good morning.  Please have a seat.
 5             Good morning.  This is case number 4:21cr10, it's
 6   United States versus Daniel Baker.  We have Mr. Murrell here on
 7   behalf of Mr. Baker.  Mr. Baker is here.  Good morning.  And Mr.
 8   Kunz and Mr. Fields are here on behalf of the government.  We
 9   have a number of motions to address today.  Is everybody ready
10   to begin?
11             MR. FIELDS:  Yes, sir.
12             MR. MURRELL:  Yes, sir.
13             THE COURT:  Okay.  Is there anything we need to
14   address before we turn to the motions?
15             MR. MURRELL:  Not from the defense.
16             MR. FIELDS:  No, nothing from the government.
17             THE COURT:  Okay.  Very good.  I thought we would
18   start with the defendant's motion to compel that you filed, Mr.
19   Murrell.  It looks like there's some common ground on what the
20   legal issues are.  So we have a subjective component of this and
21   your motion has nothing to do with that, agreed?
22             MR. MURRELL:  Yes, sir.  That's true.
23             THE COURT:  Okay.  And so on the objective side the
24   question is whether a reasonable person would view the
25   communications as a threat, right?
```

1          MR. MURRELL:  Yes, sir.

2          THE COURT:  And your argument is that because it was

3    contingent on some events that ultimately didn't come to pass

4    that that would help you with the fact issue for the jury and

5    you want to be able to show them that there was not a

6    significant real life threat?

7          MR. MURRELL:  Yes, sir.  I mean, the best example -- I

8    was thinking about this.  The best example is instead of talking

9    about armed racist he had said armed Russian communists are

10   going to take over the capitol, come to our defense and help us

11   protect the capitol, probably nobody would take that seriously

12   and it wouldn't be a true threat.

13         The government's position is that, well, gee, I can't

14   even introduce evidence showing that that threat didn't exist.

15   And, again I understand there is subjective argument.  And they

16   are right about that, that's an element.  But there is more to

17   it.  And just as the Court said, there is the subjective test.

18   And it seems to me I could introduce evidence showing the true

19   nature or providing the jury with information to show that the

20   threat really doesn't amount to anything.

21         THE COURT:  But isn't it from the perspective of a

22   reasonable person hearing what was said in the context of

23   everything else?

24         MR. MURRELL:  Well, that's right.  In the context of

25   everything else, including whether or not there really is a

1  threat.

2          THE COURT:  But from the reasonable person's

3  perspective.  I mean, so nobody's going to know what this

4  confidential assessment is.

5          MR. MURRELL:  I don't think that's right.  The

6  newspaper article I attached was saying --

7          THE COURT:  I'm sorry?

8          MR. MURRELL:  The newspaper article that I attached to

9  my motion says that, it was in the paper that law enforcement

10  was saying they didn't know of any threats.  So, yes, I think

11  the reasonable person would know that.

12          THE COURT:  The reasonable person would know that

13  there wasn't a threat?

14          MR. MURRELL:  Yes.  That there was no threat from

15  armed racists.

16          THE COURT:  Right.  But you're -- what you are trying

17  to get is something that is not part of the public, that the

18  reasonable person wouldn't have known.  You are trying to get

19  this confidential threat assessment.

20          MR. MURRELL:  Well, I think the -- I think -- I don't

21  know how confidential it was.

22          THE COURT:  Well, you're trying to get a threat

23  assessment that wasn't -- if it was public, if it was something

24  the public already knew, you would already have it.  And so what

25  you're trying to do is get something that the public wouldn't

1    have had.  And my question is --

2              MR. MURRELL:  Well, I don't really have it as a

3    trouble.  What I have is a newspaper article.  I mean, I have a

4    newspaper article which is why I subpoenaed the chief of police

5    and the sheriff -- the sheriff.  They can tell us what the

6    nature of it was.  They are talking to the press and telling the

7    press we don't know of any threat.  Well, at the very least I'd

8    like to get that information in.

9              And it does seem to me when you talk about what the

10   reasonable, when you are talking about a reasonable man, what

11   the reasonable man knows, I think it's sort of the reasonable

12   man with perfect knowledge.  I mean, if you're talking about

13   well, what does the average person know, I think that would be

14   pretty hard to figure out.  So, I think it really is what is the

15   state of affairs.  And the state of affairs, we can get that

16   from this FBI intelligence.  And --

17             THE COURT:  So, suppose we had a case --

18             MR. MURRELL:  I mean, the average person might not

19   know whether or not Russian communists are going to attack the

20   capitol.  It's not in the news.  How would the average person

21   know?

22             So, again, we need to go to sources that have that

23   information to present it to the jury.

24             THE COURT:  So suppose, let me give you a

25   hypothetical.  Suppose the charge was that someone was standing

1    in front of the courthouse and said if anyone comes out of the

2    courthouse today in a red shirt I'm going to shoot that person

3    and that person is charged with 875(c).  At trial you think it

4    would be a relevant fact whether anyone in the courthouse had on

5    a red shirt that day?

6             MR. MURRELL:  I think it would be relevant if we knew

7    that there were no red shirts in Tallahassee, sure.

8             THE COURT:  But from a person hearing that threat

9    outside, I mean the offense is complete when the statement is

10   made or else there was no offense.  And so if someone hears that

11   comment and that person is going to have to think to themselves

12   well, I don't know whether to take this seriously because I

13   don't know as a matter of fact whether someone in the courthouse

14   had on a red shirt.

15            MR. MURRELL:  I think the jury could consider that.

16   But, you know, as a practical matter, you're trying to prove a

17   probability, whether by chance there is somebody in the

18   courthouse that has a red shirt.

19            And to me that's different than saying there aren't

20   any red shirts.  People don't wear red shirts.  And that's the

21   distinction.  We're not talking about, you know, the probability

22   of some -- somebody wearing a red shirt here.  We're talking

23   about whether or not this group of armed racists exist that

24   plans to attack the capitol.  And it seems to me that's a little

25   different question than what is the probability of somebody

1    wearing a red shirt.

2         THE COURT:  But isn't the question also -- I mean, if

3    the question is what a reasonable person is going to think, it's

4    whether, not whether he can carry it out, but whether -- I mean,

5    the cases are clear on that.  Or whether it's even likely to be

6    carried out, but whether it's a serious threat.  And so it seems

7    like whether there is this band of armed racists or not it could

8    or could not be a true threat.  And it seems like that's what

9    the cases, including your case, bear out.

10         MR. MURRELL:  Well, the threat has to be imminent.

11    And whether it's conditional is a consideration as well.  So if

12    there are no armed racists out there that plan to take over the

13    capitol the threat is hardly imminent and it's certainly

14    conditioned on the fact that it doesn't exist.

15         THE COURT:  Well, let me ask about the conditional

16    nature of it because that's something that -- both sides talked

17    about this.  And I read the cases that you all cited.  And I

18    don't see anything like this where someone says, you know, if

19    this, then there's going to be this reaction where a Court said

20    that made it not a true threat.  You are right if something is

21    inherently impossible, if someone's, you know, a reasonable

22    person could take into account that and a jury might find it's

23    not a true threat for that reason.  But this idea that well,

24    what he's anticipating might happen in fact didn't happen and

25    therefore that doesn't make it a true threat.  I mean, all of

```
1   these cases talk about where someone says if so and so public
2   official comes to my town I'm going to do this.  And in none of
3   those cases is there a legal issue where the Court says, well,
4   you know, the president didn't come to this town or wasn't
5   planning to go to Philadelphia or anything like that.  And so
6   unless I'm missing some authority on that I think what people
7   are talking about the conditional nature just goes to the -- not
8   whether it was impossible or likely to happen but whether
9   someone would think it's -- still think it's a true threat.
10  Whether or not that contingency happened.
11          MR. MURRELL:  Again, I mean, my example is if he had
12  said Russian communists are going to take over the capitol
13  nobody would believe that.  I mean, you know, it's a matter of
14  degree.  You know, I suppose the likelihood of armed racists
15  taking over the capitol is a little more likely than Russian
16  communists taking over the capitol.  But our position is neither
17  one is a true threat because neither [sic] one is so unlikely.
18          Sure, there are some cases that you talk about where
19  they are conditioned on event A or event B but those are events
20  that at least could conceivably happen.
21          What I'm trying to show a jury is this event wasn't,
22  it wasn't conceivable this event would happen because there were
23  no armed racists.  I mean, you know, it seems pretty unlikely to
24  start with.  I mean, have armed racists ever taken over the
25  capitol of Florida?  Has anybody ever taken over the capital of
```

1  Florida, no.

2         THE COURT:  And that's the argument about how a

3  reasonable person would be looking at this without saying well,

4  let's go to the evidence.  And I don't think a reasonable person

5  on the street would say well, I wonder how likely this is.  I

6  wonder how closely the FBI is monitoring this.  All of those

7  things I don't think go to what your legal issue is here which

8  is why I think you've got a hard argument.

9         MR. MURRELL:  Again, it just seems to me you can talk

10  about, in fact, what the likelihood is.  If the likelihood is --

11  you can guess what the likelihood is, it's one thing.  But if we

12  have information that shows this is, in fact, unlikely it seems

13  to me we ought to be able to present that to the jury.

14         THE COURT:  Okay.  And the specific thing you're

15  seeking here is?

16         MR. MURRELL:  I mean, by the way, I've offered to

17  stipulate.  I don't care whether we have an FBI agent testify or

18  for that matter the chief of police or the sheriff.  I mean, all

19  I want the jury to know is that there did not appear to be any

20  armed group ready to invade the capitol.  And --

21         THE COURT:  As a factual matter?

22         MR. MURRELL:  Pardon?

23         THE COURT:  As a factual matter?

24         MR. MURRELL:  Yes.  Yes.  And I suppose as a subset to

25  that, the question is, what were they telling the public at the

1    time.  And it seems to me if that's what the test is, and I

2    don't think it is, but if that's what it is we can at least tell

3    the jury what law enforcement was telling the public.

4            THE COURT:  I guess I'm struggling to see what the

5    difference is between that argument and, again, if someone said

6    I'm going to kill senator so and so if he steps foot in Leon

7    County this week and then having a trial issue about what that

8    senator's travel plans were or how likely it was or how often he

9    has come to Leon County or anything like that.  And I think a

10   reasonable person would hear someone say in my hypothetical and

11   think well, that could be a true threat without getting --

12           MR. MURRELL:  Again, it seems to me it's a matter of

13   probability.  And, you know, whether the president is going to

14   or somebody's going to come to Tallahassee that's a matter of

15   probability.  But -- and that's something I think the jury can

16   consider.  But if we could show that it's -- there is no such

17   senator I think that would mean it wasn't a threat.  And that's

18   what I'm trying to show, that there's no such senator, there's

19   no such group.  And so it's not simply a matter of probability.

