1

2                        **UNITED STATES DISTRICT COURT**
                         **NORTHERN DISTRICT OF FLORIDA**
3                           **TALLAHASSEE DIVISION**

4                                           )
     UNITED STATES OF AMERICA,              )
5                                           )
                    Plaintiff,              ) Case No: 4:21cr10
6                                           )
              v.                            ) Tallahassee, Florida
7                                           ) May 4, 2021
     DANIEL ALAN BAKER,                     )
8                                           ) 8:05 AM
                    Defendant.              )
9    _____) VOLUME I OF III

10             **TRANSCRIPT OF JURY TRIAL PRETRIAL DISCUSSION**
                 **BEFORE THE HONORABLE ALLEN C. WINSOR**
11                  **UNITED STATES DISTRICT JUDGE**
                      **(Pages 1 through 166)**
12
     APPEARANCES:
13
     For the Plaintiff:        United States Attorney's Office
14                             By:  STEPHEN M KUNZ
                                    LAZARO FIELDS
15                                  Asst. U.S. Attorneys
                                    Stephen.Kunz@usdoj.gov
16                                  Lazaro.Fields@usdoj.gov
                               111 N. Adams Street, Fourth Floor
17                             Tallahassee, Florida 32301

18   For the Defendant:        Federal Public Defender
                               By:  RANDALL MURRELL
19                                  ELIZABETH VALLEJO
                                    Attorneys at Law
20                                  randolph_murrell@fd.org
                                    elizabeth_vallejo@fd.org
21                             227 N Bronough Street, Suite 4200
                               Tallahassee, Florida 32301
22
                      *LISA C. SNYDER, RPR, CRR*
23             **Official United States Court Reporter**
          **111 North Adams Street, Tallahassee, FL 32301**
24            **(850)567-1374 * lisasnydercr@gmail.com**

25

**P R O C E E D I N G S**

1

2      (Call to Order of the Court at 8:30 AM on Tuesday, May 4,

3   2021.)

4           THE COURT:  Good morning.  Please have a seat.

5           This is 1:21cr10.  It's United States versus Baker.

6           Everybody ready for the jury trial this morning?

7           MR. KUNZ:  Yes, sir.  The government is ready.

8           MR. MURRELL:  Yes, sir.

9           THE COURT:  We have the lawyers all present.

10          I had a couple of things to go over.

11          I did review the government's memo filed yesterday and

12  I want to talk about a couple of these things that may come up

13  in the next day or two.  Some of them, like the video, won't

14  come up until your case-in-chief, I guess.  Can you give Ms.

15  Stark a copy of that video so I can look at it some maybe

16  tonight, or something like that, so we can talk about it.

17          MR. MURRELL:  We have had trouble running it through

18  the court system.  I have got it where I could show it to you

19  very easily on an iPad.  It would be the easiest way to show it

20  to you.

21          THE COURT:  Okay.  It's short?

22          MR. MURRELL:  Yes.  Two minutes.

23          THE COURT:  Why don't we do that after the jury is

24  gone today.  We will do that this afternoon.

25          The other things that were raised in the memo, this

1    George Soros post, and others; are those things that you are

2    going to attempt to put in your case-in-chief, too, or are those

3    things you would do before then that we need to talk about.

4            MR. MURRELL:  We have -- the George Soros post would

5    be in our case in chief.

6            THE COURT:  Say that again.  I'm sorry.

7            MR. MURRELL:  The George Soros post would be in our

8    case in chief as would the newspaper articles.

9            THE COURT:  Okay.  And then the memes, same thing?

10            MR. MURRELL:  I am not going to introduce the memes.

11            THE COURT:  There is nothing that you need to address

12    right this second on that.

13            Voir dire topics:  I did go back through everything

14    that you all have submitted.  I have got a list of things that I

15    will go through.  Of course, you will have an opportunity to

16    make any suggestions after I am done with that.

17            I did, at the last pretrial, invite you all to confer

18    and see if anything would be agreed upon.  I don't know if you

19    did that, or not.  I think we are probably in okay shape for

20    that.

21            Is there any further discussion for voir dire topics,

22    Mr. Murrell?

23            MR. MURRELL:  We did confer, but we didn't agree I am

24    afraid.

25            THE COURT:  So you will know, what I am going to do,

1   basically is -- I think, generally speaking, most of what you

2   wanted to ask was fair.  I plan to ask most of it.  At least

3   capture the topics that you were going after.  And if I do it in

4   a way that you think is not enough, you can make some

5   suggestions over here.

6        MR. MURRELL:  I did, you know, I keep -- I'm sorry, I

7   keep supplementing my witness list.  And I filed an amended one

8   yesterday with all the witnesses.

9        THE COURT:  Yes, sir.  I did get that.

10       MR. MURRELL:  As I think about it, though, I didn't

11  add the two witnesses that we debated about quite a bit; one was

12  Sheriff McNeil, who conceivably we could still call as a

13  witness.  I can't get them to talk to me, so I guess we will

14  see.  And then the other one would be perhaps Jason Lauren,

15  L-a-u-r-e-n.  He is the deputy chief at the police department.

16  And if we called him we would call him in lieu of Chief Revell.

17       THE COURT:  I thought you had said before one of the

18  two people you had initially subpoenaed was not available or

19  something.  I thought it was the sheriff.

20       MR. MURRELL:  No.  Chief Revell was unavailable.  And

21  it turns out he has hurt his back, so he is available, but we

22  have been talking to the Deputy Chief Lauren.  That's who we

23  would call in lieu of Chief Revell.

24       THE COURT:  Again, this would be just as to what was

25  said publically.  Not about what was happening?

1          MR. MURRELL:  I think, frankly, if we get the

2    newspaper articles in we won't need to call them for the sheriff

3    or the chief of police.

4          THE COURT:  That was all I had on my list.

5          I guess we didn't do appearances.  We have Mr. Kunz

6    and Mr. Fields here for the government.  And Mr. Murrell and Ms.

7    Vallejo here for the defense.  And the defendant is present.  I

8    didn't note that before.

9          Anything else to cover before they bring the

10   prospective jurors in?  They are gathering downstairs now.  We

11   will do the usual where you have some time with the

12   questionnaires and they will come up.

13         I think we talked about this at one of the pretrials,

14   but my plan would be to be quite generous in letting people out

15   for COVID-19 reasons, if they want to.  And I want to give you

16   an opportunity to address that if you would like.  Any problems

17   with that?

18         MR. MURRELL:  No.  I think that seems fair.

19         THE COURT:  Mr. Kunz?

20         MR. KUNZ:  No, sir.

21         THE COURT:  Anything further from either side then?

22         MR. FIELDS:  Your Honor, since we have gone through

23   all the exhibits already, and Mr. Murrell had our final exhibits

24   since Friday, would it be agreeable to the Court if we

25   essentially preadmit them, so we don't have to go through the

1    formalities of showing for identification and all that.  Mr.

2    Murrell has had all of our exhibits since Friday.  We only added

3    a few photographs of Mr. Baker's arrest, but then we took out

4    several things that the Court had already agreed to let in.  So,

5    I'm not sure if the Court would be agreeable to that.

6            THE COURT:  I'm glad you brought that up.  I don't

7    know that I would have a problem with it, if you all don't.  I

8    want a clear record.  When we went through everything, we

9    started off with 404 issues on certain topics and then we ended

10   up going through every single exhibit.  And I was ruling on the

11   objections that were presented in the context of what we were

12   talking about, which was the 404 and 403 things.  So I don't

13   know if there is going to be any authenticity, or other types of

14   objections.  But what I was saying, this one is fine, and so

15   forth, didn't necessarily mean it was addressing everything but

16   what was sort of in front of us.

17           Mr. Murrell, what do you say to what you just heard?

18           MR. MURRELL:  I don't really mind.  I do want to make

19   it clear, though, of course, my objections -- there were so many

20   of them, but by and large my objection to all of them was they

21   were not coming in under this inextricably intertwined theory.

22           This was a violation of 404, and if not that, a

23   violation of 403.  As long as that's understood by everyone, and

24   I think it's preserved, I don't have any difficulty with

25   introducing all of them.

1    THE COURT:  You are saying as to the ones that you --

2  in other words, you would stand by what you said -- the ones

3  that you didn't object to the other day you are fine with coming

4  in under the circumstances?

5    MR. MURRELL:  Yes, sir.

6    THE COURT:  And I guess the record is clear as to the

7  ones that you did object to the other day on 404 and 403.

8  What's --

9    MR. MURRELL:  But I did want to make clear, and it's

10  in my motion but I didn't talk about it much the other day, I

11  also intend they are not inextricably intertwined.

12    THE COURT:  Right.  My ruling on the category of

13  documents that were these other posts is that they were, and it

14  was an alternative ruling as to the 404 that if they weren't it

15  was relevant to state of mind and intent.

16    You said, Mr. Fields, you have some other documents

17  that were not addressed the other day.  And I mean --

18    MR. FIELDS:  Yes, Your Honor.  Just so the record is

19  clear, the Court had some concern about the bookshelf and the

20  Koran.  We've cropped out the part of the Koran.

21    THE COURT:  Okay.

22    MR. FIELDS:  So we have taken care of that.  But we

23  did add a few photos of Mr. Baker's apartment from the time of

24  his arrest.  Other than that, we removed other exhibits that we

25  had previously discussed.  So the only thing we added were a few

1    photos of Mr. Baker's arrest.  That was it.

2                THE COURT:  Have you seen those photos, Mr. Murrell?

3                MR. MURRELL:  Yes, sir.  That's fine.  I will say the

4    cropped photos still have a Huey Newton book, Revolutionary

5    Suicide, so we object on that basis.

6                THE COURT:  Okay.

7                MR. FIELDS:  I have a courtesy copy for the Court of

8    our final exhibits that might be helpful.

9                THE COURT:  Okay.  That would be great.

10                MR. FIELDS:  Judge, I might have left them downstairs

11    I will go grab it for you.

12                THE COURT:  All right.

13                So the objection on the Newton book photo is just that

14    it's a 403 thing?

15                MR. MURRELL:  Yes, sir.

16                THE COURT:  Okay.  That will be overruled.

17                I think probably the way to do this would be for you

18    still to move each exhibit in, as you are doing, but without --

19    you don't have to show it to the witness and go through that.

20    You refer to it, say I will move in Exhibit 1, I will look at

21    it, I will admit it, and then outside the presence of the jury

22    we can go back through what just happened and make sure the

23    objections are clear.  And if there is any particular ruling on

24    it as the context goes.  That way that keeps you from having to

25    object to each one of these but then we will have, hopefully, a

```
 1    cleaner record of what happened.

 2              How does that sound to you, Mr. Fields?

 3              MR. MURRELL:  Yes, sir.

 4              MR. FIELDS:  Yes, sir, Your Honor.  Thank you.

 5              THE COURT:  That's what we will do then.

 6              There was a request in the memo for Jencks Act

 7    materials.  I don't know if you provided those or not.

 8              MR. MURRELL:  We don't have anything to provide.

 9              THE COURT:  All right.

10              Anything else then before we have our prospective

11    jurors in here?

12              MR. KUNZ:  No, sir.

13              MR. MURRELL:  Nothing from the defense.

14              THE COURT:  What we will do, Ms. Stark will let us

15    know when the questionnaires are here.

16              MR. MURRELL:  Oh, I'm sorry.

17              THE COURT:  Yes, sir.

18              MR. MURRELL:  I did have something.  I had this word

19    that the jurors were being excluded in advance because of

20    COVID-19 concerns.  So I did talk to the clerk's office.  I

21    don't think I had it quite right.  Apparently it's a little more

22    objective than that.  I think -- my understanding is there is a

23    flyer that goes out and asks them if they have been exposed, or

24    if they have a temperature.  I still don't know exactly what's

25    in that flyer.
```

1          My request would be that we make that flyer available

2   to counsel, and make it part of the record, so it's clear what

3   happened.  And I would like to know, too, if we can find out how

4   many jurors were excused prior to coming to the courtroom

5   because of these COVID-19.

6          THE COURT:  Okay.  We will do that.  Ms. Stark, if you

7   will get a copy of that notice.  My understanding, and I have

8   seen it and I don't have it here in front of me, is that it has

9   the kind of a standard thing about if you are having symptoms to

10  call, and I don't believe anyone -- well, we will get that

11  information to you.

12         THE COURTROOM DEPUTY:  I have got it right here.

13         THE COURT:  Okay.  Are you sure that's the correct

14  one?

15         THE COURTROOM DEPUTY:  I will print it.

16         MR. KUNZ:  Judge, here is a copy of the government's

17  exhibits.

18         THE COURT:  Thank you.

19         We do have the questionnaires.

20         How much time would you like with them?

21         MR. MURRELL:  I'm sorry?

22         THE COURT:  With the questionnaires we just received,

23  how much time would you like?

24         MR. MURRELL:  I don't know.  10, 15 minutes.

25         THE COURT:  Why don't we come back at 5 after 9.  We

1   will bring the jury in at 5 after 9 and we can go from there.

2           MR. MURRELL:  Do we have the list?

3           THE COURT:  Ms. Stark is about to hand it to you.

4           We will get at that jury information as well.

5           MR. MURRELL:  Thank you.

6           We will take a brief recess.

7       (Recess taken 8:45 AM.)

8       (Jury voir dire is filed under seal and separate cover in

9   Volume Ia.)

10      (Unsealed proceedings resumed at 12:07 PM.)

11          THE COURT:  Please have a seat.

12          I would just make the observation that I do -- I note

13  what I said, it's very encouraging that so many people are

14  willing to serve.  Mr. Murrell, you and Mr. Fields were here for

15  a trial not too long ago, and just like today nobody tried to

16  opt out based on COVID.  And, obviously, it would be

17  understandable if they did, but I think it's a testament to that

18  group that nobody chose to leave and they were all willing to

19  serve.

20          We will be back at 1:20.  What I will do, I will read

21  the preliminary instructions that the Eleventh Circuit has

22  approved with some minor non-substantive changes, and then we

23  will go into openings.

24          Are you going to make an opening or are you reserving,

25  Mr. Murrell?

1          MR. MURRELL:  I will make an opening.  Yes, sir.

2          THE COURT:  How much -- I am not going to hold you

3   hard to a clock, but 15, 20 minutes plenty for both sides?

4          MR. KUNZ:  That's fine for the government, Your Honor.

5          MR. MURRELL:  Yes, sir.

6          THE COURT:  Are there going to be any exhibits or

7   anything we need to talk about?

8          MR. KUNZ:  I am probably going to show them the two

9   threats, Judge, the threatening communications on the overhead.

10         THE COURT:  Any issues with that, Mr. Murrell?

11         MR. MURRELL:  When you say you are going to show them

12  the Call to Arms?

13         MR. KUNZ:  Yes, sir.

14         THE COURT:  And the Facebook post?

15         MR. KUNZ:  Yes, sir.

16         THE COURT:  Any issues was that.

17         MR. MURRELL:  No.

18         THE COURT:  Are there any -- we have some lurking

19  evidentiary issues about the Soros thing.  Is there anything

20  that anybody plans to raise in opening that would bring any of

21  that into issue.

22         MR. MURRELL:  Not from me, Judge.

23         MR. KUNZ:  No, sir.

24         THE COURT:  All right.  Anything else then to cover

25  between now and then?

```
 1                MR. MURRELL:  No, sir.

 2                MR. KUNZ:  No, Your Honor.

 3                THE COURT:  Very good.

 4                Y'all have a nice lunch.

 5                We will see you at about 1:20.

 6          (Recess taken 12:09 PM.)

 7          (Resumed at 1:21 PM.)

 8                THE COURT:  Please have a seat.

 9                Okay.  We have lawyers here and Mr. Baker is here.  I

10      wanted to compare the list here one last time, make sure we are

11      all on the same page jury wise.  We have ███████████████

12      ████████████████████████████████████████████

13      ███████████████████████████████████████████████████

14      ███████████████████████ and the alternate is ████████████, everybody

15      in agreement with that list?

16                MR. MURRELL:  Yes, sir.

17                THE COURT:  Mr. Fields?

18                MR. KUNZ:  Yes, sir.

19                THE COURT:  Any objections to the jury at all?

20                MR. MURRELL:  I let the whole thing go by the wayside

21      about the questionnaire and the number of jurors that actually

22      got excused.

23                THE COURT:  Yes, sir.  I was going to address that at

24      the end of the day.  My understanding is one was excused based

25      on her son having to get testing.  I'll try and get more
```

1    information on that.  That's the only one.  And I think

2    Ms. Stark has the notice that was given out.

3              Did you get a copy of that, Mr. Murrell?

4              THE COURTROOM DEPUTY:  I can give it to him.

5              THE COURT:  We'll make that part of the record too.

6              MR. MURRELL:  Obviously, there would be no basis for a

7    challenge, so we just wanted to make sure the record was clear.

8              THE COURT:  Yes, sir.  Okay.

9              Is everybody ready to begin, Mr. Kunz?

10             MR. KUNZ:  Yes, sir.

11             THE COURT:  Mr. Murrell?

12             MR. MURRELL:  Yes, sir.

13             THE COURT:  Is anyone invoking the rule?

14             MR. KUNZ:  Yes, sir.  We'd ask that.

15             THE COURT:  I'll ask, are there any witnesses in the

16   room right now, other than the case agent?

17             MR. KUNZ:  Just the case agent.

18             THE COURT:  Well, I'll ask you lawyers to make sure

19   that you keep an eye on that.  And the rule has been invoked so

20   if you'll make sure all your potential witnesses know that.

21             Okay.  We'll bring in the jury, please.

22        (Jury in at 1:24.)

23             THE COURT:  Ladies and gentlemen, if you'll please

24   have a seat.  I hope you all had a nice lunch and were able to

25   find something to eat.  We are now going to proceed in the case

1  of United States of America versus Daniel Baker.  I'm going to

2  go over some preliminary instructions with you and give you some

3  more information.  I'll talk about the schedule.  As I indicated

4  earlier, the trial will continue this afternoon.  We'll break

5  probably around 5:30.  We'll start back tomorrow morning.  Is

6  8:30 okay with everyone?  Does anyone have a long drive or is

7  8:30 okay for everyone to start in the morning?

8         Okay.  And then we'll break every morning and

9  afternoon so we'll have at least one midafternoon break today

10 and we'll continue that way.

11         I do want to, before we, before I have you sworn in I

12 wanted to just go over the list one last time and make sure we

13 have the right people.  So I'm going to read a list of the

14 jurors and you can let me know at the end if I've missed anyone

15 or read a name of anyone who is not here.

16         We have ███████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 Is that right, anybody's name not read?  Okay.  Well, very good.

20         So before I give you any more instructions I would

21 like for you to stand and I will ask the courtroom deputy to

22 swear you in.

23     (The jurors were duly sworn by the courtroom deputy.)

24         THE COURT:  Thank you.

25         If you'll give me one second here.  I need to pull up

1    something.

2           Okay.  So, I'm going to read some preliminary

3    instructions now, somewhat lengthy so I'm going to read them to

4    you.  I encourage you to pay attention and then we'll proceed

5    with the trial.

6           Ladies and gentlemen, now that you have been sworn I

7    will give you some more information about a criminal trial and

8    your duty as jurors.  These are preliminary instructions.  I

9    will give you more detailed instructions at the end of the

10   trial.

11          Your duty will be to decide what happened so you can

12   determine whether the defendant is guilty or not guilty of the

13   crimes charged in the indictment.

14          At the end of the trial I will explain the law that

15   you must follow to reach your verdict.  You must follow the law

16   as I explain it to you even if you do not agree with the law.

17          You must decide the case solely on the evidence

18   presented here in the courtroom.  Evidence can come in many

19   forms.  It can be testimony about what someone saw or heard or

20   smelled.  It can an exhibit admitted into evidence.  It can be

21   someone's opinion.

22          Some evidence proves a fact indirectly.  Like a

23   witness who saw wet grass outside and people walking into the

24   courthouse with wet umbrellas.  Indirect evidence, sometimes

25   called circumstantial evidence, is simply a chain of

1    circumstances that proves a fact.  As far as the law is

2    concerned it makes no difference whether the evidence is direct

3    or indirect.  You may choose to believe or disbelieve either

4    kind.  And you should give every piece of evidence whatever

5    weight you think it deserves.

6              Certain things are not evidence and must not be

7    considered.  These things are not evidence:  Statements or

8    arguments of the lawyers.  In their opening statements and

9    closing arguments the lawyers will discuss the case, but their

10   remarks are not evidence.

11             Questions and objections of the lawyers.  The lawyers'

12   questions are not evidence, only the witnesses answers are

13   evidence.  You should not think something is true just because

14   the lawyers' questions suggest that it is.  For instance, if a

15   lawyer asks a witness, you saw the defendant hit his sister,

16   didn't you?  The question is no evidence whatsoever of what the

17   witness saw or what the defendant did unless the witness agrees

18   with it.

19             Now, there are rules of evidence that control what can

20   be received into evidence.  When a lawyer asks a question or

21   offers an exhibit and the lawyer on the other side thinks it is

22   not permitted by the rules of evidence, the lawyer may object.

23   If I overrule the objection then the question may be answered or

24   the exhibit received.

25             If I sustain the objection then the question cannot be

1    sustained and the exhibit cannot be received.  Whenever I

2    sustain an objection to a question you must ignore the question

3    and not try to guess what the answer would have been.

4         Sometimes I may order that the evidence be stricken

5    and that you disregard or ignore the evidence.  That means that

6    when you are deciding the case you must not consider that

7    evidence at all.

8         Some evidence is admitted for a limited purpose.  When

9    I instruct you that an item of evidence has been admitted for a

10   limited purpose you must consider it only for the limited

11   purpose and for no other purpose.

12        In reaching your verdict you may have to decide what

13   testimony to believe and what testimony not to believe.  You may

14   believe everything a witness says or part of it or none of it.

15        In considering the testimony of any witness you may

16   take the following into account:  The opportunity and ability of

17   the witness to see or hear or know the things testified to, the

18   witness' memory, the witness' manner while testifying, the

19   witness' interest in the outcome of the case and any bias or

20   prejudice, whether other evidence contradicted the witness'

21   testimony, the reasonableness of the witness' testimony in light

22   of all of the evidence, and any other factors that bear on

23   believability.  I will give you additional guidelines for

24   determining credibility of witnesses at the end of the case.

25        As you know, this is a criminal case.  There are three

1    basic rules about a criminal case that I ask you just keep in

2    mind.  First, the defendant is presumed innocent until proven

3    guilty.  The indictment against the defendant brought by the

4    government is only an accusation, nothing more.  It is not proof

5    of guilt or anything else.  The defendant therefore starts out

6    with a clean slate.

7              Second, the burden of proof is on the government until

8    the very end of the case.  The defendant has no burden to prove

9    his innocence or present any evidence or to testify.  Since the

10   defendant has the right to remain silent and choose whether he

11   testifies, you cannot legally put any weight on a defendant's

12   choice not to testify.  It is not evidence.

13             Third, the government must prove the defendant's guilt

14   beyond a reasonable doubt.  I will give you further instructions

15   on this point later, but bear in mind that the level of proof

16   required is high.

17             Our law requires jurors to follow certain instructions

18   regarding their personal conduct in order to help assure a just

19   and fair trial.

20             I'm going to give you those instructions now.  One, do

21   not talk, either among yourselves or with anyone else, about

22   anything related to this case.  You may tell other people with

23   whom you live or your employer that you are a juror.  And you

24   can give them information about when you'll have to be in Court,

25   but you must not discuss with them or anyone else anything

1    related to the case.

2        Two, do not at any time during the trial request,

3    accept, agree to accept, or discuss with any person, any type of

4    payment or benefit in return for supplying information about the

5    trial.

6        Three, you must promptly tell me about any incident

7    you know of involving an attempt by any person to improperly

8    influence you or any member of the jury.

9        Four, do not visit or view the premises or place where

10   the charged crime was allegedly committed or any other premises

11   or place involved in the case.

12       You must not use Internet Maps or Google Earth or any

13   other program or device to search for a view of any location

14   discussed in the testimony.  Do not read, watch or listen to any

15   accounts or discussions related to the case which may be

16   reported by newspapers, television, radio, the Internet or any

17   other media.

18       Six, do not attempt to research any fact, issue or law

19   related to this case whether by discussions with others, by

20   going to the library, by doing Internet research or by any other

21   means or source.

22       Now, in this age of instant electronic communications

23   and research I want to emphasis that in addition to not talking

24   face-to-face with anyone about the case you must not communicate

25   with anyone about the case by any other means, including by

1    phone, text, email, social media or anything like that.  And

2    that includes any similar technology.

3            You must not provide any information about the case to

4    anyone by any means whatsoever.  And that includes posting

5    information about the case or what you were doing in the case on

6    any device or Internet site, blog, chat room, social media or

7    anything like that.  You must also not use Google or otherwise

8    search for any information about the case, about the law that

9    applies to the case, about the people involved in the case,

10   including the defendant, the witnesses, the lawyers or the

11   Judge.

12           Those are the rules.  And it's important that you

13   understand why these rules exist and why they are so important.

14   Our law does not permit jurors to talk with anyone about the

15   case or to permit anyone to talk to them about the case because

16   only jurors are authorized to render a verdict.  Only you have

17   been found to be fair and only you have promised to be fair.  No

18   one else is so qualified.