20           THE COURT:  Thank you.  Mr. Kunz or Mr. Fields?

21           MR. FIELDS:  Your Honor, very briefly.  I think this

22   talk about armed racists is symbolic.  This post was

23   January 12th, which would have been about six days after a group

24   of violent individuals overran the United States Capitol.  And

25   so armed racists in the government's argument is going to be

1   what the defendant thought was that people were coming to

2   Tallahassee.  And in fact this was being publicly reported.  You

3   know, there was a command center in Tallahassee.  Law

4   enforcement was prepared.  There was a lot of --

5         THE COURT:  Is that going to be part of the evidence

6   that there was this report that things were coming and a command

7   center set up and so forth?

8         MR. FIELDS:  No, Your Honor.  It's not.  Just for

9   purposes of this argument.

10         THE COURT:  I understand.  I was just asking the

11   question.

12         MR. FIELDS:  The only -- there is only one time in the

13   defendant's, each of the defendant's posts that the word if

14   comes up and it's at the end.  He says, if you are afraid to die

15   fighting the enemy then you can stay in bed and live.  So while

16   there was no expressed condition about waiting for potential

17   armed racists to arrive at the capitol, you know, arguably maybe

18   it wasn't implied, but it's also implied that the sun would rise

19   the next day as well.

20         And so truly I just don't think that whatever law

21   enforcement knew or didn't know about anybody else other than

22   the defendant is just irrelevant and immaterial for this trial.

23   And the government just doesn't even attempt to put any of that

24   evidence in at trial.

25         THE COURT:  So there's going to be no evidence from

```
 1   the government about how likely any of this was or what the
 2   threat level was or anything like that?
 3            MR. FIELDS:  No.  No.  It's all going to be related
 4   strictly to what the defendant did or did not do and nobody
 5   else.
 6            THE COURT:  Okay.  Thank you.  Anything further, Mr.
 7   Murrell?
 8            MR. MURRELL:  Well, again, that's a subjective test,
 9   what he did.  I think you still need to know --
10            THE COURT:  Well, the subjective test we all agree
11   doesn't haven't anything to do with your motion.
12            MR. MURRELL:  I mean, that's what he's talking about.
13   The government knew, I mean, Mr. Baker knew what he intended.
14   That's fine.  They are right about that.  But, again, that's
15   only half the test.  And I think just like my example about
16   Russian communists taking over the capitol, the jury gets to
17   consider whether that's likely.  And if a group doesn't exist,
18   it seems to me that means it's not a true threat.  So it seems
19   to me we are entitled to give information to the jury about
20   whether or not that group exists.
21            THE COURT:  Okay.  I'm going to deny the motion to
22   compel.  I don't think you've -- the information you are seeking
23   is relevant to anything, any issue in this case.  And also you
24   haven't shown that any of the information you seek would be
25   favorable or relevant evidence.  But the second component of
```

1   this -- yes, sir.

2          MR. MURRELL:  Does that mean we are excluded from

3   arguing this was not likely to happen?

4          THE COURT:  Let me -- I think the answer to that is

5   no.  And here's why.  The second element is from, as we talked

6   about the objective, it's an objective standard.  It's from the

7   standard perspective of a reasonable person.  And a reasonable

8   person is going to perceive those things the way that a

9   reasonable person is going to perceive them without knowing what

10  the underlying facts were, the likelihood and things like that.

11  And so you're right, if it's a case where someone is arguing

12  something that's inherently impossible or just outlandish, there

13  can be an argument that it wasn't a true threat for that reason.

14  If they are threatening someone who doesn't exist, to use your

15  earlier standard, that a reasonable person would know it didn't

16  exist if someone says I'm going to kill a fictional character or

17  something like that.

18          But the evidence you are seeking would not make it

19  more or less likely that a reasonable person who wouldn't have

20  access to that would view that as a true threat.  So that's the

21  ruling on the motion to compel.

22          The next motion is -- that I want to address is the

23  motion to quash which relates to a similar issue.  That's why I

24  wanted to do it next.  But I guess the first question for Mr.

25  Fields and Mr. Kunz is if this is framed as a motion to quash

saying it's burdensome and things, but is that really even your

place to say that this is burdensome to a third-party witness or

who apparently doesn't think it's burdensome, is this really

more of a motion in limine as to what those people would say?

MR. FIELDS:  I suppose if the Court wanted to treat it

as a motion in limine it would be the same result, which is what

I think the defense wants is to have either the chief of police,

the sheriff or one of their designees to testify about what the

FBI told them.  Well, I guess first of all, it's likely to be

hearsay.

Nevertheless, it's kind of related to the discussion

the Court just had with the defense and the government, it's

irrelevant what was reported in the law enforcement only phone

call.  And that clearly was leaked to the media.

As I've told Mr. Murrell and he has received the

discovery, Mr. Baker did not just come on the scene on

January 15th, the day of his arrest.  Law enforcement has known

about him for quite some time.  So what the chief or the sheriff

or the designee is going to say, putting aside hearsay, is

irrelevant and wouldn't help the jury decide anything in issue

which are these posts that the defendant communicated were they

true threats.  That would be the government's position.

THE COURT:  Okay.  Mr. Murrell, is there anything

different about this issue, I mean, in light of the ruling that

I just made?

1          MR. MURRELL:  Well, yes.  For one thing I would like

2     somebody from the police department to say there were no armed

3     racists that showed which is something I think they can

4     consider.  But number two, again, I maintain what I said all

5     along, somehow we ought to be able to show to the jury there was

6     no group that planned to attack the capitol.  But even beyond

7     that, we're talking about what information was provided to the

8     public by law enforcement.

9          And, I mean, if you want to talk about what the

10    reasonable man knew I think, again, my position is it's sort of

11    perfect knowledge but beyond that, you certainly can talk about

12    what information the police department or the sheriff department

13    provided to the public.

14         I mean, again, it is a tricky question about -- when

15    we talk about reasonable man what he or she knew, but I think at

16    the very least you could talk about what was provided to the

17    public.  He said it was leaked.  I don't think this was leaked

18    to the public.  I think these were pronouncements by the police

19    department or the sheriff department to let the citizens know

20    there really wasn't a threat to worry about.

21         THE COURT:  Getting back to your example about someone

22    threatens action against a particular non-existent human being,

23    would that be under the objective or subjective?  If that were

24    the defense and someone were --

25         MR. MURRELL:  Oh, no.  I mean, if the defendant

1    believed those people existed, and I think that's probably the

2    case here, I think Mr. Baker thought that there were armed

3    racists that were going to attack the capitol.  So I think it's

4    strictly a matter of the objective test.  Whether a reasonable

5    man would think that this threat amounted to anything if there

6    was no such group that was going to attack the capitol.

7                THE COURT:  Okay.  Mr. Fields, in the hypothetical he

8    gave about threatening against somebody who doesn't exist, how

9    does that end up in front of the jury?  In other words, if

10   someone is making a threat against a named somebody on a

11   Facebook post and there is no such person how does that work

12   out?

13               MR. FIELDS:  So, there is a person named, and we are

14   going to assume for purposes of the argument that the person

15   does not exist.

16               THE COURT:  Right.

17               MR. FIELDS:  Well --

18               THE COURT:  Or suppose it's someone that does exist

19   but, you know, suppose it's a politician but someone who died

20   several years ago.  That's the threat.

21               MR. FIELDS:  I guess the first question is, what does

22   the defendant intend subjectively.

23               THE COURT:  Okay.  So he would intend that because

24   maybe the defendant doesn't know the person, the deceased.

25               MR. FIELDS:  Objectively, it would be up to the jury

1    to decide whether they would view it or a reasonable person

2    would view that as a true threat.  Arguably that would be a

3    weaker case for somebody prosecuting it, but I think that's

4    different from what we --

5             THE COURT:  It would be weaker in the sense, but how,

6    would the jury, would that be relevant, I mean, if the defense

7    wants to say we'll just put in the fact that that person

8    didn't -- wasn't extant would that be relevant?

9             MR. FIELDS:  I suppose if, for example, the threat was

10   I'm going to kill George Washington.

11            THE COURT:  Well, pick somebody, you know, the jury

12   wouldn't know.  I mean, just --

13            MR. FIELDS:  Well, if the jury doesn't know who they

14   are, I don't know that it would be, you know, I don't know that

15   it would be relevant who they are because it could be a threat

16   nonetheless.

17            Now, the example I just gave if it's George Washington

18   the jury's going to say well, he's been dead for several hundred

19   years, you couldn't have threatened his life.  Although, there

20   could be somebody else named George Washington, but I don't

21   think that would be relevant, Your Honor, I guess, to answer

22   your question directly.

23            THE COURT:  Okay.  Give me one moment here.  I guess

24   that gets to the question of whether it would be a violation of

25   the statute to threaten something that's not possible.  And I

```
1    think the cases say you can violate the statute with something
2    that's not possible, right?
3              MR. FIELDS:  As long as an objectively reasonable
4    person would view it as a true threat.  And --
5              THE COURT:  So what's outside of that, I guess it's
6    like the other issue, what's outside of that objectively
7    reasonable person's knowledge wouldn't go into whether that
8    objectively reasonable person would view it as a threat.
9              MR. FIELDS:  That would be the government's argument.
10             THE COURT:  Okay.  Mr. Murrell?
11             MR. MURRELL:  Well, I mean, I think that the Court's
12   example is a good one.  If it's somebody that died recently and
13   the defendant thought it was, you know, assume -- he thought the
14   fellow was still alive I think it would be important for the
15   jury to know that the person didn't exist and it couldn't very
16   well be a real threat if the person doesn't exist objectively.
17             THE COURT:  Right.  But if the objectively reasonable
18   person wouldn't know that, in other words if you walked down the
19   hallway and hear somebody say I'm going to go home right now and
20   kill Mrs. Smith.
21             MR. MURRELL:  Well, I mean, if he wants to kill
22   somebody that's an obscure person that not everybody knows
23   about, well they are never going to know.