19           Our law also does not permit jurors to talk among

20   themselves about the case until the Judge tells them to begin

21   deliberations because premature discussions can lead to a

22   premature final decision.  Our law also does not permit you to

23   visit the place discussed in the testimony.  First, you can't be

24   sure the place is in the same condition it was on the day in

25   question.  Second, even if it were in the same condition, once

1  you go to a place discussed in the testimony to evaluate the

2  evidence in light of what you see you become a witness, not a

3  juror.  And as a witness you may now have a mistaken view of the

4  scene that neither party had a chance to correct and that would

5  not be fair.

6          Finally, our law requires that you not read or listen

7  to any news accounts of the case and that you not attempt to

8  research any fact, issue or law related to the case.  Your

9  decision must be based solely on the testimony and other

10  evidence presented in this courtroom.

11          Also, the law often uses words and phrases in special

12  ways so it's important that any definitions you hear come only

13  from me and not from any other source.  It wouldn't be fair to

14  the parties for you to base your decision on some reporter's

15  view or opinion or upon other information you acquire outside of

16  the courtroom.

17          These rules are designed to help guarantee a fair

18  trial and our law accordingly sets forth serious consequences if

19  the rules are not followed.  I trust that you understand and

20  appreciate the importance of following these rules and in accord

21  with your oath and promise I know that you will do so.

22          Moving on now, if you wish, you may take notes to help

23  you remember what witnesses said.  If you do take notes please

24  keep them to yourself until you and your fellow jurors go to the

25  jury room to decide the case.  Do not let note taking distract

1    you so that you do not hear answers by witnesses.  And when you

2    leave the courtroom your notes should be left in your seat here.

3    No one will be permitted to disturb or look at your notes.  So

4    leave them here on the breaks and over night.

5         Whether you take notes or not you should rely on your

6    own memory of what was said.  Notes are to assist your memory

7    only.  They are not entitled to any greater weight than your

8    memory or impression about the testimony.

9         We are now about ready for the trial to begin.  Here's

10   how it will go.  First the government will make an opening

11   statement which is simply an outline to help you understand the

12   evidence as it comes in.  Then the defense attorney will make an

13   opening statement.

14        Again, opening statements are neither evidence nor

15   argument.  After the opening statements the government will then

16   present its witnesses and counsel for the defendant may cross

17   examine those witnesses.

18        Following the government's case the defendant may, if

19   he wishes, present witnesses whom the government may cross

20   examine.  After all of the evidence is in the attorneys will

21   present their closing arguments to summarize and interpret the

22   evidence for you and then I will instruct you on the law.  After

23   that you will go to the jury room to decide your verdict.

24        So those are the preliminary instructions.  Any

25   objection to the way they were read, Mr. Murrell or Mr. Kunz?

```
 1            MR. MURRELL:  No, sir.

 2            MR. KUNZ:  No, sir.

 3            THE COURT:  Okay.  Then is the government ready to

 4    begin with its opening statements?

 5            MR. KUNZ:  Yes, Your Honor.

 6            THE COURT:  Okay.  Mr. Kunz, the floor is yours.

 7            MR. KUNZ:  May I take the mask off, Judge?

 8            THE COURT:  Yes, sir.

 9            MR. KUNZ:  Ladies and gentlemen, good afternoon.  My

10    name Stephen Kunz.  I'm an Assistant United States Attorney.

11    And Mr. Lazaro Fields also is a United States Attorney.  We

12    represent the people of the United States with respect to the

13    United States versus Daniel Baker.

14            As Judge Winsor just described to you, this is what's

15    called an opening statement.  It's an opportunity for counsel to

16    advise the jury what we expect the evidence may show in this

17    case and essentially give you an outline or a roadmap about the

18    case.

19            Now, the Court indicated that there is an indictment

20    that has been returned in this case, a document like this.  The

21    Court, I anticipate, may send that back with you when you go to

22    deliberate at the end of the case.  And as the Court indicated,

23    the indictment is not evidence.  It's merely the mechanism by

24    which somebody comes into Court and we can have a trial.

25            Now, in the indictment the defendant is charged in two
```

1    counts with communicating in interstate commerce, a threat to

2    kidnap or injure another person.  The first count relates to an

3    alleged threat made on January 12th of this year.  And the count

4    two is a threat posted allegedly on January 14th of this year.

5            Now, there are -- the Court at the end of the case

6    will instruct you as to elements of the crimes that are charged

7    and the government will prove each and every element of the

8    crimes charged in this indictment beyond a reasonable doubt.

9            Now, at the end of the case, the Court will instruct

10   you as to the law concerning making a true threat.  And, we

11   believe that the evidence in this case will support that on

12   January 12th, and again on January 14th, the defendant sent

13   threatening communication to kidnap or injure another person.

14   We believe the evidence will clearly show that both

15   communications from the defendant were true threats under the

16   law and intended to be so.

17           Let me give you a little bit of a road map or a

18   summary of what we expect the evidence may be in this case.

19           On January 12th of this year, the defendant posted on

20   his Facebook account a document, you'll see this exhibit in

21   evidence, an event.  He indicated that there was an event going

22   to happen on January 17th, which was a Sunday in January.  And

23   posted by Mr. Baker at 11:56 a.m., five days from now.  And it

24   was to start at Railroad Square.

25           And then attached to this particular document was the

1  details of what was going to happen.  And, you'll be able to see

2  this when we introduce this into evidence in a lot more detail.

3  But it indicates that, in this post that the defendant was going

4  to fight back of a planned protest at the state capitol.  And

5  you'll see the evidence will indicate that the defendant

6  indicated he would have an armed community stop them, had a duty

7  to do so.  And it goes on with various language of what they

8  were going to do.  They were going to march from Railroad

9  Square, those of you who are familiar with Tallahassee, you'll

10 have an idea where it is in relation to the capitol.  And then

11 come on down to the capitol and then they were going to encircle

12 the individuals who were protesting at the state capitol.  And

13 they wanted to use weapons and calibers of all type.  And

14 indicating the enemy is coming from all places and they are

15 going to have powerful rifles and explosives.  And they also

16 would -- Mr. Baker and others would be ready for them, and

17 militant friends.

18        And their plan was to fight them with firearms.  And

19 the last statement indicates on the bottom of this, if you are

20 afraid to die fighting the enemy then stay in bed and live and

21 call all of your friends and rise up.  This was posted on

22 January 12th, the evidence will show, by Mr. Baker.

23        Then, a couple days later, there was a poster, excuse

24 me, a post on the WTXL site concerning the Tallahassee Police

25 Chief Lawrence Revell had said his department would be fully

1   staffed and prepared ahead of any potential Inauguration Day

2   protest.

3           You're going to hear evidence in the case that there

4   were fliers that had been sent around that every state capitol

5   there were going to be armed protesters appearing.  And in

6   reaction to that Mr. Baker on January 14th posted this item.  He

7   commented on this.  And you'll see this will be presented in

8   evidence as well.  And this was a call to arms January 2021.

9   And you'll hear testimony that's a picture of Mr. Baker with a

10  firearm.  And it indicates, we'll have it blown up for you so

11  you'll be able to see it a little clearer, with an AK-47 on top.

12  And, again, it continues with language similar to the original

13  post on January 12th indicating that they need -- it was a call

14  to arms, including combat veterans to join them to protect the

15  community.  And, again, it ends by saying, if you are afraid to

16  die fighting the enemy stay in bed and live.

17          Now the evidence in this case will also indicate that

18  Mr. Baker also posted the call to arms flier on his Instagram

19  account and also as well as his Facebook account.

20          Now, you'll hear evidence in this case that the

21  defendant made a YouTube video in which he was printing multiple

22  call to arms fliers just like the one I just showed you.  And

23  the title of the video was Florida, This is a Call to Arms.

24          Now, the evidence in this case will show you that the

25  FBI actually started an investigation concerning the defendant

1  who was threatening use of violence in the United States and was

2  using social media to recruit and train like-minded individuals

3  in furtherance of his anti-government or violent extreme

4  ideology.  The defendant had multiple violent threats to those

5  he claims were fascists or white supremacists, persons with

6  different ideologies than him.  And the evidence will show that

7  by the latter part of 2020 and beginning of this year in January

8  2021, the defendant's social media posts escalated in their

9  tenor for violence indicating a potential for immediate threat

10 during the planned protest in Tallahassee, Florida shortly

11 before the Inauguration.

12        Now, you will hear evidence in this case that the

13 defendant had enlisted in the United States Army back in 2006.

14 And he served as an infantryman for about a year and a quarter.

15 You're going to hear further evidence that the defendant had

16 military training and proficiency in the use of a variety of

17 weapons, including an AK-47, sniper rifles and explosives.

18        Evidence will also show in this case that in

19 approximately 2017 the defendant joined a foreign military

20 group, The People's Protection Unit, known as YPG.  A group

21 fighting in Syria.  The defendant made posts after that service

22 in Syria with the YPG and proclaimed he was a trained sniper for

23 the YPG.  And you will see evidence that some of the defendant's

24 military activity was documented in a VICE News video in which

25 the defendant can be seen fighting in close combat and using a

1   sniper rifle and also using some other weapons.

2           The defendant posted and forwarded this video to

3   various individuals providing his bona fie-des for use of

4   weapons and tactics, namely that he had said he -- that he was

5   who he said he was and that he was very serious about what he

6   was putting out to everybody.

7           You'll also hear testimony from the FBI special agents

8   that through interviews with them Mr. Baker admitted to training

9   members who attended the YPG training facility on military

10  tactics and defensive tactics.

11          Now, the evidence will show that Mr. Baker returned to

12  the United States in April, approximately April of 2019 from the

13  Middle East after spending about a year there.  And he continued

14  to make posts and file posts with respect to threats of violence

15  and as to people with different ideologies than his.  Now, he

16  informed his followers on social media to prepare for war.

17          Now, the evidence we'll present during the trial will

18  show that the defendant had the ability, he had the intent and

19  he had the means to carry out the threats that he made on

20  January 12th and January 14th.  For example, you'll hear

21  testimony that on October 2nd the defendant posted a Facebook or

22  made a Facebook post stating, this is war, are you ready to take

23  up arms with us yet and join us in November, we are voting from

24  the rooftops.

25          The defendant also posted a video titled Training for

1  the Next Mission with his YouTube account on October 16th of

2  2020 in which he was seen shooting an AK-47 weapon at a gun

3  range.

4          The evidence will show that on October 20th of last

5  year the defendant authored a post advising of the upcoming

6  civil war.  And he indicated, God, I hope the right tries a coup

7  November third because I'm so, and he curses, effing down to

8  slay enemies.

9          On November third defendant posted a prepare for war,

10  November third posting.  And the following day he posted again

11  on Facebook saying, enjoying the peace and quite until Thursday

12  y'all, it may be the last time some of us see peace.

13          The evidence will show some other posts.  On

14  November 11, 2020 the defendant posted a video that showed him

15  in blue clothing with what appeared to be a shotgun leaning

16  against the wall behind him and a firearm, a semi-automatic

17  handgun on the shelf or bookcase behind him.  That video was

18  filmed by the defendant at his residence.  And agents observed

19  the same bookcase in the defendant's residence and the same

20  firearms when he was arrested on January 15th of this year.

21          On December 20th defendant posted on Facebook,

22  opponents still plan on violent military coup, if you don't have

23  your guns you won't survive 2021.

24          On November 17th the defendant posted on his Instagram

25  account a post that appears to resemble bombs or explosives

1    being dropped from the sky and captioned as post that the

2    Jacksonville Nazis are going to be real sad when this happens to

3    their headquarters.

4            Now, on January 12th the defendant made a post

5    indicating that his band was over and, as for Facebook and so

6    much has happened.  And he said, death to America of course and

7    F the president current and elect.  And on January 14th after --

8    on the same day that he made that second post you will hear

9    evidence that he contacted a friend that he knew on Facebook and

10   asked if her dad wanted to sell an AK or a pistol.

11           You'll hear evidence that defendant was arrested on

12   January 15, 2021 at his home.  And during the arrest the FBI

13   seized two firearms; one shotgun and one handgun, which were

14   both loaded at the time with a round in each chamber.

15           The defendant's cell phone also was seized and located

16   were several of the call to arms fliers that I just showed you.

17   You'll see those in evidence as well.  And you'll see

18   photographs of the interior of the defendant's residence.

19           A search warrant was obtained for the defendant's

20   phone.  And additional evidence, namely texts between the

21   defendant and others, concerning his call to arms, his plan and

22   threats that he made, we'll be presenting evidence concerning

23   that.

24           Finally, you're going to hear evidence that Mr. Baker

25   was constantly looking for money from individuals.  And that he

1    actually received approximately $500 from another individual on

2    January 9th, 2021 after which he purchased a 22 caliber military

3    style AK-47 type rifle and ammunition the next day after he got

4    this money for a total of approximately $500.

5              And the evidence will indicate that he was planning on

6    using that firearm with others he had for his call to arms at

7    the state capitol on January 17th and the Inauguration on

8    January 20th.

9              Ladies and gentlemen, this trial, as the Court

10   indicated, should only be another couple of days.  So it won't

11   be real long.  We expect the trial should be concluded in the

12   couple of days.

13             On behalf of the United States I would like to thank

14   you for your service in this case and your attention in this

15   matter.  Thank you very much.

16             THE COURT:  Thank you, Mr. Kunz.  Mr. Murrell?

17             MR. MURRELL:  Good afternoon.  This is not going to be

18   a whodunit.  Rather, it's going to be given the evidence did Mr.

19   Baker commit a crime, did Daniel Baker commit a crime.

20             When we get to the end of this case I think you'll see

21   the answer to that question is no.  And I will be asking you to

22   bring back a verdict of not guilty.

23             Mr. Kunz did a fine job of outlining the government's

24   case.  And I think you'll see it consists really of two things.

25   One, these social media posts and, two, the fact that Mr. Baker

1    likes guns.

2            And I think the idea will be that well, given all of

3    this, he must have intended these posts, these communications

4    that Mr. Kunz showed you to be what we call a true threat.

5            Now, that's going to be critical.  That's what the

6    case is going to be all about, whether or not there were true

7    threats made.  Now, it's not my place at this point to tell you

8    exactly what a true threat is.  The Judge will tell you that

9    later towards the end of the trial.  But I think I can safely

10   say it's a serious threat.  So the question is, do all of these

11   things show that Mr. Baker's call to arms, as we will refer to

12   them, were in fact true threats.

13           Well, as I said, a lot of this is going to be based on

14   some of these social media posts.  Some will miss their mark.

15   There is one, for example, that you will see Mr. Baker in a

16   meditative pose in camouflage and behind him what appears to be

17   an AK-47 rifle.  I guess the idea is that shows that he has a

18   familiarity with firearms.  Well, in fact, he will tell you when

19   he testifies it was a nonfunctioning weapon.  He was training in

20   Syria and they would give the trainees these rifles to carry

21   around just to get a feel for things.  The gun didn't work.  It

22   was not what it appears to be.

23           There was another post that I heard Mr. Kunz mention

24   where he is seen firing an automatic weapon.  Well, that's

25   great.  But you'll find out where he was was a place called

1    Machine Gun America.  Not far from Disney World.  You can go

2    there and you can pay some money and you can fire these guns.

3    And, in fact, the attendant has to load the gun for you.  So

4    maybe that's not quite what it appears.

5            Another example that I think you'll see misses the

6    mark, you will have a photo of Mr. Baker standing with a group

7    of, I don't know, 12 or 15 other men, that for all the world

8    look like dangerous terrorists.  All right.  Most of the men

9    have their face covered.  Somebody has a rocket launcher.  Mr.

10   Baker does not have his face covered, but most of the men do.

11   And, again, for all in the world it would look like a dangerous

12   group of terrorists.

13           Mr. Baker, as I said, he'll testify.  He'll explain to

14   you these are international volunteers, people that have taken

15   it upon themselves to fight ISIS in Syria.  ISIS, as you

16   probably well know, is an extremist group that wanted to impose

17   Syria, they wanted to impose their own version of the law in

18   Syria.  They were most known for their public beheadings.  So

19   the United States fought ISIS.  And they relied on people like

20   the Kurds, the YPG, to do the fighting on the ground.  And

21   that's what this is a picture of, a group of men that had

22   volunteered to fight ISIS.  And they had their faces covered

23   because they are concerned that if a member of ISIS saw their

24   faces it would -- they could harm them or their families.  So

25   it's not a group of terrorists.  Frankly, it's a group of

1    patriots fighting a terrible terrorist organization.  So, again,

2    it's not what it appears to be.

3            Now, some of the posts will, I suppose, be more

4    effective.  I heard Mr. Kunz mention one where it was to the

5    effect of, war is coming.  You need to bear arms.  Another post

6    was something to the effect is, Trump is going to put up a

7    fight, your neighbors will shoot at you.  Maybe the most

8    startling post will be one where he's -- this was on, I believe,

9    the 14th, the day before he got arrested, where he is texting

10   and it's pretty clear that he expects these, some of these

11   radical Trump supporters to start a war.  And he says, not clear

12   I'm going to survive it.

13           So, again, it's going to be based on those texts and

14   social media.  But, again, I'll ask you to look closely at that.

15   And Mr. Baker will explain many of those.  And I think you will

16   see they are not quite what they appear to be.

17           The other part of the government's case is the fact

18   that Mr. Baker does have an affinity for firearms.  He doesn't

19   own much in this world, but there was a pistol he had bought

20   some time back.  It was a shotgun, a standard shotgun he bought

21   a few months before his arrest.  And he did order this 22-rifle

22   that they refer to as an AK-47 style rifle.  It's a 22-rifle

23   with a bigger magazine.

24           He has a concealed weapons permit, like many

25   Floridians.  And he does -- he'll tell you too that he is a

1   member of an organization called the Socialist Rifle

2   Association.  He'll tell you that's sort of a left wing version

3   of the NRA.  And like the NRA they believe that guns should be

4   in the hands of good guys and the more guns the better.  I don't

5   know that the NRA and the Socialist Rifle Association define the

6   good guys in the same way, but that promotes firearms.

7           So that's pretty much what the government's case is

8   going to be.  It's going to be based on these social media posts

9   and the fact that he had some firearms.  And the argument is

10  given all of that he's the kind of fellow that would pose a true

11  threat.

12          Now, when we get to our side of the case we are going

13  to talk about Mr. Baker too.  We're going to present evidence

14  that he is not a violent fellow.  He does believe in

15  self-defense, but he certainly doesn't believe in initiating

16  violence.  You'll see he's about 5'3, 130 pounds.  And I think

17  he'll tell you that a lot of these aggressive, angry threats he

18  sees as sort of a way to offset his size disadvantage.

19          He has a world view, you'll find out he has a world

20  view that is different than most of us.  Had a lifestyle

21  certainly that is different than the lifestyle all of you have.

22  He was a -- he's a follower of Hare Krishna, some of you may

23  know is sort of an eastern religious organization based on Hindu

24  scripture.  He follows it for many reasons, but one of the

25  things that appealed to him was the fact that they shy away from

```
1    materialism.  Material things aren't important.  He had

2    firearms, but that's about all he did have.

3              And you'll find for a good part of the last 10-years

4    he was homeless.  He would work some odd jobs.  He would work as

5    a security guard on occasion.  He would work at a restaurant on

6    occasion.  But he spent a good part of his time homeless.  But

7    in some ways it maybe fit his lifestyle because, again, he did

8    not believe in materialism.  So material things weren't

9    important to him.

10             He practices yoga, he practices Jiu Jitsu.  Although,

11   like a lot of things, the Jiu Jitsu is a bit overstated.  You'll

12   find out, for example, he has a blue belt.  And in the scheme of

13   things, you have a white belt which is for beginners, and the

14   next step up is a blue belt.  So he is by no stretch of the

15   imagination a martial arts expert.  He did go to tournaments.

16   He competed, he won some medals, but it's at the lower level of

17   a form of judo.

18             You're going to find that he certainly has a negative

19   feeling toward President Trump.  He certainly has nothing kind

20   to say about President Trump in these posts.  You'll find that

21   he has a negative view of law enforcement as well.  Ironically,

22   his father was a law enforcement officer and that may have

23   contributed to his views, but he echos some of what you read in

24   the media today and maybe more.

25             He told the police he believes the FBI is infiltrated
```

1    by white supremacists.  He'll tell you that he believes that law

2    enforcement officers facilitated the attacks on the capitol in

3    letting some of the mob into the capitol.

4              So, again, I think you'll see his world view and his

5    politics are not like yours.  He describes himself as hardcore

6    leftist and anarchist.  And I have to say, when I think of the

7    word anarchist I think of it as being preceded by the adjective

8    bomb throwing anarchist.  He'll tell you though that that's not

9    what he means when he says he's an anarchist.  It's a lot more

10   technical.  But he'll tell you that he doesn't believe that we

11   need all of the formal government structure that we have and

12   that things would work a lot better if we had more direct

13   citizen participation.  So it's not quite as dramatic as it

14   sounds.

15             But, again, his world view and his politics are

16   probably different than -- certainly not in the mainstream.  But

17   I think what the hard part will be is well, what does all this

18   have to do with whether or not it's a true threat.  Does any of

19   this tell you whether or not he intended it to be a true threat?

20   And when you see the fliers, and if you read the whole thing,

21   what it says essentially is, look, there is going to be an armed

22   mob, armed racists are going to attack the capitol.  I'm calling

23   out for volunteers to help defend the capitol.  That's what he

24   is asking.

25             Now he does talk about, yes, we'll let them overrun

1    the police and then when they overrun the police we'll encircle

2    them and then drive them down the Parkway.  So that's what it's

3    all about.  And, in fact, even the call to arms has more of this

4    overstatement.  In the call to arms he says, we've recruited

5    armed combat veterans and volunteers to participate.  Well, you

6    know who he had recruited?  His roommate.  It was Daniel Baker

7    and his roommate, that was the group of armed volunteers.  So

8    like so much it's not really what it appears.

9            But your task, again, is going to be to figure out if

10   all of this background information, all this background

11   information tells you these were true threats.  And you're going

12   to find out that there are two parts to this.  One, did Mr.

13   Baker intend to post a true threat or did he believe others

14   would see it as a true threat is part of it.  And, two,

15   objectively was this really a true threat?  Would the reasonable

16   person see this as a true threat?

17           Well, in fact, you're going to see what he's talking

18   about hinges upon a number of things.  One, it hinges upon a

19   group of armed racists showing up at the capitol.  Two, a group

20   of armed racists deciding to attack the capitol.  And, three, a

21   group of armed racists overrunning whatever police were there.

22           You'll see it really hinges upon very unlikely,

23   unlikely events.  And more than that, I think there will be no

24   evidence that such a group even existed.  So, in the end I think

25   you'll see that what we're talking about is are some events

Direct Examination - Special Agent Nicholas Marti

1   unlikely to occur, involving a group that probably doesn't

2   exist.  All in all you'll see it's pretty farfetched.  And

3   that's why it's not a true threat.  And that's why at the end of

4   this case I'll be asking you to bring back a verdict of not

5   guilty.  Thank you.

6          THE COURT:  Thank you, Mr. Murrell.  Mr. Kunz, is the

7   government ready with its first witness?

8          MR. KUNZ:  Yes, Your Honor.  We call Special Agent

9   Nicholas Marti.

10         THE COURT:  Okay.

11         **NICHOLAS MARTI, GOVERNMENT WITNESS, DULY SWORN**

12         THE COURTROOM DEPUTY:  For the record, state your full

13  name and spell your last name.

14         THE WITNESS:  Nicholas Marti, M-a-r-t-i.

15                    DIRECT EXAMINATION

16  BY MR. KUNZ:

17  Q.   Sir, by whom are you employed?

18  A.   The Federal Bureau of Investigation.

19  Q.   Okay.  In what capacity is that?

20  A.   Special agent.

21  Q.   Okay.  And how long have you been with the FBI?

22  A.   Roughly, about a year and a half.

23  Q.   And prior to that, what employment did you have?

24  A.   I worked as a NICO Security Officer.  And I was also

25  employed by the United States Marine Corps.

Direct Examination — Special Agent Nicholas Marti

1    Q.    How long were you in the United States Marine Corps.?

2    A.    About eight years.

3    Q.    Okay.  And what type -- what was your specialty in the

4    Marine Corps, if anything?

5    A.    I was a 1345 combat engineer in the Marine Corps.

6    Q.    Okay.  And through your Marine Corps experience, did you

7    become familiar with weapons and weaponry?

8    A.    That's correct, yes.

9    Q.    Now, let's go back to October of 2020.  Had you become

10   aware of a person by the name of Daniel Baker?

11   A.    Yes.

12   Q.    And, your awareness of him, did that involve social media

13   posts?

14   A.    Yes.  It involved social media posts.

15   Q.    Okay.  I'm going to move forward to January of 2021, and

16   more specifically January 12th of 2021.  Was there a post that

17   you observed made by Mr. Daniel Baker?

18   A.    That's correct, yes.  It was the defendant's Tallahassee

19   post.

20          MR. KUNZ:  Your Honor, I'm going to show to the

21   witness what has been marked as Government's Exhibit 1A and 1B.

22   I would offer those into evidence at this point.

23          THE COURT:  Okay.  Those will be admitted.

24   (GOVERNMENT EXHIBITS 1A AND 1B:  1A and 1B received in

25   evidence.)

Direct Examination – Special Agent Nicholas Marti

1   BY MR. KUNZ:

2   Q.   Can you explain what this document is?

3   A.   Yes.  So it is a public event created on Facebook.  Created

4   by Daniel Alan Baker.  It was created on January 12th in the

5   afternoon.  And it says, defend Tallahassee post.