24             THE COURT:  That's my question.  So if someone's on
25   trial for threatening to kill Mrs. Smith, you know, calls up the
```

```
 1    newspaper and says I'm going to kill Mrs. Smith today does the
 2    jury get to know that Mrs. Smith died that morning?
 3              MR. MURRELL:  I would think so.  Well, prior to the
 4    threat they may.  Yes.  I think they would get to know that,
 5    sure.  I mean, I just don't see how --
 6              THE COURT:  But how would that affect how the
 7    reasonable person would view what he or she heard?
 8              MR. MURRELL:  Well, I think the reasonable person, if
 9    they are going to judge this threat, is going to have to know
10    whether such a person exists.  I mean, if you say I'm going to
11    murder some fictitious person, is that really a true threat?
12    And I don't think it's a true threat to threaten to kill
13    somebody that died a month ago either.
14              THE COURT:  Well, what the law says is a true threat
15    is something that an objectively reasonable person would
16    understand to be a threat to harm someone else.  And so if
17    someone says, I'm going to kill Bugs Bunny, I think a reasonable
18    person would say that's not a serious thing.  But if someone
19    hears someone say, I'm going to murder Mrs. Smith that would be
20    viewed as a serious threat without knowing whether or not Mrs.
21    Smith existed.
22              MR. MURRELL:  Well, this is really the heart of my
23    argument.  You need to let the jury know whether that person
24    exists.  I mean, I guess it shouldn't hinge upon whether you
25    want to kill somebody that everybody knows or somebody that
```

1    nobody knows.  It shouldn't hinge upon that.  It should hinge

2    upon the possibility of whether it's even possible.

3          THE COURT:  Right.  But then that person in the

4    hallway who hears the threat about Mrs. Smith would have to go

5    home and investigate who this person was before he or she could

6    perceive it.  And I don't think that's consistent with what the

7    cases say.

8          MR. MURRELL:  I just don't think that's the way it

9    works.  I mean, if you just make up somebody and say I'm going

10   to kill them, can that honestly be a true threat?  I just don't

11   see how that could be.  I mean, you know, one thing we know

12   about reading the law is that, you know, we construe this pretty

13   strictly.  The First Amendment is important.  And if you can go

14   to jail for threatening somebody that is fictitious I think

15   you've really run afoul of the First Amendment.  And I don't

16   think it depends upon whether this fictitious person is a

17   cartoon that everybody knows about or somebody with a real name

18   that -- a real name that doesn't exist.  So, I just don't see

19   how it can be a true threat if the person doesn't exist or if

20   the person was dead.  And I think a reasonable man has to know

21   in making his judgment whether or not the person exists.

22         THE COURT:  Okay.  What the jury instructions say is a

23   true threat is a serious threat, not idle talk, a careless

24   remark, or something said jokingly that is made under

25   circumstances that would place a reasonable person in fear of

1    another person being injured.

2          And I think you can make a statement, under

3    circumstances that would put a reasonable person in fear of

4    someone else being harmed, regardless of what the facts on the

5    ground are vis-a-vis that other person.  And, you know, the

6    cases do talk about it doesn't matter that it's impossible to

7    pull off.  It doesn't matter that it's something implausible

8    necessarily because there can be factors, but I do think it --

9          MR. MURRELL:  Well, I don't mean to argue with the

10   Court.  But it just seems to me if the threat has to be imminent

11   it can't very well be imminent if there's no such person.  If

12   they can consider whether the threat is conditional or not, it's

13   pretty conditional if the person doesn't exist.

14         THE COURT:  Well, I don't agree with that last

15   statement that it would be conditional, but certainly your

16   earlier statement that it has to be -- that it can't be a true

17   threat if it's not something capable of being pulled off

18   imminently.  I just think the cases go the other way from that.

19   I mean, they make clear that it doesn't have to be possible.

20   You know, we have a lot of cases where incarcerated people are

21   making threats that they are obviously not capable of carrying

22   out imminently, things like that.

23         So, anything further, Mr. Fields, on that one?

24         MR. FIELDS:  No, Your Honor.

25         THE COURT:  Okay.  The motion, which we'll consider it

1   as a motion in limine, will be granted.  I will say this, it

2   will be subject to reconsideration depending on what the

3   government puts in.  These are witnesses that you wanted to call

4   and if there is testimony that comes in about how likely a

5   threat is or what the overall risk was, then that would be

6   something that --

7              MR. MURRELL:  If I could follow up?

8              THE COURT:  Yes, sir.

9              MR. MURRELL:  So does that mean I cannot argue to the

10  jury that there's no evidence that this group even exists?

11             THE COURT:  I think what you'd be arguing is what a

12  reasonable person would see.  And if you can make arguments that

13  this is kind of an outlandish thing that was never going to come

14  to pass, I don't think that would be an improper argument.

15             I'm not necessarily ruling on the arguments right now,

16  but you can tell me if you disagree, Mr. Fields.  But the

17  argument would be about what a reasonable person in those

18  circumstances on the day those things were made, whether they

19  would have viewed as something serious or whether they would

20  have viewed it, as you've argued, as hyperbole or something like

21  that.

22             MR. MURRELL:  My argument would be, yes, a reasonable

23  person has to consider the evidence presented and there's no

24  evidence presented that there was even such a group.

25             THE COURT:  I don't know that that would be an

1  improper argument.

2          MR. MURRELL:  I'm sorry?

3          THE COURT:  I don't think that would be an improper

4  argument.  Do you disagree, Mr. Fields?

5          MR. FIELDS:  Only to the extent that we don't have to

6  prove that such group existed.  So while I think Mr. Murrell --

7          THE COURT:  I think that's an appropriate argument

8  too.

9          MR. FIELDS:  Sure.

10          THE COURT:  Okay.  All right.  So that's the ruling on

11  the motion to quash.  It's granted as a motion in limine, but

12  that brings us to the -- again, with the possibility that it

13  could be revisited at trial.

14          MR. MURRELL:  We're ready to proceed.

15          THE COURT:  The next one is motion in limine regarding

16  defense witnesses.  I don't think you filed a response on this

17  one, Mr. Murrell.  And it is noticed for today, but if you need

18  more time on that.

19          MR. MURRELL:  Oh, no.  To me it's a fairly simple

20  issue.  I think the government is right.  These are expert

21  witnesses, and I think they are right about that.  And, if the

22  government wants to have a *Daubert* hearing we are happy to do

23  that.  I think it would be a little silly.  I have the resumés

24  of both men and they are eminently qualified.

25          THE COURT:  Let's take them in order.  Dr. Enders, his

1    entire testimony would be about the George Soros conspiracy

2    theories?

3          MR. MURRELL:  Yes.  Now, if the government says we are

4    not going to introduce any evidence about George Soros, well we

5    haven't gotten to the motion in limine, but I'm assuming they

6    are going to get some of their texts in so it seems to me we can

7    introduce the texts about George Soros and so we can show the

8    jury that these texts aren't really serious.  We're talking

9    about this fantasy of right-wing conspiracy theorists.  So,

10   that's why I think it's relevant.

11         THE COURT:  So, I guess I read in the response that

12   the government was not going to put in anything about George

13   Soros.  I thought that might resolve it.  But you're saying if

14   they don't put in the George Soros texts you would put it in?

15         MR. MURRELL:  Yes.

16         THE COURT:  And then you'd put it in and then put in

17   an expert to say what?

18         MR. MURRELL:  I think most people know who George

19   Soros is, that I know of.

20         THE COURT:  Right.

21         MR. MURRELL:  But I'm not sure everybody on the jury

22   knows.  So I think he would explain that George Soros is a

23   wealthy Jewish democratic activist and that he donates to a lot

24   of causes and he is wealthy.  And then I think he will go on to

25   say George Soros is the object of all kinds of these right-wing

conspiracy theories and here are some of those theories.

THE COURT:  That would go to what issue, his subjective intent?

MR. MURRELL:  Well, it would go to show, yeah, certainly goes to his subjective intent.  But I think the government wants to introduce some of his other social media posts to show that he's a serious threat or that he has this warrior-like personality.  And I think we're entitled to rebut that by showing, hey, here's a threat that shows how silly these posts are.

THE COURT:  Okay.  I guess, what is the actual post?  Is that --

MR. MURRELL:  I don't have it in front of me.  But the gist of it is that he's --

THE COURT:  He's funded.  He says he's funded by Mr. Soros?

MR. MURRELL:  Right.  He's looking for those people that attacked the capitol on January 6th and he has money and he is funded by Soros.  And that's what the essence of it is.

THE COURT:  Okay.  Let me see if I can find it.  Do you have the actual text, Mr. Fields, or the post or whatever it was?

MR. FIELDS:  Your Honor, it was a YouTube video.  And in the comments section Mr. Baker wrote something to the effect of, I'm funded by George Soros.  I just got my Antifa card.  And

1    that, in sum, is what was included in that post.

2             THE COURT:  And that's the only reference to George

3    Soros in any of this, Mr. Murrell, as far as you know?

4             MR. MURRELL:  There's just one reference.  But, again,

5    it's in conjunction with his effort to look for these people

6    that attacked the capitol on January the 6th.  And he has money

7    to do that because he is funded by Soros is what he says.

8             THE COURT:  Okay.  I found it here.  Mr. Fields?

9             MR. FIELDS:  Judge, we weren't planning on introducing

10   a thing about George Soros.  I guess the question really is,

11   before the Court, is we would have to have a *Daubert* hearing,

12   although arguably -- the government argues totally immaterial

13   and irrelevant.  We don't need to even cross that bridge.  But I

14   just don't know how this proposed expert is going to testify

15   about, you know, political theory.  It's a side issue and it's

16   going to distract the jury.  And we'd argue it's just not

17   relevant.

18            THE COURT:  Okay.  I do think it's got the potential

19   of being a side issue.  I've got the post in front of me.  And

20   I'm still not exactly clear what he would say about the George

21   Soros related conspiracy theories.  But given that the papers

22   framed it as not a -- at least your paper is not an expert

23   issue.  I think it is an expert issue.  So I think what the

24   thing to do is to set up a separate *Daubert* hearing.  We'll try

25   to do that next week on him.  But I will say that it does seem

1    like whatever, his qualifications aside, and whatever the

2    substance of his testimony turns out to be, it seems like

3    there's at least a significant potential that it would be a bit

4    of a side show.  But, we'll address that in a separate hearing.