6   Q.   Okay.  And, maybe you can explain a little bit about what

7   does it mean to do an event on Facebook?

8   A.   So you can create an event.  It would be no different than

9   trying to invite people over for a birthday party.  You can send

10  out invitations and ask to RSVP and so that way you can find out

11  how many people will attend the event.  And so he's created this

12  event.  And, but specifically requests that people not RSVP to

13  this event.

14  Q.   Okay.  And, it indicates the date?

15  A.   That's correct.  The date that it's going to start.  So, it

16  will start on January 17th and it will end on January 24th.

17  Q.   And then below there is a location?

18  A.   Correct.  The location just below, it says Railroad Square

19  Art District, 618 McDonnell Drive.  That's the rally point or

20  the meeting location.

21  Q.   Now, in addition to this post, was there an actual post

22  that provided the details of this event?

23  A.   So the original post, if you go to it and you scroll down,

24  that's where you'll get the details of the post and the

25  specifics of the post itself.

Direct Examination – Special Agent Nicholas Marti

1    Q.    And, I want to show you what's been marked as Government

2    Exhibit 1B.  Do you recognize that?

3    A.    Yes.

4    Q.    Okay.  And, with respect to that, what can you tell the

5    Grand Jury -- when you saw this on Facebook; is that correct?

6    A.    That's correct.  I saw it on Facebook.  It's talking about

7    fighting at the capitol and --

8             MR. MURRELL:  I'm going to object to summarizing what

9    it says.

10            THE COURT:  That's sustained.  You can ask a different

11   question.

12   BY MR. KUNZ:

13   Q.    Did you -- at the time you observed this post --

14   A.    Correct.

15   Q.    -- did you -- were you aware of any planned protest at the

16   capitol, the state capitol in Florida.

17   A.    There were fliers that were sent out.  And they were read

18   specifically.  And it discussed protests that were going to take

19   place at state capitols, an armed protest.  And so that's why we

20   were -- that's what we were aware of at the time, those fliers

21   that were sent out.

22   Q.    And I think we'll get to it in a little bit.  Did Mr. Baker

23   actually have one of those fliers posted?

24   A.    He did.  That's correct.

25   Q.    Now, based on this document that was posted, what did you

Direct Examination – Special Agent Nicholas Marti

1    do?

2    A.   So, based on this document that was posted, obviously we

3    read through the details and tried to make a determination of

4    whether we perceived this to be a true threat or not.

5    Q.   Now, within two-days was there another post by Mr. Baker on

6    Facebook?

7    A.   Yes.  That's correct.  On January 14th.

8    Q.   And, I'm going to show you what's marked as Government's

9    Exhibit 2A and 2B.

10             MR. KUNZ:  Your Honor, I'd offer those into evidence.

11             THE COURT:  Okay.  2A and 2B are admitted.

12        (GOVERNMENT EXHIBITS 2A AND 2B:  2A and 2B received in

13    evidence.)

14    BY MR. KUNZ:

15    Q.   I'm going to show you first Exhibit 2A.  Can you explain to

16    the jury, what is that, sir?

17    A.   This is WTXL Tallahassee, this is their Facebook page.  And

18    this is going to show you at the top here, you'll see an article

19    specific to TPD chief, Chief Lawrence Revell.  And it's just

20    stating here that we'll be fully staffed ahead of potential

21    Inauguration Day threats.  And immediately below that you'll see

22    Daniel Alan Baker's post where he posts his call to arms in

23    response to the article.

24    Q.   And, having seen Mr. Baker, is that photograph there Mr.

25    Baker?

Direct Examination - Special Agent Nicholas Marti

1    A.    Yes.

2    Q.    Do you recognize Mr. Baker in Court?

3    A.    I do.

4    Q.    Where is he seated?

5    A.    He's sitting at the defense table wearing a gray suit.

6    Q.    Okay.  And let me just show you what's been marked 2B.  Is

7    that an enlargement of that call to arms?

8    A.    Yes, that's correct.

9    Q.    Okay.  Did this include language that was similar to his

10   post on January 12th?

11   A.    Yes.  The language is very similar to the details that were

12   posted in the Defend Tallahassee post on the 12th.

13   Q.    Now, special agent, did you have occasion, as a result of

14   this, in terms of conducting an investigation, did you or other

15   agents actually obtain a search warrant with respect to

16   Facebook?

17   A.    Yes, we did.

18   Q.    Okay.  And what did you -- what was the search warrant

19   looking for?

20   A.    The search warrant was looking for, in the return we were

21   looking specifically for any type of details about threats or

22   any details about strategy pertaining to the January 12th defend

23   Tallahassee post as well as the call to arms.

24   Q.    And, did you ask for all of Facebook's records with respect

25   to all of the posts of Mr. Baker for a specific time period?

Direct Examination – Special Agent Nicholas Marti

1  A.   Yes.  So the actual return for Facebook was in the sum of

2  about 25,000 pages, around.

3  Q.   And so, did you start your investigation going through

4  those?

5  A.   Yes.

6  Q.   I think you indicated you received various documents; is

7  that correct?

8  A.   That's correct.

9  Q.   Let me show you what's been marked as Government's Exhibit

10  4A and 4B relating to the Facebook business records.

11        MR. KUNZ:  Your Honor, I'd offer Exhibits 4A an 4B

12  into evidence.

13        THE COURT:  Yes.  4A an 4B will be admitted.

14        (GOVERNMENT EXHIBITS 4A AND 4B:  4A and 4B received in

15  evidence.)

16  BY MR. KUNZ:

17  Q.   This first document is what, sir?

18  A.   A certificate of authenticity.  And these are -- so

19  whenever you send a search warrant out to Facebook they in

20  return, along with the search warrant return, those are all the

21  documents you're going to be looking through, they will serve

22  you also with a certificate of authenticity saying that this has

23  come from Facebook.

24  Q.   And Exhibit 4B, is this a listing of subscriber information

25  with respect to the Facebook account number?

Direct Examination - Special Agent Nicholas Marti

1    A.    So, that's correct.  It's going to go ahead and give the

2    details of the subject's name.  So it will be Daniel Alan Baker.

3    And, you can see that right next to the right of the name.  And

4    then below that it will give details about the email address

5    that's associated with that.  And then at the top, specific to

6    Facebook, there's a user ID.  And you can see that at the top

7    with target account numbers.  So those are the identifiers.

8    Q.    Okay.  And, the post that you talked about in exhibit, the

9    call to arms from January 12th that was posted on January 14th,

10   they were posted on the Facebook account number that's listed

11   right here; is this correct?

12   A.    Correct, yes.

13   Q.    And, I think you indicated this email address was something

14   that you later saw Mr. Baker use too; is that correct?

15   A.    Yes.  It is registered to Mr. Baker.

16   Q.    Okay.  Let me ask you this, Agent Marti.  With respect to

17   the posts that were made by Mr. Baker on January 12th and

18   January 14th, did you determine that they were transmitted in

19   interstate commerce because they were posted by the defendant

20   here in the state of Florida and all the Facebook posts are

21   processed electronically at Facebook data centers which are

22   located outside of the state of Florida?

23   A.    That's correct.  All Facebook data servers -- Facebook does

24   not own any data centers within the state of Florida.  So any

25   time a message is sent it has to go through one of their data

48

Direct Examination - Special Agent Nicholas Marti

1  servers.  And there is none within the state.  It would have had

2  to have crossed state lines and go into Georgia.

3  Q.  Did you also serve -- let me show you another exhibit, 5A

4  and 5B, is this with respect to Instagram, that you recall?

5  A.  Yes.

6          MR. KUNZ:  Your Honor, I offer into evidence

7  Government Exhibit 5A and 5B.

8          THE COURT:  Those will be admitted.

9      (GOVERNMENT EXHIBITS 5A AND 5B:  5A and 5B received in

10  evidence.)

11  BY MR. KUNZ:

12  Q.  What is this first document, 5A?  If you can read, I can

13  follow along.

14  A.  The reason why it says Facebook on there is because

15  Instagram is owned by Facebook now.  So, when the Facebook

16  return comes back from Facebook, Inc. it's going to say

17  Facebook, but it's going to say Instagram Certificate of

18  Authenticity.

19  Q.  And, agents served the search warrant on Instagram for any

20  an all Instagram messages and posts of the defendant; is that

21  correct?

22  A.  Correct.  In excess of 2,000 pages.

23  Q.  Okay.  And, this was produced and a certification from them

24  that they gave you everything they had and that's with respect

25  to the same account number?

Direct Examination - Special Agent Nicholas Marti

1   A.    Correct.

2   Q.    That's 5A.  What about for the Grand Jury for 5B?  Is that

3   the subscriber information?

4   A.    Correct.  So you'll see at the top where it says the target

5   and there's this number, but it's account specific.  And this is

6   something that you're going to see throughout the evidence.

7   Caiprina BJJ 108, that is his Instagram user ID.  And below, if

8   you go down, you'll be able to see his name Daniel Baker as

9   well.

10  Q.    So Mr. Baker was using an Instagram account name of, how do

11  you say that?

12  A.    Caiprina BJJ.  BJJ is what I assume stands for Brazilian

13  Jiu Jitsu.  And, then at the bottom there you'll see the

14  registered email address.

15  Q.    Okay.  And, then down at the very bottom it indicated

16  registration date of this Instagram account was February 11,

17  2020?

18  A.    That's correct.

19  Q.    Did you also investigate to see if Mr. Baker had any

20  YouTube accounts?

21  A.    That's correct.  Yes.  He was the owner of a YouTube

22  account.

23  Q.    And, did -- likewise, did agents obtain a search warrant

24  for Google to produce any and all records relating to Mr.

25  Baker's YouTube account?

Direct Examination - Special Agent Nicholas Marti

1   A.    Yes.  That's correct.

2   Q.    Okay.  And, did you receive a response from Google with

3   respect to that search warrant?

4   A.    We did with multiple videos, along with meta-data and his

5   subscriber information.

6   Q.    I'm going to show you what's marked 6A and 6B.  These are

7   the responsive records from Google in terms of the subscriber

8   information and the authenticity and the actual records you are

9   maintaining and you went through them; is that correct?

10  A.    That's correct.  Yes.

11  Q.    And some of the exhibits today come out of those records

12  that you examined; is that correct?

13  A.    That's correct.

14        MR. KUNZ:  Your Honor, I offer into evidence Exhibit

15  6A and 6B.

16        THE COURT:  Those will be admitted.

17      (GOVERNMENT EXHIBITS 6A AND 6B:  6A and 6B received in

18  evidence.)

19  BY MR. KUNZ:

20  Q.    And, this first was a letter from Google; is that correct?

21  A.    It's a letter from Google with a certificate of

22  authenticity.

23  Q.    Okay.  And, it's addressed to an Agent Lazar, he's with the

24  Florida Department of Law Enforcement?

25  A.    That's correct.  Yes.

51
Direct Examination - Special Agent Nicholas Marti

1   Q.   He was working with the FBI in this matter?

2   A.   In conjunction with, the FBI was working in conjunction

3   with FDLE, Florida Department of Law Enforcement.

4   Q.   And, this is specifically with respect to the YouTube post

5   that Mr. Baker may have posted?

6   A.   That's correct.  And then there you'll see the certificate

7   of authenticity in regard to the documents.

8   Q.   Okay.  And there's attached now a couple of sheets that, it

9   has hash values for production files.  Can you explain what that

10  is, Agent?

11  A.   These are the files pertaining to the actual videos

12  themselves.  So these are the hash values or numbers that

13  generate for the -- like as you can see at the top here, they'll

14  say Google account subscriber information, that specific hash.

15  And below that will follow with videos and that's what they are

16  in that language of code.

17  Q.   Okay.  So, each YouTube that is posted has a hashtag?

18  A.   Correct.

19  Q.   Okay.  And there are about three or four pages on the

20  hashtag; is that correct?

21  A.   Correct.  And then it goes into the Google subscriber

22  information.  And here you'll be able to see Daniel Baker's

23  Google account ID and then his registered email address which is

24  justyoga108@gmail.  But then if you were also to scroll to the

25  bottom you'll be able to see his recovery emails.  So his

Direct Examination - Special Agent Nicholas Marti

1   contact being justyoga108@gmail, but then also

2   blackbeltbud108@gmail.com.  So he's the owner of that account as

3   well.

4   Q.   So he had multiple email accounts linked to the YouTube?

5   A.   That's correct.

6   Q.   And, on top it indicates his name, Daniel Baker; is that

7   correct?

8   A.   That's correct.

9   Q.   During your investigation did you determine if, in fact,

10  Mr. Baker had any military service in the United States?

11  A.   That's correct.  Yes.  Mr. Baker served in the United

12  States Army for a period of time.  Was specifically though --

13  Q.   Let me just interrupt you there one second.

14          MR. KUNZ:  Your Honor, counsel and the government have

15  come to a stipulation of facts concerning that.  May I offer

16  into evidence at this point Government Exhibit Number 3?

17          THE COURT:  Just one moment.  Any issue with that, Mr.

18  Murrell?

19          MR. MURRELL:  No, sir.  It's a stipulation.

20          THE COURT:  You can go ahead.

21          MR. KUNZ:  May I publish that, Judge?

22          THE COURT:  Yes, sir.

23       (GOVERNMENT EXHIBIT 3:  Received in evidence.)

24          MR. KUNZ:  Okay.  This stipulation, may I read this to

25  the jury, Your Honor?

Direct Examination - Special Agent Nicholas Marti

1           THE COURT:  Yes, you may.

2           MR. KUNZ:  Stipulation of facts in the matter of

3    United States versus Daniel Alan Baker.  The government and

4    defendant hereby agree and stipulate that the following facts

5    are true and correct as they pertain to the proof at trial of

6    the former military service of the defendant in the United

7    States Army and offer the following stipulation in the trial of

8    this case.  The parties agree and stipulate that on March 29,

9    2006 defendant entered active duty in the United States Army and

10   his primary specialty was eleven B1P infantryman, and the

11   defendant remained in the Army until November 2, 2007 when the

12   defendant was discharged from the United States Army.  And, its

13   second page of the stipulation, Your Honor, is signed by both

14   Mr. Murrell and myself.

15          THE COURT:  Okay.  And, ladies and gentleman, this is

16   a stipulation and so that is considered evidence.  I mean, you

17   may rely on that stipulation as to the facts that it lays out.

18   You can go ahead with your next question, please.

19          MR. KUNZ:  Thank you, sir.

20   BY MR. KUNZ:

21   Q.   Through your investigation did you determine that Mr. Baker

22   had joined a group known as the YPG that was a military unit

23   operating in Syria?

24   A.   That's correct.

25   Q.   And, did you observe a post of Mr. Baker in a uniform of

Direct Examination - Special Agent Nicholas Marti

1    YPG?

2    A.    Yes.

3    Q.    Okay.  I'm going to show you what's been marked Government

4    Exhibit Number 7.

5              MR. KUNZ:  I offer that in evidence, Your Honor.

6              THE COURT:  Yes.  Exhibit Number 7 will be admitted.

7         (GOVERNMENT EXHIBIT 7:  7 received in evidence.)

8              THE WITNESS:  So this is a photograph of Mr. Baker

9    dated September 16, 2018.  And it appears that he's in a

10   meditation stance with the AK-47, or what appears to be an AK-47

11   military assault rifle in the background.

12   BY MR. KUNZ:

13   Q.    Okay.  Now, this is September of 2018; is that correct?

14   That's when this was posted?

15   A.    Yes.

16   Q.    Did you also locate a post of Mr. Baker wearing his YPG

17   uniform also in possession of an AK-47 type rifle and also some

18   hand grenades?

19   A.    Yes.

20             MR. KUNZ:  We'd offer into evidence, Your Honor, and

21   publish to the jury Government Exhibit Number 8.

22             THE COURT:  Yes.  Government 8 will be admitted.

23        (GOVERNMENT EXHIBIT 8:  8 received in evidence.)

24             THE WITNESS:  So, in this photo, I know it's going to

25   be hard for some of you to see, I apologize.  So this is dated

Direct Examination – Special Agent Nicholas Marti

1    December 22, 2018.  But in this photo Mr. Baker is holding what

2    appears to be a military AK-47 assault rifle.  But in his hands

3    he's holding what appears to be grenades.  There are grenades

4    there.  And it's a little bit lighter photo.  If you can zoom

5    back in a little bit.  And you can see in his hands there that

6    there are grenades in both his hands.

7    BY MR. KUNZ:

8    Q.   This was posted on or about December 22, 2018?

9    A.   Correct.

10   Q.   And, was this also a Facebook post?

11   A.   Yes.

12   Q.   And the actual photographs will be easier to see than what

13   we blew up; is that correct?  You can see --

14   A.   That's correct.  Once they are in your hand you'll be able

15   to see on the bottom near his hands there are grenades in his

16   hand.

17   Q.   Now, did you also locate an Instagram post of Mr. Baker

18   with a number of individuals and with a sign in front of them?

19   A.   Yes.

20   Q.   And, was that posted on or about February 13th of 2020?

21   A.   Yes.

22        MR. KUNZ:  Your Honor, I'd move into evidence

23   Government's Exhibit Number 10.

24        THE COURT:  Yes.  10 will be admitted.

25   (GOVERNMENT EXHIBIT 10:  10 received in evidence.)

Direct Examination – Special Agent Nicholas Marti

1  BY MR. KUNZ:

2  Q.   First of all, is this an Instagram post?

3  A.   This is an Instagram post.  And, again, I know it may be

4  hard to see here, but towards the right of the photo Mr. Baker

5  is kneeling down.  He has his glasses on.  And he's with a group

6  of members of the YPG.

7  Q.   Okay.  And, there's some language with respect to whatever

8  the sign is there; is that correct?

9  A.   Yes.  It's from Rojava.  It says, we resist oppression,

10  never stop fighting, towards the bottom.

11  Q.   Now, was there another page to this post which Mr. Baker

12  indicated that he's on the right side of this formation?

13  A.   Yes.

14  Q.   I'll just show you page two of Exhibit Number 10, sir.

15  A.   And, so immediately at the top where you see text, just

16  below 2020, 02-13 you see, I'm on the right side of this

17  formation.  And he goes into details about where he says that

18  this is my class and squad of comrades who volunteer to fight

19  ISIS with the Kurdish YPG.

20  Q.   And that links to the photograph that he posted?

21  A.   Yes.  That's in reference to his photograph up top.  That's

22  correct.

23  Q.   Okay.  Now, is there another Facebook post that you located

24  of Mr. Baker back in February 2020, namely February 20th, 2020?

25  A.   Yes, sir.

Direct Examination - Special Agent Nicholas Marti

1            MR. KUNZ:  And, Your Honor I'm going to offer in
2   evidence Government Exhibit Number 11.
3            THE COURT:  11 will be admitted.
4       (GOVERNMENT EXHIBIT 11:  11 received in evidence.)
5   BY MR. KUNZ:
6   Q.   Okay.  Now, this is another Facebook post you located; is
7   that correct, of Mr. Baker?
8   A.   Yes.  So, this is Mr. Baker.  And so he appears to be
9   holding a Russian made Dragunov sniper rifle.  And it's kind of
10  hard to see, but there's a firearm that appears to be slung in
11  the back and what appears to be an AK-47 that is slung around
12  his back there.  So it's more towards his back leg on the back
13  there.  And then but, yes, he appears to be holding a Dragunov
14  sniper rifle.  And that is something he's been trained in.
15  Q.   And which person is Mr. Baker in this photograph?
16  A.   So he's going to have the military cover on.  He has
17  glasses.  He has the yellow patch that appears to be in a
18  triangle with the red dot on the side.
19  Q.   And, that type of rifle, you said it's a sniper rifle?
20  A.   That's correct.  It's a long range sniper rifle.
21  Q.   And then in the post he indicated the title of this, good
22  times, showing the friends one of our sniper rifles; is that
23  correct?
24  A.   That's correct.  Yes.
25  Q.   And the date of this post was what's indicated there,

Direct Examination - Special Agent Nicholas Marti

1    February 20th of 2020?

2    A.    2020, 2-20-20, correct.

3    Q.    Okay.  Through your investigation, did you learn that there

4    had been -- Mr. Baker had posted some video known as a VICE news

5    video featuring him?

6    A.    Yes.

7    Q.    And I'm going to show you what's been marked as Exhibit

8    12A.  And there was also -- I think we're going to offer into

9    evidence 12B, which is actually the YouTube video.  You reviewed

10   those before we came to Court, sir?

11   A.    I have.

12        MR. KUNZ:  One second, Your Honor.  Your Honor, I

13   offer into evidence Exhibit 12A.  And then we'll play 12B to the

14   jury after I have shown the witness 12A.

15        THE COURT:  Just one moment.  Can I see the lawyers

16   here at the bar for a moment?

17        (Following conference held at sidebar at 2:33 PM.)

18        THE COURT:  Continue on the process that we've been

19   entering exhibits, we'll go back and revisit everything on a

20   break about the documents.  But the video, as I recall, you had

21   a 403 objection to it.  I have not seen the video.  I don't know

22   if it would call in the same category as everything else.  I'm

23   not sure what's on the video.

24        MR. KUNZ:  It does, it relates to what's on this 12A

25   where he's saying, this is an official VICE news video.  I'm the

59
Direct Examination - Special Agent Nicholas Marti

1    one with the hoody, Aviator Desert Camo, Russian sniper rifle,

2    an AK and also the one with the grenade and the one seen in the

3    middle.

4              THE COURT:  How long is the video?

5              MR. KUNZ:  What we're going to show is about

6    six-minutes, Judge.  And we're going to show the first

7    six-minutes and I'm just going to show a few points where they

8    can see Mr. Baker.  But it's basically with him fighting in

9    combat.

10             MR. MURRELL:  I would argue that it's overkill.  It's

11   just more YPG emphasis.  And --

12             THE COURT:  Yeah, I do feel like to evaluate your

13   objection I would want to see it.  So how long is this witness

14   going to be?

15             MR. KUNZ:  A while, Judge.  Because we have to go

16   through 20, 30 of the exhibits with him.

17             THE COURT:  Maybe the thing to do is if you can -- I

18   don't know how important the sequence is to you, but if we could

19   come back to that I can look at it on the break.  Because if

20   he's going to be there a long time we'll have a midafternoon

21   break at some point.

22             MR. KUNZ:  Yes, sir.  Thank you.

23             THE COURT:  Okay.

24        (Sidebar concluded at 2:35 PM.)

25   BY MR. KUNZ:

60
Direct Examination - Special Agent Nicholas Marti

1  Q.   Agent, we'll come back to that YouTube video.

2        Now, let me ask you, on or about October 2nd of 2020, did

3  you observe a post that the defendant had made on Facebook with

4  respect to the rooftops?

5  A.   Yes.  That's correct.

6        MR. KUNZ:  Your Honor, we'll offer into evidence

7  Government's Exhibit Number 13.

8        THE COURT:  13 will be admitted.

9        (GOVERNMENT EXHIBIT 13 received in evidence.)

10       THE WITNESS:  So about halfway down the page Mr. --

11 BY MR. KUNZ:

12 Q.   If you could just explain a little bit about this.  This is

13 a Facebook --

14 A.   Facebook business record.  And this would have come from

15 the Facebook certified return.

16 Q.   Okay.  And, there is some, you said I think halfway down?

17 A.   About halfway down you can see there October 2, 2020, this

18 is war, are you all willing to take up arms with us yet.  Buy

19 guns and join us this November we are voting from the rooftops.

20 Q.   And the next post by Mr. Baker indicated, I'm American, I

21 can buy firearms at grocery stores so I just did; is that

22 correct?

23 A.   Correct.

24 Q.   And, the date is, as indicated there, October 2, 2020?

25 A.   October 2, 2020.  Correct.  This is war and then I'm

61

Direct Examination – Special Agent Nicholas Marti

1  American.  That was the next day on the third.

2  Q.  Now, Agent Marti, I meant to ask you, on a number of these

3  Facebook posts there's a time listed as UTC.  What does that

4  mean?

5  A.   So, UTC, if I'm not mistaken, I apologize, it's obviously

6  not using standard time.  So that's four-hours ahead of Eastern

7  Standard Time.

8  Q.   Is that like ZULU time?

9  A.   Yes.

10 Q.   That's what it is?  Okay.

11     So this post may say this time, but this actually would

12 have been four-hours earlier on that date; is that correct,

13 according to us here in Tallahassee?

14 A.   Yes.

15 Q.   Now, sir, on October 20th, did you locate another post by

16 Mr. Baker with respect to slaying enemies?

17 A.   Yes.

18         MR. KUNZ:  Your Honor, we offer into evidence

19 Government Exhibit Number 15.

20         THE COURT:  Okay.  15 is admitted.

21     (GOVERNMENT EXHIBIT 15:  15 received in evidence.)

22         THE WITNESS:  So you'll see right there --

23 BY MR. KUNZ:

24 Q.   First of all, this is also from the Facebook record?

25 A.   The Facebook record.  That's correct.

Direct Examination - Special Agent Nicholas Marti

1   Q.   And, then I think you indicated --

2   A.   Just about the top there it says, on October 20, 2020, God

3   I hope the right tries a coup November third because I am so

4   F'ing down to slay enemies again.  And then it goes into a

5   conversation that Mr. Baker is having with Kevin Hodge.

6   Q.   And then down in that group after he's communicating with

7   this Mr. Hodge, there's a -- what that bottom thing?  What you

8   want doesn't matter?