5    So that's as to Dr. Enders.

6              The other gentleman is Mr. Phillips, who his testimony

7    will be about two organizations, the relationship between the

8    YPG and PKK?

9              MR. MURRELL:  Well, actually, no.  I mean, this

10   business about the PKK, I mean, if the Court will bear with me.

11             THE COURT:  Yes, sir.

12             MR. MURRELL:  It's been an issue.  Page four of the

13   government's complaint there is information that the YPG is

14   connected to the PKK and the PKK is a terrorist organization.

15             You can find the same representation on page 11 of

16   Judge Frank's detention order.

17             THE COURT:  Yes, sir.

18             MR. MURRELL:  You can find it on page 18 of Judge

19   Frank's probable cause order.  And you can find it on page five

20   of the government's, what I call the government's motion in

21   limine.  And you can find it on page eight of the government's

22   response to my motion to reconsider Mr. Baker's detention.  So

23   we didn't bring this up to start with.  The government has

24   repeated all this claim about the PKK and the YPG.

25             THE COURT:  I understand that.  I think -- yes, I

1  understand that.  And, you've acknowledged in the response to

2  the motion in limine that the fact that he was in some foreign

3  militia-type organization is relevant.  I think that's correct.

4  The question is, is it relevant whether -- how the United States

5  government viewed this particular militia he was associated

6  with, do they consider it a terrorist organization or did they

7  not.  I think your argument is that's prejudicial.  And if the

8  government's going to say this was a terrorist organization, I

9  think you would be entitled to say it wasn't.  But I'm not sure

10  that's what they were going to say anyway.

11        So, I guess if they just say he was a part of this

12  militia in this country, which I agree with you is relevant

13  because it shows as to the subjective intent as to his

14  seriousness, it shows that he's, you know, willing to travel and

15  fight for his beliefs and so forth, but if the government

16  doesn't put in anything about whether it is or is not a

17  terrorist organization, does that resolve your issue as to

18  Mr. Phillips?

19        MR. MURRELL:  No.  And, again, I don't think it should

20  come in as to PKK.  I mean, maybe we agree on that.

21        THE COURT:  Wait a minute.

22        MR. MURRELL:  I still think we are entitled to explain

23  to the jury what the YPG is.  I mean, the government is talking

24  about putting up texts about where he's bragging to be a member

25  of the YPG.  They want to put up a Facebook page showing him

1    with a YPG flag.  And I don't think people know what the YPG is.

2    And I think there's certainly the risk that the jury might

3    think, boy, this is some kind of middle-aged militia, this must

4    be some kind of terrorist organization and, therefore, Mr. Baker

5    must be dangerous and so, therefore, these threats are serious.

6         Well, I think if the jury understands what the YPG

7    really is, a militia that really fought and pursued the benefits

8    of the United States, or the purposes of the United States, I

9    think that would solve the problem.  But I think if they don't

10   have any information there is a risk, particularly with the way

11   the government treats some of this, that they are going to think

12   this is some sort of terrorist organization.

13        THE COURT:  Okay.  Well, let me ask this.  We agree

14   it's relevant that he was part of this group, his training and

15   military and so forth.  I think there's agreement that whether

16   this group was good, bad or indifferent is not relevant to the

17   issue of why his participation in it was relevant.  In other

18   words, it's relevant that he was in the organization because it

19   shows he is capable of fighting, shooting, those types of

20   things, and willing to travel to do these things.  And I think

21   it makes it more likely that it was a serious threat.  It's

22   relevant to that point.  So whether it's good or not, as an

23   organization, probably is not relevant.  You agree with that?

24        MR. MURRELL:  Well, not really.  I mean --

25        THE COURT:  All right.  Well, how is it relevant that

1    if you were to prove that this was a pro United States

2    organization, when again the whole reason that it's coming in is

3    to show that he's capable and serious about taking action,

4    shooting, for whatever his beliefs are.

5            MR. MURRELL:  That is to give the jury an accurate

6    picture of what the YPG is.  And, again --

7            THE COURT:  But why is it -- my question is, why is it

8    relevant what kind of organization YPG is?

9            MR. MURRELL:  Because if they think it's a terrorist

10   organization they are going to think he's dangerous.

11           THE COURT:  And if it were a terrorist organization

12   that would be irrelevant as well, right?

13           MR. MURRELL:  Well, I don't know.  My guess is that

14   you'd be hearing from the government they'd want to introduce

15   that.  But, I think that they shouldn't leave the jury to guess

16   what kind of organization this is.  This really isn't debatable,

17   frankly.  I mean --

18           THE COURT:  The government says it is.  They say that

19   your expert contradicts what someone else --

20           MR. MURRELL:  Well, they want to debate whether they

21   are affiliated with the PKK.  And there might be a debate about

22   the extent of their affiliation with the PKK.  But in terms of

23   what the YPG is, I think we ought to be able to tell the jury.

24           If they have an expert that wants to disagree with

25   what we say about the YPG, fine, let them bring the expert in.

1   I don't think such expert exists.  Because these are just basic

2   facts about what the YPG is.  And if you don't give that

3   information to the jury, the jury is free to think whatever they

4   want.  And they may --

5           THE COURT:  Right.  And that's your argument, is that

6   if you leave it hanging out there, they may attribute some evil

7   intent to it and think worse of your client.  That's the

8   argument.

9           MR. MURRELL:  And I think that's more likely than not,

10  given that it's the fighting in the Middle East.

11          THE COURT:  But, that's not a relevance argument.

12  That's sort of a -- and that could be cured by a jury

13  instruction to say you are not to take into account what the

14  purpose of that organization was.  You are only to consider it

15  for these purposes.

16          MR. MURRELL:  An instruction like that just tells the

17  jury that it's a dangerous organization.  When the Court tells

18  the jury, don't consider what kind of organization this is, I

19  mean, the jury instructions carry some weight.  But, you know,

20  that's like --

21          THE COURT:  Well, they carry a lot of weight and we

22  presume that the jury follows them.

23          But my question is, you've said that you want them to

24  know it's not a terrorist organization so they don't think ill

25  of your client.  As a practical matter that is very reasonable,

1    but my question is, how is it relevant --

2              MR. MURRELL:  Well, okay.  I mean, here's --

3              THE COURT:  -- as a legal matter?

4              MR. MURRELL:  I don't know what the Court is going to

5    let in.  The government wants to introduce a video of Mr. Baker

6    fighting with the YPG.  They want to introduce text messages and

7    posts where he's proud of the fact he is a member of the YPG.

8    They want to introduce a photo of Mr. Baker standing in front of

9    the YPG and Antifa flags, if I understand it right.  I think the

10   jury ought to know something about the YPG.

11             THE COURT:  But my question is, why is the nature of

12   the YPG legally relevant to any issue in this case?  I

13   understand why you want them to know that it's not a terrorist

14   organization.

15             MR. MURRELL:  Well, because it's, I mean, if you fight

16   for the PKK, you know, the jury is going to think you are a

17   terrorist and therefore you are more likely to make these

18   threats.  If you fight for the U.S. military nobody is going to

19   think you are a terrorist and likely to make these threats.  And

20   so we got the YPG and they are simply left to guess what kind of

21   organization it is.

22             I mean, I do think the nature of the organization

23   tells you something about whether or not the individual presents

24   a threat.  I don't think that's -- certainly in the eyes of the

25   jury, I think that's going to be important.

1           THE COURT:  Okay.  Mr. Fields?

2           MR. FIELDS:  Your Honor, we don't plan to get into the

3     PKK at all.  The reason -- the only reason we would is if the

4     defense, because this case has been litigated and we haven't

5     fleshed these things out, but I anticipate that some of the

6     cross-examination might be, well, the YPG is just a friend of

7     the United States.  And if that's going to be the argument from

8     the defense or the evidence and testimony, I fear that, again,

9     we're going to get into a side show about that.  And, candidly,

10    it's not just relevant.  And the government doesn't want to

11    touch that.  As I stated in the response, we just want to elicit

12    that this is a foreign militia and this is where he got some of

13    his training.  And it kind of ties in to --

14          THE COURT:  And how's that going to come in?  I mean,

15    you've got the posts themselves, but are you going to have a

16    witness that says this organization, this is where it is, this

17    is what it is, or is it just going to be through his actual

18    words and his posts?

19          MR. FIELDS:  No, Your Honor.  The only witness would

20    be an agent who interviewed the defendant in the Middle East.

21    And he told the agent about his time in Syria and what he

22    learned and what he didn't learn, including the fact that he

23    said that the PKK was with the YPG and they were training

24    together.  But, again, we don't plan to get into that, but

25    that's the manner in which that evidence would come in.

```
 1          THE COURT:  What do you say, you don't plan to --
 2          MR. FIELDS:  The government does not anticipate on
 3   direct examination or in our case in chief eliciting anything
 4   about the YPG's relation to any foreign terrorist organization
 5   at all.  It's just -- we argue it's not relevant.
 6          THE COURT:  Or its relations to the PKK?
 7          MR. FIELDS:  That's the foreign terrorist organization
 8   I'm referring to, Your Honor, yes.
 9          THE COURT:  No.  But, I mean, it's one thing to say
10   you are not going to talk about the PKK versus you are not going
11   to call it a foreign terrorist organization.  But I guess you
12   had mentioned before that there was going to be some evidence
13   from a gentleman who interviewed Mr. Baker after Mr. Baker
14   returned to the United States.  Would that include that the PKK
15   and the YPG were in cahoots?
16          MR. FIELDS:  No, Your Honor.  Unless the defense
17   elicits that and we have to rehabilitate the witness.  That's
18   the only reason it would come in.
19          THE COURT:  Okay.  You stood, Mr. Murrell.  You had
20   something to say?
21          MR. MURRELL:  Well, okay.  I mean, maybe I
22   misunderstood.  I thought they were going to say that they were
23   going to just talk about the interview with Mr. Baker and how he
24   said he was with the YPG and the PKK was present.  Did I -- you
25   are not going to mention anything about the PKK?
```

1           MR. KUNZ:  No.

2           MR. MURRELL:  Well, that's better.  But, again, it

3    just seems to me that certainly everybody that's detained --

4    judges that have detained Mr. Baker thought that was relevant

5    that made him more dangerous.  It just seems to me that's what

6    the jury is going to --

7           THE COURT:  I mean, the judges on detention are

8    looking at dangerousness as something that's -- and there's

9    issues at detention that don't go into issues of guilt.