9   A.   Yeah.  So it says, what you want doesn't matter.  The enemy

10  is training and there's evidence that they will move in

11  November.  And he indicates which side are you on.

12  Q.   Sir, did there come a point in time where you observed a

13  photograph that was posted by Mr. Baker on or about

14  November 11th?

15  A.   Yes.

16       MR. KUNZ:  Your Honor, I would offer into evidence

17  Government Exhibit Number 17.

18       THE COURT:  17 will be admitted.

19       (GOVERNMENT EXHIBIT 17:  17 received in evidence.)

20       THE WITNESS:  So what you're seeing here is a still

21  shot of Mr. Baker's YouTube.  And in the photo Mr. Baker is in

22  the blue uniform.  His roommate Eric Champagne is in the white

23  uniform.  And they are practicing Brazilian Jiu Jitsu.  But on

24  the bookshelf, and why this is specific, because this is the

25  inside of their house.  And on that bookshelf, as you can see

1    towards kind of the center of the page there there's something

2    red.  It appears to be a red book.  Well, there's a still shot

3    of a firearm that's leaning up against the bookshelf.  Then of

4    course you can see the long shotgun that's sitting to the right

5    of Mr. Baker against the wall.

6    BY MR. KUNZ:

7    Q.   So the object in front of that red-orange book is a

8    firearm; is that correct?

9    A.   Yes.  That's correct.  It is a firearm.

10   Q.   That's a shotgun then to the right; is that correct?

11   A.   And then a shotgun to the right.  That's correct.

12   Q.   Now, were similar items, firearms seized from Mr. Baker's

13   residence when he was arrested on January 15th?

14   A.   Yes.  A handgun and a shotgun were seized from his

15   residence.

16   Q.   Now, did you locate a Facebook posting by Mr. Baker on or

17   about November 23rd of 2020?

18   A.   Yes.

19         MR. KUNZ:  Your Honor, we offer into evidence

20   Government Exhibit Number 18.

21         THE COURT:  Yes.  Government 18 will be admitted.

22       (GOVERNMENT EXHIBIT 18:  18 received in evidence.)

23   BY MR. KUNZ:

24   Q.   Okay.  Now, overall, this is a portion of the Facebook

25   records; is that correct?

Direct Examination - Special Agent Nicholas Marti

1   A.    Correct.

2   Q.    This relates to November 23rd, 2020?

3   A.    Yes.

4   Q.    And about halfway down, let me just see if we can raise

5   that up a little bit there.

6   A.    Yeah.  About halfway down here, Mr. Baker, on

7   November 23rd, 2020, I'm banned on Facebook, or FB, which stands

8   for Facebook, SI.  Can you share this.  The thing the

9   revolutionary learned from CHAZ-CHOP, one, bring guns, they are

10  going to shoot at us whether we are armed, underarmed or

11  peaceful anyway.

12         Two, strike and hold targets of little value to the enemy.

13  Strike and abandon immediately targets which the enemy will be

14  forced to fight over on TV.

15         Three, federal agents are killing and kidnapping us.

16         Four, the enemy is using helicopters and drones in addition

17  to new advanced cell phone tracking and monitoring technology.

18         Five, we have learned to operate without communicating

19  sensitive details over -- we have to learn to operate without

20  communicating sensitive details over smart phones and radio.  We

21  have to go low tech.

22  Q.    Now, the thing the revolutionary learned from CHAZ-CHOP.

23  What is CHAZ-CHOP?

24  A.    CHAZ-CHOP is an autotomous zone located in Seattle,

25  Washington.

Direct Examination - Special Agent Nicholas Marti

1   Q.   That was done in the summer of 2020?

2   A.   Yes.  Correct.

3   Q.   And, from their Facebook posting it appears that's what

4   he's referencing; is that correct?

5   A.   That appears what he is referencing.  That's correct.  Yes.

6   Q.   Through your continuing investigation did you determine

7   that there was a post by Mr. Baker that included a couple, it

8   looks like sketches or some sort of artwork with a reference to

9   those by him?

10  A.   Yes.

11  Q.   Okay.  And, was that posted on or about December 13 of

12  2020?

13  A.   Yes.  That's correct.

14  Q.   I'm going to show you the first page of this post.

15          MR. KUNZ:  First, I would move it into evidence, Your

16  Honor.  Exhibit Number 19.

17          THE COURT:  19 will be admitted.  Yes, sir.

18          (GOVERNMENT EXHIBIT 19:  19 received in evidence.)

19  BY MR. KUNZ:

20  Q.   Okay.  And, I think there's -- this indicates there is a

21  text down at the bottom; is that correct?

22  A.   Yes.  So on this Instagram record itself there's photos.

23  And then below that, the text indicates that these photos

24  created by Mr. Baker would be more valuable after he's in

25  prison.

Direct Examination – Special Agent Nicholas Marti

1  Q.   Let me show you page two of this post.  That's the other

2  one; is that correct?

3  A.   So then as you can see right there immediately at the top,

4  just below where it says Instagram business record, follows the

5  page before originals.  They are going to be valuable when I'm

6  in prison.  Limited time only LMAO, which is laugh my butt off.

7  Q.   And, going back to the first one, he was offering to sell

8  these; is that correct?

9  A.   That's correct.  Yes.  He was offering to sell these.

10  Q.   Okay.  On Instagram also did you locate a posting on or

11  about December 8, December 18 of 2020 of Mr. Baker with respect

12  to dropping some sort of grenades from the air?

13  A.   That's correct.  Yes.

14       MR. KUNZ:  I'll offer in evidence, Your Honor, Exhibit

15  Number 20.

16       THE COURT:  20 will be admitted.

17       (GOVERNMENT EXHIBIT 20:  20 received in evidence.)

18       THE WITNESS:  So what you see here appear to be two

19  bombs dropping from the sky.  Looking down it would be hitting a

20  target below on land.  And then it follows onto the next page

21  where Mr. Baker references that Jacksonville Nazis are going to

22  be really happy or, I'm sorry, going to be really sad when this

23  happens to their headquarters.

24  BY MR. KUNZ:

25  Q.   Okay.  So, this is the text that goes with that?

1   A.   That's correct.

2   Q.   Is that correct?

3   A.   Yes.

4   Q.   That's on top?

5   A.   Jacksonville Nazis are going to be real sad when this

6   happens to their HQ.

7   Q.   And, this is a posting with respect to Instagram, is that

8   one name, that Caipnhab?

9   A.   Correct.  Caipnhabjj108.

10  Q.   That links to Mr. Baker as well; is that correct?

11  A.   Yes.

12         MR. KUNZ:  Your Honor, could we approach sidebar for a

13  second?

14         THE COURT:  Yes, sir.

15      (Following conference held at sidebar at 2:46 PM.)

16         MR. KUNZ:  I just want you to reserve.  That's why I

17  didn't want to do anything until we talked.

18         THE COURT:  Yes, sir.  Let me -- and the objection was

19  403?

20         MR. MURRELL:  Yes, sir.

21         THE COURT:  Okay.  And so these two go together?  I'm

22  looking at pages --

23         MR. KUNZ:  Actually, the bottom left is not really

24  part it.  It was the next post that he put on Instagram in the

25  sequence there, Judge.

Direct Examination - Special Agent Nicholas Marti

1          THE COURT:  The sequence starts on the second page?

2          MR. MURRELL:  Well, I'll let Mr. Kunz explain.

3          THE COURT:  And the reason I'm asking this, certainly

4    the statement about buying guns and it says relating to --

5          MR. KUNZ:  Right.  That's what we're interested in.

6          THE COURT:  -- stimulus I should say.  And I guess

7    it's in the context of someone else -- this first post here had

8    nothing to do with guns, right, it's a stimulus thing and then

9    he's responding what he's going to do with his stimulus?

10          MR. KUNZ:  Yeah, that's basically what it is, Judge.

11   That was done and then he linked this to write, if you give me

12   2,000 we will just buy more guns.  That's what that --

13          THE COURT:  Okay.  What's the significance of the

14   MOAR, the spelling, if any?  And I guess --

15          MR. MURRELL:  It's like, if it makes any difference

16   it's a mime.  There's some pictures of, and I can show you the

17   mime, but it's just a joke that's on some of these pages that

18   say buy more guns.  It's more of a right wing thing.  If we have

19   more money we'll buy more guns.

20          THE COURT:  Let me ask this, your objection from the

21   pretrial hearing as I recall it has a Speaker Pelosi and you

22   thought it was just sort of injecting other things?

23          MR. MURRELL:  Well, I just think it's -- I mean, it's

24   403 I suppose is how you put it.  Yes, sir.

25          THE COURT:  As to the whole thing.  But I guess what

Direct Examination – Special Agent Nicholas Marti

1    I'm asking, if your objection is to this we can talk about

2    whether just the second page goes in about Q and A, but was that

3    in response to another post about stimulus checks or something

4    like that that achieves what they are going hear and resolves

5    your issue, but I don't know.

6           MR. MURRELL:  I mean, I suppose.  Again, it's not just

7    that it's Nancy Pelosi.

8           THE COURT:  No, I understand that.  There's multiple

9    parts of it.  To the extent it's about purchasing guns the

10   objection would be overruled as to the 403.  Certainly, in terms

11   of undue prejudice, I don't think there is any.  There's lots of

12   evidence about his gun issues.  But I think it fits in the

13   context of all of this.  So it's overruled as to that.  If you

14   want to be heard separately on the Pelosi thing or if it's just

15   the same thing --

16          MR. MURRELL:  If it was up to me I would prefer only

17   the second page come in than one and two.

18          THE COURT:  Okay.  Well, the only purpose of the first

19   I think is to give context to the second.  And so if you are

20   fine with the question and answer about was that in response to

21   a posting about stimulus checks that gets you there I think.

22   Any problem with that?

23          MR. MURRELL:  So the suggestion is he just puts in

24   page two?

25          THE COURT:  Yeah.

Direct Examination – Special Agent Nicholas Marti

1          MR. MURRELL:  Well, sure.  That would solve part of

2   the problem.

3          THE COURT:  Is there any purpose of page one other

4   than the --

5          MR. KUNZ:  This whole thing, the stimulus checks are

6   coming here, we'll get one.  And, then his response --

7          THE COURT:  No, I understand.  But if you ask the

8   agent, was this post, the $2,000 post, in response to an

9   Internet posting about stimulus checks that achieves that

10  without having a political figure on there.  It's not a huge

11  deal.

12         MR. KUNZ:  I'll just lead him then.

13         THE COURT:  Are you fine with that?

14         MR. MURRELL:  Other than what I've stated already.

15         THE COURT:  Right.  So the second page will go in.

16  The first page I'll omit.  And you will just remark on the

17  second page?

18         MR. KUNZ:  Yes, sir.  We'll do that.

19      (Sidebar concluded at 2:50 PM.).

20         THE COURT:  Thank you, ladies and gentlemen.  Sorry

21  for stepping away there.

22         Mr. Kunz, whenever you're ready.

23         MR. KUNZ:  Thank you.

24  BY MR. KUNZ:

25  Q.   Now, was there an Instagram business record that was posted

Direct Examination – Special Agent Nicholas Marti

1    in response to another posting concerning stimulus checks and

2    $600 are coming, who will get one?

3    A.   Yes.

4    Q.   Okay.  And, I'm just going to show you that second page,

5    our Exhibit Number 21.  Right here.  Now, this was on what date,

6    sir?

7    A.   This is going to be December 23, 2020.  And this is

8    referencing the COVID-19 stimulus bills that were being issued

9    to United States citizens.

10   Q.   And the text indicates if you give 2,000 we'll just buy

11   more guns?

12   A.   Correct.  If you give 2,000 we will just buy more guns.

13   That's correct.

14   Q.   Okay.  And the defendant posted this on his Instagram on

15   December 23rd?

16   A.   Yes.  Correct.

17            MR. KUNZ:  One second.

18            THE COURT:  Yes, sir.

19   BY MR. KUNZ:

20   Q.   Now, sir, on or about December 29th was there a post on Mr.

21   Baker's Instagram that he posted something with respect to

22   killing individuals and asking about protests and would this

23   person he was communicating with be willing to assault a cop?

24   A.   Yes.

25            MR. KUNZ:  Your Honor, I offer in evidence Government

Direct Examination – Special Agent Nicholas Marti

1    Exhibit Number 22.

2         THE COURT:  Yes.  22 will be admitted.

3         (GOVERNMENT EXHIBIT 22:  22 received in evidence.)

4    BY MR. KUNZ:

5    Q.   So this exhibit is also from the Instagram of Mr. Baker; is

6    that correct?

7    A.   Yes.

8    Q.   Okay.  And, if we look down to December 29th at 2020 at

9    1432, that's about a third of the way down?

10   A.   Yes.

11   Q.   Can you see that?

12   A.   Yes.

13   Q.   And what does that say there?

14   A.   So on December 29th, I've killed Americans who were Daesh

15   so forgive me for not trusting.  And then below that immediately

16   following, and many American who kill Daesh are also my enemies.

17   I'm aware of free infiltrators.

18   Q.   And then, a little further down at 12-29, 2020, at 1452?

19   A.   Yes.

20   Q.   What did he post then?

21   A.   He says, before we continue I have a few questions.  Would

22   you be willing to assault a cop at a protest.

23   Q.   Now, this posting he's doing here on Instagram, is he

24   communicating with somebody else?

25   A.   Correct.

73
Direct Examination - Special Agent Nicholas Marti

1   Q.   So he's asking various questions; is that correct?

2   A.   That's correct.  Yes.  He's having a conversation.

3   Q.   They were discussing fighting and fighting enemy and

4   everything else; is that correct?

5   A.   That's correct.

6   Q.   Sir, on or about January 18th of '21 did Mr. Baker make

7   another post on Instagram that you located?

8   A.   Yes.

9        MR. KUNZ:  Your Honor, Exhibit Number 23 for the

10  government we offer into evidence.

11       THE COURT:  23 is admitted.  Yes, sir.

12       (GOVERNMENT EXHIBIT 23:  23 received in evidence.)

13  BY MR. KUNZ:

14  Q.   It's another Instagram record; is that correct?

15  A.   Yeah.  So, it's an Instagram record.  And just towards the

16  top there on 01-08, 2021 the, 1807 he says, I'm a killer and my

17  Ninja.  Google -- it says, Google can Baker YPG Sniper.

18  Q.   Let me just get that up larger a little bit.  There you

19  are.  Okay.  That's the one you are talking about January 8,

20  2021?

21  A.   Correct.

22  Q.   And, what's that Google Baker YPG Sniper?

23  A.   It's in reference to a YouTube video that he has posted on

24  his channel.  And it's of him in a military uniform holding a

25  Dragunov sniper rifle while he's overseas in the Middle East.

74

Direct Examination – Special Agent Nicholas Marti

1  Q.   Of what, sir?

2  A.   It's of him holding a Dragunov sniper rifle while he's

3  overseas.

4  Q.   Okay.  Let me show you the second page to Exhibit 23.

5  A.   At the top there he references how many people he's killed.

6  So if you scroll --

7  Q.   Let me do that.

8  A.   So it is an Instagram business record.  And then this is

9  dated for 01-08-2021.  It says, I stopped counting at 16 kills,

10 see you soon.  That's because he's in that conversation back and

11 forth.

12 Q.   And then down a little bit, on January 9, 2021 at 2234,

13 what did he post?

14 A.   In the center there it says, I'm a leftist sniper in the

15 YPG International Battalion.  You F'd up my Ninja.

16 Q.   Was this the continued conversation that he was having with

17 that other fellow?

18 A.   Correct.

19 Q.   On or about January 10 of 2021 on Facebook did Mr. Baker

20 post something with respect to, talking about 22 purchases and

21 what he could do with them, 22?

22 A.   Yes.  In reference to a rifle.  Correct.

23        MR. KUNZ:  Your Honor, we'd offer into evidence

24 Government Exhibit Number 24.

25        THE COURT:  24 is admitted.

Direct Examination - Special Agent Nicholas Marti

1          (GOVERNMENT EXHIBIT 24:  24 received in evidence.)

2          THE WITNESS:  So here, right in the middle there,

3    you're going to see on January 10, 2021, 2013, UTC, Mr. Baker,

4    he has a discussion about a 22 long rifle.  And he says, it's

5    always fun and cheap to practice with a 22 long rifle and it's

6    viewed as a sport or practice rounds but is deadly AF, which

7    means as F.  It's used as a silenced weapon with subsonic rounds

8    and a water bottle.  And he's referencing being able to suppress

9    some of the noise that comes out if you are firing a weapon with

10   a water bottle.

11   BY MR. KUNZ:

12   Q.   Thank you, sir.

13        Now, sir, on or about January 12th, the same day that the

14   post call to arms was posted, did you locate on Facebook another

15   post where Mr. Baker talked about death to America?

16   A.   Yes.

17        MR. KUNZ:  Your Honor, I offer in evidence Government

18   Exhibit Number 25.

19        THE COURT:  Just one moment.  Yes, 25 is admitted.

20        (GOVERNMENT EXHIBIT 25:  25 received in evidence.)

21   BY MR. KUNZ:

22   Q.   And this was another Facebook post; is that correct?

23   A.   Yes.  That's correct.

24   Q.   And then so --

25   A.   So right there down towards the bottom of the page there.

Direct Examination – Special Agent Nicholas Marti

1    So on the same day the defend Tallahassee post was created, that

2    public event.  This is where he says, wholly F'ing S my ban is

3    over.  And he's referencing that his Facebook ban, he's been

4    allowed to reactivate his account.  Y'all, so much has happened.

5    Death to America, of course, F the president, current and elect.

6    Q.    Okay.  And then a little further down did he indicate that

7    Florida racist plan to attack Tallahassee?

8    A.    Yes.  And then on the same day, Florida racist plan to

9    attack Tallahassee, Florida.

10   Q.    Now, did you locate on Instagram a post that Mr. Baker had

11   posted on or about December 27th of 2020 concerning the

12   Inauguration date January 20th, 2021?

13   A.    Yes.

14        MR. KUNZ:  Your Honor, we would offer in evidence

15   Government Exhibit Number 26.

16        THE COURT:  26 is admitted.

17   (GOVERNMENT EXHIBIT 26:  26 received in evidence.)

18        THE WITNESS:  So once it's zoomed out you'll be able

19   to see towards the bottom of the photo there it's referencing

20   January 20.  And it's Homer Simpson with an AK-47 at the top of

21   a house with everything else burning around it.  And that's just

22   in reference to Inauguration Day and what he expected would be

23   happening.

24   BY MR. KUNZ:

25   Q.    So that object, I think the actual photo may be clearer

Direct Examination – Special Agent Nicholas Marti

1   than this, but that's what you said, there's a firearm?

2   A.   There is a firearm that Homer Simpson is holding while he's

3   at the top of the building.  Correct.

4   Q.   And everything around there is burning; is that right?

5   A.   Everything around is burning.

6   Q.   I think you mentioned earlier that there had been some

7   posts out there with respect to armed march on, not on Capitol

8   Hill in D C, but also state capitols; is that correct?

9   A.   That's correct.  All state capitols across the U.S.

10  Q.   Now, looking at the Instagram records of Mr. Baker, did you

11  likewise find that document you are talking about?

12  A.   Yep.

13       MR. KUNZ:  Your Honor, I would offer into evidence

14  Government Exhibit Number 27.

15       THE COURT:  27 is admitted.

16       (GOVERNMENT EXHIBIT 27:  27 received in evidence.)

17       THE WITNESS:  So I just want to reiterate, this is not

18  a flier --

19       THE COURT:  Just wait for a question, if you would,

20  please.

21       THE WITNESS:  Yes, sir.

22  BY MR. KUNZ:

23  Q.   Okay, sir.  Now, this is a portion of it; is that correct?

24  A.   That's correct.

25  Q.   And this was posted on or about January 14th?

Direct Examination - Special Agent Nicholas Marti

1    A.    Yes.  That's correct.

2    Q.    That's the same day of the second post in response to the

3    WTLV article?

4    A.    Correct.

5    Q.    Or their post?

6    A.    Correct.

7    Q.    And this is what you were indicating earlier about the

8    march on the state capitols; is that correct?

9    A.    Yes.

10   Q.    Now, let me ask this question with respect to this

11   Instagram.  Was this being sent to somebody or was it just

12   posted?

13   A.    So he posted it.  And this is not a post that he created.

14   It's a post that was circulating throughout the country at the

15   time.  And this was disseminated to the local law enforcement

16   because in reference to what had happened at the capitol and

17   that this was circulating for all 50 state capitols to be on

18   alert and be prepared.

19   Q.    Well, my question though, was he sending this to somebody

20   or was he just posting it?

21   A.    He reposted it.  That's correct.

22   Q.    Now, through the Facebook records did you locate some

23   communications between Mr. Baker the defendant and a lady known

24   as Lyra Lorelei on the Facebook that discussed him getting an

25   AK-47?

Direct Examination – Special Agent Nicholas Marti

1    A.    Yes.

2            MR. KUNZ:  Your Honor, we would offer into evidence

3    Government Exhibit Number 28.

4            THE COURT:  Yes.  28 will be admitted.

5        (GOVERNMENT EXHIBIT 28:  28 received in evidence.)

6    BY MR. KUNZ:

7    Q.    This was Facebook also, sir?

8    A.    That's correct.

9    Q.    And maybe you can explain Lyra Lorelei.  This communication

10   picks up right here, right?

11   A.    Correct.

12   Q.    Okay.  At the top it's talking about my dad owns what,

13   one-third of them?

14   A.    Yes.

15   Q.    And a little further down, about a third of the way down,

16   what did Mr. Baker ask her?

17   A.    So he asks Lyra Lorelei, does he want to sell an AK or a

18   pistol.  He's asking to purchase a firearm.

19   Q.    And his next text or next posting is what?

20   A.    I could use a few more, like one or two.

21   Q.    And what did she indicate?

22   A.    Oh, so oh, he's's hoarding and laugh out loud not likely.

23   Q.    Okay.

24   A.    But she references that she's going to ask her father.

25   Q.    Okay.  And, this was posted on the same day of the second

Direct Examination – Special Agent Nicholas Marti

1  post, call to arms threat; is that correct?

2  A.   Correct, on social media.

3         THE COURT:  Mr. Kunz, before you go on, let me ask,

4  ladies and gentlemen of the jury if you need a break now?  I

5  thought maybe we'd go until 3:30, is that fine or is anybody

6  itching for a break?  Okay.  We'll keep going then.  Mr. Kunz?

7  BY MR. KUNZ:

8  Q.   Let me move ahead just for a second.  On January 15th of

9  2021, this year, was Mr. Baker arrested by you and other members

10 of the FBI?

11 A.   Yes.  That's correct.  He was.

12 Q.   Had you obtained an arrest warrant from the Court to arrest

13 him?

14 A.   Yes.  That's correct.

15 Q.   And, approximately what time of day was he arrested?

16 A.   In the morning.  Around 8 a.m.

17 Q.   And did there come a point in time that a cellphone was

18 seized from him, his cellphone?

19 A.   Yes.  That's correct.

20 Q.   Let me show you that.  Exhibit 31 is a photograph of the

21 phone.  I'm going to offer that into evidence.

22         THE COURT:  Okay.

23         MR. KUNZ:  31L.

24         THE COURT:  That will be admitted.

25    (GOVERNMENT EXHIBIT 31:  31L received in evidence.)

Direct Examination - Special Agent Nicholas Marti

1   BY MR. KUNZ:

2   Q.   I want to show you this picture of a cellphone.  Is this

3   the cellphone that, when Mr. Baker was arrested he had that in

4   his possession?

5   A.   Yes.  That is correct.

6   Q.   It's a Galaxy cellphone?

7   A.   Samsung Galaxy S Plus.

8   Q.   Okay.  Now, did you apply for a search warrant to search

9   the contents of this phone?

10  A.   Yes.  That's correct.

11  Q.   Okay.  And, was the warrant granted by the Court?

12  A.   Yes.

13  Q.   Okay.  And you executed the search warrant on the carrier;

14  is that correct?

15  A.   Correct.

16  Q.   And then you obtained the contents of the phone?

17  A.   And obtained the contents of the phone.

18  Q.   Okay.  Can you explain in terms of how did you obtain the

19  contents?  What was done to get the contents of this phone?

20  A.   So there's a program that we use in the FBI.  It's called

21  Cellebrite Reader.  And what that does is give us the ability to

22  download all of the information, content that's on the phone and

23  to put that onto an application that we can read messages,

24  emails, downloads and content.  And so we utilize that

25  Cellebrite Reader to download all the information so we can

82

Direct Examination – Special Agent Nicholas Marti

1    conduct an investigation on his phone and dig into more

2    information.

3    Q.    Now, was that process done with respect to Mr. Baker's

4    phone?

5    A.    Yes.

6    Q.    And, did you learn that there was some texts relevant to

7    your investigation contained in the cell phone of Mr. Baker?

8    A.    Yes.  Yes, sir.

9    Q.    And, did you have some of those texts printed out?

10   A.    Yes.  Yes, sir.

11            MR. KUNZ:  Your Honor, we offer into evidence

12   Government Exhibit Number 34, which is a group of these texts.

13            THE COURT:  Just one moment.

14            MR. KUNZ:  I'm sorry, Judge.  It should be 30.  I

15   apologize.

16            THE COURT:  All right.  Okay.  30 will be admitted.

17       (GOVERNMENT EXHIBIT 30:  30 received in evidence.)

18   BY MR. KUNZ:

19   Q.    Let me start with the rear because I think that's an

20   earlier day.