10          MR. MURRELL:  But, is the jury more likely to convict

11   him if they think he is dangerous?  Of course they are.  And it

12   just seems to me we ought to be able to present evidence to show

13   them the nature of what he was doing.

14          THE COURT:  Right.  But by that logic, I mean, you can

15   put in anything about how he is peaceful and not dangerous and

16   trials end spiraling down --

17          MR. MURRELL:  Well, I mean, you are talking about

18   reputation testimony and opinion.  We are just talking about

19   what the YPG is.  And it seems to me to leave the jury guessing

20   about what it is is a mistake because they are liable to think

21   it's some kind of terrorist organization which makes him more

22   dangerous which makes it more likely these were real threats.

23          THE COURT:  Right.  But, that's what I'm saying.  I

24   think if the concern is that the jury is going to think things

25   that are irrelevant, and so you can put in other facts that are

1   irrelevant, that's just not the way it works.

2           I guess what I'm struggling to gather from your

3   argument is what would make the PKK's status vis-a-vis part of

4   the defense legally relevant.

5           MR. MURRELL:  Well, I guess part of the question is

6   does that mean the government can introduce a picture of Mr.

7   Baker standing in front of the YPG flag, does that mean they

8   can't introduce texts where he's claiming to be a member of the

9   YPG?  If that's irrelevant, why would they introduce that?

10          THE COURT:  Well, we're going to get to the texts here

11  in a minute, and maybe we should have done this in the other

12  order.  And I did this one first because I thought it might sort

13  of resolve themselves.  So maybe let's do that.  Let's skip

14  ahead to the 404 motion and then come back to this.

15          But, to answer your question, I think some of the

16  messages -- well, you've acknowledged some of the messages will

17  come in on this idea that it's all part of the context.  If it

18  was just a picture of him in front of some flag, I don't know

19  that that would be relevant.  We'll hear what the government

20  will say about that.  But if it's him in front of a flag with

21  rifles in the context of these other things that we've talked

22  about, then that might be different.

23          But, let's turn to the other motion and we'll come

24  back to the motion in limine.  But, again, as to Dr. Enders,

25  we'll set up a separate *Daubert* hearing on that.

1          So the next one is document 35.  And I think maybe the

2    thing to do, again, there's some common ground here, there's

3    some disagreement and then there's some disagreement from you,

4    Mr. Murrell, based on what you anticipate they might be.

5    There's a notice issue to the extent this is a 404 issue.  But,

6    it might make sense to just find out where there is agreement

7    and then go through -- you've attached kind of a list to your

8    response, Mr. Murrell, that I think is helpful.

9          But, broadly speaking, the three categories that the

10   government has raised are the military service, which is not an

11   issue anymore.

12          MR. MURRELL:  I might say there is a question about

13   whether they intend to introduce the fact that he was AWOL.

14          THE COURT:  Well, we'll talk about that.  That's a

15   fair point.  The firearm, I'm just talking about the broad

16   categories.  The firearms you agree.  And then the social media

17   posts you agree to some and not others.  But, Mr. Kunz, how do

18   you propose we do this?  Go through the list one by one?

19          MR. KUNZ:  If I may respond on this, Judge?  And I

20   wanted to tell counsel and the Court that as to number 46, the

21   document where he specifically listed various items, there is

22   about 12 that we're not going to try to introduce.  So we can

23   just resolve that right up front.

24          Looking at page two of document 46, that's the first

25   set of numbers one through 18.  That number three, Judge, that

1    was in parentheses and highlighted by defense counsel.  We're

2    not going to introduce that affiliation that I think you just

3    talked to with Mr. Fields about that.

4              Number four, we're not going to introduce that, sir.

5              THE COURT:  Just a moment.

6              MR. FIELDS:  Do you want me to read what they are,

7    Judge?

8              THE COURT:  No, I've got them here.  So the bolded

9    part of number three about the affiliation about the two

10   organizations you are not going to introduce?

11             MR. KUNZ:  Yes, sir.

12             THE COURT:  You were going to say something about

13   number four?

14             MR. KUNZ:  Yeah.  Entirely number four, we're not

15   going to introduce any testimony with respect to that.

16             THE COURT:  All right.

17             MR. KUNZ:  Then skip down to number 16.  We're not

18   going to introduce anything concerning number 16.

19             And, then in the next group, Judge, he renumbers them

20   one through 14 starting on page three.  Number four and number

21   five on page three of document 46 we are not going to introduce

22   anything with respect to that.

23             THE COURT:  You said four and five?

24             MR. KUNZ:  Four and five.

25             THE COURT:  Okay.  Any others?

1          MR. KUNZ:  Yes, sir.  On page four, number seven we
2    are not going to introduce that.
3          Number nine, we're not going to introduce that.
4          And numbers 12 and 13, we're not introducing anything
5    with respect to those.
6          THE COURT:  All right.  So then what I would suggest
7    we do is if we go through your list will that cover everything,
8    Mr. Murrell?
9          MR. MURRELL:  Well, I don't honestly know.  That's
10   part of the problem.  I don't know if there is any other
11   information the government intends to introduce.  I just went
12   through the motion in limine and read the complaint.  There are
13   certainly other things they have provided to us in discovery.
14         THE COURT:  All right.  Let me tell you what my sort
15   of broad thoughts are on the social media posts.
16         So the cases are clear that the context of the actual
17   charge statements, context in which they were made matters a
18   lot.  And so a lot of these types of posts would not be, I don't
19   think, subject to 404.  I think they would just be relevant
20   evidence.  And I think you agree with that, to at least some of
21   them; right, Mr. Murrell?
22         MR. MURRELL:  Well, I don't know that I agree any of
23   these are inextricably intertwined or tell the whole story.
24   Again, if you look at those cases, and I mentioned this in the
25   memo, those cases are much more specific.  And the government's

1  theory seems to be well, he's got this warrior mentality, and

2  these posts are evidence of this warrior mentality.  None of

3  those cases they've cited talk about character traits or

4  personality.

5         THE COURT:  Right.  I think you are right as to some

6  categories.  Generally speaking, that you have two categories of

7  social media posts.  Some that are around this time and that

8  would provide context for the reasonable person that we talked

9  about before about whether something was a true threat or not.

10  So I think there's some subset of texts that would not be

11  subject to 404 at all.  When you start getting farther removed

12  from this, then maybe there are others and then we've got this

13  notice issue.  So I don't know if --

14         MR. MURRELL:  I'm assuming that we can cure the notice

15  issue, but I do think they --

16         THE COURT:  Well, that's what I'm saying.  I guess the

17  question, Mr. Kunz or Mr. Fields, is are there statements or

18  social media posts that aren't mentioned in this document 46 or

19  otherwise mentioned that you would plan to put in that would

20  potentially be 404?  I know you phrased your argument as sort of

21  a contingent 404 thing, but --

22         MR. KUNZ:  Judge, there may be some other ones that

23  are not specifically addressed by Mr. Murrell, but I think they

24  are consistent with or part of these same type of posts or the

25  same time frame, Judge.

1        THE COURT:  Are there any social media posts that you

2   would say are outside of the sort of context sphere that would

3   be other acts that would be subject to 404?

4        MR. KUNZ:  No, sir.  The ones that were not addressed

5   by Mr. Murrell, there is a post, for example, of talking about

6   why the .22 rifle is good to use as a sniper weapon.  And the

7   defendant indicates that to somebody, is explaining why a .22 is

8   wonderful to have as a weapon, and things like that, Judge.

9   That all relates, I think, to the same type of things for

10  training which the jury could determine from all of this that he

11  knows what he's talking about.  And counsel complains about the

12  warrior mentality.  But, Judge, that exactly is what is

13  appropriate for the jury to look at this threat saying this is

14  somebody who's got a lot of training and experience and done

15  this and done that.  And that's what makes this a true threat.

16       It's not somebody in a basement of some home who

17  doesn't have weapons and doesn't do this, has never traveled

18  anywhere.  There are some posts, Judge, with respect to pictures

19  of him with rifles and some other stuff with the YPG.  That just

20  corroborates what he said, Judge.  He told agents he was with

21  the YPG.  And to us it bolsters the situation as being a true

22  threat because he's not, you know, bluffing about stuff.  He's

23  not living in a basement and saying, oh, I've been in the

24  military, but he hasn't really been there.  A lot of the posts

25  that he's done and the statements he's made that we're going to

1    introduce will support that, Judge.  And that's the purpose.

2              THE COURT:  What's the overall time frame of all of

3    the messages?  In other words, do you know when the earliest one

4    was?

5              MR. KUNZ:  I think, Judge, around 2019 to the present

6    date.

7              THE COURT:  Okay.

8              MR. KUNZ:  And, again, our view, Judge, he's been

9    making posts and escalating in terms of the comments about

10   stuff.  And that's why it culminated on January 12th and 14th

11   with the actual posting of these specific threats.

12             THE COURT:  But don't you think there's a difference

13   between the ones that were sort of made right before and things

14   going back further in time in terms of -- I mean, frankly, with

15   a lot of this you have a very good 404 argument, but the

16   question would be, you know, then that would be a notice thing.

17   But, I mean, if someone is saying something three years before

18   that or making some other threat or something that would be

19   perceived as another threat it might go to his intent whether he

20   means to convey a true threat, but it may not be within the

21   context that would help a reasonable person know whether these

22   actual communications in the indictment were true threats.

23             MR. KUNZ:  Judge, we're not talking about threats that

24   he made two years ago or anything.  You know, 2017 his traveling

25   to Iraq and Syria and joining, you know, the YPG, all of that is

1   relevant to show that he had military tactics, training so

2   that's what that would be relevant to.

3          The posts that he has done with respect to his

4   participation in this and using a sniper rifle and being able to

5   do -- he's trained.  I mean, that's the purpose we're doing

6   this.  Not that what he did there or didn't do there is

7   significant.  It's significant to show that he had military

8   training, he knew about rifles, he knew about sniper rifles.  He

9   expressed his intent to kill people.  Wanted to kill people.

10  And, again, it goes to show in this message when he gives a

11  message, the threats in this case, would he understand them to

12  be a threat.  That's what we think some of the background stuff

13  is, some of those older posts.