21   A.    Yes.

22   Q.    And, does this go from the bottom to the top?

23   A.    Top down, sir.

24   Q.    So 1-4-21 at 2:17?

25   A.    Yes.

1   Q.   And 1-9 is on top.  So if I want -- is that what it goes

2   from?

3   A.   Yes.  Correct.

4            THE COURT:  That was part of 30 that you had up there?

5            MR. KUNZ:  Yes, sir.  Part of 30.  Yes, sir.

6   BY MR. KUNZ:

7   Q.   So on January 9th, this is a series of texts between --

8   could you identify Mr. Baker and somebody else?

9   A.   So the left there you can see it says, to.  And it says,

10  Jack.  And then it provides their cell phone number.  And then

11  the body is going to be the content of the message that was sent

12  outgoing.

13  Q.   Okay.  Now, that first text indicates what?

14  A.   So he's just speaking in reference to -- he says, our

15  place, comrade, the community paid for the space and it is for

16  revolutionaries to rest and train and laugh out loud.  I'm sure

17  that's fine.  And so he's just saying that basically the

18  community pays for his housing and that's a place for

19  revolutionary members of his following to stay.

20  Q.   Now, the next one January 9, a little bit later, what did

21  Mr. Baker text?

22  A.   This is going to be another outgoing message to Jack.  And

23  so it says, we all have 10-days to buy firearms before certain

24  death comes to our door.  The world's largest security companies

25  like G4S tried to warn people about January 6th and now they are

1    screaming about an attack on Inauguration Day.  I wonder if the

2    Signal friends still think I'm crazy.

3    Q.    Now, are you familiar with the term, signal?

4    A.    Yes.

5    Q.    What is that?  Explain to the jury.

6    A.    Signal is a peer-to-peer encrypted application.  What it

7    does is it provides people the opportunity or the ability to

8    speak without -- within an encrypted app so no one can enter

9    that application without knowing that code, specific to the

10   application.

11       So if you were to have a conversation with somebody else

12   you guys could -- the two parties could speak freely on an

13   encrypted app and no one would be able to retrieve the contents

14   of that message whatsoever.

15       Now, this can be in reference to one peer to another peer

16   or one person to a group of people.  Now, if I were to go to

17   Signal itself, the company, and say I want a subpoena for all of

18   the documents and messages that are from this one individual

19   they would not be able to provide me with messages from that

20   individual whatsoever.  And getting into an encrypted app is

21   extremely difficult.

22   Q.    Now, with respect to the examination of Mr. Baker's cell

23   phone, did you determine that at one time he had Signal?

24   A.    At one point Mr. Baker had the application Signal on his

25   phone, but he deleted it at some point.

Direct Examination – Special Agent Nicholas Marti

1  Q.   The next text up top indicates what?

2  A.   So on 1-9-2021, and once again, this is going to be to

3  Jack, same individual it's been for the past two messages.

4  Steel your nerves, buy a gun, train a few more days and then

5  rest on the 9th.

6  Q.   Then in that sequence of texts was there a continuing text

7  on the 14th of 2021?

8  A.   Correct.  And, once again, this is going to be the same

9  individual, Jack.  So this is going to be the day before his

10 arrest here on 1-14.  We can radicalize liberals outside of the

11 space we teach strangleholds in.  And he continues same day,

12 listen, I'm not very optimistic about surviving the weekend.  I

13 hope y'all understand the gravity of this moment.  Continues on,

14 or we might stay and invite a fight in a space we know and can

15 set up an ambush.

16 Q.   And then continuing, the text on the 14th?

17 A.   The 14th.  Also the plan is the encirclement strategy.  We

18 need friends to advance from Railroad Square to Cascades and

19 also down Tennessee Street to create the horns of a dilemma

20 around the capitol.  Then the vehicles will close the circle on

21 Monroe.  He's talking about a detailed strategy here.

22 Q.   That's with respect to the state capitol?

23 A.   Yes.  Correct.

24 Q.   And that's consistent with the call to arms that he talked

25 about?

Direct Examination - Special Agent Nicholas Marti

1              MR. MURRELL:  I'm going to object to an explanation as

2    to -- we've done this a couple of times now.  As to what he's

3    saying, whether it's in code or something I would guess that's

4    not proper.

5              THE COURT:  Will you repeat that last question?

6              MR. MURRELL:  I think we have past that point, we've

7    done it a couple of times.

8              THE COURT:  So you're objecting to the pending

9    question?

10             MR. MURRELL:  There is no pending question.

11             THE COURT:  I'm sorry?

12             MR. MURRELL:  There is no pending question.

13   BY MR. KUNZ:

14   Q.   On January 14, 2021 what was the post that Mr. Baker or,

15   I'm sorry, the text that he sent?

16   A.   Whatever people decide to do is on them alone.  If someone

17   joins the protest and gets killed by Nazis that is only the

18   Nazis' fault.  Blame the enemy, not yourself or each other.

19   Q.   And, the last text on January 14th?

20   A.   I'm encouraging people to either stay in bed and live or

21   come fight if they are not afraid to die at the hands of the

22   enemy.

23             MR. KUNZ:  One moment, Your Honor?

24             THE COURT:  Yes, sir.

25

Direct Examination – Special Agent Nicholas Marti

1   BY MR. KUNZ:

2   Q.   Sir, I think you indicated that Mr. Baker was arrested at

3   his residence.  What was his residence?

4   A.   1516 High Road, Apartment C2, Tallahassee, Florida.

5   Q.   And once he was placed under arrest did you actually

6   transport him somewhere?

7   A.   That's correct.

8   Q.   Were you with anyone else?

9   A.   Special Agent McNair of the FBI.

10  Q.   And did you attempt to interview Mr. Baker at that time?

11  A.   No.

12  Q.   And so you just were transporting him to where?

13  A.   To the FBI Tallahassee office for questioning.

14  Q.   Now, during the transport did Mr. Baker make any -- did he

15  volunteer any statements to you?

16  A.   Yes, he did.  He, he voluntarily stated that he -- once he

17  arrived at prison that he would attempt to radicalize people who

18  are in prison.  And that he created the posts on social media to

19  scare, with the intent to scare people because he was afraid

20  that Neo-Nazis were coming after him.  And that he had a large

21  following and that this large following would be looking for

22  him.

23          MR. KUNZ:  Your Honor, can we approach the bar one

24  second?

25          THE COURT:  Yes, sir.

Direct Examination - Special Agent Nicholas Marti

1          (Following conference held at sidebar at 3:19 PM.)

2          MR. KUNZ:  May be a good time to break.  We have

3     actually 3 videos we want to show.  One is very brief showing

4     him printing these call to arms things.  The second one is the

5     one that Mr. Murrell referenced in his opening about him firing

6     a machine gun.  And the third one would be the one that you

7     wanted to see.

8          THE COURT:  I'll watch all of them on the break then.

9     And then once we come back how much further in direct would you

10    anticipate?

11         MR. KUNZ:  After I finish these with him I think I'll

12    actually be done.

13         THE COURT:  Okay.  So 10 more minutes.  And then the

14    best guess as to cross?

15         MR. MURRELL:  At this point I don't think I have any,

16    but I might -- at best it would be a question or two.

17         THE COURT:  And then you've got another witness after

18    that?

19         MR. KUNZ:  Yes, sir.

20         THE COURT:  Okay.

21         (Side bar concluded.)

22         Ladies and gentlemen, we are going to take our

23    afternoon break now.  So gather up your things and you can go in

24    the jury room.  And we'll come back in roughly 20-minutes, if

25    that's enough time for you.  Again, leave your pads in your

1    chairs, please.  No one will disturb them and look at them here.

2    And don't talk about the case.  And also you've heard some

3    evidence but not all of the evidence so don't form any

4    preliminary opinions or anything like that.  And we will look

5    forward to seeing you back in about 20-minutes or so.

6        (Jury out at 3:20.)

7        THE COURT:  Please have a seat.  Do any of the lawyers

8    or Mr. Baker need a quick break before we talk about what we are

9    going to talk about when the jury is out or is everybody ready

10   to keep going?

11       Before we look at the videos I want to go back through

12   the exhibits that have been admitted and consistent with the

13   process that we talked about earlier to make sure we're all on

14   the same page.  Does everyone have their list in front of them?

15       Okay.  So 1A and 1B and 2B were admitted.  Those were

16   the posts.  And there was no objection to those the other day.

17   So those are in without objection; is that right, Mr. Murrell?

18       MR. MURRELL:  I'm just flipping through.

19       THE COURT:  Yes, sir.

20       MR. MURRELL:  Yes, sir.  No objection to those.

21       THE COURT:  Okay.  Same thing with 4A and 4B, 5A, 5B,

22   6A, 6B, those are the social media certificate of business

23   records and so forth for Instagram, Facebook and YouTube.  Those

24   are in without objection, correct?

25       MR. MURRELL:  That's correct.

1          THE COURT:  Okay.  Government 7 was the picture of the

2    defendant posted on September 18th, him in the sort of mediation

3    pose.  There was a 401 and 403 objection that I addressed at the

4    hearing the other day.  Those were overruled.  The Exhibit 3,

5    the stipulation I should say, went in without objection.

6    Government's 8 is the photo of him holding grenades and an

7    assault rifle would be behind him, but that was subject to a 403

8    objection from the other day which was overruled.

9          Government 10 is the group photo, the people that you

10   mentioned in the opening, Mr. Murrell, some face covering and so

11   forth.  That's Government's 10.  That was a 403 objection that

12   was overruled.  Have I missed anything so far?

13         MR. MURRELL:  No.

14         THE COURT:  11 is the Facebook post where he appears

15   to be holding a sniper rifle.  That was subject to a 403

16   objection that was overruled.  12A and 12B not in yet.  We're

17   going to address that in a little bit.  That's the video.  And

18   it's a page authenticating the video.

19         13 is the voting from the rooftops Facebook post that

20   was subject to a 403 objection that was overruled.  15 is the, I

21   hope the right tries a coup November 3rd, et cetera.  A Facebook

22   post that was subject to a 403 objection that was overruled the

23   other day.

24         17 that's a photo in front of the bookcase doing Jiu

25   Jitsu.  The objection was that it was cumulative.  That was

1    overruled, that's 17, the other day.  18 was the Facebook post

2    mentioning CHAZ-CHOP and what was learned from that.  That was

3    subject to a 403 and 404(b) objection.  That 403 was overruled

4    the other day.  And the 404 was -- I deemed it not 404 evidence,

5    but alternatively, that it would be allowed.

6           19 is the artwork of the younger looking character.

7    That was entered without objection; is that right, Mr. Murrell?

8           MR. MURRELL:  I guess I did say there at the end I

9    didn't object to that.

10          THE COURT:  So 19 is in without objection.  20 is the

11   bombs falling on the Nazis in Jacksonville reference that was

12   subject to a 401 and 403 objection.  It was overruled.

13   Government 21 was subject to a 403 objection.  Only the second

14   page went in.  That 403 objection was overruled as to it and

15   that second page will be renumbered.

16          Government's 22, the text about willingness to assault

17   a police officer and so forth.  That was subject to 401, 403 and

18   404(b) objections.  And those were addressed and overruled at

19   the hearing the other day.

20          23 was subject to a 403 and 404(b) objection that was

21   overruled.  That's the Google Baker YPG Sniper post.

22          Anything missed to this point, Mr. Murrell,

23   objections?

24          MR. MURRELL:  No, sir.  Again, to the extent anybody

25   thinks this is intertwined evidence I object to that on that

1    basis as well.

2              THE COURT:  On the 23?

3              MR. MURRELL:  Well, for all of these exhibits.  It

4    seems to me the government's position was they come in either

5    because they are inextricably intertwined or because it's 404.

6    And I just want to make it clear I object to either theory.

7              THE COURT:  I think some them you were just on 403 the

8    other day.  But to the extent that any of these we talked about,

9    the ruling would be that as the 404(b) I do think that because

10   the context matters of all of these that it is inextricably

11   intertwined and not subject to 404, but alternatively, if

12   404)(b) were at issue it would come in as evidence of intent.

13             You know, I think I explained that in more detail the

14   other day.  But that's the ruling as to the argument you just

15   made.  And I just addressed 22 I think.  23 is the, I'm a killer

16   my ninja post.  403 and 404(b) on that one.  That was overruled.

17   404, excuse me.  Government's 24 there was no objection.  That's

18   the text about the 22 practice; is that right?

19             MR. MURRELL:  No, I objected to that.

20             THE COURT:  You objected to 24?

21             MR. MURRELL:  24 was the business about the silencer

22   and the 22?  Yes.

23             THE COURT:  What was the objection?

24             MR. MURRELL:  Well, 404 and 403.

25             THE COURT:  Okay.  That would be the same ruling on

1    that then.  That's overruled.

2          25 about the ban being over.  The only objection I

3    have noted here was 401.  Was there a 403 on that one as well?

4          MR. MURRELL:  25 about death to America.  Yes, sir.

5    Irrelevant.  Relevancy is outweighed by --

6          THE COURT:  Okay.  401 and 403 are overruled there.  I

7    do think it's relevant for context.

8          26, that's the Homer Simpson.  That was a 401, 403 and

9    404(b).  That was addressed the other day and overruled.

10         27, that's the refuse to be silenced armed march

11   poster.  There was no objection to that, is my understanding?

12         MR. MURRELL:  That's correct.

13         THE COURT:  That's in without objection.  28, that's

14   the direct messages with Ms. Lyra Lorelei about purchasing a gun

15   that her father owned.  Was there an objection to that one?

16         MR. MURRELL:  No, sir.

17         THE COURT:  Okay.  And then the last two I have here

18   31L, the photo of the phone, came in, I believe that was without

19   objection; is that right?

20         MR. MURRELL:  Yes, sir.

21         THE COURT:  And then just as we are going through

22   this, as to the rest of 31, was the photos of everything from

23   the search warrant, my understanding is your only objection was

24   as to the one photo that's been a little bit redacted now that

25   had the book on it; is that right?

1          MR. MURRELL:  Yes, sir.

2          THE COURT:  And that objection is 403?

3          MR. MURRELL:  Yes, sir.

4          THE COURT:  That one is overruled.  I think it's

5     relevant because it matches up the gun from the other photo.

6     And I don't find that there is any undue prejudice, much less

7     anything that would substantially outweigh the probative value.

8     So that one is overruled.  And then there's no other objections

9     to the photos that comprise 31?

10          MR. MURRELL:  That's correct.

11          THE COURT:  And then 30, the text messages that have

12     come in, there's no objection to any of those; is that right?

13          MR. MURRELL:  No objection.

14          THE COURT:  Okay.  Have I missed any exhibits?  Okay.

15     All right.  Then let's take a look at the videos.  There's three

16     you said, Mr. Kunz?

17          MR. KUNZ:  Yes, sir.  12B, 16 and 29.

18          THE COURT:  We'll look at them in any order you see

19     fit.  Is this disclaimer part of the video that was posted or is

20     that something that you all added?  The disclaimer that was just

21     up there, is that part of the video that was posted or is that

22     something you all added?

23          MR. FIELDS:  Yes, Your Honor.

24          THE COURT:  Okay.

25          Video shown for Court.

95

```
1         MR. FIELDS:  Judge, there should be some audio here,
2   but I'm not sure that we're hearing it much.
3         MR. MURRELL:  The audio has been a real problem.
4         MR. KUNZ:  There should be much more sound there,
5   Judge.  We tested it yesterday, Judge.  And it worked.
6         THE COURT:  Where is the sound coming from -- is there
7   sound coming out of your laptop as well, Mr. Fields?
8         MR. FIELDS:  No.
9         THE COURT:  You may have an option to do that and then
10  you can just put the microphone up to your -- I think the
11  change, Mr. Fields, may have piped it right out of his laptop in
12  which case you could just put that microphone at the lecturn up
13  to that.
14         I can hear that.
15         (Video resumed.)
16         That's where you would stop it?
17         MR. KUNZ:  Yes, sir.  And Mr. Baker is throughout
18  this, Judge, that's why --
19         THE COURT:  Well, maybe I overlooked it, but about the
20  second half, so it's paused right now at 629 out of 928.  We saw
21  from almost the beginning to 629.  It looked to me, maybe I
22  missed it, but that he was only in the last couple of minutes.
23  Is that --
24         MR. KUNZ:  No, sir.  He's with the sniper rifle.  And
25  he mentions in there he's hit two people.  We were planning on
```

1  playing from 39 to 42.  246 to 302 he talks about -- his voice

2  is recognizable where he's indicating that.  He was the one who

3  was talking about, you know, that Korean who may be dead.

4          THE COURT:  Right.  So, you are seeking to admit the

5  whole thing or you are seeking to admit parts of it?

6          MR. KUNZ:  Well, we want to put the six-minutes in,

7  Judge.  And we can go and show specifically to the jury these

8  portions that directly involve Mr. Baker.

9          THE COURT:  Okay.  But in terms of what you would have

10 go back with the jury would be the full 9-minutes or just the

11 six-minutes?

12         MR. KUNZ:  No.  Six-minutes, Judge.  Six-minutes and

13 30-seconds.

14         THE COURT:  All right.  And, this is something that he

15 posted himself?

16         MR. KUNZ:  Yes, Judge.  With the exhibit 12B he sent

17 this to somebody.  If you look at Exhibit 12A, rather, this is

18 the official VICE news video.  I'm one with the hoody, aviators,

19 desert camo, the Russian sniper rifle, an AK and also the one

20 with the grenades and the one seen in the middle.  And that's

21 the one dark spot that he was holding grenades.

22         THE COURT:  And this is a private message or post on

23 the public, on his main page?

24         MR. KUNZ:  Yes, sir.

25         THE COURT:  Which?

```
1                MR. KUNZ:  I'm sorry?

2                THE COURT:  Is it a peer-to-peer message or something

3      he posted on his own page?

4                MR. KUNZ:  It's posted on his Facebook page.

5                THE COURT:  All right.  And so the objections, Mr.

6      Murrell, are what?

7                MR. MURRELL:  Well, I don't actually have any

8      objection.  If they are going to play all six-minutes that's

9      fine.

10                THE COURT:  Okay.  Well, then, that will be admitted

11      without objection.

12           (GOVERNMENT EXHIBIT 12B:  12A received in evidence.)

13                THE COURT:  In terms of what will be back at the jury

14      room at the conclusion of all of this you would just cut off,

15      delete everything after the 629 mark?

16                MR. KUNZ:  Yes, sir.  If you give us that permission,

17      Judge, we'll make sure we cut tonight the remainder of the

18      video.  We only have from 00 to 630.

19                THE COURT:  Okay.  But you're not seeking to admit any

20      more than the 6 and a half minutes?

21                MR. KUNZ:  No, sir.

22                THE COURT:  All right.  Well, that resolves that.  So

23      that one will be admitted.  What are the other two?

24                MR. KUNZ:  The other one is number 16, the video of

25      him shooting.
```

 1                THE COURT:  Before you do that, Mr. Johanssen is here,

 2    our IT guru.  Mr. Johanssen, we're having a little trouble with

 3    the audio there.  And maybe you can help us with that before the

 4    jury comes back in.  While they are looking at that, what was

 5    the next video?

 6                MR. KUNZ:  It's him printing the call to arms sheets,

 7    Judge.  It's very short.

 8                THE COURT:  Is there an objection to this one, Mr.

 9    Murrell?

10                MR. MURRELL:  No, sir.

11                THE COURT:  I'll take a look nonetheless, if it's

12    ready.  That was -- which number was that, Mr. Kunz?

13                MR. KUNZ:  Judge, that was, I'm sorry, that's Exhibit

14    16.

15                THE COURT:  16.  Okay.  16 will be admitted without

16    objection.

17            (GOVERNMENT EXHIBIT 16:  16 received in evidence.)

18                THE COURT:  And then the third video?

19                MR. KUNZ:  Is the one he did not object to, the

20    printing of the call to arms sheet.

21                THE COURT:  I'm sorry.  So we watched them out of

22    order.  I asked you, Mr. Murrell, if you objected to the print

23    of the call to arm sheets.

24                MR. MURRELL:  No, sir.  I don't object to that.

25                THE COURT:  And then the video we just saw of him in

1    the shooting range, you don't object to that?

2              MR. MURRELL:  No.  I think it's irrelevant and 404,

3    403.

4              THE COURT:  You think it's irrelevant?

5              MR. MURRELL:  I think it's irrelevant and so 404 and

6    403.

7              THE COURT:  So you do object to that one?

8              MR. MURRELL:  To the machine gun, yes.  Not to the

9    printing of the fliers.

10             THE COURT:  The machine gun, those objections will be

11   overruled.  I do think it's relevant to the subjective intent,

12   the ability to carry this out or the subjective intent.  And it

13   was also posted.  So it goes to the context for the objective

14   side of things as well.  So I think it is relevant.  I think 404

15   is not an issue.  And if it is, I think that it is relevant

16   under 404 to show intent.  So that's overruled.  And that was,

17   which one was the machine gun one, was that 12?

18             MR. KUNZ:  16, sir.

19             THE COURT:  16.  And then 12 is the printing?

20             MR. KUNZ:  12B, I'm sorry, no, sir.  29 is the

21   printing.

22             THE COURT:  Okay.  And there is no objection to that.

23   And then 12B is the --

24             MR. KUNZ:  The combat.

25             THE COURT:  6 and a half minutes.  And that's in

1  without objection or will be.  I would still like you to move

2  those in, in front of the jury and they'll come in that way.

3           I don't know that we talked about all of the photos

4  from the search warrant.  Or is that 30?  Is 30 all of the

5  photos from the search warrant?

6           MR. KUNZ:  Yes, sir.

7           THE COURT:  And there's no others?

8           MR. KUNZ:  No, sir.

9           THE COURT:  And you don't object to any of those other

10  than the bookcase we've already addressed?

11           MR. MURRELL:  Other than the one about the bookcase.

12  Yes, sir.

13           MR. KUNZ:  I'm sorry.  Our photos of the AK, the

14  firearm, the Mauser firearm that he purchased.  And we have

15  that.  So that's 35.

16           THE COURT:  That's like two pictures of it in a

17  shipping container?

18           MR. KUNZ:  Yes, sir.  Three pictures with the purchase

19  order, with the box open.  Yes, sir.

20           THE COURT:  Okay.  Any objection it to that one, Mr.

21  Murrell?

22           MR. MURRELL:  I'm sorry, to which one?

23           THE COURT:  It's 35.

24           MR. KUNZ:  A through C, sir.

25           THE COURT:  35A through C.

1          MR. MURRELL:  No objection to any of those.

2          THE COURT:  Okay.  And, then is 34 going to be through

3    this witness?

4          MR. KUNZ:  No, sir.  We're going to have another

5    witness bring that in.

6          THE COURT:  All right.  Any other exhibits coming in

7    through this witness that we have not talked about?

8          MR. KUNZ:  Just these three videos would be the end of

9    this, Judge, for this witness.

10         THE COURT:  Okay.  All right.  Well, why don't we take

11   a short break for ourselves and then come back and bring the

12   jury back.  Is five minutes plenty of time for you all?  Okay.

13      (Recess taken 3:45.)

14      (Resumed at 3:55.)

15         THE COURT:  Please have a seat.

16         Is everybody ready?

17      MR. KUNZ:  Yes, sir.

18      MR. MURRELL:  Yes, sir.

19         THE COURT:  Before we bring the jury back in, we don't

20   have too much longer here and you probably don't have too much

21   cross, how long is the next witness, would you anticipate?

22         MR. KUNZ:  Only 15 to 20-minutes.

23         THE COURT:  And then you have another one after that?

24         MR. KUNZ:  Yes, sir.

25         THE COURT:  How long would that one be, roughly?

1           MR. KUNZ:  Another 15, 20 minutes.

2           THE COURT:  And then do you have another one after

3      that?  I'm trying to map out the rest of the day.

4           MR. KUNZ:  Yeah, we can put another one on too.

5           THE COURT:  Well, I would like to probably go to about

6      5:30.  And I want to give the jury some type of update on where

7      we are, but your best guess is --

8           MR. FIELDS:  Well, we only have five witnesses and

9      this is the longest witness, Judge.  So we'll be done tomorrow

10     morning.  Even if we don't get all three on today I think we'll

11     be done tomorrow morning.

12          THE COURT:  All right.  Then I'll tell them it still

13     looks like a couple of days, a couple more days.  All right.

14     Everybody ready for the jury then?

15          MR. MURRELL:  Yes, sir.

16          THE COURT:  Please bring in the jury.

17        (Jury in at 3:58.)

18          THE COURT:  You all can have a seat, please.  Welcome

19     back, ladies and gentlemen.  I hope you had a nice break.

20     Before we resume, let me just ask you, are you all warm in here,

21     everyone feels okay?  Very good.