14         THE COURT:  And I don't disagree with that.  What I'm

15  saying, I guess, if you have something that's not inextricably

16  intertwined with this it may be relevant to those issues, but I

17  think there's a big difference between something that was the

18  day before in terms of being inextricably intertwined, or

19  something that, you know, if -- and I don't know exactly what

20  the posts are which is why I'm asking this.  But if you had

21  something from two years before where he says I'm going to do X,

22  Y, Z to this group or something like that, I'm not sure that

23  wouldn't be something that 404 would cover that would -- it

24  really just comes down to a notice issue.  Because I think,

25  again, you'd be able to say we're not putting this in as to his

1    character, but this is a prior act that's kind of a negative

2    prior act and so it would go through the 404 test and decide,

3    well, does it relate to one of these things like intent or the

4    ability to carry this out.  And I think you'd have a good

5    argument on that.

6              But what I don't want to do, and again not knowing

7    what they are, is show up at trial with a particular one that

8    seems like it should have been noticed and that he had a fair

9    opportunity to rebut and then having to go through this there.

10             MR. KUNZ:  If I might, sir, we should have, by next

11   week pretty much, a pretty good exhibit list.  What I was going

12   to do, we can give it to Mr. Murrell and so he'll know exactly

13   what we're using.

14             THE COURT:  Why don't we do that in the context of a

15   404(b) notice just to the extent that these things, you know, I

16   think he makes a point that some of these things, I guess he

17   would say all of them, but some of them could be 404 issues.

18             MR. KUNZ:  Okay.  Our view, Judge, is we've given a

19   pretty good notice with respect to these things, Judge.

20             THE COURT:  Well, let me ask about that.  And I know

21   the rules change, but does -- would the rule not oblige you to

22   provide the specific posts?  I mean, is it enough to say

23   generally speaking we're going to put in posts for these

24   purposes?

25             MR. KUNZ:  Well, we've already given them discovery,

1    Judge.  And we gave in our discovery letter indicating the types

2    of things we are going to be putting in and then we gave 404(b)

3    notice in an abundance of caution.  Although, we think a lot of

4    it is inextricably intertwined.

5            THE COURT:  Right.  Right.  But my point is I don't

6    think the 404 notice, it sounds like what you're saying it

7    doesn't specifically identify every post that you would put in.

8            MR. KUNZ:  Judge, again, he has them all.  It's not

9    like we are giving something new to him.  He had them in

10   discovery.  But, again, we're willing to, you know, I'll file

11   another notice next week, Judge, listing the specific ones if

12   that's what the Court feels we need to do for Mr. Murrell.

13           THE COURT:  All right.  Yes, sir?

14           MR. MURRELL:  Well, the rule says you have to provide

15   notice and have to explain why it's relevant and why it's not

16   simply a matter of propensity.  So, yes, it's more than just

17   giving me discovery and this general matter about this post.

18           THE COURT:  I agree with you about that.  And, again,

19   not to -- they've got an argument that they are doing this only

20   in an abundance of caution.  And I think some of them are or

21   will turn out to be inextricably intertwined and not 404 issues

22   at all.  But you're right, the rule requires more than just

23   we've already provided it.

24           So, let's go through these.  I guess we'll start with

25   -- we'll kind of follow Mr. Murrell's list.  But we have the

1   AWOL and less than honorable discharge.  What's the relevance of

2   that, Mr. Kunz or Mr. Fields?

3        MR. KUNZ:  Judge, our view is with respect to his

4   going AWOL, he got less than honorable discharge.  He is -- he

5   left the Army, Judge, with an attitude that we think is relevant

6   with what developed later with him going to the YPG and his

7   hostility to the United States and things that occurred.  And it

8   fits with the posts that he has done, Judge.

9        He made statements about why he left, why he went AWOL

10  and not happy with them, what they are going to do and what his

11  unit was going to do being shipped to Iraq.  And, Judge, our

12  feeling is, we were only intending to introduce that he had been

13  in the U.S. Army.  He, you know, was separated from it based on

14  the AWOL.  And from that later on he joined YPG to do military

15  training.  So he had training in the military that's important,

16  number one.  He was trained as a military person.  Used

17  firearms, explosives, everything else.  He was getting ready to

18  be shipped out to Iraq when he was separated.  So we think

19  that's relevant besides the training that he got at YPG, he was

20  trained with the U.S. Army.

21       THE COURT:  Well, there's no question it's relevant

22  that he was trained with both of the organizations.  I guess the

23  question is, what issue does the fact that you said that he

24  disliked the government, that kind of gets into the issues we

25  were talking about before about whether the organization over in

1    Syria was good or bad, but the fact that he didn't comply with
2    his military obligations and was dismissed dishonorably, what's
3    the material issue that that relates to?
4          MR. KUNZ:  Well, Judge, we just think the way he was
5    separated.  To put things in context, it kind of explains how
6    things started and why he would go to YPG.  And, you know, he
7    was unhappy with the military.  He was separated.
8          THE COURT:  But if the point of -- if the reason the
9    jury gets to hear about YPG is the fact that he had weapons
10   training and, you know, was willing to go travel and shoot and
11   follow through on those types of things, why does why he ended
12   up there in the first place matter?
13         MR. KUNZ:  Well, Judge, our feeling is that for
14   whatever reason he didn't stay in the U.S. military.  Instead,
15   he chose and went over and did training with the YPG.  Of
16   course, the significance of all of that is the training.  What
17   he was doing --
18         THE COURT:  That's my point, is if the significance of
19   it is he has the training from these different organizations and
20   thus the capability and so forth, then with his views on the
21   U.S. military or his ability to follow orders while in the U.S.
22   military, he's got the training either way.  He's got the
23   training if he's honorably discharged and completes his duty.
24   He's got the training if he's kicked out for anything.  So I
25   guess I'm just struggling to see what the relevance of that is.

1          MR. KUNZ:  Well, Judge, the only thing is, counsel is

2    going to attack some later posts that he made saying that's

3    nonsense, and like he said, he wanted to bring in George Soros

4    and he's talking about Soros and stuff like that.

5          Well, judge, I think the jury will have a better feel

6    with respect to his posts, why he's going out to Seattle and to

7    Chad's place and doing this and participating in that and

8    directing people what they should do, how they should deal with

9    law enforcement who he's hostile with.  All of that goes to show

10   this is a true threat that he made.  Is he somebody who has done

11   things?  And his intent, Judge, all of these are facts and

12   circumstances that go to his intent is our position in this.

13         THE COURT:  All right.  Mr. Murrell?

14         MR. MURRELL:  I couldn't help but hear him say, well,

15   he disliked the United States that's why he went to the YPG.

16   That goes back to why we need to explain what the YPG is.

17         THE COURT:  Well, that goes back to my earlier point

18   too, that depending on what comes in, we could revisit that.

19   Because certainly if the jury is hearing that well, he was part

20   of this organization that was dedicated to, you know, harming

21   NATO interests or whatever, and then you would be in better

22   footing to say, you know, you can put someone in to say it was

23   doing good work.

24         MR. MURRELL:  At any rate, this is about his bad

25   character.  If the government wants to say, gee, if he went AWOL

1   he's more likely to commit crimes.  Well, to me it's pretty

2   clear that whether or not somebody went AWOL -- and by the way,

3   the reason he went AWOL was because he had heard the troops

4   talking about committing rape and other crimes.  But, again,

5   whether he went AWOL or not it seems to me is completely

6   irrelevant, only goes to character.

7              THE COURT:  Okay.  Let's go to number five then, the

8   video of the fighting in Syria with the YPG.  First of all, is

9   everyone on the same page about what that video is?  I mean, you

10  put in your response, so I guess you know what that is, Mr.

11  Murrell.

12             MR. MURRELL:  Oh, sure.  It's a, I don't know, a five

13  minute clip.  And he's firing a rifle at ISIS.  You know, part

14  of this is all right, so he has the training.  Well, how much do

15  they get to pile on to show that he has this training?  This is

16  just a dramatic --

17             THE COURT:  Okay.  So the argument is not that it's

18  irrelevant, just you've got a 403 argument on that that it's

19  just too much or cumulative.  I mean, it seems like if there's a

20  video of him fighting and shooting that goes to what you've

21  already said is relevant, right?  So that's your argument on

22  that one?

23             MR. MURRELL:  That he knows how to fire a gun, but I

24  don't think you need to show a video of actual combat and the

25  drama.  I just think it's overkill.

1          THE COURT:  Okay.  Fair enough.  Denied as to that

2     with the caveat that depending on what comes in at trial you can

3     renew that.  There could be a point where -- what comes in,

4     there could be a point where you'd have an argument like that,

5     but at this point that will be allowed.

6          And then the number six, the social media posts about

7     his affiliation with YPG, does everyone know what those are?  I

8     mean, I guess there's -- are there a lot of different ones in

9     that category?

10          MR. KUNZ:  Yeah, there's a couple, Judge.  Posting

11     with YPG insignias and weapons, Judge.

12          THE COURT:  Say that again.

13          MR. KUNZ:  Yeah.  They are posting with him with

14     firearms, Judge, weapons.  And YPG, I think one of them has a

15     flag in it too, a flag or something, Judge, with that.

16          THE COURT:  Okay.

17          MR. MURRELL:  Again, the YPG isn't important.  Why are

18     we getting all of this stuff in?  Again, if you want to show him

19     with guns, well, you know, how much do we get to go on about

20     this?  We're going to spend half the trial talking about him

21     fighting with the YPG and, of course, the jury doesn't know what

22     the YPG is.

23          MR. KUNZ:  Judge, from the government's position, this

24     is not a one-day session he had at some group.  This is on a

25     regular basis.  And I think the jury should know that this guy

1    is very proficient.  He was trained very well.  And that's what

2    all these things indicate.  There are different dates and

3    different times and stuff which corroborate what he has made

4    admissions to being part of the YPG.

5                THE COURT:  There are two posts that number six would

6    encompass?

7                MR. KUNZ:  About two, Judge.  Yes, sir.

8                THE COURT:  Okay.  Maybe the thing to do would be to

9    address -- if you're going to do a notice to cover everything to

10   address these when we have the actual posts and the context and

11   can go through them rather than doing it now sort of just

12   abstract.  I think generally speaking, a lot of your objections,

13   Mr. Murrell, like I just said as to number five, really deal

14   with these 403 issues, and not relevance, right?  I mean, a lot

15   of these things you're objecting to you would concede are

16   relevant?

17               MR. MURRELL:  Yes, sir.  I don't disagree with that.

18               THE COURT:  Then maybe the thing to do would be just

19   to address it at a separate hearing next week after that if you

20   are going to provide a different notice.