22          Mr. Kunz, are you ready to continue?

23          MR. KUNZ:  Yes, sir.

24          THE COURT:  Okay.  Whenever you are ready.

25

```
1                    CONTINUED DIRECT EXAMINATION
2     BY MR. KUNZ:
3     Q.   Special Agent Marti, on or about May 8th of 2020 was there
4     a VICE news video that Mr. Baker posted on Facebook, was sent to
5     somebody?
6     A.   Yes.  That's correct.
7              MR. KUNZ:  Your Honor, I'm going to offer in Exhibit
8     12A which is the Facebook post and then 12B which is the video
9     that was attached.
10             THE COURT:  Okay.  Those will be admitted.
11         (GOVERNMENT EXHIBITS 12A AND 12B:  12A and 12B received in
12    evidence.)
13             MR. KUNZ:  We need to switch this to the other
14    document.  Thank you, ma'am.
15    BY MR. KUNZ:
16    Q.   This is Exhibit 12A; is that correct?
17    A.   Yes.  That's correct.
18    Q.   And, looking down towards the upper top third there, at
19    May 8, 2020 at about 16:18?
20    A.   Yes.
21    Q.   What does that indicate on that post?
22    A.   It says in the body, "this is the official VICE news video.
23    I'm the one with the hoody, aviators, desert camo, a Russian
24    sniper rifle and AK and also the one with the grenade and the
25    one seen in the middle".
```

Direct Examination – Special Agent Nicholas Marti

1    Q.    And did you then review the VICE news video?

2    A.    Yes, I have.

3    Q.    And we have it as Exhibit 12B.  You've viewed that before

4    coming to Court; is that correct?

5    A.    That's correct.

6    Q.    And that's the same item you received from Facebook that

7    was produced?

8    A.    Correct.  It was also on his, yes, on Facebook.

9            MR. KUNZ:  Your Honor, can we play Exhibit 12B for the

10   jury?

11           THE COURT:  Yes, sir.

12           (Video playing.)

13   BY MR. KUNZ:

14   Q.    Agent Marti, if we can go back to 0039 on that video.  Now,

15   do you recognize anybody in that video?

16   A.    Yeah.  So I recognize Daniel Alan Baker.  As he indicated

17   in the Facebook post, he's wearing aviators, desert cammies and

18   the hoody.  And he's holding right there a Russian Dragunov

19   sniper rifle.  And behind him slung in a sling is an AK-47.

20   Q.    Now, he's the individual whose in the prone position in

21   that picture; is that correct?

22   A.    That's correct.  Yes.

23   Q.    Can we play up to 42?

24           (Video playing.)

25   A.    So, once again, Mr. Baker aviators, hoody, desert cammies,

Direct Examination – Special Agent Nicholas Marti

1  and he's holding the Dragunov sniper arrival and he is firing

2  that weapon downrange towards something or an enemy.

3           THE COURT:  For the record, that's paused at 42

4  seconds, right there, 042?

5           MR. KUNZ:  Yes, sir.  42.  Yes, sir.

6  BY MR. KUNZ:

7  Q.   We can go to two minute and 46 seconds on this.  Do you

8  recognize that voice?

9  A.   Yes.  That's the voice of Daniel Alan Baker.

10  Q.   Okay.  And so, I didn't understand what he said.  What did

11  he say, there were two bodies you said?

12  A.   He's speaking in reference to two bodies.  And, so what

13  he's doing in the scene is he's talking about military tactics.

14  And this speaks for his understanding of being a military

15  tactician.  So, there is a -- there's Mr. Baker sitting down and

16  he's on top of -- sitting down on just a bucket, but he's in a

17  position looking downrange through the scope.  And he's

18  identifying targets for the rest of the members of his team to

19  pick out other people who are on the opposing side.

20  Q.   Let's continue planning through 302.

21           (Video playing.)

22  Q.   Okay.  Was that Mr. Baker taking that rifle away from the

23  wall?

24  A.   Once again, yes.  That was Mr. Baker taking the rifle away

25  from the wall.

Direct Examination – Special Agent Nicholas Marti

1   Q.   Now, we can move this video forward to 402.

2        (Video playing.)

3   Q.   What is depicted in 402 through 405?

4   A.   So it is difficult to see, but it's kind of blacked out on

5   the screen there.  It's Mr. Baker and he's holding a grenade and

6   he has the rifle slung in front of him.

7   Q.   If we can proceed to 428 and play that, 428 through 434.

8        (Video playing.)

9   Q.   Who is that running?

10  A.   And that running was Mr. Baker.

11  Q.   Okay.  And we can proceed to, Mr. Fields, 4:57 through

12  5:07.

13       (Video playing.)

14  Q.   Okay.  What is that?

15  A.   Again, that was Mr. Baker.

16  Q.   Okay.  And if we can proceed, Mr. Fields, to 5:38 to 5:49.

17       (Video resumed.)

18  Q.   And who is that?

19  A.   That's consistent with his voice before and it's Mr. Baker

20  again wearing the aviators, hoody and the desert cammies.

21  Q.   And the last approximately 40 seconds Mr. Baker runs to the

22  truck with the other individuals?

23  A.   Yes.

24  Q.   Where is he in the truck?

25  A.   He jumps into the back of the vehicle with a rifle.

Direct Examination – Special Agent Nicholas Marti

1   Q.   That's Mr. Baker?

2   A.   Yes.

3           MR. KUNZ:  Your Honor, we would now -- well, let me

4   ask Agent Marti this.

5   BY MR. KUNZ:

6   Q.   Sir, on or about October 20, 2019 was there a YouTube video

7   posted by Mr. Baker?

8   A.   Yes.

9           MR. KUNZ:  Your Honor, we would offer Exhibit 16 into

10  evidence.

11          THE COURT:  Okay.  Just one moment.  Yes, sir.  16 is

12  admitted.

13          (GOVERNMENT EXHIBIT 16:  16evidence.)

14          MR. KUNZ:  May we publish that to the jury?

15          THE COURT:  You may.

16          MR. KUNZ:  If you would play that, sir.

17          (Video playing.)

18  BY MR. KUNZ:

19  Q.   Agent Marti, let's move ahead with respect to January 14th

20  of 2021.  You testified previously about the call to arms.  Did

21  Mr. Baker post a YouTube on January 14th with respect to a

22  printing those call to arms fliers?

23  A.   Yes.  That's correct.  He printed those call to arms.

24          MR. KUNZ:  Your Honor, we'd offer into evidence

25  Exhibit Number 29 which was a video posted by the defendant?

Cross-Examination - Special Agent Nicholas Marti

1          THE COURT:  Yes.  29 will be admitted.

2       (GOVERNMENT EXHIBIT 29:  29 received in evidence.)

3          MR. KUNZ:  May we publish that?

4          THE COURT:  Yes, sir.

5          MR. KUNZ:  Thank you, sir.

6          (Video playing.)

7    BY MR. KUNZ:

8    Q.   And, I think you indicated that was posted by Mr. Baker; is

9    that correct?

10   A.   Correct.  When I received the YouTube search warrant return

11   back from Google that video was part of the meta-data that came

12   back with the return.

13   Q.   And the call to arms there, sir, was that the same as the

14   call to arms that was on Exhibit 2A and 2B?

15   A.   Yes.

16   Q.   Okay.  That was posted on Facebook on January 14th?

17   A.   Yes.

18          MR. KUNZ:  May I have one moment, Your Honor?

19          THE COURT:  Yes, sir.

20          MR. KUNZ:  Your Honor, I have no further questions of

21   Agent Marti.  Thank you.

22          THE COURT:  Thank you.  Mr. Murrell?

23                    CROSS-EXAMINATION

24   BY MR. MURRELL:

25   Q.   Agent Marti, you talked about your investigation and that

Direct Examination – Special Agent Denise Biehn

1   it went on for a period of time?

2   A.   Yes, sir.

3   Q.   During this period of time, did anybody ever call in to

4   complain about this call to arms?

5   A.   No, sir.

6   Q.   Nobody called in to say they felt like they were threatened

7   by the call to arms?

8   A.   No, sir.

9            MR. MURRELL:  Thank you.

10           THE COURT:  Okay.  Anything further, Mr. Kunz?

11           MR. KUNZ:  No, Your Honor.

12           THE COURT:  Okay.  Special agent, you can step down.

13           THE WITNESS:  Yes, sir.  Thank you.

14           MR. FIELDS:  United States calls Denise Biehn.

15           THE COURT:  I'm sorry.  Would you say that name one

16   more time?

17           MR. FIELDS:  Yes, Your Honor.  Denise Biehn.

18           **DENISE BIEHN, GOVERNMENT WITNESS, DULY SWORN**

19           THE COURTROOM DEPUTY:  For the record, state your name

20   and spell your last name.

21           THE WITNESS:  My name is Denise.  And the last name is

22   Biehn.  It's spelled B-i-e-h-n.

23                        DIRECT EXAMINATION

24   BY MR. FIELDS:

25   Q.   Good afternoon.

1    A.    Good afternoon.

2    Q.    Where are you employed?

3    A.    I'm employed by the FBI.  Currently I'm based in Pretoria,

4    South Africa.

5    Q.    And, what is your title with the FBI?

6    A.    Right now I'm a supervisory special agent, but I'm a

7    transnational anticorruption adviser for the FBI.  And I cover

8    the continent of South Africa.

9    Q.    Just for the benefit of the jury, why would the FBI have

10   assets in other parts of the world?

11   A.    We are routinely deployed overseas and often embedded in

12   embassies and consulates because, as we all know, the real world

13   is getting to be a smaller and smaller place.  And we represent

14   the FBI's interests in those areas and also assist when we have

15   relations with those governments, assist them in their

16   investigations as well.  And so it's a collaborative

17   relationship a lot of the times.

18   Q.    And, how long have you been with the bureau?

19   A.    18 years this summer?

20   Q.    You stated that your current duty station is Pretoria,

21   South Africa.  Have you been stationed in other regions of the

22   world as well?

23   A.    Yes, I have.  I've done what we call temporary duty

24   assignments in other countries such as Pakistan, Haiti,

25   Afghanistan, the Philippines.  But then I've also been stationed

1    for a year abroad and that was in Erbil, Iraq.

2    Q.   And while you were in Erbil, Iraq could you just briefly

3    tell the ladies and gentlemen of the jury what your duties were?

4    A.   Yes.  I served as a -- it's called an assistant legal

5    attache.  So Iraq has a U.S. consulate.  So the state department

6    is there.  And I was based within that consulate.  I was the

7    only FBI representative in the consulate.

8         My duties were to facilitate investigations that touched on

9    the United States, but also to facilitate and enhance our

10   relationship with the Kurdistan region of Iraq.  I think a lot

11   of people, when you look at the map of Iraq, the Kurdistan

12   region is the northern region which borders Syria and also Iran.

13   So, they have their own independent, well, somewhat independent

14   government.  So I was the representative to those agencies for

15   the FBI.

16   Q.   Special Agent Biehn, with respect to your time in Iraq I

17   want to direct you specifically to March 6th of 2019.  Were you

18   on duty in Erbil, Iraq that day?

19   A.   Yes, I was.

20   Q.   And did you have the opportunity to interview an individual

21   named Daniel Alan Baker that day?

22   A.   I did.

23   Q.   Do you recognize that individual here in Court today?

24   A.   Yes, I do.

25   Q.   And could you please identify him by an article of

1   clothing?

2   A.   He's the gentleman that just waived to me with the blue

3   mask and the blue shirt.

4   Q.   Let the record reflect that the witness has identified the

5   defendant.

6        Where did this interview take place, Special Agent Biehn?

7   A.   It took place at the consulate, in an interview room at the

8   consulate.

9   Q.   And, what were the circumstances surrounding the interview?

10  For example, did you summon the defendant there or was it kind

11  of by happenstance?

12  A.   I did not summon him.  He had appeared at the consulate.

13  And I was notified of his presence.  And I asked him if he

14  wouldn't mind if I sat down and spoke to him for a while.

15  Q.   This was a voluntary interview?

16  A.   Yes.

17  Q.   You and the defendant did, in fact, sit down and have a

18  conversation?

19  A.   Yes, we did.

20  Q.   Did the defendant give you a little bit of background on

21  his, kind of his history or background, if you will?

22  A.   Yes, he did.  I generally start interviews just asking a

23  little bit about where someone is from and what brought them to

24  be where they are today.  And, so we did have those discussions,

25  yes.

1    Q.    Did he mention anything about serving in the U.S. military?

2    A.    He did.  He said that he was in the Army and that he had

3    been assigned to the airborne infantry division.

4    Q.    And that was from approximately 2006 to 2008, give or take?

5    A.    That's correct.

6    Q.    Did the defendant mention anything to you about his living

7    situation after he left the Army?

8    A.    Yes.  He mentioned that he was -- lived in the Tallahassee

9    area and often was without a steady place to live, so sometimes

10   homeless.  Sometimes staying with other people who had a place

11   for him.  But he was homeless often he said.

12   Q.    He had a transient lifestyle?

13   A.    Yes.

14   Q.    Now, eventually did the conversation with the defendant

15   turn into the reason for him being in the Middle East?

16   A.    Yes, of course.

17   Q.    And, did he mention anything about what's known as the YPG?

18   A.    Yes, he did.

19   Q.    What did the defendant say about how he heard about the

20   YPG?

21   A.    He said that he had heard about it online through the

22   Internet.  And that he had made contact with the YPG through a

23   Proton email address.

24   Q.    Did the defendant use any particular words to describe the

25   YPG?

1  A.   Yes, he did.  He described the YPG as a left-wing militant

2  group.

3  Q.   Did he mention how he saved up some money to travel over to

4  the Middle East?

5  A.   Yes.  He talked about the process of making contact with

6  the YPG and having a bit of a test or something to get accepted

7  by the YPG as potentially being invited to come over to Syria.

8  He said that in order to do that he had to pay his own way.  So

9  he had to buy his plane ticket.  So he wasn't able to afford a

10  place to live because he was saving his money to buy that plane

11  ticket to get to Syria, eventually to Syria, but he flew through

12  Iraq.

13  Q.   And, that was in about 2018?

14  A.   That's right.

15  Q.   Did the defendant mention anything about receiving training

16  while he was -- initially arrived there with the YPG?

17  A.   Yes, he did.  He said that he initially went to a camp and,

18  like an international training academy.  And that while he was

19  there he received training in weapons and weapon disassembly and

20  reassembly and other tactical type training.

21  Q.   Was this international training academy in Derik Syria?

22  A.   That's what he said, yes.

23  Q.   D E R I K?

24  A.   Yes.  The spellings on some of these can change because the

25  way that we would say in English and the way they spell it is

1    often different.  But, yes.

2    Q.    Now, did the defendant make any comments about, let's say,

3    the quality of the training or lack thereof?

4    A.    He said that some of the training didn't seem tactically

5    sound and gave an example of a time where they were training

6    about an attack position on a hilltop and he thought they would

7    be silhouetted on the hilltop and that wasn't a sound tactical

8    position.

9    Q.    Did he indicate that the training lasted about a month?

10   A.    About a month and that they were anxious to actually go and

11   engage in the fight.

12   Q.    Did he mention anything about an alias that he was using?

13   A.    He did.  The international individuals would receive a

14   name, a YPG name, a moniker.  And his YPG name that he was able

15   to choose was Alieserqerecox, and I don't know if I'm saying

16   that right.

17   Q.    Special Agent Biehn, I'm showing you what's been admitted

18   in evidence as Government Exhibit 4B.  That has been admitted in

19   evidence.  You mentioned it was Alieserqerecox.  Does that

20   appear to be the same name that Mr. Baker gave you in Erbil,

21   Iraq that day?

22   A.    It does.

23   Q.    And this is Government Exhibit 5B.  It's already been

24   admitted in evidence.

25         The same question here, this is an Instagram business

1    record for a recovery email address.  Is that the same -- appear

2    to be the same name that was given to you?

3    A.    It was.  But, you know, there was space in between ali and

4    then a space after ser and then qerecox.

5    Q.    Did the defendant mention any specific types of weapons

6    that he was given specialty training in?

7    A.    He did.  He said that the weapons that they trained on

8    were, for example, Kalashnikovs, Dragunovs and Pixies.

9    Q.    And, there was also physical and ideological training

10   included?

11   A.    Yes.

12   Q.    Now, at some point did the defendant mention a specific

13   battle that was memorable to him?

14   A.    Yes.  He said that in January 2019, I think he described it

15   as the battle of the bridge, that he was able to participate in

16   that battle with some of the other individuals from the

17   international training academy.  So, yes, he did talk about that

18   battle.

19   Q.    Did he indicate to you whether a video of this battle had

20   been published online?

21   A.    He said at one point he was in a building and the VICE news

22   crew, which is I guess was a news crew from HBO, was there with

23   him filming the event.  And later he told me how I could find

24   that video clip and where it was online.

25   Q.    Did you, in fact, watch it?

1    A.    I did.  After the interview concluded later that night I

2    went and watched that video clip.

3    Q.    And, did you recognize him?

4    A.    I did.  I recognized both him and his voice as well.

5    Q.    Throughout the discussions that you had with the defendant,

6    what was his disposition?  How did he seem?

7    A.    Pardon?

8    Q.    What was his disposition?  How did he seem when he was

9    discussing these events?

10   A.    So, you know, he was calm.  He was well organized

11   thought-wise.  He was very polite.  I think that, you know,

12   there were parts of the story that he was telling me about the

13   battle that he took pride in.  Like, he told me that at one

14   point he was able to kill some ISIS individuals that were

15   driving on a motor bike towards him.  And he said that he was

16   able to kill two ISIS fighters with one bullet.

17   Q.    After this battle that the defendant was describing to you,

18   did he eventually return to the international training academy,

19   according to him?

20   A.    Yes.  According to him that's what happened.

21   Q.    And, what did he do when he returned to the academy?

22   A.    They were digging tunnels and kind of preparing a defensive

23   position in that area.

24   Q.    He also mentioned physical and tactical training?

25   A.    And they continued, yes.  They continued some physical and

1    tactical training.  And he provided some of that training

2    because he's a yoga instructor and has some Jiu Jitsu skills.

3    And he said he provided some of that training as well.

4    Q.   Did he mention why he was leaving Syria?

5    A.   Yes.  He said that he was leaving because the conflict was

6    winding down and also his father was very ill.

7            MR. FIELDS:  May I have one moment, Your Honor?

8            THE COURT:  Yes, sir.

9    BY MR. FIELDS:

10   Q.   Special Agent Biehn, was it your impression from your

11   discussions with the defendant, Mr. Baker, that the

12   international training academy where he was training was

13   somewhere that he was impressed with or not so much?

14   A.   Not so much.  He didn't find the training to be as -- up to

15   his standards.  He thought they could do better.

16   Q.   Your impression was that he had perhaps gotten better

17   training elsewhere?

18   A.   Potentially, you know, from his time in the military.

19   Q.   Thank you.

20           THE COURT:  Mr. Murrell?

21                   CROSS-EXAMINATION

22   BY MR. MURRELL:

23   Q.   Do I have it right, Biehn; is that right?

24   A.   It's Biehn like the vegetable.

25   Q.   Like a bean.  I had it right.  In this discussion with you,

Cross-Examination – Special Agent Denise Biehn

1  he gave you an account of who volunteered, which Americans

2  volunteered for the YPG?

3  A.   Yes.  To a degree, yes.

4  Q.   I mean, he gave you a list of names and told you what he

5  knew about them?

6  A.   Yes.

7  Q.   He also mentioned a fellow Jordan Drube, do you remember

8  that?

9  A.   No, sir.  But I could review my --

10 Q.   Sure.  Death threats, he said something about death threats

11 he had received, when he talked about white nationalists?

12 A.   Is there a page on the 302 I can refer to?

13 Q.   How about page 9?

14 A.   My 302 only goes to page 8.

15 Q.   Well, let's see.  Maybe it's somebody else's 302.

16       MR. MURRELL:  That's right.  He had a later interview

17 and it was not your interview.  So I'll withdraw that question.

18 Thank you very much.

19       THE COURT:  Any -- that's all?  Any redirect, Mr.

20 Fields?

21       MR. FIELDS:  No, Your Honor.

22       THE COURT:  You can step down.  Thank you very much.

23       THE WITNESS:  Thank you.

24       MR. FIELDS:  United States calls Jeffrey Wynn.

25       **JEFFREY WYNN, GOVERNMENT WITNESS, DULY SWORN**

```
 1            THE COURTROOM DEPUTY:  For the record, state your full
 2   name and spell your last name.
 3            THE WITNESS:  Jeffrey Wynn, W-y-n-n.
 4                        DIRECT EXAMINATION
 5   BY MR. FIELDS:
 6   Q.   Good afternoon.
 7   A.   Hi.
 8   Q.   What is your occupation, sir?
 9   A.   I'm a supervisory officer with the Transportation Security
10   Administration.
11   Q.   And, how long have you been so employed?
12   A.   I have been with the TSA for 11 years.
13   Q.   What are your duties as a supervisor with TSA?
14   A.   The general oversight of a federal checkpoint.
15   Q.   And where is your duty station?
16   A.   Tampa International Airport.
17   Q.   So basically you oversee a checkpoint at the Tampa
18   International Airport?
19   A.   Yes, sir.
20   Q.   Is that here in Florida?
21   A.   Yes, sir.
22   Q.   Now, I'm going to direct your attention to January 6th of
23   2020.  Were you on duty that day?
24   A.   Yes, sir.
25   Q.   And, did you have the opportunity to come into contact with
```

Direct Examination - Jeffrey Wynn

 1  an individual named Daniel Alan Baker?

 2  A.    I did.

 3  Q.    Could you identify that individual here in Court today?

 4  A.    I do.

 5  Q.    And could you identify him by article of clothing?

 6  A.    He's the defendant wearing a blue shirt and gray blazer.

 7  Q.    Let the record reflect the witness has identified the

 8  defendant.

 9        Now, you are a supervisor.  Do you stand around the

10  checkpoint all day or sometimes you come and go?

11  A.    I'm at the checkpoint the majority of the day.

12  Q.    Okay.  And, on January 6th, when you arrived did you see

13  the defendant and, if so, where?

14  A.    I was already on the checkpoint when the defendant arrived.

15  The defendant was proceeding through the checkpoint attempting

16  to proceed to get on an aircraft.

17  Q.    So, the defendant was trying to go through security to get

18  onto an airplane?

19  A.    Correct.

20  Q.    Now, at some point, while the defendant was going through

21  security, did he get pulled over for additional screening?

22  A.    Yes.  We were conducting additional screening and had

23  received an alarm of an explosive trace detection on one of the

24  bags that he had which led us to do even further additional

25  screening.

Direct Examination - Jeffrey Wynn

1   Q.   So sometimes when you go through security, it's happened to

2   me, but you might see TSA officers using a whippy to wipe

3   individuals hands or bags?

4   A.   Correct.  To swab.  Yes, sir.

5   Q.   To swab.  And that's a test for different items that

6   shouldn't be going through security?

7   A.   That's correct.

8   Q.   For safety?

9   A.   Correct.

10  Q.   Now, it doesn't necessarily mean that those items are in

11  the bag at that time?

12  A.   Correct.  It picks up trace amounts.

13  Q.   It could have been there in the past?

14  A.   Yes, sir.

15  Q.   And in this case Mr. Baker was going through security and

16  during screening this test alerted for the presence of potential

17  explosives?

18  A.   Yes, sir.

19  Q.   Was there an additional search of Mr. Baker's person and

20  luggage that was conducted?

21  A.   Yes, sir.  The checked bag he said he had was removed from

22  the aircraft.  Several ETD tests were conducted of those as

23  well.

24  Q.   Now, while Mr. Baker was being searched you were there and

25  present?

Direct Examination - Jeffrey Wynn

1    A.    Yes, sir.

2    Q.    Did you engage Mr. Baker in conversation?

3    A.    Yes, sir.  I did.

4    Q.    Did Mr. Baker make any comments to you that referenced his

5    time in the military?

6    A.    He did.  He -- well, he spoke about his time in the U.S.

7    service.  And he also talked about when he was fighting with the

8    Kurds.  He had gone overseas and fought with the Kurds.  During

9    that conversation we discussed quite a few different things,

10   including the fact that he enjoyed the thrill of the kill.

11   Q.    Were those the defendant's words?

12   A.    Yes, sir.

13   Q.    Did he mention a video?

14   A.    He talked about a YouTube video that he had showing him

15   fighting with them.

16   Q.    Did he mention being at Fort Bragg?

17   A.    He did.

18   Q.    Now, during this time, were you able to observe the

19   defendant's demeanor or the way that he was coming off to you

20   while you were having this discussion with him?

21   A.    He was very proud of the things that he was discussing

22   almost glamorizing himself.

23   Q.    And, again, that was January 6th of 2020?

24   A.    Yes.

25        MR. FIELDS:  No further questions, Your Honor.

1          THE COURT:  Okay.  Mr. Murrell?

2                    CROSS-EXAMINATION

3   BY MR. MURRELL:

4   Q.    He was proud of his work in the military?

5   A.    He was, sir.  And also of the fighting that he said he had

6   gone and done.

7   Q.    Fighting with the YPG in Syria?

8   A.    Yes, sir.

9   Q.    So, he had this alert because of the test.  It turned out

10  he did have a handgun in his luggage?

11  A.    That was in his checked bag, not in his carry on.  The

12  alarm was on his carry on bag that he had on his person.

13  Q.    But there was no firearms or explosives in his carry on?

14  A.    That's correct.

15  Q.    And, what he did have though was a handgun in his luggage?

16  A.    That's correct.

17  Q.    And, there wasn't anything illegal about that?

18  A.    No.  It was done correctly.

19  Q.    And, so he missed his flight, I gather?

20  A.    Yes, sir.

21  Q.    But then he got his luggage back and he got the next flight

22  out?