21               Any objection to doing it that way, Mr. Murrell?

22               MR. MURRELL:  No, sir.  That would be fine.

23               THE COURT:  All right.  Let me look and see if there's

24   anything else we can address today.  Because these are all

25   social media posts.  And on page two here, except for the AWOL.

1 And then everything in the next batch is also social media

2 posts.  So I think that's the way to handle that.

3          MR. KUNZ:  We can do that, sir.

4          THE COURT:  Okay.

5          Then I think that covers everything that, motions-wise

6 that we were going to address.

7          Let me -- let's see about scheduling something now

8 while we are all here.

9          Wednesday afternoon work for everybody?

10          MR. KUNZ:  Yes, sir.

11          MR. MURRELL:  That would be the 28th?  That would be

12 fine.

13          THE COURT:  Okay.

14          MR. MURRELL:  Is that when we are going to do this

15 *Daubert* hearing too?

16          THE COURT:  Yes, sir.  What I would envision is having

17 one hearing, going through this stuff we were just talking

18 about, doing the *Daubert* piece of things.  We can also talk a

19 little bit about jury instructions at that time.  I did see that

20 you filed a couple of proposals.

21          The -- so we can, why don't we start at 1:30 on

22 Wednesday.

23          MR. MURRELL:  I do wonder about Mr. Phillips.  I guess

24 it's depending on what the government introduces, there is still

25 a chance we may be able to use Mr. Phillips' testimony.  So

1   should we include him in the *Daubert* hearing too?

2           THE COURT:  I think so.  Yeah, I think we ought to

3   just get all of that resolved.

4           MR. MURRELL:  And along those same lines, would it be

5   permissible to the Court if Mr. Phillips and Dr. Enders appear

6   virtually through the video?

7           THE COURT:  At the hearing you mean?

8           MR. MURRELL:  Well, actually at the hearing.  And I

9   was going to ask about the trial too.  I had approached the

10  government about that and they said they didn't have any

11  objection.

12          THE COURT:  Okay.  You do not have any objection to

13  them -- they are both -- well, one's at Columbia, right?

14  Where's the other one?

15          MR. MURRELL:  Louisville.

16          THE COURT:  Oh, that's right.

17          MR. KUNZ:  Judge, the one about, I think it's from

18  Louisville, I'm not sure if that's Enders.

19          MR. MURRELL:  That's Enders, right.

20          MR. KUNZ:  Enders, Judge.  That's one source.  Judge,

21  I don't know what we'd be doing for a *Daubert* hearing on that

22  because I don't think that's going to be relevant.

23          THE COURT:  Right.  But your motion has said I

24  thought -- well, one, it said that this was all expert testimony

25  which I think is right.  But then, two, I thought you made a

1    *Daubert* objection to how he's going to testify about what

2    certain people on the Internet think about George Soros.  If

3    you're right about that, then the relevance issue goes away

4    anyway.  But, no, this isn't to say that if we find that this is

5    reliable testimony that it's therefore going to come in because

6    there is a separate issue about -- your point I guess is why

7    bother?

8            MR. KUNZ:  Yeah, Judge.  I thought the Court had

9    indicated he questioned pretty significantly how is that going

10   to be relevant and we don't think it's relevant at all.

11           THE COURT:  Well, I do think there's some serious

12   issues about that, but I don't know exactly what he's going to

13   say.  So we'll have a *Daubert* hearing on both of them.

14           MR. MURRELL:  That would include Mr. Phillips too?

15           THE COURT:  Yes, sir.  Because you have a *Daubert*

16   objection to both of them, correct, in addition to him?

17           MR. KUNZ:  Yes.

18           THE COURT:  All right.  So we'll do both of those.

19           MR. MURRELL:  Do I understand, assuming that they do

20   get to testify, that they can testify at the trial remotely?

21           THE COURT:  There is no objection to that?  We can

22   address that.  Well, I guess --

23           MR. MURRELL:  It's just I need to make reservations

24   and so on.

25           MR. KUNZ:  Our preference would be to have him come to

1    the jury trial, but we don't want to be unreasonable.

2            THE COURT:  How long would you anticipate their

3    testimony being, Mr. Murrell?

4            MR. MURRELL:  I think Dr. Enders will be about 10

5    minutes.  And I think Mr. Phillips would be about 15 minutes.

6            THE COURT:  Okay.  They can -- if they do appear, and,

7    again, I think you've got a hard argument to make there on how

8    these help.  But if they are permitted to testify at trial they

9    can do it by video.  There is nobody else on either side that

10   would be by video; is that right?

11           MR. MURRELL:  No.

12           THE COURT:  Okay.  Witness and exhibit lists by Monday

13   after next; does that work for both of you?  The trial starts on

14   Tuesday.

15           MR. MURRELL:  Oh, sure.  That would be fine.

16           THE COURT:  Okay.  And then voir dire topics proposed

17   by this coming Thursday, a week from yesterday?

18           MR. MURRELL:  That would be fine.  There are some

19   things that I haven't filed, but I was going to ask the Court to

20   allow limited voir dire by counsel.  It seems to me there are

21   some -- we can talk about that now or later, but it seems to me

22   there are some questions that would be difficult for the Court

23   to pose that counsel might be able to pose.

24           THE COURT:  Like what?

25           MR. MURRELL:  Well, you know, I'm going to talk about

 1    what some of the evidence is and about Mr. Baker's obvious

 2    antipathy towards President Trump and how this is, you know, and

 3    what I want to ask the jury is, did anybody have any strong

 4    feelings about the president or this stolen election business

 5    that they would not be able to be fair and impartial.

 6            Mr. Baker's biases are going to be very obvious in the

 7    course of the trial.  And I think that would be something that

 8    we would need to know.

 9            THE COURT:  Well, I don't think those are improper

10    questions.  I doubt Mr. Kunz or Mr. Fields would disagree.  But

11    I guess I'm not sure why --

12            MR. MURRELL:  Well, in my experience the Court

13    sometimes is reluctant to talk about evidence that will come

14    into play at the trial.  And it just seems to me counsel is

15    freer to talk about, I think you're probably going to hear this

16    or hear that and that's why we're concerned about this.

17            THE COURT:  Well, we can talk more about that at the

18    pretrial.  I do think the fact that he has some pretty strong

19    views, that are definitely going to come in, is something that

20    we need to explore at jury selection and make sure no one's

21    going to hold that against him.  But I think if you all submit

22    proposed topics I'll have some time to go through those and then

23    we can talk more about it.  Mr. Kunz?

24            MR. KUNZ:  The government was going to ask the court

25    to inquire into some of these issues, Judge.  I don't think

1    counsel needs to question or voir dire the jury.

2              THE COURT:  No, I think it will be a more complicated

3    potential jury selection than in some cases for certain.

4              Okay.  Then what is the government's best estimate now

5    about what the length of the government's case will be?

6              MR. KUNZ:  We think about two days or so is what we

7    could do.  Maybe three days depending on what the defense does

8    or what have you.  But we think -- we don't have a lot of

9    witnesses, Judge.  We have depos and this and that.  And I think

10   some of the videos are only 10, 12 minute videos, so...

11             THE COURT:  Okay.  Mr. Murrell?

12             MR. MURRELL:  That sounds about right to me; yes, sir.

13             THE COURT:  Two or three days for the whole time

14   you're saying exclusive of jury selection?

15             MR. MURRELL:  I think so.  Yes, sir.

16             THE COURT:  Okay.  Anything else for today?  Yes, sir.

17             MR. MURRELL:  I did have two other things.  You know,

18   we talked about the subpoena to the police chief and whether

19   they can testify -- whether he can testify about what was known

20   about armed groups.  I also want to present testimony about what

21   happened on Inauguration Day and whether anybody showed up at

22   the capitol.  And that's another reason I would like to subpoena

23   the police chief.  My position is that is relevant because it,

24   again, shows that there probably wasn't any threat to begin

25   with.

1          THE COURT:  Well, I think this was sort of resolved by

2     the earlier rulings.  I mean, whether it came to pass or not --

3          MR. MURRELL:  Well, I just want to make it clear,

4     that's my position that that is relevant as well, the fact that

5     nobody -- there was no armed protest at the capitol on January

6     20th.

7          THE COURT:  So you think the criminality or

8     non-criminality of the statements was not determinable at the

9     time they were made?

10          MR. MURRELL:  No.  I think, this goes to my history.

11     If the group didn't exist, we know it didn't exist because, A,

12     the police intelligence showed it didn't exist and, B, sure

13     enough, on the day of the inauguration nobody showed up.  So it

14     goes to whether or not this group of armed racists existed.  So

15     it may well be that your ruling resolved it, but I did want to

16     make it clear that was part of the reason I wanted to offer the

17     testimony of the police chief as well.

18          THE COURT:  Okay.  And you said you had a couple of

19     other things?

20          MR. MURRELL:  Yeah.  As far as the -- you ruled so far

21     that we can't -- it doesn't look like we can introduce

22     Mr. Phillips' testimony.  That we cannot --

23          THE COURT:  Which one?  Remind me which one he was.

24          MR. MURRELL:  Phillips is the one about the YPG.  The

25     fellow from Columbia.  And it looks certainly questionable

1    whether we can introduce Dr. Enders' testimony.  And you

2    excluded the possibility of us introducing testimony about what

3    the law enforcement told the public or that there was no threat

4    or that there was in fact no threat.  I guess the question is,

5    how much of that do I need to proffer for the Court?  I'm

6    assuming it's pretty clear to the Court at this point what we

7    intend to introduce, but I didn't want to --

8            THE COURT:  Well, as to the -- it's not entirely

9    clear.  There is a range of things.  So I think if you want to

10   make a proffer you certainly can.  But, no, I can't say that I

11   know exactly what you would have the police chief say or what

12   the issue was.

13           MR. MURRELL:  So here is the problem, they won't talk

14   to me.  So the only way I can get them to make that proffer is

15   to bring them to Court.  And I would be happy to do that.  It

16   would take another subpoena.  But that's where we are.

17           THE COURT:  Okay.  I don't have a problem with you

18   making a proffer.

19           MR. MURRELL:  Okay.  Maybe we can do that at the

20   hearing on Wednesday.

21           THE COURT:  That would be fine with me.  Mr. Kunz or

22   Mr. Fields?

23           MR. KUNZ:  I'm not sure I understand.  Is he going to

24   subpoena them to come to the hearing, Judge?