23  A.    Flew out the next day.

24          MR. MURRELL:  Thank you.  That's all I have.

25          THE COURT:  Mr. Fields, anything further?

```
 1                    MR. FIELDS:  Nothing further, Your Honor.

 2                    THE COURT:  Okay.

 3                    MR. FIELDS:  You can step down, sir.  Thank you.  May

 4      this witness be excused, Your Honor?

 5                    THE COURT:  Yes, sir.  No objection to that?

 6                    MR. MURRELL:  That's fine with me.

 7                    MR. FIELDS:  United States calls Special Agent Katie

 8      Hill.

 9                    Your Honor, can we approach for one moment?

10                    THE COURT:  Sure.

11             (Following conference held at sidebar at 4:41 PM.)

12                    MR. KUNZ:  Judge, this may be the last witness we have

13      today because we didn't expect such short cross.  We only have

14      two more witnesses that we can do first thing in the morning.

15                    THE COURT:  Two after her?

16                    MR. KUNZ:  One more.

17                    THE COURT:  All right.  Well, we'll just --

18                    MR. KUNZ:  I'm sorry, Judge.

19                    THE COURT:  That's close enough.  It will be five

20      o'clock.  And it does seem like we're ahead of schedule.

21                    MR. KUNZ:  I think so.

22                    THE COURT:  So the final witness for tomorrow morning

23      will be?

24                    MR. KUNZ:  McNair.

25                    THE COURT:  It will be shortish?
```

```
 1            MR. KUNZ:  Yes, sir.

 2            THE COURT:  Okay.  Anything further?

 3            MR. MURRELL:  Just while we're sitting here, if we can

 4  talk afterwards because we've got to figure out, we've got

 5  witnesses sort of hanging, depending on some of these rulings.

 6  And if we can talk about that afterwards.

 7            THE COURT:  Yes, sir.  We'll do that for sure.

 8        (Sidebar concluded at 4:42 PM.)

 9            KATIE HILL, GOVERNMENT WITNESS, DULY SWORN

10            THE COURTROOM DEPUTY:  For the record, state your name

11  and spell your last name.

12            THE WITNESS:  Katie Hill, H-i-l-l.

13                        DIRECT EXAMINATION

14  BY MR. FIELDS:

15  Q.   Good afternoon.  What is your occupation, ma'am?

16  A.   Special agent with the FBI.

17  Q.   And where are you so employed?  What area?

18  A.   Tampa division.

19  Q.   How long have you been employed with the FBI?

20  A.   Approximately 12 years.

21  Q.   As part of your responsibilities as a special agent with

22  the FBI, do you have specific responsibilities with relation to

23  Tampa International Airport?

24  A.   Correct.  Yes.  I am the airport liaison agent for Tampa

25  International Airport.
```

Direct Examination - Special Agent Katie Hill

1  Q.   What does that mean for the average person?

2  A.   So, for the average person, so any incidents at the airport

3  or call about suspicious individuals, or crimes against -- in a

4  plane or interference with the flight crew I respond to the

5  airport.  So I'm the main contact for Tampa Division at that

6  airport to respond to anything that happens that could be a

7  federal violation.

8  Q.   Now, specifically, on January 6, 2020, were you on duty

9  that day?

10 A.   Yes.

11 Q.   And, did you respond to Tampa International Airport?

12 A.   Yes.

13 Q.   The basis for that was a suspicious person?

14 A.   Yes.

15 Q.   Now, when you arrived, did you go to like a TSA checkpoint?

16 A.   I did.  TSA asked me to come to a checkpoint.

17 Q.   And, did you come into contact with an individual named

18 Daniel Alan Baker?

19 A.   Yes.

20 Q.   Do you recognize that person here in Court today?

21 A.   Yes.

22 Q.   And could you identify him by an article of clothing?

23 A.   He's sitting in a gray suit.

24      MR. FIELDS:  Okay.  Let the record reflect the witness

25 identified the defendant.

Direct Examination - Special Agent Katie Hill

1  BY MR. FIELDS:

2  Q.   Was the defendant pulled over for some additional

3  screening?

4  A.   Yes.

5  Q.   And, what was the basis for that?

6  A.   He had alert -- he had -- when he went through screening

7  there was an alarm that went off for PETN tetryl is what I was

8  -- that's what he was alerted for.  And then they did an

9  inspection of his luggage.

10 Q.   While this was happening did you have the opportunity to

11 speak with the defendant?

12 A.   Yes.

13 Q.   Was your discussion with him voluntary on his part?

14 A.   Yes.

15 Q.   Did the defendant mention anything about a firearm that

16 day?

17 A.   He said he had recently purchased a firearm.

18 Q.   And, was that firearm with him at the airport that day?

19 A.   The firearm was in checked luggage.

20 Q.   Did you have the occasion to discuss anything with the

21 defendant as it related to his travel overseas?

22 A.   Yes.

23 Q.   And, what was that?

24 A.   We talked to him about him traveling, what his plans were,

25 where he was planning to travel.  And he stated that he wanted

Direct Examination - Special Agent Katie Hill

1    to go back over to Syria, but at this time he couldn't go to

2    Syria so he was going to Nashville to meet up with some friends.

3    Q.   Did you make any comments to the defendant about the

4    possibility of being captured overseas?

5    A.   Yes.  So I took a code book with me to discuss if he had

6    traveled overseas, if he went to travel overseas to fight, he

7    could be in violation of federal law.  And then we told him if

8    you -- we read code sections to him and said, hey, if you do any

9    of this stuff you could be held in violation of federal law.

10   And then we said if you are caught there is a low likelihood of

11   the U.S. government being able to come get you.  And he stated

12   that he did not plan to be captured alive.

13   Q.   When you say, when you got caught, you mean if you were

14   captured --

15   A.   If you were captured.

16   Q.   -- overseas, the likelihood of being rescued would be

17   minimal?

18   A.   Correct.

19   Q.   Did the defendant give you his phone to take photos of?

20   A.   The defendant -- he pulled up his Facebook account and let

21   us view the Facebook account.  Not go into the Facebook account,

22   but we did see the front of the Facebook account.  And we did

23   take photos of that account.

24   Q.   Did you take those photos?

25   A.   I did.

Direct Examination - Special Agent Katie Hill

1   Q.   I'm going to show you 9A and 9B.

2          MR. FIELDS:  The government moves 9A and 9B in, Your

3   Honor.

4          THE COURT:  Just a moment.  9A and 9B are admitted.

5      (GOVERNMENT EXHIBITS 9A AND 9B:  9A and 9B received in

6   evidence.)

7   BY MR. FIELDS:

8   Q.   Special Agent Hill, I'm showing you Exhibit 9A.  Is this a

9   photo that you took of the defendant's phone that day?

10  A.   Yes.

11  Q.   This is the defendant's Facebook profile?

12  A.   That is the Facebook profile that he pulled up that day.

13  Q.   What does it show as his employment down there at the

14  bottom?

15  A.   Squad designated sharpshooter at YPG and fighter blue belt

16  at Brazilian Jiu Jitsu.

17  Q.   Showing you 9B, again, did you take this photo?

18  A.   Yes.

19  Q.   Does this photo show how many friends the defendant had on

20  Facebook or how big his following was?

21  A.   Yes.  Over 3,000 friends.

22  Q.   How did the interview end with the defendant?

23  A.   The defendant missed his flight and was rebooked on another

24  flight the following day.  He spent the night at the airport.

25  And his bag with the firearm was held by the airline.

Cross-Examination – Special Agent Katie Hill

1    Q.    But after your discussion with him he was free to go?

2    A.    He was free to go.

3    Q.    Thank you.

4            THE COURT:  Thank you, Mr. Fields.  Mr. Murrell?

5                        CROSS-EXAMINATION

6    BY MR. MURRELL:

7    Q.    Good afternoon.  I was curious, what would have been

8    illegal about him going overseas?

9    A.    It was specifically the 951 and the 956.  Specifically,

10   956, kill, maim, injure or kidnap, fighting overseas.  That was

11   what we read to him.

12   Q.    And does it make any difference who you're fighting?

13   A.    I'm not exactly sure on that.

14   Q.    I see.  All right.  Thank you.  That's all I have.

15           THE COURT:  Okay.  Special Agent, you can step down.

16   Thank you.

17           MR. FIELDS:  May this witness be released, Your Honor?

18           THE COURT:  Yes.  Any issue with that?

19           MR. MURRELL:  I'm sorry?

20           THE COURT:  Any issue releasing the witness?

21           MR. MURRELL:  No.

22           THE COURT:  All right.  Ladies and gentlemen, that is

23   your last witness for today so we're going to finish a little

24   early today.  So you'll be excused in just a minute.  We'll

25   start back tomorrow at 8:30.  I appreciate your attention today.

1    Again, if you'll leave your pads there in the chairs they will

2    be secure tonight.  No one will touch them or read them.

3         It's very important, again, that you not discuss the

4    case with anyone else, including with each other.  Don't seek

5    out any media reports.  Don't -- if you stumble across any make

6    sure you ignore them or if something comes on TV turn off the TV

7    or leave the room.

8         Also, don't form -- even in your head don't form any

9    initial views on anything because you've only heard part of the

10   evidence.  So, again, appreciate your attention today.  And,

11   you'll be excused and we'll see you tomorrow at 8:30.  Thank you

12   very much.

13        (Jury out at 4:51.)

14        THE COURT:  Okay.  Everyone can have a seat, please.

15        Okay.  The jury is out.  The Government Exhibits 9A

16   and 9B that just came in, those are the pictures that Agent Hill

17   took of the defendant's Facebook page on his phone.  Again,

18   that's 9A and 9B.  That was subject to a 401 and 403 objection

19   that I overruled the other day.  I don't think anything else

20   came in that we hadn't already addressed.  Did I miss anything?

21        MR. KUNZ:  No, Your Honor.

22        THE COURT:  Okay.  All right.  So you have one more

23   witness, so you anticipate you'll be in a position to rest

24   fairly early in the morning?

25        MR. KUNZ:  Yes, sir.

1           THE COURT:  Okay.  And then your best estimate of the

2     length of your case, Mr. Murrell?

3           MR. MURRELL:  I don't think it will be long.

4     Probably, I do think Mr. Baker will testify.  That will take

5     some time.  We've got just a handful of other witnesses and some

6     of those depend on the Court's ruling.

7           THE COURT:  Okay.  We'll talk about those in just a

8     minute.  Mr. Baker, have you had a chance to talk to Mr. Murrell

9     about whether you'd like to testify or not?

10          THE DEFENDANT:  Yes, Your Honor.  I would like to

11    testify.

12          THE COURT:  I'm sorry?

13          THE DEFENDANT:  I would like to testify.

14          THE COURT:  Okay.  I just want to make sure you

15    understand that it's your choice alone.  Nobody can make the

16    choice for you.  There are certain things in this process that

17    only you get to decide, not your lawyer.  That's one of them.

18          I also want to make sure that you have plenty of time

19    to either -- if you haven't already or between now and when you

20    make your decision, to go through carefully with Mr. Murrell all

21    the pros and cons of testifying.  And I'll ask you a little bit

22    more about that tomorrow.  But, that's all for now.  I just want

23    to make sure you understand it's your choice and make sure that

24    either way that you spend some time talking to Mr. Murrell about

25    it, okay?

 1                THE DEFENDANT:  Understood.

 2                THE COURT:  Okay.  You can have a seat, sir.  Then

 3      before we get to your evidentiary issues, Mr. Murrell, are there

 4      any outstanding or any anticipated evidentiary issues on the

 5      government's side of things for tomorrow for the last witness?

 6      I think we've talked about all of the exhibits.

 7                MR. KUNZ:  No, Judge.  I think we have some records

 8      with respect to the purchase of that Mauser.  We have photos of

 9      it.  And the firearms themselves, the 9-millimeter and the

10      shotgun and then Mauser and then the photos of the residence.

11                THE COURT:  Okay.  And then we talked about at the

12      pretrial that there were some photos from the airport, but those

13      are not -- you're not introducing them?

14                MR. KUNZ:  We cut those out, Judge.  So we solved that

15      issue.

16                THE COURT:  Very good.  Then your issues, Mr. Murrell,

17      where we left off we had a video that you were going to play.

18      And I guess the objection was hearsay.  And if the defendant is

19      testifying that may resolve that issue.  Is that where we stand,

20      Mr. Kunz?  If he does testify, you don't have an objection to

21      that video that you had objected to earlier?

22                MR. KUNZ:  Judge, he can testify about that.  I'm not

23      sure we need a video unless we attack him and he says it didn't

24      happen that way or whatever.  But if he does testify, Judge, I

25      don't think they can introduce that video.

1              THE COURT:  You don't think what?

2              MR. KUNZ:  I don't think they can introduce that

3     video.  It's kind of self-serving.  He can testify to what's

4     there.  And, of course, we can cross examine him about saying

5     he's not telling the truth on that, then they could put that in.

6              THE COURT:  But in the video, I guess this is the

7     video I need to see.  This is one that was at the -- it was part

8     of a questioning after the arrest, is that what it was, Mr.

9     Murrell?

10             MR. MURRELL:  Yes, sir.

11             MR. KUNZ:  He was taken over to the FBI, Judge.  And

12    then he was -- they started to process him.  He invoked his

13    rights.  And I think counsel wants to put in something he may

14    have said either before the rights or after the rights.  I'm not

15    sure.

16             MR. MURRELL:  Before the rights.

17             MR. KUNZ:  It was before the rights, Judge.

18             MR. MURRELL:  And I have a transcript as well.  I can

19    show you the video or I can play the transcript or show you the

20    transcript.

21             THE COURT:  I'll just take a look at the video.

22             MR. MURRELL:  I have it here on my iPad.

23             THE COURT:  Okay.  We can do it at the sidebar area

24    here.  Mr. Kunz, if you want to come up?

25             MR. MURRELL:  The transcript might be better, but --

1           THE COURT:  You do have a mechanism to play this?

2           MR. MURRELL:  Yeah, we've been working on it.  Here it

3    is.  You want to watch it?  Here it is quick.

4           (Video playing.)

5           That's it.

6           THE COURT:  So the objection is hearsay, Mr. Kunz.  Is

7    there any other objection?

8           MR. KUNZ:  Well, again, Judge, I don't know what it

9    would be put in there for.  If he's testifying about it he can

10   testify about it.

11          THE COURT:  So you've got a relevance objection and

12   hearsay?

13          MR. KUNZ:  Yes, sir.

14          THE COURT:  And we'll talk about the relevance first,

15   Mr. Murrell.

16          MR. MURRELL:  It's not hearsay.  And, again, --

17          THE COURT:  Well, we'll talk about the relevance first

18   and then we'll talk about hearsay.

19          MR. MURRELL:  Relevance.  Okay.  So, he can testify

20   about it, but it's not as -- they'll say you can't believe Mr.

21   Baker.

22          THE COURT:  No.  No.  The question is how is it

23   relevant.

24          MR. MURRELL:  Well, you know, we talked about his

25   world view.  And we're trying to explain how some of these

1    things came about.  He's a fellow that believes that the FBI is

2    infiltrated by white nationalists.  He believes that Chic-fil-A

3    is supporting some anti-gay operation in Africa.  He believes

4    that he's in danger of being shot by Nazis, Neo-Nazis.  And it's

5    relevant and in a lot of ways explains some of this. We have had

6    all these posts and so on, it helps explain why some of these

7    posts came about.  Helps explain the Neo-Nazi business, explains

8    why he had the firearms.  And, again, as I said in my opening

9    statement, I think you have to consider what his world view is

10   in deciding whether or not these are credible threats.

11        THE COURT:  Okay.  Well, his subjective intent, not

12   the objective side of it.  But, okay.  And on the relevance

13   alone, we'll come back to hearsay, Mr. Kunz.  I mean, it does

14   seem relevant, right, what his subjective views of things at the

15   time --

16        MR. KUNZ:  Well, it's a very narrow shot of what he's

17   saying, Judge.

18        THE COURT:  But that doesn't speak to its relevance.

19   It speaks to how useful overall it is.  But either it's relevant

20   or it's not, right?

21        MR. KUNZ:  Yes, sir.  And, you know, we'd submit that

22   I just don't think it's relevant, number one.  Number two,

23   Judge, I don't know how he puts in a videotape of him with an

24   interview.  It's an out of Court statement in order to prove the

25   truth of the matter.  And it's no different than any other

1    witness we put on.  We don't have them read their statement that

2    they gave to somebody.  That's not permissible unless there's a

3    challenge as to the voracity of it.  And Mr. Murrell can put

4    this in.

5              THE COURT:  Now, we're talking about the hearsay.  I

6    do see two different things in there.  I was going to ask you

7    what the non-hearsay purpose of it was.  And I think you've

8    answered that which is to say that, you know, that he's thinking

9    things or viewing things that aren't inherently incredible, is

10   that the long and short of it?

11             MR. MURRELL:  Yes, sir.

12             THE COURT:  But I do think some aspects of a hearsay,

13   he's saying he feels safer there than he does on the street.

14   When we talked about this before it was about the, you know,

15   well, is it for the truth of what Chic-fil-A is doing.  No, it's

16   not.  But, yeah, I do think it is when he says I feel safer

17   here, I'm more comfortable here.  That is, to the extent that

18   shares his world view it's doing it by saying a statement that

19   the jury would have to believe to make anything of that.

20             To the extent he's saying inherently incredible things

21   or some of the things at the beginning I guess I have to look at

22   a transcript to parse it.  But I do think at least part of it is

23   hearsay.  And so when he says something like, this is how I'm

24   feeling right now, why would that not be hearsay?

25             MR. MURRELL:  If it's hearsay it's a statement of his

1   mental intent.  I mean, his mental state.  I mean, there's an

2   exception for mental state.  And that's -- if you think it's

3   hearsay that would be an exception on that basis.  State of mind

4   I suppose is how they refer to it.

5            THE COURT:  Present state of mind?

6            MR. MURRELL:  Yes, sir.  803(3). I'm not sure.

7            MR. KUNZ:  Judge, one other thing is what Mr. Murrell

8   wants to do is show a snippet of an interview.  Of course, after

9   this snippet that he has the defendant invoked and didn't want

10  to talk to them.  And they told him, he kept wanting to talk to

11  them after he said I want to get a lawyer and everything else.

12  And they said, no, we're not going to do this.

13           And there's one statement in there that he talked

14  about, you know, you know if I go to prison I'm going to be a

15  career offender.  Do you understand that?  And some other

16  things.  It just puts the government in an awful position,

17  Judge, because I can't cross him about the full extent.  It's

18  not just this one little snippet.

19           THE COURT:  Well, that's a different issue than what

20  we've been talking about to this point.

21           MR. KUNZ:  No, but I think it relates to it though,

22  sir, most respectfully, because there's a continuity of him

23  being there and he said some other bizarre things that I can't

24  cross him because they picked a shot right before he was read

25  his rights and they are having some preliminary discussion.  And

1   then when he's being processed after he did invoke his rights he

2   made some other statements.  Our feeling is we don't get the

3   whole flavoring, Judge, because it's one little thing saying,

4   oh, yeah, my mind was such and such.  Well, it wasn't really if

5   you look at the whole content.

6         THE COURT:  So what would be the cure for that?  Are

7   you saying there's other aspects of things that you'd want to

8   put in and sort of a complete statement issue or what --

9         MR. KUNZ:  Yes, Judge.  I think it's kind of like a

10  rule of completeness in terms of the whole circumstances of

11  him -- you're talking about the FBI.  He didn't just complain

12  about this.  He was, you know, it starts out with other stuff

13  and then he invoked his rights and then he kept wanting to talk

14  about some things.

15        All that shows is state of mind, Judge.  They're

16  saying, oh, he's frightened of the Nazis and all.  And didn't

17  mention the Nazis until after he had invoked and then he was

18  volunteering he was going to be a career offender.  And then I

19  think he made some other statement.  He made some statement --

20  well, that's just our thought, Judge, is they are putting part

21  of it in and kind of disadvantages the Judge because he invoke*s*

22  *his Miranda rights.  And we didn't go near that for that reason.*

23  *We don't want to do that.*

24        THE COURT:  What are the parts that you would want to

25  put in for completeness that either you would ask to put in or

1    that you're saying you couldn't put in because they came after

2    he invoked?

3            MR. KUNZ:  Well, I think the post-Miranda invocation

4    he talked about being a career offender.  If he went to prison

5    he was going to be a career offender.

6            THE COURT:  How's that relate, though?

7            MR. KUNZ:  Well, I think it's relevant, Judge, with

8    respect to -- as he posted stuff, when he was arrested he told

9    them he was going to radicalize folks.  And that's consistent

10   with what he orally told them.  There's no recording of the

11   transport that, you know, if he goes to prison he's going to

12   radicalize the prisoners.  This corroborates that even more so

13   saying it just shows a different attitude.  And counsel's trying

14   to portray him as, oh, he's afraid in person and afraid on the

15   street that he's going to be shot by Neo-Nazis and stuff.  Yet

16   he's an emboldened person when he's talking to them a little

17   further on down the road in that time frame.

18           THE COURT:  I couldn't hear the last bit because

19   something printed up here or something.  But would you just

20   repeat what you just said?

21           MR. KUNZ:  Yes, sir.  The rest of the interview post

22   indication memoranda he's not acting like a person whose

23   concerned or frightened like counsel wants to say about on the

24   street he may be shot by Neo-Nazis.  Instead, he's very

25   emboldened.  And he's telling the FBI when he's being printed,

1    they are telling him a couple of times don't talk to us.  We're

2    just processing him and fingerprinting him.  And he says, you

3    know, you understand that I want to be a career offender now.

4    You understand that.  And, he's very emboldened, Judge.  You're

5    not talking as a frightened person.  He's talking his intent.

6    And my point is within 5, 10, 15 minutes it's not the same

7    intent that's there, Judge.

8              THE COURT:  But in terms of what the legal objection

9    would be then that's not relevance, that's not hearsay, that is,

10   what, a rule of completeness or just sort of a fundamental

11   fairness based on the fact that you couldn't put in the rest of

12   it?  Help me understand what the -- you know, I may ask for

13   authority on this, but I'm just trying to understand what the --

14   I do think it's relevant.  I think at least parts of it are

15   hearsay.  I think when he says I'm scared or uncomfortable, I

16   forget the word he said.  It wasn't one of those.  But it does

17   seem like it would be an exception of his then existing mental

18   condition, would it not?

19             MR. KUNZ:  Possibly.  Yes, sir.

20             THE COURT:  Okay.  And so then what you are talking

21   about now is something different.  I just want to understand

22   exactly what it is.  And it seems to me you would have the same

23   issues if he was just testifying to these things.  If he said,

24   you know, I mean, the government would be able to use those

25   statements if it found them useful, correct?  The statements

1    that are at issue here?

2            MR. KUNZ:  My concern, Judge, is we would not use any

3    of those statements.  It was after he invoked his right to

4    counsel.

5            THE COURT:  No.  But, the statements at issue here was

6    before he had invoked his rights?

7            MR. KUNZ:  Yeah.  Absolutely, Judge.

8            THE COURT:  But the rule of law would be what, that if

9    there's a statement that halfway through someone invokes, the

10   defendant cannot put in an otherwise admissible pre-invocation

11   statement?  I'm not asking the question --

12           MR. KUNZ:  No, Judge.  I don't think that's the rule.

13   No, I don't think that's the rule.  I'm just saying it puts the

14   government at a disadvantage because some of the post-invocation

15   conduct in terms of looking at state of mind, you can draw a

16   different conclusion than just hearing him at the beginning talk

17   about --

18           THE COURT:  I understand that.  But I'm asking, you

19   know, put you in a tough position is not -- I'm asking what the

20   specific legal objection would be to something if I find it is

21   relevant and if I find portions of it are not hearsay and the

22   portions that are hearsay are subject to an exception, what

23   would be the basis for excluding it, you know, pointing to a

24   rule of evidence or something like that?

25           MR. KUNZ:  It would be the rule of completeness,

1    Judge.  We can't bring in the rest of the statement.

2         THE COURT:  Okay.  And your response on the rule of

3    completeness, Mr. Murrell?

4         MR. MURRELL:  It doesn't complete anything.  I mean,

5    this idea that he would be a career criminal, I just don't know

6    how that has any link to what we're introducing.  It just has no

7    connection.

8         THE COURT:  I mean, I don't know what else is on it.

9    Do we have a transcript of the whole interview or just the

10   portion you're after?

11        MR. MURRELL:  Actually, I do have a transcript of the

12   whole interview.  I didn't print it.  I have it.

13        THE COURT:  Well, if you can get that to me I'll look

14   at it tonight.  And then if you all want any authority on that.

15   I know there are some complicating factors on this area of the

16   law and I want to make sure we get this right.  But it does seem

17   to me there would have been something tying the portions that

18   you would otherwise say make it complete to this.  I mean, the

19   rule of completeness would not just be unrelated things just

20   because they are part of the same exchange, I don't think.  But,

21   is that something you can email to Ms. Stark or something, Mr.

22   Murrell?

23        MR. MURRELL:  I was just going to say we were just

24   going to do that.  We just got to find that and we can do that.

25        THE COURT:  Well, do that.  And then whatever

1    authority you all want to file on that issue tonight I will take

2    a look at and we'll address that first thing in the morning.  So

3    that's as far as we can go on the video I think for right now.

4              What's the next issue, Mr. Murrell?

5              MR. MURRELL:  We got the business about the George

6    Soros post.

7              THE COURT:  So the government is not going to put on

8    anything about George Soros.  You were going to introduce a post

9    about George Soros, correct?

10             MR. MURRELL:  There again, I can show it to you here.

11             THE COURT:  I think, I think I have the info on that

12   post.