25           THE COURT:  Well, I don't know that you all have the

1    standing to say that he can't subpoena somebody.  Do you

2    disagree with that?  I mean, the thrust of your motion was it

3    was too burdensome and so forth.  So the sub-thrust was it's

4    irrelevant things.

5            MR. KUNZ:  They subpoenaed a witness and the witness

6    had contacted us and said can we file a motion ourselves to, you

7    know, quash.  And we said, no, we're going to do that.  And we

8    have an interest, of course, Judge, as to the law enforcement

9    information and what have you.

10           THE COURT:  Well, I guess that's a different issue

11   about the -- that was reflected in the papers.  I didn't think

12   of it until just now, but that interest.

13           MR. MURRELL:  The question here is whether I can make

14   a proffer.  And the only way I can make a proffer is to get

15   these people to come to court if they won't talk to me.

16           MR. KUNZ:  I think he can make a proffer, Judge, by

17   indicating what he expects them to say.  He's going to say come

18   in, tell me everything you know about this.  He obviously knows

19   what he wants to ask them, Judge.  He can tell the Court now.

20   And I think the Court has already ruled that that's not

21   relevant.

22           MR. MURRELL:  I'll be happy to make the proffer.  I

23   mean, if there's no disagreement.  I expect that both the

24   sheriff and the police chief would come in and say, well, yes,

25   they were monitoring the situation and as far as they could tell

1    there was no threat to the capitol.  I think they would say as

2    well that on January 20th no one showed up at the capitol.

3    There was, in fact, no threat posed to the capitol on --

4            THE COURT:  Well, that piece of it's easy.  I mean,

5    there's no disagreement from the government that there was some

6    event at the Florida state capitol on Inauguration Day, right?

7    I mean, that's not going to be an issue?

8            MR. KUNZ:  No, sir.  But, I mean, I don't think that's

9    quite the issue.  The issue was on the 17th there were supposed

10   to be armed protests throughout the country.  And the emergency

11   command center was in operation, law enforcement was here ready,

12   they were getting ready for all of these things on potential.

13   And just saying, well, it never happened, that's not quite the

14   same thing about whether this threat was true or not.

15           THE COURT:  I understand that, which is why I made the

16   ruling about what the jury is going to be able to hear and not

17   hear.  But in term of his proffer, you know, the government's

18   not going to be in Atlanta saying, well, we don't know as a fact

19   matter whether there was an event at the capitol on Inauguration

20   Day.

21           MR. KUNZ:  No, Judge.  We don't disagree with that.

22           THE COURT:  We can sort of take judicial notice of

23   that.  Nothing happened that day.

24           MR. MURRELL:  That would be on the 17th or the 20th.

25   And now I guess the harder issue is they don't want to concede

1    one way or another whether there were any threats.  But that

2    would be my proffer that law enforcement would testify that, A,

3    there were no threats and, B, that information was distributed

4    to the public through the media.

5               THE COURT:  Okay.

6               MR. MURRELL:  I mean, if that's an adequate proffer

7    for everybody that's fine and I won't need to call the

8    witnesses.  But I just want to make sure we're all on the same

9    page.

10              MR. KUNZ:  Judge, we disagree with the fact that there

11   weren't any threats, Judge.

12              THE COURT:  I'm sorry.  Say that again.

13              MR. KUNZ:  Yeah, we disagree that there weren't any

14   threats that law enforcement was aware of.  In fact, they

15   assembled the command center based on posted information that

16   there were going to be armed protests at every capitol in the

17   country.  And this is coming after January 6th, Judge.  So law

18   enforcement was all geared up and waiting for things.  Now

19   because it didn't never happen, I mean, I don't think that makes

20   a difference in terms of a threat.

21              Just so the record's clear, we're not agreeing that

22   law enforcement didn't have a basis to or have information or

23   intelligence that there could be a problem.  So they were ready

24   for that.

25              MR. MURRELL:  It sounds like I need to call a witness

1    to demonstrate this.  But, you know, to proffer, at one point,

2    yes, there was something that went out that said there was a

3    threat on the capitols.  But as we got closer to Inauguration

4    Day, the information available to law enforcement from the news

5    articles I read says that they weren't aware of any threats to

6    the Florida capitol.  That's what I would expect the officers to

7    testify to.  But if the government doesn't think that's an

8    adequate proffer, I suppose we could go ahead and introduce the

9    testimony by subpoena.

10            THE COURT:  Okay.  So your expectation is they would

11    testify that there was no real threat at all is what the law

12    enforcement witnesses you want to subpoena or have subpoenaed,

13    that's your proffer as to what they would testify to?

14            MR. MURRELL:  Yes, sir.

15            THE COURT:  And so I know you disagree with what the

16    facts would bear out, but, I mean, do you disagree that that's

17    an adequate proffer for what he's doing now?

18            MR. KUNZ:  No, sir.

19            THE COURT:  What's that?

20            MR. KUNZ:  No, sir.  I don't disagree with what you

21    just said.

22            THE COURT:  You don't disagree -- so you agree that

23    it's an adequate proffer?

24            MR. KUNZ:  Yes, sir.  Yes, sir.  I'm sorry.  I

25    misspoke.

1          THE COURT:  Well, I may have misspoken.

2          MR. KUNZ:  I misunderstood your question.

3          THE COURT:  Does that resolve your issue, Mr. Murrell?

4          MR. MURRELL:  Yes, sir.  There are a couple other

5    things.  I don't know if the Court wants to address them.  I

6    haven't even talked to the government about this.  But there are

7    some things that I would intend to introduce.  And I don't know

8    if we want to debate about it now or later.

9          THE COURT:  Well, why don't we get at least a preview

10   now and maybe we can resolve it now or, you know, maybe we can

11   at least be thinking about it and resolve it Wednesday.

12         MR. MURRELL:  These aren't, I don't think they are all

13   that dramatic.  But we could call a witness to testify.  Much

14   has been made of Mr. Baker's prowess in jujitsu, claiming that

15   that makes him dangerous.  We could call a witness that would

16   give the Court an accurate -- and the jury an accurate

17   information about Mr. Baker's talents and abilities in jujitsu.

18         One of Mr. Baker's claims that sort of explain his

19   actions at the time of his arrest was that he was concerned

20   about threats and that, in fact, he had been receiving death

21   threats for some time.  It's possible we could call a witness

22   that would testify about an incident in Gainesville.

23         THE COURT:  Would you back up a second about the death

24   threat?  I didn't catch the first part of what you said.

25         MR. MURRELL:  I'm sorry.  I need to -- I shouldn't

1    look down when I talk like that.  Well, again, there is -- this

2    is another issue about his arrest that we haven't discussed.

3    But the circumstances of his arrest are this:  The officers went

4    to the door, and I guess they tried to fool Mr. Baker saying

5    they were from Chic-fil-A.  And Mr. Baker opened the door a

6    crack and then slammed it shut.  And then the officers broke

7    down the door, they threw in a flash bang grenade.  It was all

8    pretty dramatic.  And, you know, my concern is going to be

9    that's another inference that Mr. Baker is dangerous, given the

10    way that the officers felt like they had to execute the warrant.

11            But at any rate, should Mr. Baker testify he would

12    certainly talk about the fact that he was concerned because he

13    had received death threats over a period of really a few years.

14            THE COURT:  I see.  So that would be the explanation

15    as to why he slammed the door on the officers?

16            MR. MURRELL:  Well, and there is testimony that he and

17    his roommate were staying up in shifts so that -- so at least if

18    somebody attacked them.  And there's going to be an explanation

19    they had firearms there at the residence.  So that would

20    certainly be part of the explanation that he had received death

21    threats.

22            THE COURT:  The explanation of the firearm?

23            MR. MURRELL:  Of the firearms, why he and his roommate

24    were staying up in shifts keeping an eye on the apartment, and

25    why he was so concerned when somebody showed up with this

1  Chic-fil-A business.  But, anyway, part of that goes to an

2  incident, I don't know, 2019 I think it was, Richard Spencer, a

3  white nationalist, gave a speech at the University of Florida.

4  There was an incident where a fellow whose name right now

5  escapes me, took a shot at some of the protesters.  And Mr.

6  Baker was in that group.  And that's part of the reason why he's

7  had an ongoing battle with some of these people in these white

8  nationalist groups.  Anyways, that's one of the circumstances

9  that led him to think that he was in danger, that this fellow

10  took a shot at, at least some of the protesters there.  We could

11  have a witness to testify about that incident.

12      We also might introduce threats that he received over

13  social media, death threats.  I have an ad for the same type AK,

14  as they described AK type .22 rifle that I introduced at the

15  detention hearing that advertises that the gun is a lot of fun,

16  it's good for plinking and target shooting.  I would like to

17  introduce that because, of course, the inference that because

18  this is an AK type .22 it's a dangerous weapon.

19      And that -- these are some of the things that are

20  certainly possible.

21      THE COURT:  Well, why don't you all talk about those

22  types of things and then we can maybe write them into the issues

23  for resolution.  It sounds like some of it probably could be

24  addressed among the parties.  I mean, you're not going to put in

25  anything about the means of the arrest, Mr. Fields, or are you?

1          MR. KUNZ:  Judge, I think there will be testimony

2     about having to enter the apartment.  He didn't let them in.

3     They had to do that, you know, break open the door.  And that

4     there were firearms, loaded firearms laying right there next to

5     where the agents came in.  So, I mean, there will be testimony

6     about that.  I think so.

7          THE COURT:  All right.  Well, why don't you all talk

8     about all of that and we can address that next Wednesday, but I

9     have jotted down some notes here.

10         Anything further, Mr. Murrell?

11         MR. MURRELL:  Nothing from the defense.  No, sir.

12         THE COURT:  Mr. Kunz or Mr. Fields?

13         MR. KUNZ:  Nothing further.  Thank you.

14         THE COURT:  We will be back here then on Wednesday at

15    1:30.

16         And we'll be adjourned in the meantime.

17      (Proceedings concluded at 11:05 AM on Friday, April 23,

18    2021.)

19                         * * * * * * * *

20         I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
21    Any redaction of personal data identifiers pursuant to the
      Judicial Conference Policy on Privacy are noted within the
22    transcript.

23    /s/ Lisa C. Snyder                    11/23/2021

24    Lisa C. Snyder, RPR, CRR                Date
      Official U.S Court Reporter

25