13             MR. MURRELL:  Again, the point of this, we had I don't

14   know how many, 25 posts introduced by the government.  And the

15   suggestion is that you should take these things seriously.  This

16   is one post that is obviously not something that should be taken

17   seriously.  And it reflects, I think, on the value of these

18   other posts as well.

19             THE COURT:  Okay.  The response on the Soros post, and

20   then is the expert still at issue because we'll talk about that

21   next.

22             MR. MURRELL:  Yes.

23             THE COURT:  Mr. Kunz, on the Soros post -- and does

24   anyone have the actual post handy?

25             MR. MURRELL:  I have it right here.

1          THE COURT:  Will you just read it into the record?  I

2    have seen it, I just can't find it at my fingertips here.

3          MR. MURRELL:  Well, it says, I have acquired a sponsor

4    paren Soros, you know, the Antifa card was finally approved end

5    paren.  And I and my daughters will be offering cash rewards for

6    information leading to the verified identification of any and

7    every individual in this video.  It's the video of the

8    January 6th incident.  Don't worry, I won't be going to the

9    cops.  We have decided to handle this ourselves because the D.C.

10   cops let them in and all cops are infiltrated.  There will be no

11   faith in law enforcement until every single department is shut

12   down and replaced by new faces.

13         THE COURT:  Okay.  And the objection so that post, Mr.

14   Kunz, is what?

15         MR. KUNZ:  It's hearsay, Judge.

16         THE COURT:  Okay.  And the non-hearsay purpose of it

17   is just that it's obviously fanciful, is that what you're --

18         MR. MURRELL:  It's the opposite.  I mean, we're

19   proving that this 139 not true.

20         THE COURT:  That's what we're going to get to in a

21   minute.  I don't think it's proper to put in a statement as

22   non-hearsay saying it's something false or something that's

23   obviously not true.  And the reason it's relevant is because

24   it's so obviously not true and then say, well, we need to call

25   an expert to show that it's obviously not true.  I think that's

1    too many steps.  So we'll talk about, and I'll explain why in a

2    minute, but we'll talk about just the post.

3              MR. MURRELL:  The post, again, I think it's useful to

4    show that it's not true.  And in my view it's obviously not

5    true.  But now a lot of people don't know about Soros and they

6    won't realize it's untrue.

7              THE COURT:  Right.  But then if you're saying it's

8    going in to show it's obviously not true, but it needs an

9    explanation from an expert to say it's not true, then I think we

10   either --

11             MR. MURRELL:  Well, I mean, I don't think you have to

12   introduce -- I mean, I don't think the basis for introducing is

13   it's obviously not true.  I think it's a post we would like to

14   introduce and prove that it's untrue.

15             THE COURT:  I'm not sure I've seen a hearsay thing

16   where it's going in to prove it's not true.

17             MR. MURRELL:  Well, I mean, A, it's not hearsay.  So

18   then the question is, is it relevant?  And it seems to me, yes,

19   it's relevant because it proves that you can't rely on the face

20   value of these posts.  And to make sure the jury understands

21   that we would like to call a witness who will explain who George

22   Soros is.

23             THE COURT:  Okay.  For the purpose of showing that

24   what your client said was not true?

25             MR. MURRELL:  Yes.  And then --

1          THE COURT:  Even though we don't know.  I mean, it's

2     easy for us to sit around and say it's obviously not true, but

3     the expert would just be saying there are these conspiracy

4     theories out there.  I guess what I'm asking is it your purpose

5     to say it was a joke or that it was just like a bald face lie --

6     or --

7          MR. MURRELL:  No, it was a --

8          THE COURT:  Just a minute.  Is he making fun of people

9     on the right who believe these things about George Soros, is

10    that what you're saying he's doing?

11         MR. MURRELL:  Yes.  To a degree he's doing that.  Yes.

12    I think that's right.  He's sort of making fun of the -- that's

13    right.  He's sort of making fun of people on the right who make

14    these claims that George Soros is funding all of these different

15    things.  And, again, it just goes to show that the tenor of some

16    of these posts.  And I think it's relevant to -- the government

17    claims all of these posts you can take them at face value.  I'm

18    showing that he has posts that you can not take at face value.

19         THE COURT:  So the post itself will be allowed.  If

20    the government requests an instruction that it's not to be taken

21    for the truth of the matter, that it's in there to -- then they

22    can consider whether he made the post, but it's not proof that

23    Mr. Soros is funding anything.  Tell me what else is in the

24    statement again, Mr. Murrell?

25         MR. MURRELL:  Well, it says he's looking for the

1    people that were involved in this January 6th incident.

2            MR. KUNZ:  Judge, I have a copy.

3            THE COURT:  Please.

4            MR. KUNZ:  It's a black and white copy.

5            THE COURT:  That's fine.  Thank you.  So, the post

6    will be allowed.  There will be a hearsay instruction if the

7    government requests one.  The problem I have with the expert is,

8    you know, I have reserved on the issue of whether it would be

9    something that would help the fact finder with the fact in issue

10   dealing with the expertise.  Again, I don't know that the fact

11   of who George Soros is or whether he's part of a right wing

12   conspiracy helps explain this post.  And to the extent it does,

13   you know, we end up, I think, potentially with an issue where we

14   are confusing the jury when we have an expert testify about who

15   some person is to prove, I guess you would say, that this was a

16   joke.

17           Obviously, if Mr. Baker does testify he can testify as

18   to what he intended it to be.  But I think if we go down the

19   path of having an expert come in who had no connection to this

20   post and no connection to this defendant to explain what he

21   suspects might be the purpose of a post I think risks confusing

22   the jury.  And I think that risk is substantially outweighed by

23   the probative value of what the expert Mr., is that Enders?  I

24   get the two mixed up.

25           MR. MURRELL:  Enders.  Yes, sir.

1          THE COURT:  Mr. Enders.  So the post will be allowed.

2    The expert will not.  That's the ruling on the Soros matter.

3          MR. MURRELL:  I didn't want there to be any confusion.

4    What we were going to introduce is what we proffer.  He wasn't

5    going to offer any opinion about what this post means.

6          THE COURT:  Well, that's what the purpose of it would

7    be to allow the jury to make an inference about this.

8          MR. MURRELL:  Yes, sir.

9          THE COURT:  No, I understand that.  And I know he

10   wasn't going to offer an opinion about what Mr Baker actually

11   meant, but what he would be doing is providing an opinion that

12   would allow the jury to find that.  And, again, going back to

13   the -- what you said before, you know, if the jury takes this at

14   face value and does believe it, it's actually, I'm looking at it

15   here, yeah, so I think that that would -- I think it would

16   really be going down a rabbit trail introducing one ancillary

17   comment and then bringing an expert in there to provide context

18   for it, particularly when, you know, if the defendant does

19   testify that would be something we could address.  Mr. Kunz, you

20   are standing.

21         MR. KUNZ:  No, I'm going to try to shut this skylight.

22         THE COURT:  Actually, if you'll wait for the roof to

23   shut.  Sorry about that.  Mr. Kunz.

24         MR. KUNZ:  Yes, sir.  Judge, the government agrees

25   with your ruling.  I just want for the record to indicate that

1    we don't believe this expert can testify about this.  That's

2    not, you know, he qualified about doing surveys on Soros and

3    stuff.  It's not something like this, Judge.  And I think under

4    Rule 403 and the Eleventh Circuit case law this type of

5    testimony would lead to more confusion with the jury than

6    anything else.

7            THE COURT:  That's the sum and substances of my ruling

8    is -- well, it's twofold, really.  But the 403 is part of it

9    that I do think bringing an expert in would introduce confusion

10    and it would outweigh any probative value.  But I also find that

11    it would not help the jury with any material fact at issue.  So,

12    that's the ruling on Mr. Enders.

13            And, Mr. Murrell, what's next?

14            MR. MURRELL:  Well, I did want to make sure I had a

15    final understanding about Mr. Phillips and whether we could call

16    him as a witness to testify about the YPG.  We've had a great

17    deal of testimony about it.  It seems to me it would aid the

18    jury if they had some accurate information.

19            THE COURT:  What was -- do they have inaccurate

20    information right now?  I mean, nothing he proffered the other

21    day was inconsistent with anything I've heard today unless I've

22    missed it.

23            MR. MURRELL:  Well, you know, we've got -- Mr. Baker

24    will testify about the YPG as well, but, there again, it's

25    subject to attacks by the government.

1          THE COURT:  Well, let me say this --

2          MR. MURRELL:  We had testimony that it would be

3    illegal to go -- it might be illegal to go overseas.  We've had

4    a lot of conversation about the YPG.  I think it's just

5    reasonable to let the jury know who the YPG is.

6          THE COURT:  Here's the situation with that.  One, as

7    to Special Agent Hill's testimony about what was -- I don't

8    think that opens the door to this expert on ISIS and YPG at all.

9    I don't know if that's what you were saying.  She was relaying

10   what she told him.  You followed up and asked, you know, what

11   the sum and substance of the -- what the substance of what the

12   law was.  She didn't know.  But that had nothing to do with what

13   Mr. Phillips was going to talk about.  He certainly didn't

14   proffer anything about saying it was -- to the extent your point

15   is she suggested it would be illegal for him to go fight for the

16   YPG nothing he says would say otherwise one way or the other.

17         MR. MURRELL:  Right.  But it's Mr. Baker against the

18   FBI agent.

19         THE COURT:  No, no, no.  Nothing Mr. Phillips would

20   say.

21         MR. MURRELL:  Well, right.  I suppose that's true.

22   And I might add too that one agent said that Mr. Baker described

23   the YPG as a left wing militant group.

24         THE COURT:  Right.  But does Mr. Phillips say it's

25   not -- it's something else?  The point of Mr. Phillips'

1    testimony was that they are an ally of the United States and are

2    fighting against ISIS.  As I think we saw at the hearing the

3    other day this can unfold quite quickly with all of the sort of

4    different ways people look at all of the different

5    relationships.  And it really -- and I think you made the point

6    pretty well at the hearing that, you know, now we're talking

7    about all the different groups.  Now we're talking about all of

8    the different countries and their relationships and things like

9    that.

10            And, so to the extent his testimony would be that the

11    United States supported them.  You know, I've been listening

12    very carefully to make sure that the, as I said at the pretrial

13    hearing, what the government put in on what this group was doing

14    was going to be important and in terms of this issue.  And I

15    didn't hear anything suggesting this was a terrorist

16    organization.  I heard a lot suggesting that they were fighting

17    against ISIS, not just from Mr. Baker, but also from the video

18    that went in without any objection and I think some other

19    sources as well.

20            But, if we bring in an expert to say that this is not

21    a terrorist organization, when there is no evidence that it is

22    and all of the evidence is that it is not and it's fighting

23    against ISIS, I think we run the risk that you talked about the

24    other day, which is, we end up down this -- all these different

25    rabbit holes about what these different groups were doing.  So

1    I'm happy to hear any other argument.

2          Also I would note that his -- well, that's what I'm

3    thinking right now.  But I'm happy to hear any further argument

4    on that.

5          MR. MURRELL:  Well, I don't think I can add anything

6    to what I've said already.  And, again, I don't have any

7    intention of getting into whether Turkey is now an ally of the

8    United States.  And we've got very --

9          THE COURT:  I think that's unavoidable to some extent.

10   And I think the other day's hearing indicated that.  And then,

11   you know, we'll have a jury wondering what the pertinence of any

12   of this is.  And the answer is none of it.

13         You know, so when I look at the Daubert issue, you

14   know, is something he's saying helpful to the jury on a material

15   point, on a point that matters.  The point he would be is that

16   whether this group is with Turkey, against Turkey, all of those

17   type of things that isn't part of this case.

18         The point of all this is that he was getting weapons

19   training, that he was willing to travel abroad, that he was

20   willing to go fight, and all of those things that I think are

21   relevant to the issues of whether we had this subjective intent

22   here.  And I think that Mr. Phillips would not speak to that.  I

23   don't think his testimony would be helpful.  And to the extent

24   it is on anything relevant, I do think that for all of the

25   reasons I've said that risk of confusion to the jury would

1    substantially outweigh any probative value.

2              MR. MURRELL:  Well, given your ruling then we won't

3    call Dr. Enders or Mr. Phillips.  What is left though we've got

4    these newspaper articles from the Tallahassee Democrat and the

5    Tampa Bay Times.

6              THE COURT:  Okay.  And, I have had those.  Let me see

7    if I have them right now.  Do you have them handy?

8              MR. MURRELL:  I do.  I do.  I can show them on the

9    iPad here.  Actually, I think I have them on paper too.

10             THE COURT:  Do you have it -- if you've got, if

11   anyone's got an extra I'll take it.

12             MR. KUNZ:  Yes, sir.

13             MR. MURRELL:  I can give you the exact form here.

14             THE COURT:  Okay.  How would these come in, Mr.

15   Murrell?

16             MR. MURRELL:  I would introduce them through our

17   investigator who researched them and came up with the articles.

18             THE COURT:  Okay.  Okay.  And the objection we'll

19   start with Defense 1, which is the Democrat Article dated

20   January 13th, Mr. Kunz.

21             MR. FIELDS:  It's Mr. Fields, Your Honor.

22             THE COURT:  Oh, I'm sorry.  I didn't look up.  Yes,

23   sir.

24             MR. FIELDS:  It's okay.  Hearsay and lack of

25   authentication.

1          THE COURT:  So the hearsay would be addressed this

2    way.  The jury would be told they are not to take this for the

3    truth of the matter.  This gets back to what we talked about

4    earlier, the context of what was going on in the community.  And

5    I think this -- the fact that things like this would be written

6    would change the way or could affect the way a reasonable person

7    would look at it.

8          So, I do think it can come in for -- I think the

9    hearsay objection would be overruled.  Obviously, the jury would

10   be told not to take any of this for the truth of the matter.

11   And I would craft an instruction that would say essentially why

12   they could take it, which would be, again, that the context of

13   what was being communicated to the public and how a reasonable

14   person would receive the comments or the statements that were

15   made.

16         I did have a question about the sort of last five or

17   six paragraphs here.  It seemed like they are completely

18   changing gears and talking about some of the race issues.  Maybe

19   it's related.  What's the response to the authentication issue?

20         MR. MURRELL:  Actually, newspaper articles are

21   self-authenticating.  What is it, Rule 904 or 902.  But even

22   beyond that, I'll have an investigator to say she located the

23   article.

24         THE COURT:  Okay.  Anything else on that, Mr. Fields?

25         MR. FIELDS:  Well, Your Honor, I guess, and I don't

1    want to argue with the Court, obviously.  I'm just thinking in

2    my head how this is any different than the article that the

3    government tried to introduce last week, Wednesday, that an

4    agent pulled from the website with the defendant's statements

5    and a picture of him.  I'm struggling to understand why this

6    article is not hearsay, but that was one.

7            THE COURT:  Right.  And the answer is because that was

8    sort of double -- well, number one, I did reserve ruling on that

9    issue and you were going to revisit that.  We had an

10   authenticity issue where this was something that someone had

11   just found was my understanding of it, that somebody just found

12   this article.  And the article was saying what the defendant

13   said.  And so, that's double hearsay.

14           The defendant statement would be subject to an

15   exception as a statement by a party opponent.  But it was

16   newspaper articles saying that he said that thing.  And that

17   second piece of it was missing.

18           But, again, I didn't rule that that would be excluded.

19   We had some issues about authenticity.  I think there was some

20   questions about how it would come in.  And the way we left it, I

21   think Mr. Kunz said we were going to look into that and come

22   back around on it.  I also don't know that it was even clear

23   where it came from.  I mean, to the extent we're talking about

24   self-authenticating newspaper articles, if it's the exhibit I'm

25   remembering, it was unclear that even it was.  I think it was

1    something someone said they just found on the Internet.  Is that

2    not right?

3            MR. FIELDS:  Yes.  It was like a blog of someone who

4    had interviewed the defendant.

5            THE COURT:  Somebody who said they interviewed the

6    defendant.

7            MR. FIELDS:  With a picture of them.  But, certainly,

8    I understand what the Court is saying.  I guess just the article

9    that Mr. Murrell is talking about, a lot of it has I guess TPD

10   chief's statement in it, right.  So the statement that TPD gave

11   to a reporter is then being printed.  So I just -- in my mind

12   I'm seeing them very similarly in terms of the hearsay issues,

13   but, you know, again, I don't want to --

14           THE COURT:  Well, I don't think they are the same.

15   But, I also think that when we're talking about the context if

16   it turned out, you may disagree with me that this is something

17   that would help on the issue of how a reasonable person would

18   view this, but if every newspaper in the state were reporting

19   and attributing to Chief Revell's statement that he did not make

20   it would still affect the way that that would be viewed because

21   everyone's looking at these things and accepting that.

22           In other words, it doesn't matter whether he actually

23   said this or not.  What matters is what a reasonable person

24   absorbing all of this information would think.  And so that's

25   why I think it's not hearsay.  So the Defense 1 will be allowed

1    subject to the authentication issue being resolved.  I'm not

2    sure that -- I mean, it would have to be a certified copy or

3    something I think to --

4             MR. MURRELL:  No.  Just as newspaper articles are

5    self-authenticating 902(6), is that what we said?  But, again,

6    I'm going to have an investigator testify that she found this.

7             THE COURT:  Okay.  All right.  And then 2.  Similar

8    issue -- well, 2 is two different things, right?

9             MR. MURRELL:  One article is from the Tampa Bay.  The

10   second article is from the Tampa Bay Times.  And the dates are

11   of some importance too.

12            THE COURT:  Which article -- well, which article?

13            MR. MURRELL:  Well, there are 4 pages.  The second two

14   pages just show you what it looks like on the face of the paper,

15   on the newspaper.  But the articles I'm interested in are the

16   ones that are blown up there in the first two pages.

17            THE COURT:  Okay.  I see.  Right.  Because there are

18   other things in this --

19            MR. MURRELL:  Right.  But I'm just showing you how it

20   appears on the front page of the --

21            THE COURT:  Okay.  But, in terms of what you would

22   have go to the jury would be just the front two pages?

23            MR. MURRELL:  Well, I could do that.  I just thought

24   it might make it more credible or more acceptable if you got to

25   see the whole paper, but I can certainly limit it to the first

1   two pages.

2           THE COURT:  Okay.  Any reason that, just a moment.

3   Let me read the second page.  Okay.  Any reason this one would

4   be treated differently, Mr. Kunz, than the other?

5           MR. KUNZ:  Yes, sir, Judge.  You know, the first -- I

6   guess the first -- he has put two pages here, Judge.  The first

7   page, based on the Court's prior ruling, I would agree.  But the

8   second page is talking about every quote from every politician

9   they could find talking about things, and talking about the

10  capitol, what happened at the capitol, and who knows what,

11  Judge.  This is just rank hearsay.  And then the national

12  developments, the military investigating troops for the role in

13  the capitol violence.

14          THE COURT:  Well, I think the national developments

15  portion of the bottom right-hand page two is a completely

16  different article.  I don't think that would go back for any

17  reason.  Do you disagree with that, Mr. Murrell?

18          MR. MURRELL:  No.  That just happened to be part of

19  the page there.

20          MR. KUNZ:  Judge, they talk on that second page too

21  about people arrested at the capitol including a man walking

22  with Speaker Pelosi.  None of that is relevant to anything,

23  Judge.  A, it's hearsay.  And, B, it's not relevant to anything

24  in the case here.  And Mr. Horavoy's (phonetic) comment, someone

25  from the Defamation League Center comment.  And they took a shot

1    in there about democratic lawmakers whose in committee meetings

2    are concerned about their personal safety after seeing Trump

3    loyalists storm the U.S. capitol and breach security protocols.

4    Totally irrelevant to this case, Judge.

5              MR. MURRELL:  I can save everybody some time.  I was

6    more worried about rule of completeness, but I guess if that

7    doesn't concern Mr. Kunz, the government in the first place,

8    that's fine.

9              THE COURT:  I mean, actually some of the stuff you are

10   talking about Mr. Kunz I don't think helps the defendant at all.

11   That's not my issue I guess.  But I will rule on the objections.

12   But you're saying you would just put in the first page?

13             MR. MURRELL:  That would serve our purposes.  Yes,

14   sir.

15             THE COURT:  Yeah.  A lot of the second page talking

16   about people being fearful of what Mr. Murrell is saying never

17   stood a chance of happening.  Which is the -- which exhibit is

18   the CNN article that's already in?

19             MR. MURRELL:  CNN article is Exhibit 4.

20             THE COURT:  Well, no.  I don't believe so.

21             MR. MURRELL:  They don't have any objection to the CNN

22   article.

23             THE COURT:  Yeah, I know.  I was going to compare it.

24   That's yours or that's one of your exhibits, it's not already

25   in?

```
1                MR. MURRELL:  That's correct.

2                THE COURT:  Can I see that, please?

3                MR. MURRELL:  Sure.  This, again, was -- this was

4    the -- if you follow the link on the call to arms you would end

5    up at that article.

6                THE COURT:  Okay.  I will allow the first page of

7    Exhibit 2.  We'll craft an instruction to go along with it.

8                MR. MURRELL:  I can put those back in there, Judge, if

9    that would help.

10                THE COURT:  The instruction would be something like

11    you are not to consider this for -- as proof of anything stated

12    in the article.  You are to consider it only for purposes of how

13    a person --

14                MR. MURRELL:  Maybe what information was available to

15    the public or something like that?

16                THE COURT:  Yeah, something like that.  I'll come up

17    with something and we can talk about it more in the morning.

18                Anything further for today?

19                MR. MURRELL:  No, I think that is everything for us.

20                THE COURT:  Mr. Kunz or Mr. Fields?

21                MR. KUNZ:  No, sir.

22                THE COURT:  All right.  Then I'll see you all back at,

23    maybe we'll come in at 8:15 so we can address that issue with

24    the video.  And, again, if you file any authority on that rule

25    of completeness issue I'll look at that tonight or first thing
```

1   in the morning.

2           MR. MURRELL:  I might say this, of course, we do have

3   the jury instructions which will be very important.

4           THE COURT:  Yes, sir.  We are probably going to have

5   to do that on -- well, let's talk about it a little bit now.

6   Well, no.  Let's -- why don't we begin at 8 tomorrow and we can

7   do some of that and then we can address some more of that on the

8   breaks.  But I guess you're anticipating this would go to the

9   jury tomorrow?

10          MR. MURRELL:  Yes, sir.  I would think so.

11          THE COURT:  Okay.  Well, we'll -- 8 o'clock okay for

12  everybody?

13          MR. MURRELL:  Yes, sir.  We were trying to meet

14  Mr. Johanssen here at 7:30 to work out some video, I think that

15  will work out.

16          THE COURT:  Thank you.  We will be in recess.

17      (Proceedings concluded at 5:43 on Tuesday, May 4, 2021.)

18                      * * * * * * * *

19          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
20  Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
21  transcript.

22

23  /s/ Lisa C. Snyder                   11/23/2021

24  Lisa C. Snyder, RPR, CRR                 Date
    Official U.S Court Reporter

25

```
 1

 2   OTHER RECORD MADE                                   PAGE

 3   Jury Instructions Read By the Court                   16
     Opening Statements By Mr. Kunz                        24
 4   Opening Statements By Mr. Murrell                     32

 5                          I N D E X

 6   GOVERNMENT'S WITNESSES                              PAGE

 7   NICHOLAS MARTI
     Direct Examination By Mr. Kunz                        40
 8   Cont. Direct Examination By Mr. Kunz                 103
     Cross-Examination By Mr. Murrell                     108
 9
     DENISE BIEHN
10   Direct Examination By Mr. Fields                     109
     Cross-Examination By Mr. Murrell                     118
11
     JEFFREY WYNN
12   Direct Examination By Mr. Fields                     120
     Cross-Examination By Mr. Murrell                     124
13
     KATIE HILL
14   Direct Examination By Mr. Fields                     126
     Cross-Examination By Mr. Murrell                     131
15                        E X H I B I T S

16   GOVERNMENT'S EXHIBITS                   OFFERED   RECEIVED

17   1A AND 1B  Posts                          41         41

18   2A AND 2B  Posts                          44         44

19   3       Stipulation                       52         52

20   4A AND 4B  Facebook records               46         46

21   5A AND 5B  Instagram records              48         48

22   6A AND 6B  Google records                 50         50

23   7       Photograph                        54         54

24   8       Photograph                        54         54

25   9A AND 9B  Photographs                    130       130
```

```
 1   Cross-Examination By Mr. Murrell                    131
                         E X H I B I T S
 2
     GOVERNMENT'S EXHIBITS                   OFFERED   RECEIVED
 3
 4   10      Instagram post                    55         55

 5   11      Facebook post                     57         57

 6   12B     Video                             97         97

 7   12A AND 12BFacebook post and video       103

 8   12B AND 12B                                         103

 9   13      Facebook business record          60         60

10   15      Facebook post                     61         61

11   16      Video                             98         98

12   16      Video                            107        107

13   17      Photograph                        62         62

14   18      Facebook post                     63         63

15   19      Facebook post                     65         65

16   20      Instagram post                    66         66

17   22      Instagram post                    72         72

18   23      Instagram post                    73         73

19   24      Facebook post                     75         75

20   25      Facebook post                     75         75

21   26      Instagram post                    76         76

22   27      Instagram post                    77         77

23   28      Facebook messages                 79         79

24   29      Video                            108        108

25   30      Text messages                     82         82
```

```
Cross-Examination By Mr. Murrell                      131
                          E X H I B I T S

GOVERNMENT'S EXHIBITS                      OFFERED   RECEIVED

31      Photograph                            80        80
```