1

2                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF FLORIDA**
3                        **TALLAHASSEE DIVISION**

4                                        )
    UNITED STATES OF AMERICA,            )
5                                        )
                   Plaintiff,            ) Case No: 4:21cr10
6                                        )
            v.                           ) Tallahassee, Florida
7                                        ) May 5, 2021
    DANIEL ALAN BAKER,                   )
8                                        ) 8:05 AM
                   Defendant.            )
9   _____) VOLUME II OF III

10                  **TRANSCRIPT OF JURY TRIAL**
              **BEFORE THE HONORABLE ALLEN C. WINSOR**
11               **UNITED STATES DISTRICT JUDGE**
                     **(Pages 1 through 252)**
12
    APPEARANCES:
13
    For the Plaintiff:        United States Attorney's Office
14                            By:  STEPHEN M KUNZ
                                   LAZARO FIELDS
15                                 Asst. U.S. Attorneys
                                   Stephen.Kunz@usdoj.gov
16                                 Lazaro.Fields@usdoj.gov
                              111 N. Adams Street, Fourth Floor
17                            Tallahassee, Florida 32301

18  For the Defendant:        Federal Public Defender
                              By:  RANDALL MURRELL
19                                 ELIZABETH VALLEJO
                                   Attorneys at Law
20                                 randolph_murrell@fd.org
                                   elizabeth_vallejo@fd.org
21                            227 N Bronough Street, Suite 4200
                              Tallahassee, Florida 32301
22
                         ***LISA C. SNYDER, RPR, CRR***
23              **Official United States Court Reporter**
          **111 North Adams Street, Tallahassee, FL 32301**
24            **(850)567-1374 * lisasnydercr@gmail.com**

25

**P R O C E E D I N G S**

1

2          (Call to Order of the Court at 8:05 AM on Wednesday, May 5,

3     2021.)

4               THE COURT:  Good morning.  Please have a seat.

5               Back on the record for day two.  And we have the

6     defendant present and the lawyers are all present.  Good

7     morning.

8               Let's first talk about the schedule.  Are we still --

9     is it still the case that there'll be one more government

10    witness and no more, Mr. Kunz?

11              MR. KUNZ:  Yes, sir.

12              THE COURT:  And I think you said yesterday that's a

13    relatively short one.

14              MR. KUNZ:  Yes, sir.

15              THE COURT:  And then, I guess, I understand we will

16    need a little time in between, after the government rests to

17    deal with some technical issues.  Are there going to be motions,

18    do you anticipate, Mr. Murrell, that we'll need to deal with?

19              MR. MURRELL:  Yes, sir.  There will be a motion for

20    judgment of acquittal.

21              THE COURT:  Okay.  Then I guess we'll take, maybe it

22    will time out that can be our mid-morning break.  But we'll

23    definitely take a break after the government rests.

24              Okay.  I have -- I am going to hand down a verdict

25    form and some jury instructions.  These are drafts.  They have

1    some placeholders in them.  But we can address some of it before

2    the jury comes back today.  We can address more of it on the

3    breaks.  Is there anything on the indictment that would need to

4    be redacted other than the signature?

5            MR. KUNZ:  I don't think so, Your Honor.

6            THE COURT:  I didn't see anything.  All right.  So

7    we'll talk now about the rule of completeness issue.

8            I said I would consider any additional authority.

9    Nothing was filed, at least last I checked this morning.  Is

10   there any additional argument on the rule of completeness

11   objection to the video going in?

12           MR. KUNZ:  No, Your Honor.

13           THE COURT:  Okay.  So, here's the ruling on that.  I

14   did already rule that that excerpt was mostly not hearsay

15   because it wasn't offered for the truth of the matter, and to

16   the extent it was hearsay, it was subject to the state of mind

17   exception under 803(3).

18           The problem with the rule of completeness objection,

19   one, I mean the rule would allow you to introduce extra things,

20   not take things away.  But none of the extra things that you

21   identified yesterday really are necessary to sort of complete

22   what's there.  They are just kind of discreet topics.  You had

23   mentioned the comment he made about being a career offender and

24   so forth.  So I don't think that that's necessary to preclude

25   any misunderstanding of what was in.  So that objection is

1  overruled.

2        On the newspaper articles I did say I would prepare a

3  hearsay instruction on the government's request when those

4  articles come in.  This is what I put together.  I'm open to any

5  other thoughts.  And, again, this is just if the government

6  wants a hearsay instruction on those.  Ladies and gentlemen, two

7  newspaper articles have come into evidence.  These are

8  statements of what happened and they are made by others, the

9  author of the articles and those quoted, people who did not

10 testify in this case.  Normally, this would be hearsay and not

11 permitted, but there is an exception for when statements are not

12 offered for the truth of the matter as asserted.  In this case

13 you are not to treat these articles as evidence that they --

14 what they say is true or that what is quoted in them -- well,

15 what those quoted in them say is true, these are not evidence of

16 that.  The articles may be considered only to show what

17 information was conveyed to the public at the time the articles

18 were published.

19        Any suggestions, objections, thoughts on that

20 instruction?  First, I guess, does the government want a hearsay

21 instruction when the articles come in?

22        MR. KUNZ:  Yes, sir.  We would.  We have no objection

23 to that.

24        THE COURT:  Mr. Murrell?

25        MR. MURRELL:  I guess my thought is it's, from my view

1    at least, it's a bit of overkill.  I think that's longer than

2    the 404(b) instruction.  But I suppose it's accurate.  So I

3    don't have any objection.

4            THE COURT:  Okay.  What I'll do, this is coming in

5    through your investigator.  When she's finished testifying

6    before the next witness I'll read that instruction then.  I

7    think it's a fine time to do it.

8            There was some discussion in the trial brief that the

9    government submitted about character evidence.  And I think the

10   law they stated is true.  I didn't know if there's anything we

11   need to talk about before your case begins, Mr. Murrell, about

12   anything they've raised.  I'm sorry?

13           MR. MURRELL:  This is Ms. Vallejo's territory.

14           THE COURT:  Okay.  Ms. Vallejo?

15           MS. VALLEJO:  Yes, Your Honor.  We're in agreement

16   with what the government has purported the law to be.  And we

17   don't intend to get into good character.  We intend to stay

18   within the realm of rebutting what has been presented that Mr.

19   Baker is a violent person.  So we intend to introduce reputation

20   and opinion testimony to show that he is a peaceful person.

21           THE COURT:  Okay.  Anything further to talk about on

22   that before that all begins, Mr. Fields?

23           MR. FIELDS:  No, Your Honor.

24           THE COURT:  Okay.  Well, then, in the remaining time

25   we have, unless you all have anything, I thought maybe we'd

```
 1   start talking about the jury instructions.  Is there anything
 2   else that we need to address before the jury comes in, Mr.
 3   Murrell, or Ms. Vallejo or Mr. Kunz?  Anybody?
 4            MR. KUNZ:  No, sir.
 5            MR. MURRELL:  No.  From our perspective it's only the
 6   jury instructions.
 7            THE COURT:  Okay.  Well, let's look at the jury
 8   instructions and we'll see what progress can be made now.
 9            The first couple of pages in what I've handed out is
10   styled Final Jury Instructions.  These are obviously not final.
11   But the first couple of pages are much of the standard things.
12   And there will need to be some changes made depending on whether
13   the defendant testifies or not.  On page four we have
14   impeachment based on the felony.  We haven't had that be a
15   feature of the case yet.  I don't know if it will be.  Same
16   thing with the defendant's testifying.
17            Let's turn to page five.  Page five, the top part of
18   it is straight from the pattern.  The government has proposed
19   adding to the interstate commerce explanation that it includes
20   sending something over the Internet.  What I've got here is not
21   the exact wording they have proposed.  But first let me see what
22   the defendant's position is on the Internet.  I don't think the
23   interstate commerce is much of an issue in this case.
24            MR. MURRELL:  If you want to add that, that's fine
25   with us.
```

1          THE COURT:  Okay.  The government's proposal was a

2   little bit broader.  Let me get it in front of me.  Is it fine

3   the way I have it, Mr. Kunz?

4          MR. KUNZ:  I'm sorry, sir?  Judge, I misunderstood.

5   Are you going to include only the Internet?

6          THE COURT:  Well, I put this in here so we could talk

7   about it.  Mr. Murrell does not object to putting it the way

8   I've got it here.  But it's -- what I've put in here on page

9   five is not identical to what you proposed.  And I'm trying to

10  pull up what you proposed.  Yours was a little broader and I was

11  concerned maybe not completely accurate in all cases.  Although,

12  it was certainly probably correct in this case.  You said this

13  requirement is satisfied when the communication was transmitted

14  or received over the Internet.

15         Well, let me just ask this, do you have any objection

16  to exactly the way the government has proposed it, Mr. Murrell?

17         MR. MURRELL:  No.  I would say it's a lot more words,

18  but either way.

19         THE COURT:  Okay.  Well, do you have a preference Mr.

20  Kunz or -- I will probably just add, in another state, including

21  over the Internet.

22         MR. KUNZ:  That's fine, Judge.

23         THE COURT:  All right.  Then we get into this true

24  threat thing.  And, Mr. Murrell, I'll start with your most

25  recent suggestion about the element.  You've cited an Eighth

1    Circuit case.  I guess I'm struggling to see how it's not

2    covered by the definition of a true threat.

3              MR. MURRELL:  And I looked at that again last night.

4    I think in a sense -- I mean, I think it is frankly.  But my

5    request though is that it be made clearer.  My request is that

6    you explain that there are elements.  One, that the defendant

7    knowingly sent a message through interstate commerce

8    containing -- one, the defendant knowingly sent a message in

9    interstate commerce.  Two, the defendant sent the message with

10   the intent to communicate a true threat or with knowledge that

11   it would be viewed as a true threat.  And, three, that it was,

12   in fact -- the message was, in fact, a true threat.  My request

13   is that you separate that into three elements.

14             THE COURT:  Well, I think if it were separated into

15   three then the first element would have to not say true threat.

16   And the case that you cited that was the problem they had, they

17   just said communication.

18             MR. MURRELL:  That's exactly right.  But I'm just

19   saying the first paragraph you should shorten it.  The defendant

20   knowingly sent a message in interstate commerce.  Two, the

21   defendant sent the message with the intent to communicate a true

22   threat or with the knowledge it would be viewed as a true

23   threat.  And, three, the threat was in fact a true threat or the

24   communication was in fact a true threat.

25             I say that simply because I think it's clearer.  We

```
 1   went through the thing with the government seemingly thinking we

 2   had only a subjective test.  And I just think that it's

 3   important that the jury understand that there are really two

 4   questions that it has to answer.  One is subjectively is it a

 5   true threat.  And objectively is it a true threat.  So, again, I

 6   think you're right.  I think it doesn't -- it's included in

 7   number one in the pattern instruction.  My position, I'm

 8   requesting a different instruction that makes it clearer.

 9            THE COURT:  I think it makes it less clear if you have

10   true threat as an element twice the way that you are laying it

11   out.  If it's going to be three different elements then it would

12   have to be like that case where it doesn't say true threat

13   because the --

14            MR. MURRELL:  Right.  I mean, I agree.  The first one

15   shouldn't say anything about true threat.  The first one should

16   just say the defendant knowingly sent a message in interstate

17   commerce.

18            THE COURT:  That's an element.

19            MR. MURRELL:  And then, two, defendant sent the

20   message with the intent to communicate the true threat, as it

21   reads.  And then, three, that the communication was, in fact, a

22   true threat.

23            THE COURT:  I see what you're saying.  So the intent

24   to communicate a true threat?

25            MR. MURRELL:  Yes, sir.  I think that would be
```

1    clearer.

2            THE COURT:  Okay.  Mr. Kunz or Mr. Fields?

3            MR. KUNZ:  Judge, the pattern instructions covers

4    that.  The two elements that list a true threat and then it's

5    defined.  And I think it's adequate because it's frequent

6    throughout the other instruction, Judge.  I don't think there's

7    any confusion based on the pattern jury instruction.

8            THE COURT:  Yeah, I agree with that.  I think actually

9    the way you laid it out Mr. Murrell may have made it more

10   confusing.  The pattern defines true threat to include the

11   objective standard.  And then that's built into the two elements

12   that are there.  So I think the pattern is adequate.  I'll

13   overrule the request for adding it as a third element.

14           That takes us to your other proposals, Mr. Murrell.

15   You requested to qualify as a true threat it must be a threat to

16   commit an unlawful act.  That's similar to or perhaps

17   overlapping with the Virginia versus Black language that the

18   government has proposed.  I think Friday or last week, Wednesday

19   or Thursday, whatever day it was, we talked about you all seeing

20   if there was any agreement on specific language there.

21           MR. MURRELL:  There was not.

22           THE COURT:  Okay.  Well, I guess the point of the

23   first full paragraph that the government's proposed in paragraph

24   55, and this is something I understand you do not take issue

25   with, Mr. Murrell; is that right, the first paragraph?

1          MR. MURRELL:  Well, I just think it's terribly

2    redundant.  I mean, it's accurate I think, but I don't know why

3    you're telling them that when you've already, a few paragraphs

4    down, tell them what a true threat is.

5          THE COURT:  Let me hear from you Mr. Kunz on that.

6    Let me tell you what I'm thinking.  One of the objections Mr.

7    Murrell had to some of yours was that these are contextual

8    pieces about whether it's conditional and things like that.  He

9    doesn't say those are inaccurate statements.  Although, I do

10   think what you propose down the line about not needing to be

11   communicated directly to someone is accurate.  I think that's

12   probably appropriate here.  But Mr. Murrell's point is

13   everything has to be in context of considerations.  Which is, I

14   guess, part of what the point you were making with this first

15   paragraph.  So it seems like you all may be kind of on the same

16   page.  But a lot of what you proposed in this first bolded

17   paragraph on page three of document 55 certainly seems like

18   we've already captured it.  And so what I've done here on page

19   five of what I've just handed you, defines true threat, which is

20   straight from the proposal.  And then adds the defense proposal

21   that it must be a threat to commit an unlawful act, which is

22   consistent and actually broader than what the government has

23   proposed.

24          And then picks up this language context and

25   circumstances of the communication which you propose from Black,

1    which I think is appropriate.  And then puts in -- I think the

2    way it would flow is those are things that can be considered in

3    the context at the bottom of page five here.

4            So it does -- I do think the way the government had it

5    laid out has some redundancies and some -- well, it has some

6    redundancies that I think could potentially cause confusion.  So

7    the question is, is the way I've got it here on page five

8    objectionable to either side.

9            MR. KUNZ:  I'll let Mr. Fields respond.

10           MR. FIELDS:  Your Honor, I agree that a lot of it is

11   kind of redundant.  And we just wanted to give the Court some

12   tools and that's why we've proposed this the way we did.

13   However, I would note that if the Court were inclined to include

14   the defense proposal about it must be a treat to commit an

15   unlawful act it would seem to me that really the second part of

16   that sentence in Black would be appropriate too where it says,

17   particular individual or group of individuals.  You know, I

18   recognize that further on down the Court was inclined to give it

19   doesn't have to be transmitted to a particular victim

20   instruction.  So, again, I do agree that there is some

21   redundancy.  But perhaps if the Court wants to give the defense

22   request that finishing the sentence might be appropriate.

23           THE COURT:  Okay.  I mean, the defense request was

24   essentially your request, which was a true threat, it's a

25   serious expression of an intent to commit an unlawful act -- an

1    act of unlawful violence to a particular individual or group of

2    individuals.

3            Any objection to saying that, Mr. Murrell?  I mean,

4    I'm not sure either one is necessary, but it's not inaccurate.

5            MR. MURRELL:  I'm sorry.  Where are we reading this

6    from?

7            THE COURT:  What I was reading is from the

8    government's proposal.  So if you look at what I've handed down,

9    where it says, D proposal, ECF 37, the statement that follows

10   that is directly from what you've submitted.  They've submitted

11   something very similar, or I thought it was very similar, at

12   document 55.  If you have that?

13           MR. MURRELL:  I have it right in front of me.

14           THE COURT:  Okay.  On page three at the top.

15           MR. MURRELL:  Page three at the top.

16           THE COURT:  And they've got a cite to Virginia versus

17   Black.

18           MR. MURRELL:  I mean, I guess that would be fine too.

19   Serious expression of intent to commit.  That would be fine.

20   Although, I think --

21           THE COURT:  It really just repeats the --

22           MR. MURRELL:  I mean, it's inconsistent with some of

23   the later language that it doesn't have to be directed to a

24   particular individual.

25           THE COURT:  My other concern is it sort of provides a

1    separate and second -- I mean, we just defined what a true

2    threat is out of the pattern.  This doesn't, I guess, help me

3    understand Mr. Fields how the second part of that or adding to

4    what I have here helps.  I mean, we're saying violation to a

5    particular individual or group of individuals.  Mr. Murrell's

6    suggesting, I think he's right, that may be inconsistent with

7    what the instructions say later, but it actually narrows the

8    definition.  It seems like we're defining true threat in two

9    similar but not quite identical ways back to back.  And if the

10   point is just that the threat has to be something to commit an

11   unlawful act I think that's covered by the way I've got it here

12   which is how the defendant proposes it.

13           MR. FIELDS:  So, would one of the options be to remove

14   it Your Honor or are we --

15           THE COURT:  Well, everything is an option, I guess.

16   That's what I'm trying to figure out here.

17           MR. FIELDS:  If the Court would like to remove it we

18   are not going to object to that.  I'm sorry.  When I say that,

19   Your Honor, it qualifies as a true threat, the communication

20   must be a threat to be an unlawful act.

21           THE COURT:  Right.  I understand.  Mr. Murrell?

22           MR. MURRELL:  Well, I think the jury needs to know it

23   has to be an unlawful act.  I mean, that's pretty critical.

24           THE COURT:  This is the question, Mr. Fields.  What

25   you propose is one hundred percent consistent with this idea

1  that we've got here that a communication must be a threat to

2  commit an unlawful act.  Isn't what you are proposing narrowing

3  what would qualify?  Going from unlawful act, as he has proposed

4  it, to unlawful violence to an individual or group of

5  individuals?

6          MR. FIELDS:  I suppose it could be construed that way.

7          THE COURT:  How else would it be construed?

8          MR. FIELDS:  Well, my only point, Your Honor, was that

9  the particular individual or group of individuals, in this case

10  because the threat was not communicated directly to somebody,

11  it's unlike other cases where the president of the United States

12  is threatened, for instance.  Here I can see the jury thinking

13  well, and Mr. Murrell has argued this, well, who is really being

14  threatened by this.

15          THE COURT:  Right.

16          MR. FIELDS:  And so my only point was that the second

17  part of that Virginia versus Black sentence is appropriate under

18  the circumstances.

19          THE COURT:  But I'm asking why.  I guess, if they are

20  inclined to think, well, there's not -- it wasn't made to a

21  particular person, you're asking for it to be -- is it because

22  it says group, is that what you're getting at?

23          MR. FIELDS:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. MURRELL:  It's fine with me if you give it.  I

1    don't want the Court to misunderstand my position.

2            THE COURT:  Okay.  Well, I guess then the first half

3    is what -- I just don't want to define the term twice.  We can

4    leave it as it is and add, as to a particular individual or

5    group of individuals behind unlawful act in what we've got right

6    now.  Any objection to that, Mr. Murrell?

7            MR. MURRELL:  I'm sorry?

8            THE COURT:  We would just add, if you look at page

9    five of what I've got, which is your proposal Mr. Murrell, to

10   qualify as a true threat a communication must be a threat to

11   commit an unlawful act.  And then just add there, to a

12   particular individual or group of individuals or as to a

13   particular individual or group of individuals.

14           MR. MURRELL:  That's fine.

15           THE COURT:  Then that works for you, Mr. Fields?

16           MR. FIELDS:  Yes, Your Honor.  Thank you.

17           THE COURT:  Okay.  What we'll do, we'll keep working

18   on this until the jury is here and then we'll just bring them in

19   and continue so they are not waiting.

20           Does anybody need a break before the jury does come

21   in?  You need to use the restroom or something?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  Okay.  That's fine.  You can take him.

24           THE DEFENDANT:  Yes, sir.

25           MR. MURRELL:  If he is going to take a break I might

1  take a break, too, Judge.

2              THE COURT:  Okay.  I'll just sit right here.

3              (Break taken.)

4              MR. MURRELL:  Judge, Mr. Baker was asking if he could

5  have a bottle of water here.  Is that acceptable to the Court?

6              THE COURT:  Yes, that would be fine.  Do you have one?

7              MR. MURRELL:  Well, we got somebody bringing one.

8              THE COURT:  Is someone getting one right now?

9              MR. MURRELL:  We'll just go out and meet them in the

10  hall.

11             THE COURT:  All right.  Well, the jury is ready.  So

12  is everyone ready?

13             MR. MURRELL:  We are.  Yes, sir.

14             THE COURT:  Please bring in the jury.

15             MR. FIELDS:  Your Honor, is the rule still invoked?

16             THE COURT:  Yes.

17        (Jury in at 8:33.)

18             THE COURT:  Good morning, everyone.  Please have a

19  seat.

20             Welcome back.  Hope you had a restful evening.  Thank

21  you all for being here on time this morning.  And we are ready

22  to begin.  Is the government ready with its next witness?

23             MR. KUNZ:  Yes, Your Honor.  We call Special Agent Dan

24  McNair, sir.

25          **DANIEL MCNAIR, GOVERNMENT WITNESS, DULY SWORN**

Direct Examination - Special Agent Daniel McNair

1          COURTROOM DEPUTY CLERK:  For the record, state your

2   full name and spell your last name.

3          THE WITNESS:  My name is Daniel McNair, M C N A I R.

4                      DIRECT EXAMINATION

5   BY MR. KUNZ:

6   Q.   Good morning, sir.

7   A.   Good morning.

8   Q.   And by whom are you employed?

9   A.   With the FBI.

10  Q.   In what capacity is that, sir?

11  A.   I'm a special agent.

12  Q.   And how long have you been a special agent with the FBI?

13  A.   It's been about nine years now.

14  Q.   Okay.  I want to direct you back to January 15th of this

15  year, 2021.  On that particular day, did you participate in the

16  execution of an arrest warrant for Daniel Baker?

17  A.   Yes, sir.

18  Q.   Okay.  And can you explain to the jury what location did

19  you go to?

20  A.   We went to Daniel Baker's residence located at 1516 High

21  Road, apartment C2 here in Tallahassee.

22  Q.   And approximately what time of day was it?

23  A.   It was in the morning, around 8 o'clock in the morning.

24  Q.   And with respect to executing the arrest warrant what did,

25  what procedure did you employ?  What did you do?  What happened?

Direct Examination - Special Agent Daniel McNair

1   A.   Well, the plan was to get him there at his residence, as I

2   said.  We believed Baker to be a dangerous individual since we

3   knew that he was armed.  And he had made some threats online as

4   well.  So our plan was to have an agent pose as an Uber Eats

5   delivery driver, that way we could verify that Baker was in fact

6   home.  And, we would have liked to get Baker outside of his

7   residence.  It's safer to arrest somebody outside of their

8   residence rather than going into their apartment to get them

9   since we knew that he had weapons.  So that was the plan.  And I

10  was part of the arrest team.

11       So, we had an agent knock on the front door.  Myself and

12  the rest of the arrest team, we were out of view of the front

13  door that way Baker could not see us.  But we were close enough

14  so we could hear what was going on.

15       When the agent knocked on the door, eventually Baker came

16  to the door.  He cracked the door just a few inches.  It was

17  hard to tell exactly what was being said, but Baker never came

18  out of the residence.  And when it became clear that he was not

19  going to come out, I came around the corner, clearly marked with

20  a ballistic vest that said FBI on it.  I said, FBI, don't move.

21  And Baker slammed the door and locked the deadbolt.

22  Q.   Okay.  And what did you do next?

23  A.   We went to the front door.  Agents and I, we announced

24  multiple times FBI, arrest warrant, come to the door.  And Baker

25  never complied, never came to the door.

Direct Examination - Special Agent Daniel McNair

1    And eventually we forced entry.  We breached the door using

2    a ram to make entry.

3    Q.   Okay.  And once you did that, what occurred?

4    A.   Once we made entry, you know, standing out in front of the

5    front door is a dangerous spot to be as law enforcement.

6    Bullets go through doors, bullets go through walls.  And, again,

7    we knew that Baker was armed.  So we did not want to stay there

8    long.

9        As we breached the door we deployed a flash bang into the

10   residence.  And just so the jury knows what a flash bang is,

11   it's a diversionary device that law enforcement uses to distract

12   and to disorient occupants.  And we do it for safety.  It makes

13   a really loud bang essentially.  And it is distracting.  And we

14   do it for safety to protect agents as we're making entry into

15   the residence.

16   Q.   So y'all used a flash bang?

17   A.   Correct.  Yes, sir.

18   Q.   And what happened then?

19   A.   Once we made entry, Daniel Baker was in the front room, it

20   was kind of like a kitchen area.  He was on the floor.  And he

21   had a handgun in the vicinity, near him, on the floor.

22   Q.   Was Mr. Baker cuffed?

23   A.   Yes, sir.  We placed him in handcuffs.

24   Q.   Do you recognize Daniel Baker in Court today?

25   A.   Yes.

Direct Examination - Special Agent Daniel McNair

1  Q.   And where is he seated?

2  A.   He's seated on the right side of the table.

3  Q.   Defense counsel table?

4  A.   Correct.  Yes.

5  Q.   What color outfit does he have?

6  A.   He has a gray suit on.

7  Q.   Thank you.  Now, were photographs taken of the interior

8  when you arrived, after you had arrived and had taken Mr. Baker

9  into custody?

10 A.   Correct, yes.

11 Q.   I'm going to show you a series of photographs.

12      MR. KUNZ:  And, Your Honor, we're going to move into

13 evidence Exhibits 31A through 31K.

14      THE COURT:  Okay.  Those will be admitted.

15      (GOVERNMENT EXHIBITS 31A-31K31A through 31K received in

16 evidence.)

17      MR. KUNZ:  May I publish?

18      THE COURT:  Yes, sir.

19      MR. KUNZ:  Thank you.

20 BY MR. KUNZ:

21 Q.   Sir, what's this Exhibit 31A a photograph of?

22 A.   This is a photo of the front door to Baker's apartment.

23 Q.   Okay.  I'm going to show you what's marked Exhibit 31B in

24 evidence.  What's this a photograph of?

25 A.   It's a photo of, it looks like a sign that says, the

Direct Examination - Special Agent Daniel McNair

1   revolution is not a party.  The top left of the photo you can

2   see the handgun which originally was on the floor near Baker,

3   but as soon as agents went in we took the handgun to get it away

4   from him so he didn't grab it and made it safe.

5   Q.   Where was Mr. Baker in relation to this photograph?

6   A.   He was on the floor.  That photo is kind of taken of the

7   corner of the room, but he was more so in kind of the middle of

8   the room on the floor.

9   Q.   We have another photograph we can show you too.

10  A.   Yeah.

11  Q.   Let me show you Exhibit 31C in evidence.  And so this was

12  the firearm that he had next to him --

13  A.   Correct, yes.

14  Q.   -- when you entered the premises?

15       And what type of firearm was that?

16  A.   It's a 9-millimeter.

17  Q.   And I notice the magazine is out.  Was the magazine out of

18  it when you first located it?

19  A.   No.  The magazine was in the weapon and there was a round

20  in the chamber as well.

21  Q.   That's what the round is up on the top?

22  A.   Correct, yes.

23  Q.   And that magazine was fully loaded?

24  A.   That's correct.  Yes, sir.

25  Q.   I'm going to show you Exhibit 31D.  And does this give a

Direct Examination - Special Agent Daniel McNair

1   bigger shot or bigger view rather of that kitchen area where you

2   found Mr. Baker?

3   A.    Yes, sir.

4   Q.    And now where was he now, if you could indicate?

5   A.    He was -- from what I remember, he was kind of in the

6   middle of the room there closer to the front door.

7   Q.    And in this shot, it looked like there was a firearm case

8   on the floor that's been picked up and the firearm that had been

9   placed on the window sill for safety had been taken already; is

10  that correct?

11  A.    That's correct, yes.

12  Q.    And was this the kitchen area?

13  A.    That is the kitchen area, yes, sir.

14  Q.    Now, in the next room -- if you can explain the layout of

15  the apartment?

16  A.    Yeah, so the photo is taken essentially from the view of

17  the front door looking into the apartment.  So there's the

18  kitchen area.  And that room there to the right that's the

19  bedroom, the bedroom area.

20  Q.    Let me show you Exhibit 31E.  And is that the room that

21  you're looking into from the kitchen area?

22  A.    Correct, yes.

23  Q.    And, what's on the floor there?  Is that how the shotgun

24  was located?

25  A.    Yes, sir.  It was a 12-gauge shotgun on the floor.

24

Direct Examination - Special Agent Daniel McNair

1  Q.    Okay.  And let me just move it a little bit more.  What are

2  those two red items?

3  A.    Those are 12-gauge shotgun shells.

4  Q.    Okay.  And was the shotgun loaded with ammunition?

5  A.    It was, yes, sir.  It was fully loaded.

6  Q.    Those shotgun shells were additional ones; is that correct?

7  A.    Correct, yes.

8  Q.    Now, another corner of the room, I want you show you

9  Exhibit 31G.  After the shotgun was picked up, is this how the

10  room looked?

11  A.    Yes, sir.

12  Q.    Okay.  And then to the lower left there, what were those

13  documents there?

14  A.    Lower left, those are the fliers titled call to arms

15  January 20th.

16  Q.    Let me show you Exhibit 31F.  Is this a closeup of that?

17  A.    That is.  Yes, sir.

18  Q.    And were there a number of these there?

19  A.    Yes, sir.  There were.

20  Q.    Again, y'all pulled this out and took another picture of

21  that; is that correct?

22  A.    That's correct.

23  Q.    Call to arms January 28, 20th, I'm sorry; is that correct?

24  A.    That is correct, yes.

25  Q.    Also, I want to show you Exhibit 31I.  What is this a

Direct Examination - Special Agent Daniel McNair

1    photograph of?

2    A.    That's a photo of the bookshelf in the bedroom.

3    Q.    Okay.  And is that the same room where the shotgun was?

4    A.    Correct, yes, sir.

5    Q.    And that call to arms?

6    A.    Yes.

7    Q.    And then looking over towards the left of the photo, let's

8    move that in there, was that one of those call to arms fliers?

9    A.    Yes, sir.  That is.

10   Q.    On the bookshelf, back this off, okay.  Is this the item, a

11   closeup view of what appeared on the bookshelf?

12   A.    Yes, the patch?

13   Q.    Yes, sir.

14   A.    Yes.  That's a YPG patch.

15   Q.    Let me show you 31K.  What's this room?

16   A.    That's the closet right off the bedroom.

17   Q.    And I'm not sure, it looks pretty dark, but can you

18   indicate is there a -- what's on the floor in there?

19   A.    It looks like there's a sleeping bag in a closet where

20   someone is sleeping in the closet.

21   Q.    Were there any beds located in the premises?

22   A.    No, sir.

23   Q.    Any tables?

24   A.    Tables, no, sir.

25   Q.    No furniture to speak of?

Direct Examination - Special Agent Daniel McNair

1    A.   No furniture.

2          MR. KUNZ:  May I approach the witness with a few

3    items, Your Honor?

4          THE COURT:  Yes, sir.

5    BY MR. KUNZ:

6    Q.   Special Agent McNair, I've just left for you exhibits

7    marked 32A and 32B.

8          MR. KUNZ:  Your Honor, we'd offer those in evidence at

9    this point.

10         MR. MURRELL:  No objection.

11         THE COURT:  Okay.  That will be admitted.

12         (GOVERNMENT EXHIBITS 32A-32B:  32A and 32B received in

13   evidence.)

14   BY MR. KUNZ:

15   Q.   Sir, is that box marked 32A?  Could you open that?

16   A.   It is, yes.  Yes, sir.

17   Q.   If you can open that?  Okay.  And what is the item that

18   came out of 32A?

19   A.   This is a 9-millimeter Taurus handgun.

20   Q.   And it's unloaded I take it?

21   A.   Correct, yes.

22   Q.   And you checked that before coming in?

23   A.   Yes, we did.

24   Q.   Okay.  And is that the same Taurus that was seized next to

25   Mr. Baker when he was arrested on January 15th?

Direct Examination – Special Agent Daniel McNair

1    A.    That's correct, yes, sir.

2    Q.    And that was taken into custody.  And 32B, it's a packet of

3    ammunition; is that correct?

4    A.    Yes, sir, that's correct.

5    Q.    Okay.  And that's ammunition that was loaded in the Taurus?

6    A.    Yes, sir.

7    Q.    Thank you, sir.  You can put that back.

8    A.    Okay.

9              MR. KUNZ:  May I approach the witness, Your Honor?

10             THE COURT:  Yes, sir.

11             MR. KUNZ:  Exhibit 33A and 33B, Your Honor, we would

12    move into evidence at this point.

13             THE COURT:  Can we have a brief sidebar?

14         (Following conference held at sidebar at 8:51 AM.)

15             THE COURT:  We may have talked about this already, but

16    just consistent with our procedure, I just want to confirm you

17    don't have any objection to any of these guns coming in and

18    ammunition?

19             MR. MURRELL:  No.

20             MR. KUNZ:  I'm sorry.

21         (End of sidebar conference.)

22             THE COURT:  That's Exhibit 33A and B, is that what you

23    said?

24             MR. KUNZ:  Yes, sir.

25             THE COURT:  Okay.  Those will be admitted.

Direct Examination - Special Agent Daniel McNair

1          (GOVERNMENT EXHIBITS 33A-33B:  33A and 33B received in

2    evidence.)

3    BY MR. KUNZ:

4    Q.    If you look in 33A, what's in that box?

5    A.    It's a 12-gauge shotgun.

6    Q.    Okay.  And where have you seen that before?

7    A.    That was the weapon on the floor in the bedroom.

8    Q.    Okay.  And can you just take that out and show the members

9    of the jury?  And that's the same weapon that you seized that

10   day; is that correct?

11   A.    Yes, correct.

12   Q.    And Exhibit 33B, are those the shotgun shells that were in

13   the weapon?

14   A.    Yes, they are.

15   Q.    All right.  Thank you, sir.  You can put that back in the

16   box.

17   A.    Yes, sir.

18   Q.    Now, sir, during your investigation of Mr. Baker, you were

19   aware that his cellphone was seized; is that correct?

20   A.    Yes, sir.

21   Q.    In fact, the cellphone was present and a photograph had

22   actually been taken of that; is that correct?

23   A.    That's correct, yes.

24   Q.    All right.  And were you aware that the contents of the

25   phone were examined?

Direct Examination - Special Agent Daniel McNair

1   A.   Yes, sir.

2            MR. KUNZ:  I want to move into evidence, Your Honor,

3   Exhibit Number 34, which is emails from that phone.

4            THE COURT:  Yes, sir.  Exhibit 34 will be admitted.

5        (GOVERNMENT EXHIBIT 34:  34 received in evidence.)

6   BY MR. KUNZ:

7   Q.   Third page from that exhibit, what do these relate to,

8   Agent McNair?

9   A.   These messages relate to Baker's purchase of a firearm

10  online.

11  Q.   Okay.  Now, the first message relates to a purchase of some

12  sort of 3D printer; is that correct?

13  A.   That's correct, yes.

14  Q.   It's indicating here, and it's an order that indicates it's

15  confirmed and indicates Daniel getting an order ready to be

16  shipped; is that correct?

17  A.   Correct, yes.

18  Q.   And the price of that, if you look down, is what?

19  A.   $214.99.

20  Q.   And is there an address where it was being sent to?

21  A.   Yes.  It's Baker's apartment.

22  Q.   Now, the next item from his phone on or about January 9th,

23  2021, that middle message, what does that indicate?

24  A.   It indicates that Baker received $500.

25  Q.   Okay.  And, addressed to him and it's from -- who is it

1    from, does it indicate?  Support Action --

2    A.    Support Action Rojava.

3    Q.    Okay.  Sending $500; is that correct?

4    A.    Yes.

5    Q.    Now, the very next email on top is a, on January 10, about

6    3:40 UTC time is an indication of registration to Sportsman

7    Outdoor Super Store; is that correct?

8    A.    Yes, sir.

9    Q.    And let's go a little further here.  On the bottom here on

10   January 10th about 3:44, there's a Sportsman Outdoor Super Store

11   order confirmation; is that correct?

12   A.    Yes, sir.

13   Q.    And if you can indicate, what was ordered by Mr. Baker?

14   A.    He purchased a Mauser AK-47 rifle.

15   Q.    Okay.  And also did he purchase some ammunition from

16   another location?

17   A.    He did.  Yes, sir.

18   Q.    That ammunition was going to be delivered to his home

19   address, shipping address; is that correct?

20   A.    Correct, yes.

21   Q.    Let me just go back down.  The Mauser rifle that we're

22   talking about, long rifle, where was that going to be shipped

23   to?

24   A.    He was having that shipped to Mike's Pawn Shop which is a

25   federal firearms licensed dealer.

Direct Examination - Special Agent Daniel McNair

1    Q.   So an individual can order a firearm online from a company,

2    but it's going to be sent to a licensed firearm dealer; is that

3    correct?

4    A.   That is correct, yes, sir.

5    Q.   And that's where the individual would go and pick it up?

6    A.   That's correct, yes.

7    Q.   I haven't shown -- I'm not going to go back and show that,

8    but was some of the ammunition that was ordered was it hollow

9    point ammunition?

10   A.   That's correct.

11   Q.   Can you explain to the jury, hollow point ammunition, is

12   there any significance to that?

13   A.   Hollow point ammunition is designed to be more lethal than

14   regular full metal jacket rounds.  They are designed on impact

15   to mushroom and expand to do more trauma.

16   Q.   And that ammunition that was ordered from that other

17   surplus place included hollow point ammunition; is that correct?

18   A.   That's correct, yes, sir.

19   Q.   Based on this information, did you and Agent Marti go to

20   Mike's Pawn Shop?

21   A.   We did, yes, sir.

22   Q.   Did you learn that in fact the Mauser firearm that Mr.

23   Baker had paid for was delivered to Mike's Pawn Shop?

24   A.   Yes, it was.

25   Q.   And on or about January 27th, did y'all go to Blue Line

Direct Examination - Special Agent Daniel McNair

1  Solutions, I'm sorry, to Mike's Pawn Shop and obtain the firearm

2  that Mr. Baker had actually purchased?

3  A.    We did, yes, sir.

4  Q.    And that firearm, let me just show you this first.

5           MR. KUNZ:  Your Honor, I move Exhibit 35A through C

6  into evidence.

7           THE COURT:  Okay.  35A through C are admitted.

8       (GOVERNMENT EXHIBITS 35A-35C:  35A through 35C received in

9  evidence.)

10  BY MR. KUNZ:

11  Q.    Is this a picture of the firearm you picked up from Mike's

12  Pawn Shop?

13  A.    Yes, it is.

14  Q.    And this is that Mauser .22 long rifle that Mr. Baker had

15  purchased; is that correct?

16  A.    That is correct, yes, sir.

17  Q.    He just hadn't picked it up yet; is that right?

18  A.    Correct, yes.

19  Q.    Now, looking close on this firearm, is there an insignia on

20  the top AK-47?

21  A.    Yes, sir, there is.

22  Q.    In terms of referencing the model; is that correct?

23  A.    Correct, yes, sir.

24  Q.    Exhibit 35B, this is the box that it was shipped in?

25  A.    Yes, sir.

Direct Examination – Special Agent Daniel McNair

1   Q.   Okay.  And you received the box and that rifle; is that

2   correct?

3   A.   Correct, yes, sir.

4   Q.   And 35C, attached to it was a purchase order; is that

5   correct?

6   A.   That's correct, yes.

7   Q.   And that's from Sportsman Outdoor Super Store; is that

8   correct?

9   A.   Yes, sir.

10  Q.   And it describes it as a Mauser Blueline Solution long

11  rifle, AK-47, .22 long rifle; is that correct?

12  A.   Correct, yes, sir.

13  Q.   And the price for it was what, total price paid?

14  A.   The total is $483.74.

15  Q.   Okay.  And, this was billed to Mr. Baker at his High Road

16  address; is that correct?

17  A.   That's correct, yes.

18  Q.   But it was shipped to Mike's Pawn Shop on West Tennessee

19  Street?

20  A.   Yes, sir.

21          MR. KUNZ:  May I approach the witness, Your Honor?

22          THE COURT:  Yes, sir.

23  BY MR. KUNZ:

24  Q.   Agent McNair, if you can take a look at that.  And do you

25  recognize that item in Exhibit Number 36?

Direct Examination - Special Agent Daniel McNair

1   A.   Yes, sir.  I do.

2              MR. KUNZ:  Your Honor, we'd move that into evidence.

3              THE COURT:  Okay.  That will be admitted.

4        (GOVERNMENT EXHIBIT 36:  36 received in evidence.)

5   BY MR. KUNZ:

6   Q.   And what is that item?

7   A.   It is the rifle that Baker ordered, the AK-47.

8   Q.   And maybe if you can just show how it was packaged to the

9   jury so they can get a better view of it.

10  A.   Sure.  It's got the rifle with the buttstock that's

11  detachable and the magazine.

12  Q.   Okay.  And does that stock get affixed to that?

13  A.   Yes.

14  Q.   Or it could be used without that stock; is that correct?

15  A.   Yes, sir.

16  Q.   And then there is a magazine?

17  A.   Yes, correct.

18  Q.   And that's what was delivered to Mike's Pawn Shop for Mr.

19  Baker; is that correct?

20  A.   Yes, sir.

21  Q.   That's the actual firearm he purchased?

22  A.   That is the firearm, yes, sir.

23  Q.   Okay.  Thank you, sir.

24  A.   You are welcome.

25             MR. KUNZ:  I have no further questions for Agent

Cross-Examination – Special Agent Daniel McNair

1    McNair.  Thank you, Your Honor.

2             THE COURT:  Okay.  Thank you.

3                    CROSS-EXAMINATION

4    BY MR. MURRELL:

5    Q.   If I could have just a moment to borrow one of the

6    government's exhibits here?

7         Good morning, Agent McNair.

8    A.   Good morning.

9    Q.   So as far as executing the search warrant the plan was to

10   make it look like it was a delivery, Chic-fil-A?

11   A.   Yes, sir.

12   Q.   And when Mr. Baker opened the door a crack somebody held up

13   the Chic-fil-A bag?

14   A.   Yes, that's my understanding.

15   Q.   And then he slammed the door?

16   A.   Correct, yes.

17   Q.   Slammed the door shut?

18   A.   Yes, when I said FBI, don't move.

19   Q.   Right.  Right.  You ran up.  And then you said it's not a

20   good idea to stand in front of the door for very long, it's

21   dangerous?

22   A.   Correct, yes, sir.

23   Q.   So y'all didn't stand in front of the door very long?

24   A.   I'm not sure exactly how long we were.  Maybe 30 seconds;

25   20, 30 seconds as we're announcing.

Cross-Examination - Special Agent Daniel McNair

1   Q.   But the idea is it's dangerous, you don't want to stand in

2   front of that door?

3   A.   Correct, yes.

4   Q.   So you want to get in as quickly as you can?

5   A.   Yes.

6   Q.   And when you got in I heard you say that the firearm, the

7   handgun was in the vicinity of Mr. Baker?

8   A.   Correct, yes.

9   Q.   He didn't have it in his hand?

10  A.   That's right.  He did not have it in his hand.

11  Q.   It was some distance away?

12  A.   I don't remember exactly how far away it was from him.  I

13  believe it was within arm's reach of him.

14  Q.   But he didn't have the gun?

15  A.   Correct.  It was not in his hand.

16  Q.   And he was already on the ground?

17  A.   Yes.

18  Q.   Face down on the ground?

19  A.   Yes.

20  Q.   You know I heard you and Mr. Kunz talking about the AK-47.

21  I didn't count it exactly, but between you and Mr. Kunz I think

22  you mentioned that AK-47 about maybe 10 times?

23  A.   If you say so, yes, sir.

24  Q.   Let me show you Government Exhibit 35B.  And this is

25  already in evidence.  What I didn't hear anybody mention was

Cross-Examination – Special Agent Daniel McNair

1   that it was an AK-47 replica.  Did you say anything about that?

2   A.   I don't believe so.  No, sir.

3   Q.   Okay.  An AK-47 is a pretty lethal weapon, isn't it?

4   A.   Yes, sir.

5   Q.   What sort of -- a real AK-47, what sort of ammunition is

6   used in a real AK-47?

7   A.   It shoots a larger caliber bullet.  It's a 7.62-millimeter

8   by 39-millimeter I believe.

9   Q.   And this was a 22-caliber rifle?

10  A.   That's correct.  Yes, sir.

11  Q.   It had a little bigger magazine than a regular 22-caliber

12  rifle?

13  A.   Yes, sir.

14  Q.   But it was a 22-rifle?

15  A.   Correct, yes, sir.

16  Q.   Same kind of rifle people use for target shooting, hunting?

17  A.   Yes, sir.

18  Q.   We've had 22-rifles around for a long time?

19  A.   Yes, sir.

20  Q.   This is a pretty cool looking 22-rifle, right?

21  A.   It's designed to look like a military style assault rifle,

22  correct, yes.

23  Q.   But it's a 22-rifle?

24  A.   It is, yes, sir.

25  Q.   And it's a replica?

Redirect Examination – Special Agent Daniel McNair

1    A.    Yes.

2    Q.    And he never did pick up this firearm, did he?

3    A.    He did not.  It was shipped to the dealer on January 19th

4    after he was arrested.

5    Q.    Right.  So he never took possession of the firearm?

6    A.    He did not have possession of it.

7              MR. MURRELL:  Thank you.  That's all the questions I

8    have.

9              THE COURT:  Okay.

10                    REDIRECT EXAMINATION

11   BY MR. KUNZ:

12   Q.    One question, Special Agent McNair.  In your experience as

13   an FBI agent, what is your understanding of whether a 22-rifle

14   can be lethal or not?

15   A.    Yes.  It's still a firearm.  And a 22 round is definitely

16   lethal.  And it's my understanding that they are easier to

17   suppress as well.  It's lower caliber.

18   Q.    Thank you, sir.

19   A.    You are welcome.

20             THE COURT:  Special agent, you can step down.  Thank

21   you.

22             THE WITNESS:  Thank you, sir.

23             MR. KUNZ:  Your Honor, the government would rest its

24   case.

25             THE COURT:  Okay.  Ladies and gentlemen, the

1   government has now rested its case.  Before we move to the next

2   phase of the case, we're going to have to take a break.  So our

3   mid-morning break is a little earlier today.  We may have

4   another break later in the morning, but this will probably be

5   about 20 to 30 minutes before we have you back in.  If you'll

6   head to the jury room.  Leave your pads there again.  And,

7   again, do not talk about the case, don't form any conclusions or

8   opinions until you've heard all of the evidence and begin

9   deliberating.  So thank you, ladies and gentlemen.

10        (Jury out at 9:08.)

11             THE COURT:  You all have a seat.  Okay.

12             MR. MURRELL:  I would ask the Court for a judgment of

13   acquittal.  In our view --

14             THE COURT:  Can you, I'm sorry, before we do this, can

15   we just go over the exhibits that just came in?  I just want to

16   make sure we are consistent with our thing.

17             So, the photos 31A through 31K were the search warrant

18   photos.  And there was an objection only to the one photo of the

19   bookcase, as I recall.  And that was a 403 and that was

20   overruled.  Anything else on 31, those photos, Mr. Murrell?

21             MR. MURRELL:  There were no other objections.  No,

22   sir.

23             THE COURT:  Okay.  And then the actual firearms 32A,

24   and B, the firearm and ammunitions, the 9-millimeter firearm and

25   ammunition, 33A and B, the shotgun and ammunition, there was no

1  objection to those, correct?

2          MR. MURRELL:  That's correct.

3          THE COURT:  And then the receipts, Government 34,

4  there was no objection.  I think we talked about that the other

5  day; is that right?

6          MR. MURRELL:  Yes, sir.  That's correct.

7          THE COURT:  And then 35A through C, the photos of the

8  Mauser 22 there was no objection to, correct?

9          MR. MURRELL:  Yes, sir.

10          THE COURT:  And 36, there was no objection to the

11  rifle itself?

12          MR. MURRELL:  Correct.

13          THE COURT:  I'm sorry.  I didn't mean to interrupt

14  you.  Yes, sir.  You can make your motion.

15          MR. MURRELL:  I was going to ask the Court for a

16  judgment of acquittal.  I would say as a matter of law the

17  government hasn't proven that there was a true threat.  I think

18  too given the evidence no reasonable jury could find Mr. Baker

19  guilty of the offense.

20          I say that on the basis of the objective part of the

21  requirement.  The threat was very much a conditional threat.  It

22  was conditioned upon some extremely unlikely events.  One, an

23  armed racist mob showing up at the capitol.  Two, this armed

24  racist mob deciding to attack the capitol.  And, three, this

25  armed racist mob overrunning the police.  So it was conditioned

1    upon some very unlikely events.

2         It was from, all appearances the group that was

3    supposedly targeted did not exist.  We've had some debate about

4    this.  But my view is that in judging the reasonable man

5    standard you attribute the reasonable person, the reasonable

6    person standard you attribute what I described as perfect

7    knowledge to the reasonable man.  But maybe another way to say

8    it would be that the reasonable person has an accurate

9    understanding of what the true facts are.

10         But even with that, the Court takes a narrower view.

11   The Court's view is that it's based on information that was

12   available to the public.  We haven't introduced the evidence yet

13   that shows that the best information out there was that there

14   were no immediate threats.  But, again, I think whether you use

15   that standard or whether you use the standard that I've

16   proposed, it does not appear the group even existed.

17         So you have an unlikely -- based on unlikely series of

18   events with a message communicated to a group that doesn't

19   exist.  And beyond that, I would argue that what Mr. Baker was

20   talking about, defending the capitol, was entirely legal.

21   Citizens do have the right to bear arms to protect the state.

22   And for that reason alone, as well as with the others, our view

23   is that as a matter of law the government has not proven that

24   there was a true threat and that no reasonable jury could find

25   that this was a true threat.

1          THE COURT:  Okay.  And to be clear, you are not making

2   any argument on the subject of side things, this is all based on

3   the objective reasonable threat test?

4          MR. MURRELL:  All based on the objective test.

5          THE COURT:  Okay.  Mr. Fields or Mr. Kunz?

6          MR. KUNZ:  Judge, the burden here, Judge, is that it

7   doesn't have to show that no reasonable jury could ever return a

8   guilty verdict.  I don't think that's the case here, Judge.  The

9   evidence is more than ample to satisfy all of the elements of

10  the crime.  Counsel's assertion that it's a conditional threat,

11  so therefore it's not valid, that's contrary to the law, Judge.

12  It doesn't have to be a person.  They've indicated to -- the

13  threat was made to individuals coming to the capitol, for

14  individuals. That's consistent with the case law.

15          The potential defense that counsel is talking about,

16  Judge, is really not relevant to this motion for acquittal at

17  this point.  But in any event, Judge, this defendant did not

18  have a right to be an armed person to go in the state of Florida

19  and say I'm going to defend against people coming here to

20  protest.

21          Law enforcement exists.  National Guard exists.

22  Individuals just can't suddenly go out there and say I'm going

23  to commit an act of violence to protect the capitol from

24  attacks.  So we disagree with what defense counsel is arguing

25  that he has a Second Amendment right to just go outside one day

1    and say I'm going to go out and kill some protesters who may be

2    attacking the capitol.  The evidence is more than ample, Judge,

3    with respect to defendant's commission of this offense.  So we

4    would ask the Court to deny the motion.

5            THE COURT:  Okay.  Any final word, Mr. Murrell?

6            MR. MURRELL:  Well, I do want to make it clear that's

7    not the charge that he was going to -- I mean, that's not the

8    call to arms that he was going to assault protesters.  The call

9    to arms says, we need to act only if they overrun the police and

10   take over the capitol.

11           THE COURT:  Okay.  Well, the motion will be denied.  I

12   mean, there's no argument that he didn't make the

13   communications.  There's no argument that he didn't have a

14   subjective intent to make a threat.  So really the question is

15   whether the government's presented evidence that this was a true

16   threat.  And as we were talking about with the jury

17   instructions, a true threat is a serious threat that made under

18   circumstances that would place a reasonable person in fear of

19   being kidnapped or injured or another person being kidnapped or

20   injured.

21           That's typically an issue for the fact finder.

22   Obviously, the question is whether a reasonable fact finder

23   could find under these facts that it was a true threat.  And I

24   think they could.

25           Again, viewing the evidence in the light most

1   favorable to the government, and looking at the communications

2   themselves, a reasonable jury could disagree with what you are

3   saying about exactly what was being communicated here.

4           So anyway, the motion for judgment of acquittal is

5   denied.

6           Anything further on that or any clarification or

7   anything?

8           MR. KUNZ:  None.

9           MR. MURRELL:  Nothing further, Judge.  Thanks.

10          THE COURT:  All right.  We talked about this a little

11  bit yesterday, Mr. Baker.  I just want to revisit this issue

12  about your testifying.  I want to make sure you understand that

13  even though there's been some discussion that you would testify

14  and it was suggested in the opening argument or opening

15  statement that you would, you have the right to choose to or to

16  not testify.  Do you understand that?

17          THE DEFENDANT:  I understand, Your Honor.

18          THE COURT:  And it's your choice to testify?

19          THE DEFENDANT:  I will testify.

20          THE COURT:  Okay.  And you've talked to Mr. Murrell

21  again about the benefits, pros and cons of testifying?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Are there any prior felony impeachment

24  issues, Mr. Murrell, with this?

25          MR. MURRELL:  No, sir.

1          THE COURT:  Let's pick up where we left off about the

2     jury instructions, if we can.  We've resolved on page five the

3     issue about to qualify as true threat, that statement there.  So

4     the next issue is the government's proposal which has been, I

5     think, I paraphrased it here, second to last paragraph on page

6     five.  What I did here was pick up the, some of what you had in

7     the first paragraph, Mr. Kunz or Mr. Fields, about the context.

8     And it also picked up I think or was trying to address your

9     requests Mr. Murrell about pointing out that the overall

10    context, circumstances matter, which you had made in response to

11    their request for some of these specific things.

12          So, any objection to the penultimate paragraph here on

13    page five that begins, in determining whether?

14          MR. MURRELL:  None from the defense.

15          MR. KUNZ:  None from the government, Judge.

16          THE COURT:  Okay.  We'll add that.  And then the last

17    paragraph here on page five is the several points that the

18    government requested that I think you said Mr. Murrell are

19    correct statements of law and I think they are.  And I think

20    from the facts of this case that has been presented as

21    appropriate, but I wanted to see if you had any further

22    objections.  I had addressed some of what you had raised, I

23    think with this previous statement, but let me hear what you

24    think about that last one.

25          MR. MURRELL:  Well, I do object to that.  Again, to

1  me, it's not balanced.  I think it's an accurate statement of

2  the law, but my concern is that a jury would then think that

3  these things are circumstances they cannot consider.  I think

4  they can consider whether it's directed to a particular person,

5  they can consider whether it's conditional and they can consider

6  whether it's imminent.  And my concern is that this instruction

7  will lead them to believe that these factors are irrelevant all

8  together, and they are not.

9            THE COURT:  Okay.

10           MR. MURRELL:  The law is clear that they are.

11           THE COURT:  I don't know that it would lead them to

12  think that, but I think perhaps adding a sentence at the end of

13  that that just says, however, these are factors that may be

14  considered in determining whether something is a true threat.

15  Any objection to that?

16           MR. MURRELL:  That would be fine.

17           THE COURT:  Mr. Kunz?

18           MR. KUNZ:  That's fine, Judge.

19           MR. MURRELL:  So with that I don't have any objection.

20           THE COURT:  Okay.

21           The government had proposed, in document 55 at the

22  bottom of page three, a statement about the First Amendment and

23  the Second Amendment.  I'm not sure how the Second Amendment

24  would even come in or how someone would consider that to be an

25  issue here.  The First Amendment, I understand the point.  I

 1  guess the question is, why that would be necessary in light of

 2  the overall, you know, it would be multiple instructions that

 3  they are to just make these factual decisions that defines what

 4  the facts they'd have to find to find a true threat.  I'm not

 5  sure that the overall instruction is helpful or useful.  But,

 6  what is the, on the Second Amendment, help me understand how a

 7  juror would even conceivably think that there would be a Second

 8  Amendment defense to this?

 9          MR. FIELDS:  Well, I suppose it kind of depends on

10  Mr. Murrell's argument, but I anticipate the defenses argument

11  would be that Mr. Baker was defending the capitol and he has a

12  right to do so.  And, you know, juries, they are finicky and

13  will hone in on issues that lawyers sometimes don't think are

14  issues and they end up being issues.  And our position, Your

15  Honor, is just that with respect to the right to free speech or

16  the right to bear arms, that's not something for them to

17  consider in this case because I just don't think that this is a

18  self-defense case or really a free speech case.  And so that's

19  the reason why the government opposed this just so that the jury

20  does not wade into those mucky waters.

21          THE COURT:  Okay.  Mr. Murrell?

22          MR. MURRELL:  I think the jury does need to consider

23  these things, but I don't think they need to be phrased in terms

24  of the First Amendment or the Second Amendment.  And I think the

25  instructions that the Court is proposing addresses the First

```
1    Amendment concerns.
2              THE COURT:  When you say the jury should be
3    considering First Amendment issues, what do you mean by that?
4              MR. MURRELL:  Well, they have to decide whether it's a
5    true threat.
6              THE COURT:  Right.  But they do that based on the
7    definition that I give them which the Supreme Court has said --
8              MR. MURRELL:  Right.  And that's exactly what I'm
9    saying, that the instructions already address that issue.  So we
10   don't need to mention the First Amendment.
11             THE COURT:  Are you going to be mentioning the First
12   Amendment in your closing?
13             MR. MURRELL:  No, sir.
14             THE COURT:  I mean, I guess the concern would be that
15   they could say well, I think X, Y, Z communication is First
16   Amendment protected and so we're not going to convict even if it
17   meets this definition.  I don't understand the Second Amendment
18   concern.
19             MR. MURRELL:  Well, I mean, as far as the instructions
20   I think you have to assume the jury is going to follow the law
21   and not strike out on their own and say, oh, gee, we're going to
22   forget these instructions and we understand what the First
23   Amendment is or says and so we're going to find him not guilty.
24   I don't think you can assume that.  I think the instructions
25   adequately cover the topic.  I don't think we need to mention
```

1   the First Amendment at all.

2          THE COURT:  What's the prejudice in just saying you're

3   not to consider whether any statement was protected by the First

4   Amendment?

5          MR. MURRELL:  Well, because I think it's wrong.  I

6   mean, they are considering that.  That's exactly what they are

7   considering.  But we just don't toss around the term First

8   Amendment.

9          THE COURT:  In what context are they considering that?

10         MR. MURRELL:  Well, if it's going to comply with the

11  First Amendment it has to be a true threat.  And you're telling

12  them what a true threat is.  So that's how it's being

13  considered.  I think, you talk about instructions that confuse

14  the jury, well, what does the First Amendment mean?  How do they

15  interpret the First Amendment?  It's only going to confuse the

16  jury.  And, again, --

17         THE COURT:  You said they should be thinking about the

18  First Amendment.  I guess I'm not following you.

19         MR. MURRELL:  I'm not saying -- they just follow the

20  instructions.  They don't have to think about the First

21  Amendment at all.  But in following the instructions they will

22  be complying with the requirements of the First Amendment.

23         THE COURT:  Okay.  But what's the prejudice in telling

24  them that?  I mean, I do understand that there could be a

25  situation where someone is saying, hey, wait a minute, and so if

1    we say, by following these instructions, or say something like

2    you are not to concern yourself with the First Amendment because

3    these instructions --

4            MR. MURRELL:  I mean, I think it's just dead wrong

5    because they -- I mean, in their own way, given the

6    instructions, they are considering the First Amendment.  I mean,

7    this is -- here you're telling them -- you're giving them the

8    law about the First Amendment really.  In effect that's what

9    you're doing.  And then you're turning around the proposal you

10   turn around and say, oh, don't consider the First Amendment.  I

11   mean, it's entirely inconsistent.  I think it's legally

12   incorrect.  And I think it's just going to confuse the jury.

13           THE COURT:  It's not legally incorrect to tell them

14   that a true threat is not protected by the First Amendment.

15   Now, to say it that way is perhaps confusing because then they

16   would start having to wonder whether something is protected by

17   the First Amendment.  I guess I'm not understanding exactly what

18   you're saying about their consideration of the First Amendment.

19   There should be no argument about the First Amendment.

20           MR. MURRELL:  I agree.

21           THE COURT:  And there should be --

22           MR. MURRELL:  I'm not going to say a word about it.

23           THE COURT:  And there should be no deliberations, the

24   question should be whether the statements, as to this part of

25   the deliberations, whether the statements were true threats as

1    defined by the law.  And what I think the government is saying

2    they want to avoid is the jury saying, well, we do think it

3    meets this definition, but we have our own personal legal

4    concept of what the First Amendment does or doesn't protect and

5    so we're going to acquit based on our own First Amendment views.

6            MR. MURRELL:  And if you start throwing around the

7    term First Amendment it doesn't solve that problem.  Somebody

8    might -- I mean, you'd have to explain to them what the First

9    Amendment means if you're going to tell them the First Amendment

10   has no application here.  It just seems to me it's ripe for

11   confusion and it's not an issue.  I mean, we could talk about

12   all kinds of amendments, I suppose.  It's not a violation of due

13   process.  I mean, it just goes on and on and I don't see any

14   sense in it.  It's just going to confuse the jury.

15           THE COURT:  Anything further, Mr. Fields?

16           MR. FIELDS:  No, Your Honor.

17           THE COURT:  We'll come back to that one.  There won't

18   be an instruction about the Second Amendment.  I'm not sure how

19   that would fit in anyway.  And I don't think there's any

20   suggestion or could be a suggestion that the Second Amendment

21   protects the right to make threats or say these communications.

22   The issue about whether they have a Second Amendment right to

23   defend the capitol I guess is what we'll talk about next.  And

24   that's number 36, ECF 36.

25           So there's two points to this.  And I asked you at the

1   last hearing whether there was any additional authority.  I have

2   looked at what you submitted.  But the first part of this,

3   citizens have the right to use armed force and even deadly force

4   to defend the state against an imminent threat.  I didn't see

5   the application of that here.  And you were talking about the

6   state and the capitol as a symbol and things like that.  But

7   give me whatever your argument is on this one, Mr. Murrell.

8          MR. MURRELL:  Well, again, I think citizens do have

9   the right to defend their capitol.

10          THE COURT:  But what does that mean?  In other words,

11   if people are vandalizing the state capitol, people have the

12   right to do what?

13          MR. MURRELL:  To bring a hault to it.  Can citizens

14   prevent somebody from vandalizing the capitol?  Yes, I think so.

15   You have to use proportional force.  You know, if it's a group

16   of people that wander in and start writing graffiti on the wall

17   could a citizen intervene?  I think so.  You wouldn't expect a

18   citizen to use an armed rifle because that's not proportional.

19          On the other hand, if a group of armed individuals

20   assault the capitol, and in an attempt to take it over, yes, I

21   think it would be proportional to defend the capitol with arms.

22          THE COURT:  The capitol building?  I mean, is that

23   what you mean when you say the state?  We touched on this a

24   little bit.  Would you have a different analysis if it were a

25   SunTrust Bank building?

1          MR. MURRELL:  We talked about this.  Yes, I think it's

2    a harder question.  It's a harder question.  But here it seems

3    to me it's not a hard question because capitols traditionally

4    are viewed as a symbol of the state.  Armies, when they attack a

5    country, they want to take the capitol.  This goes back to, who

6    knows how far.  But, yes, the capitol is a symbol of the state.

7    And when you're defending the capitol building I would suggest

8    you are defending the state.

9          You know, a lot of talk about the incident in

10   Washington D.C., one of the most common terms was that this was

11   an insurrection.  It's not an insurrection to just vandalize a

12   building.  It's an insurrection when you take over the capitol.

13   It would be an insurrection here to take over the Florida

14   Capitol.  So, yes, I think that when you defend the capitol

15   building you are defending the state.

16         THE COURT:  And this goes to his subjective intent?

17         MR. MURRELL:  No.  It goes to whether it's a -- I'm

18   sorry, it goes to whether it's an objective threat, yes.  I

19   mean, it cannot -- well, for that matter, I guess it does go to

20   subjective intent.

21         THE COURT:  That's the only thing -- I thought that

22   whole argument was that is what he was intending here.

23         MR. MURRELL:  Well, no.  I mean, it's from the face of

24   the flier.  I mean, if you read the flier it says, help us

25   defend the capitol against these armed racists.  So I think it

```
1   probably applies to both.  A, he did intend to defend the
2   capitol, which would make it lawful.  And, B, objectively that's
3   what the flier says, we need volunteers to defend the capitol.
4              THE COURT:  Mr. Kunz or Mr. Fields?
5              MR. KUNZ:  Judge, I think we've argued this
6   previously.  We still take the position that it's not an
7   appropriate instruction.  It's not a defense to true threat
8   because I plan on going to the capitol and I'll kill people,
9   armed people if they try to take over the capitol.  We just
10  don't think that's correct, Judge.
11             THE COURT:  I guess the argument -- it doesn't go to
12  whether something is a true threat except to the extent that I
13  guess you're saying a true threat has to be an unlawful act and
14  it wouldn't be unlawful in this circumstance to use deadly
15  force.  I guess that's the argument.
16             MR. MURRELL:  Exactly.  Yes, sir.
17             THE COURT:  Okay.  I'm going to overrule that one.  I
18  don't think what you have proposed here is an accurate statement
19  of the law about defending the statehouse.  It's too broad.  And
20  so that one --
21             MR. MURRELL:  Well, if I could --
22             THE COURT:  I also think it's very confusing.  I think
23  that it would be unclear to a jury how that fits in here.  Yes,
24  sir, you were going to say something?
25             MR. MURRELL:  Well, I was just wondering where that
```

1    leaves us.  We're telling the jury that the conduct must be

2    unlawful, so where does that leave me in my closing argument?

3    Can I say, look, in all likelihood this was lawful, he was

4    trying to defend the capitol?  Can I not make that argument?

5    Where do we stand on that?

6          THE COURT:  Well, I don't think it's a correct

7    statement of the law to say that you can use what was laid out

8    in this communication to just broadly generally defend the state

9    or the capitol.  So, yeah, I don't think that would be an

10   appropriate argument.

11         MR. MURRELL:  Just so, I mean, I'm not -- given the

12   Court's ruling I'm not going to make that argument that I would

13   otherwise make.

14         THE COURT:  Okay.  Do you have any -- you want to be

15   heard any further on it, Mr. Kunz?

16         MR. KUNZ:  No, sir.

17         MR. MURRELL:  Well, okay.

18         THE COURT:  All right.

19         MR. MURRELL:  Well, I suppose that does leave one

20   other thing.  I suppose that still leaves the subjective

21   question.  So then if Mr. Baker says, well, I thought I was

22   doing the right thing, I was defending the capitol, can I argue

23   then that it's subjectively not a true threat because he thought

24   he was committing a lawful act?

25         THE COURT:  Well, let me look back at the definition

1    here.  Mr. Kunz, what's your view on that on the subjective side

2    of things?  I guess the question is, if someone is intending to

3    make a statement that they think will be viewed, if in their

4    subjective view what their quote unquote threatening is

5    something lawful, where does that leave us as a legal matter?

6            MR. KUNZ:  I think he can say that, Judge.  And

7    counsel can argue to the jury that he didn't intend it to be a

8    threat.

9            THE COURT:  He didn't intend it to be a threat because

10   he didn't intend to do anything unlawful?

11           MR. KUNZ:  Yes, sir.  I think he can argue that, but

12   that's different than asking for a specific instruction that he

13   did.  That's a different issue.

14           THE COURT:  Okay.  So I do agree with that.  I think

15   it would go to the subjective inquiry whether he thought he was

16   doing something lawful.  So I think you can ask those questions.

17   I think you can make the argument as to the subjective side of

18   things at closing.  And I still don't think what you have

19   proposed here is an accurate statement of the law.  And I also

20   don't think it effects the objective inquiry.  So that's it on

21   number 36.  That will not be included.

22           Anything else on page six, below what we just talked

23   about?

24           MR. KUNZ:  No, sir.

25           THE COURT:  Mr. Murrell, anything on page six?

1          MR. MURRELL:  I don't have any other comments or

2     objections.

3          THE COURT:  On page seven either?

4          MR. MURRELL:  No, sir.  I don't have any other.

5          THE COURT:  Okay.

6          MR. MURRELL:  I think as far as the verdict form, I'm

7     assuming that -- I got it front and back, but I'm assuming

8     they'll have two separate pages?

9          THE COURT:  Yes, sir.  Any objections to the verdict

10    form?

11         MR. MURRELL:  None from the defense.

12         MR. KUNZ:  No, sir.

13         THE COURT:  Okay.  Here is a -- let me pull up --

14    circling back to the First Amendment issue, I do think the way

15    that you proposed the First Amendment thing Mr. Kunz or Mr.

16    Fields brings into -- I think Mr. Murrell is correct, it's not

17    that they are not to -- well, let me back up.

18         It's correct that it's not their job to decide whether

19    there was a violation of the First Amendment.  Everyone agrees

20    with that, correct?

21         MR. MURRELL:  Yes, sir.

22         MR. KUNZ:  Yes, sir.

23         THE COURT:  So the question is, are they instructed

24    anything about that.  I think given that this is, you know,

25    these were public statements made on Facebook, there could be

1    some confusion about that.  And I'm prepared to do an

2    instruction that would say this:  You are not to concern

3    yourself regarding whether the alleged communications are

4    protected by the First Amendment.  You are to determine whether

5    the defendant is guilty based only on these instructions.  I

6    think that would address your issue.  I'm not going to say

7    anything about the Second Amendment, but I know you'll object to

8    that, Mr. Murrell.  And you all will be the ones ultimately

9    defending this.  I do think that there is a potential for

10   confusion without this instruction which is why I would be

11   willing to give it.  But I also think that the, you know, read

12   logically the way it was laid out without that, clearly says

13   that you are supposed to decide whether it's a true threat,

14   here's how you decide whether it's a true threat.  So I don't

15   know that it's an essential instruction, but I am prepared to

16   give it.  The government would be the one ultimately defending

17   it.

18          Any objection to the specific wording of that or any

19   request for any clarification on that, Mr. Murrell, if I do give

20   it?

21          MR. MURRELL:  Well, I object to everything; the

22   wording, the content.  Yes, I do object to it.  I mean, the

23   Eleventh Circuit didn't think it was necessary to put that in

24   the pattern instruction.

25          THE COURT:  And I'll respond to that, I don't think

1    it's appropriate in every case.  Certainly, if you are making a

2    phone call to an ex-wife and saying something I don't think it

3    would have the same value that it would in a case like this.

4    And, certainly, the fact that it's not in the pattern

5    instruction isn't dispositive.

6          MR. MURRELL:  If I dare say, I don't think you can

7    find a published case where an instruction like this was given,

8    but I do object to it.

9          THE COURT:  Mr. Kunz?

10          MR. KUNZ:  Judge, we are satisfied with the proposed

11   instruction.  Our concern, Judge, is the jurors may have some

12   understanding or idea of this and how it weaves into it.  We

13   just don't want them worrying about that.

14          THE COURT:  I think that's a fair consideration.  And

15   I think it's an appropriate instruction.

16          MR. KUNZ:  Thank you, sir.

17          THE COURT:  In my discretion, I'm going to provide the

18   instruction I just read which is, I'll say it again for the

19   record.  You are not to concern yourself regarding whether the

20   alleged communications are protected by the First Amendment.

21   You are to determine whether defendant is guilty based only on

22   these instructions.

23          And, again, if you have any particular suggestion that

24   would address any of your issues without, recognizing your

25   objection, Mr. Murrell, I'll hear that, but that will be

1    otherwise the instruction.

2            MR. MURRELL:  I don't have anything to add to what I

3    said.

4            THE COURT:  Okay.  All right.  So then that I think

5    completes the jury instructions.  What we'll do, we'll get a

6    clean copy, circulate it.  I want to have it in final print

7    before closing arguments begin.  I guess we'll take a break

8    after your case.  What's your best estimate of the total length

9    of your case, Mr. Murrell?

10           MR. MURRELL:  Maybe an hour.

11           THE COURT:  Okay.

12           MR. MURRELL:  Mr. Baker was just asking if he could

13   use the restroom.  I did want to make sure our electronic

14   equipment worked too.

15           THE COURT:  I think we're fine on time.  I told the

16   jury this would be a little bit longer one.  If you want to use

17   the restroom that will be fine.

18           MR. MURRELL:  Judge, one other thing, the marshals

19   brought this to my attention.  Ordinarily, if Mr. Baker takes

20   the stand the marshals would have to follow him over there.  So

21   we would like to take a break before he testifies so it won't be

22   quite so obvious.

23           THE COURT:  Is he not testifying first?

24           MR. MURRELL:  No.  He'll be the last witness.  We have

25   three relatively short witnesses.

1          THE COURT:  What we'll do then, we'll call that our

2    other mid-morning break.  We'll have your short witnesses.

3    We'll just have him on the stand after a 10-minute bathroom

4    break or something.  And then at lunch, let's see here, probably

5    what we'll end up having to do, just so we have time to finalize

6    the jury instructions and give you all a minute to prepare for

7    closing, is we'll probably take about a, maybe almost two-hour

8    lunch.  If we're done in an hour from now --

9          MR. MURRELL:  Well, it may be longer.  I don't know

10   how long cross examination is going to last of Mr. Baker.

11         THE COURT:  I guess you may have a rebuttal case.  I

12   don't know if you will or not.

13         MR. KUNZ:  We haven't decided yet, Judge.

14         THE COURT:  Right.  Okay.  Well, we'll address that

15   later.  But what we might do, I have another matter I have to

16   attend to during the lunch hour if I'm able to also, is do your

17   case.  Then if there is a rebuttal case do that.  And then over

18   the break finalize the jury instructions, prepare for closings

19   and then do closings.

20         I guess that's probably the only thing we can do.  If

21   you need to use the restroom that will be fine.  Anyone else can

22   step out now if you'd like and we'll bring the jury back in, in

23   just a moment.

24         (Recess taken 9:47.)

25         (Resumed at 9:56.)

 1              MR. MURRELL:  We are ready, Judge.

 2              MR. KUNZ:  Yes, Your Honor.

 3              THE COURT:  The video that we were talking about

 4    yesterday, the video that we were talking about yesterday that

 5    was subject to the hearsay objection I've overruled, that's

 6    coming in when Mr. Baker testifies?  Is that what I understand?

 7              MR. MURRELL:  Yes, sir.

 8              THE COURT:  And there is, okay.  And then are you

 9    going to -- is your plan to rest with him on the stand?  I'm

10    asking for the same issues of sort of going back and forth.

11              MR. MURRELL:  Right, yes.  I suppose we could do it

12    that way, sure.

13              THE COURT:  Well, that's what we'll do.  We'll take

14    another short break so he can return to his seat.  And if

15    everyone's ready then we'll bring the jury in and start with the

16    defense case.  Is everybody ready?

17              MR. MURRELL:  We're ready.

18              MR. KUNZ:  Yes, Judge.

19              MR. MURRELL:  Would you like Ms. Perez to go ahead and

20    take the witness stand?

21              THE COURT:  That will be fine.

22         (Jury in at 9:59.)

23              THE COURT:  Please have a seat.

24              Welcome back, ladies and gentlemen.  I want to thank

25    you for your patience.  I know you were out longer than I had

```
 1    told you.  We probably would have you out, but we were able to
 2    take care of some things that hopefully will reduce the overall
 3    time.
 4          The government rested before you took your break.  So
 5    now it's the government's [sic] turn to put on evidence, if it
 6    chooses.  As I indicated at the outset, the government has the
 7    burden of proof.  The defendant doesn't have to put on a case,
 8    but it may, if it chooses.  And now I'll turn to you, Mr.
 9    Murrell, and you can begin.
10          MR. MURRELL:  Thank you, Judge.  I would like to call
11    Kassandra Perez as a witness.
12          **KASSANDRA PEREZ, DEFENSE WITNESS, DULY SWORN**
13          COURTROOM DEPUTY CLERK:  For the record, state your
14    full name and spell your last name.
15          THE WITNESS:  My name is Kassandra Perez.  I'm sorry.
16    P E R E Z.
17                          DIRECT EXAMINATION
18    BY MR. MURRELL:
19    Q.   Ms. Perez, what do you do for a living?
20    A.   I am an investigator at the Federal Public Defender's
21    Office.
22    Q.   And we work together?
23    A.   Yes, sir.
24    Q.   Did I ask you to look up some -- see if you can find some
25    newspaper articles that occurred sometime in January of this
```

Direct Examination - Kassandra Perez

1    year?

2    A.    Yes, sir.

3    Q.    I'm going to show you what is marked as Defendant's Exhibit

4    Number 2.  Do you recognize, it's on your monitor there, do you

5    recognize it?

6    A.    Yes, sir.

7    Q.    It's an article from what newspaper?

8    A.    Tampa Bay Times.

9    Q.    And what's the date on it?

10   A.    January 12th, 2021.

11   Q.    And this is an article about whatever threat there might be

12   to the Florida Capitol?

13   A.    Yes, sir.

14        MR. MURRELL:  Judge, at this time I would like to

15   offer into evidence Defense Number 2.

16        THE COURT:  Defense 2 is admitted.

17   (DEFENDANT EXHIBIT 2:  2 received in evidence.)

18        MR. MURRELL:  May I publish it?

19        THE COURT:  Yes, sir.

20   BY MR. MURRELL:

21   Q.    Okay.  There it is.  I'm going to ask you to read just part

22   of this.  Let me do this.  I just want to get this to work.  I'm

23   going to enlarge it here.  Can I get you to read that section

24   that I've drawn the square around?

25   A.    Yes.  Tallahassee, with the FBI on Monday issuing a

Direct Examination - Kassandra Perez

1   bulletin about possible armed marches on state capitol buildings

2   across the country this weekend, Florida law enforcement

3   officials are monitoring online chatter from extremists like the

4   ones that ransacked the U.S. Capitol last week.  So far they say

5   they aren't aware of any credible threats directed toward

6   Tallahassee or elsewhere in the state.

7   Q.   So they weren't aware of any credible threats directed

8   towards Tallahassee?

9   A.   Yes, sir.

10  Q.   Did you find a second article?  And let's take that down

11  for a second.  And did you find a second newspaper article?

12  A.   I did.

13  Q.   And, I want to show you what's marked as Defendant's

14  Exhibit Number 1.  Can you tell me what that is?

15  A.   Yes.  It is an article from the Tallahassee Democrat.

16  Q.   And what's the date on that article?

17  A.   January 13th, 2021.

18        MR. MURRELL:  Judge, at this time --

19  BY MR. MURRELL:

20  Q.   And it's about whether there are any threats against

21  Tallahassee?

22  A.   Yes.

23        MR. MURRELL:  Judge, at this time I would like to

24  offer into evidence Defense Exhibit Number 1.

25        THE COURT:  Yes.

Direct Examination - Kassandra Perez

1          (DEFENDANT EXHIBIT 1:  1 received in evidence.)

2               MR. MURRELL:  May I publish the article?

3               THE COURT:  You may.

4    BY MR. MURRELL:

5    Q.   This is the Tallahassee Democrat, right?

6    A.   Yes, sir.

7    Q.   And January 14, I'm sorry, January 13, 2021?

8    A.   Correct.

9    Q.   All right.  I'm going to once again highlight some of this,

10   if I can do it right.  All right.  And I'm going to ask you just

11   to read the headline and that first paragraph?

12   A.   Okay.  TPD Chief Revell, no specific threat against

13   Tallahassee amid warnings of violence.

14   Q.   That's the headline?

15   A.   That is the headline.

16   Q.   And then the next sentence?

17   A.   Tallahassee Police Chief Lawrence Revell said there are no

18   specific threats against Florida's capitol but that law

19   enforcement is girding for the possibility of violence given

20   recent FBI warnings.

21   Q.   So no specific threats?

22   A.   Right.

23               MR. MURRELL:  That is all the questions I have, Judge.

24               THE COURT:  Okay.  Would you like me to read the

25   instruction before cross examination?

Cross-Examination - Kassandra Perez

1          MR. FIELDS:  Yes, please, Your Honor.

2          THE COURT:  Ladies and gentlemen, I'm going to give

3     you an instruction about the evidence that just came in.  Two

4     newspaper articles have just come into evidence.  The newspaper

5     articles include statements of what happened and those are

6     statements that are made by other people, the author of the

7     articles and those quoted within the articles.  Those are people

8     who did not testify in this case and normally that would be

9     hearsay and not permitted.  But there is an exception for when

10    the statements are not offered for the truth of the matter

11    asserted.

12          In this case, you are not to treat those articles as

13    evidence that what they say in the articles is true or that what

14    the people quoted in the articles say is true.  You are not to

15    consider them for those.  They are not evidence of that.  The

16    articles may be considered only to show what information was

17    conveyed to the public at the time the articles were published.

18          You can proceed, Mr. Fields.

19          MR. FIELDS:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21    BY MR. FIELDS:

22    Q.   Ms. Perez, the excerpt here at the top of Defense Exhibit 1

23    that Mr. Murrell had you read quotes the Tallahassee Police

24    Department Chief, right?

25    A.   Yes.

Direct Examination - Desiree Gattis

1    Q.    It doesn't quote the FBI?

2    A.    It does not.

3    Q.    And further on down toward the middle of this exhibit, it

4    says, the FBI warned earlier this week that violent protests

5    were planned at statehouses across the country on Sunday; is

6    that right?

7    A.    That's what it says, yes.

8              MR. FIELDS:  Thank you.  No further questions, Your

9    Honor.

10             THE COURT:  Any redirect?

11             MR. MURRELL:  I don't have any other questions.  May

12    the witness be excused?

13             THE COURT:  Yes.  You may step down.  Thank you,

14    Ms. Perez.

15             MR. MURRELL:  Judge, our next witness is going to be

16    Desiree Gattis.  We will get her on the stand in just a second.

17    Ms. Gattis?

18         **DESIREE GATTIS, DEFENSE WITNESS, DULY SWORN**

19             COURTROOM DEPUTY CLERK:  For the record, state your

20    full name and spell your last name.

21             THE WITNESS:  Desiree Gattis, G-a-t-t-i-s.

22                     DIRECT EXAMINATION

23    BY MS. VALLEJO:

24    Q.   Good morning, Ms. Gattis.

25    A.   Good morning.

Direct Examination - Desiree Gattis

1  Q.   Where do you live?

2  A.   In Tallahassee.

3  Q.   How long have you lived here in Tallahassee?

4  A.   Since 2009.

5  Q.   Okay.  What brought you to Tallahassee?

6  A.   Graduate school.

7  Q.   What was your graduate work in?

8  A.   Music.

9  Q.   What do you do for a living now?

10 A.   I'm a music teacher.

11 Q.   Do you know Daniel Baker?

12 A.   Yes.

13 Q.   How do you know him?

14 A.   I used to drive by the area that he would stand on when I

15 was on my way to school.  And I would see him just about every

16 day and I'd stop and talk to him.

17 Q.   Okay.  And when you say the area he would stand on, what do

18 you mean?  What was he doing?

19 A.   Well, when he was homeless he would go out and hold a sign

20 that says like need work, looking for work, please help.  And I

21 would stop and talk to him then.

22 Q.   Okay.  And how long have you known him?

23 A.   About a decade.

24 Q.   Okay.  At one point did you allow Mr. Baker to live in your

25 backyard?

Direct Examination - Desiree Gattis

1   A.   I had known him about a year, maybe a little bit more at

2   that point.

3   Q.   So is that a yes?

4   A.   Oh, yes.  Sorry.  I didn't hear you.

5   Q.   That's okay.  So at one point you allowed Mr. Baker to live

6   in your backyard?

7   A.   Yes.

8   Q.   And who, if anyone, lived with you in your home when

9   Mr. Baker was living in your backyard?

10  A.   I live alone.

11  Q.   How did that situation with Mr. Baker living in your

12  backyard come about?

13  A.   About a year or so after knowing him, he and I had had

14  several discussions about a lot of the difficulties of being

15  homeless.  You don't have -- you can't really apply for jobs

16  without a physical address.  And there are some issues with

17  violence against the homeless here especially when you're

18  sleeping, getting mugged.  And he was having a lot of difficulty

19  getting back on his feet.  So I wanted to give him a safe place

20  to stay so he could actually have a fighting chance.

21  Q.   At some point did he stop living with you?

22  A.   Yes.

23  Q.   How did that come about?

24  A.   He got more financially stable and was able to be more

25  independent.

Direct Examination - Desiree Gattis

1   Q.   Now, would you say that Mr. Baker is known in the homeless

2   community here in Tallahassee?

3   A.   Yes.

4   Q.   And, how do people in the homeless community know Mr.

5   Baker?

6   A.   He travels around and distributes like care packages and

7   food and --

8            MR. FIELDS:  Objection, Your Honor.  Improper

9   character evidence.

10           THE COURT:  Let's have a brief sidebar.

11       (Following conference held at sidebar at 10:11 AM.)

12           THE COURT:  So, if you will respond to that.  I mean,

13   first of all, some of what she is saying is not really relevant

14   at all.  And character evidence leading up to that about how

15   difficult it is to be homeless, things like that.  But now

16   you're getting into the -- or the response started being kind of

17   good things he's doing, nice things he's doing.  So tell me how

18   this all fits together.

19           MS. VALLEJO:  I think it's relevant in the sense that

20   she was explaining how he was known in the community.  I'm

21   trying to establish the community for the purposes of

22   establishing he has a reputation in it, but I'm happy to move to

23   the next question and just ask what his reputation is within the

24   community.

25           THE COURT:  Well, I think you'll need to establish how

Direct Examination - Desiree Gattis

1   she knows it.  But, she has to do that based on her knowledge,

2   right?

3          MS. VALLEJO:  Right.

4          THE COURT:  You want to flush out the objection any

5   more?

6          MR. FIELDS:  Well, if it's establishing how she knows

7   him that's okay.  I just think going into specific instances of

8   what he's done is what's --

9          THE COURT:  And I think that's a fair point.  I mean,

10  I think what she was about to say, this is my anticipation, is

11  that's how he got to know people by going around and doing these

12  things.  That may be unavoidable, but we're not going to have

13  he's a nice guy and he has had a hard time in life and things

14  like that.  But you can just ask a different question to

15  establish her knowledge of his reputation in the community.

16         MS. VALLEJO:  Sure.

17         MR. MURRELL:  I mean, I think we can explain how

18  people in the homeless community know him.  We've been fighting

19  about this for week now or days.  I mean, it might be used for

20  one purpose, but it's relevant to show how he is known in the

21  community.  So I would suggest it's an entirely proper question.

22  I don't think we need to go much beyond that, but I think she

23  can certainly explain how it is that people in the homeless

24  community know Mr. Baker.

25         THE COURT:  If she knows, but I mean --

1              MR. MURRELL:  She does know.

2              MS. VALLEJO:  She does.

3              THE COURT:  Anything further on that?

4              MR. FIELDS:  If the proper foundation is laid then it

5    wouldn't be an issue, but I guess the foundation --

6              THE COURT:  When you talk about the foundation, to get

7    the foundation, you are talking about the foundation of how she

8    knows that he goes out and distributes these things?

9              MR. FIELDS:  How she knows his reputation in the

10   homeless community.

11             THE COURT:  Well, she hasn't had an opportunity to get

12   there yet.  But I agree with you, she has to lay a foundation.

13   Okay.

14        (Sidebar concluded at 10:13 AM.)

15             THE COURT:  You can continue.

16   BY MS. VALLEJO:

17   Q.   Now, Ms. Gattis, going back, are you aware of Mr. Baker's

18   interaction with people in the homeless community?

19   A.   Yes.

20   Q.   Okay.  And how are you aware of that?

21   A.   He has not only helped me a great deal, but he's also

22   traveled around on his own to distribute food and just provide

23   basic first aid, make them feel human.

24   Q.   And you've been with him when he's done that?

25   A.   Yes.

Direct Examination - Desiree Gattis

1    Q.    Okay.  Does he have a reputation among the homeless

2    population in the area?

3    A.    Yes.

4    Q.    What's he known for?

5    A.    Mostly just deescalating conflicts between them, being a

6    peaceful soul, a good influence and just making them feel valued

7    and human.

8    Q.    And having known Mr. Baker, you said for approximately

9    10-years, what is your opinion of his character?

10   A.    He is just thoughtful and kind and compassionate, caring, a

11   genuinely good person.

12   Q.    Would you say that he is peaceful?

13   A.    Absolutely.

14   Q.    Can you give us an example of a situation in which he has

15   avoided a confrontation?

16   A.    There are several over the course of awhile.  Oftentimes I

17   will organize these opportunities where we get to make a mass

18   meal and feed people at Lake Ella.  And there are always some

19   people that come up and try to -- whether it's because they have

20   some kind of mental issue or just angry, they don't understand

21   necessarily that we're trying to help.  And they'll sometimes

22   come up and just be intimidating or try to just yell.  And he's

23   always the first one to get in the way and say, hey friends,

24   we're just here to distribute food, if you want something come

25   over here and grab a plate or there are some care package bags

Direct Examination - Desiree Gattis

1  over here, no need to raise your voice.  He's always really soft

2  spoken and approaches them and just tries to calm them down.

3  Q.    Okay.  Now, switching gears here, Ms. Gattis, I'm going to

4  show you what's been previously introduced by the government as

5  Government's Exhibit 28.  Do you recognize this?

6  A.    Yes.

7  Q.    Okay.  What is it?  How do you recognize this?

8  A.    That is a Facebook, like a post on Facebook that I had

9  responded to.

10 Q.    Okay.  So you engaged in this conversation that's a comment

11 on Facebook?

12 A.    Yeah.

13 Q.    What was the context of this conversation?

14 A.    Dan had posted something about how many like officers there

15 are in Tallahassee, and how many like registered firearms that

16 are in the city.  And I had just jumped in because it seemed

17 like some people on there were escalating the conversation.

18 They were getting riled up.

19 Q.    What was your user name in these postings here?

20 A.    It's Lyra Lorelei.

21 Q.    So, you told us a few minutes ago that your name is Desiree

22 Gattis.  Why is your Facebook name different?

23 A.    I changed my Facebook name because I'm a teacher and I

24 don't think it's appropriate for my students or young people in

25 general to be able to see their authority figures personalized.

Direct Examination - Desiree Gattis

1    So I changed it so they couldn't search for me.

2    Q.    Now, I want to focus your attention on the conversation

3    specifically that you had with Mr. Baker in this post.  In the

4    post what, if anything, did you mention about your father's

5    guns?

6    A.    I said that he owns half of them or a third of them in the

7    state.

8    Q.    Okay.  Is that true?

9    A.    No.

10   Q.    Why did you say that?

11   A.    I was trying to -- the people were starting to argue and I

12   thought making a joke would defuse some of the attention in the

13   room.

14   Q.    Does your father, in fact, have a collection of guns?

15   A.    He does.

16   Q.    And, at the time that you engaged in this Facebook

17   discussion, to your knowledge, did your father own an AK-47

18   rifle?

19   A.    No.

20   Q.    What types of guns does he typically collect?

21   A.    Um, he has some like custom pistols, some target shooting

22   rifles.  He has ones that have been put additions onto or like

23   the -- they are just fancier.  I don't know a lot about them.

24   Q.    Okay.  What, if anything, did you tell Mr. Baker in this

25   conversation about your father selling Mr. Baker an AK-47?

Cross-Examination – Desiree Gattis

1    A.    That he's not likely to sell them.

2    Q.    Did you ever ask your father to sell Mr. Baker an AK-47?

3    A.    No.

4    Q.    How about any gun?

5    A.    No.

6    Q.    Did you intend to ask your father to sell Mr. Baker an

7    AK-47?

8    A.    No.

9    Q.    Did you take any steps to facilitate a sale of a gun from

10   your father to Mr. Baker?

11   A.    No.  I, my dad and I don't really talk all that frequently,

12   so I would have never reached out to him.

13   Q.    Why did you post that comment stating that you intended to

14   ask your father to sell him the gun then?

15   A.    I could tell that I really wasn't defusing much of the

16   situation.  And I had better things to do than argue with people

17   on the Internet.  So I just wanted to wrap the conversation up.

18   Q.    Is it fair to say you were speaking in hyperbole?

19   A.    Yes.

20   Q.    Is that something that's typical between you and Mr. Baker?

21   A.    Yes.  All the time.

22   Q.    Thank you, Ms. Gattis.

23          MS. VALLEJO:  Your Honor, I have no further questions.

24          THE COURT:  Okay.

25                      CROSS-EXAMINATION

1    BY MR. FIELDS:

2    Q.   Good morning.

3    A.   Good morning.

4    Q.   Ms. Vallejo was just walking you through Government Exhibit

5    28.  And you said that at some point you had better things to do

6    than continue with this Facebook conversation?

7    A.   Yeah.

8    Q.   And your way of ending it was by saying that you would ask

9    your father if Mr. Baker could buy an AK or a pistol from him?

10   A.   Sure.

11   Q.   Right?

12   A.   Yes.

13   Q.   And you said, I'll ask though?

14   A.   Uh-huh.

15   Q.   There was no LOL or laughing out loud after that, right?

16   A.   No.  I was kind of irritated with it.  And I just didn't

17   want to deal with it any more.

18   Q.   You were irritated that the conversation was continuing

19   about firearms?

20   A.   I was irritated that I couldn't come in to get everybody to

21   laugh.

22   Q.   And how would you get people to laugh over the Internet?

23   A.   I just, joking around and just being silly.  Like stating

24   that my dad owns a third of the guns in the state.

25   Q.   Ms. Gattis, you testified that in your opinion Mr. Baker is

Cross-Examination - Desiree Gattis

1    a non-violent person?

2    A.    Yes.

3    Q.    And that is due to your interactions with him and other

4    members of the homeless community here?

5    A.    That's right.

6    Q.    You are friends with Mr. Baker on social media; is that

7    right?

8    A.    Yes.

9    Q.    Did you see most of his posts?

10   A.    Some of them, most of them, yeah.  I would imagine.  I

11   never went to his exact page and just read through everything.

12   Q.    Did you ever see posts about firearms, other than the one

13   we just discussed?

14   A.    Over about 10-years, probably.

15   Q.    How about posts about violence?

16   A.    When he's exaggerating, yeah.

17   Q.    Would it change your opinion -- strike that.

18         I'm going to show you what's been admitted as Government's

19   Exhibit 15.  Mr. Baker here in the middle says, "God, I hope the

20   right tries a coup November third because I am so fucking down

21   to slay enemies again."

22         Would it change your opinion about Mr. Baker if you had

23   read that previously?

24   A.    No.  He tends to exaggerate things.  When he was living in

25   my backyard he would often say things like, it's hot as Hades

1   or, oh gosh, what else?  He overstates things just for dramatic

2   effect and oftentimes to make people laugh.

3   Q.   Hades is the Greek God of Hell?

4   A.   Which I imagine would be hot.

5   Q.   Did Mr. Baker talk to you about his time overseas?

6   A.   Not a ton.

7   Q.   You were aware that he was indeed overseas, right?

8   A.   Yes.

9   Q.   Did he ever talk to you about killing?

10  A.   Not directly.

11  Q.   Indirectly, perhaps?

12  A.   Um, I've probably read through some of this, yeah.

13  Q.   I'm showing you Government Exhibit 22.  Have you seen this

14  post before where Mr. Baker says, "I've killed Americans who

15  were Daesh so forgive me for not trusting?"

16  A.   I don't think I saw it on Facebook.  I see it here.

17  Q.   And, would it change your opinion about Mr. Baker's

18  violence or nonviolence now that you've read it?

19  A.   No.  He's a little dog with a big bark.  He talks a big

20  game because he's such a small person and doesn't want to get

21  bullied.

22  Q.   How about further below where it says, would you be willing

23  to assault a cop at a protest?  Have you seen that before?

24  A.   Not on Facebook.  No.

25  Q.   And does that change your opinion about his violence or

Cross-Examination – Desiree Gattis

1  nonviolence?

2  A.   Not really.  I think he's just talking a big game.

3  Q.   I'm going to show you Government's Exhibit 2.  It's been

4  admitted.  You see up here where it says, I'm a killer my ninja

5  Google can Baker YPG Sniper?  Have you seen that before?

6  A.   Not online, no.

7  Q.   And this Caipnhab Instagram handle, is that Mr. Baker's

8  Instagram handle?

9  A.   I don't know.  I wasn't on his Instagram.

10  Q.   You weren't friends with him on Instagram?

11  A.   No.

12  Q.   Would it change your opinion about his violence if you had

13  read this before?  I'm a killer my ninja?

14  A.   No, he always says silly things.

15  Q.   How about this one, this is the second part of Government

16  Exhibit 23?  Mr. Baker says, I stopped counting at 16 kills.

17  You haven't seen that one either?

18  A.   No.

19  Q.   And this one doesn't change your opinion either?

20  A.   I believe that he's overexaggerating things to make himself

21  kind of puff up.  And I don't think that's true.

22  Q.   So perhaps he says things sometimes intending to scare

23  people?

24  A.   Not scare people.  I think that he knows that he's going to

25  be viewed as a runty little guy and so he may try to represent

1   himself in ways that compensate for that so that he just doesn't

2   get bullied.

3   Q.   Thank you, Ms. Gattis.

4   A.   Thank you.

5           THE COURT:  Any followup?

6           MS. VALLEJO:  No further questions, Your Honor.

7           THE COURT:  Ms. Gattis, you can step down.  Thank you.

8           THE WITNESS:  Thank you.

9           MS. VALLEJO:  Your Honor, defense would call Paul

10  Arnold.

11          THE COURT:  Paul Arnold, okay.  Mr. Fields, does the

12  last witness need to be excused?  Are we completely done with

13  her?

14          MR. FIELDS:  She can be excused.

15          THE COURT:  So she can sit in on the proceeding?

16          MR. FIELDS:  Yes, Your Honor.

17          THE COURT:  Okay.

18          **PAUL ARNOLD, DEFENSE WITNESS, DULY SWORN**

19          COURTROOM DEPUTY CLERK:  For the record, state your

20  name and spell your last name.

21          THE WITNESS:  Paul Arnold, A-r-n-o-l-d.

22                      DIRECT EXAMINATION

23  BY MS. VALLEJO:

24  Q.   Good morning, Mr. Arnold.

25  A.   Good morning.

Direct Examination - Paul Arnold

1    Q.    Where do you live?

2    A.    I live in Tallahassee, Florida.  Buck Lake.

3    Q.    How long have you lived in Tallahassee?

4    A.    I moved up in 2006.

5    Q.    Okay.  And what brought you here to Tallahassee?

6    A.    Law school, Florida State.

7    Q.    Okay.  So what do you for a living?

8    A.    I'm an attorney.  I work for Legal Services of North

9    Florida.  I have worked there since 2009, September 2009.

10   Q.    And do you know Daniel Baker?

11   A.    I do.

12   Q.    How do you know him?

13   A.    I know him through -- I do Brazilian Jiu Jitsu at Zicro.

14   It's a school here in Tallahassee.  And we both attended the gym

15   together there.

16   Q.    Okay.  When did you first meet Mr. Baker at Zicro?

17   A.    I want to say, my time line, I've been doing Jiu Jitsu for

18   10-years now.  So a lot of people come and go.  But I want to

19   say maybe four-years ago I first met him, thereabout.  But I'm

20   not exactly positive.  But thereabout, about probably four-years

21   ago I think.

22   Q.    Now, just for a minute can you explain to us what Jiu Jitsu

23   is?

24   A.    Sure.  Jiu Jitsu is, it's a fitness club.  It's like a

25   grappling club.  You basically, we wrestle.  We go and we're

1  learning -- Jiu Jitsu stems from judo and wrestling, it's kind

2  of a combination.  So, we essentially -- we work on -- there's

3  no striking, there's no kicking or anything like that.  We're

4  just trying to grapple each other, either sweeping each other,

5  pinning, reaching submissions.  So it's a sport.  It's just a

6  hobby.  It's a lot of fun.

7  Q.   Is it based on self-defense?

8  A.   It is.  I mean, self-defense is a big component.  Honestly,

9  our school is more about competition.  So we do probably about

10  20 percent self-defense.  And a lot of it then is just around

11  the sport of Jiu Jitsu, which is, we have a point system based

12  on if, you know, if someone is on top of you and you sweep them

13  off and you go on top you get two points.  If you get a pin,

14  which is called side control, you get two points.  If you get on

15  top of them you get three points.

16      So it's -- our school is mainly focused on the sport aspect

17  of it, but we do a lot of, you know, probably 20 percent

18  self-defense but there's not as much emphasis on self-defense as

19  there is the sport of it at our school.

20      Krav Maga, I think other types like that, focus more on,

21  you know, the military style application of martial arts and

22  ours is a lot more just sport.

23  Q.   Okay.  And just briefly, what are the different proficiency

24  levels in Jiu Jitsu?

25  A.   You start as white belt.  And then you work your way to in

1    about, anywhere from a year to two years you can get the blue

2    belt.  And another three years purple belt.  And then two years

3    brown belt.  And then two years after that black belt.  So those

4    are the levels.  That's how we evaluate it.

5    Q.    What's your proficiency level?

6    A.    I'm a purple belt.  I should be a brown belt, but I have

7    kids so my time is -- I've been doing it for 10-years.  I

8    probably should be further along, but I just do it when I can

9    kind of thing so.

10   Q.    Now, going directly to your experience with Mr. Baker, at

11   Zicro, when was the last time you practiced Jiu Jitsu with Mr.

12   Baker?

13   A.    I can't give you an exact.  I'm sorry.  It's probably been,

14   I think, two years.  I really don't know exactly.  I'm thinking

15   it was about two years.  I know that he was moving down to --

16   the last time we talked I think he was getting ready to move

17   down to South Florida.  And people kind of come and go.  We have

18   an academy of a hundred people so it's hard to keep up with

19   everyone's different schedules.  But probably -- I think it's

20   been about two years or so.  I'm not sure.  I'm sorry.  I wish I

21   could --

22   Q.    No, that's okay.

23         From what you recall, what was Mr. Baker's level of

24   proficiency?

25   A.    He started -- well, I'm not sure where he started because I

1  think he transferred from another school.  But he was a blue

2  belt.  I'm pretty sure he was a blue belt when he was with us.

3  So just beyond beginner.

4  Q.   Okay.  And how many times would you say that you were at

5  the gym, ballpark, with Mr. Baker?

6  A.   I think about 40 to 50.  I would say 40 to 50 classes.  We

7  break them into class segments, about two and a half hours each.

8  So probably 40 to 50 over the course of two years.  I usually

9  train about two to three times a week.  He was there a lot of

10  times when I would train.

11  Q.   And I know you said the gym has a pretty big membership of

12  about a hundred people?

13  A.   Just the adult -- I mean, our membership overall is

14  probably 250.  I would -- but that includes kids' classes.  And

15  so I was in the advanced class so that's a separate 6:30 PM

16  class.  So there was probably a hundred of us.  But, maybe 250

17  over the whole gym if you include the beginner classes and then

18  the children's classes.

19  Q.   And were there a group of individuals at Zicro who were

20  familiar with Mr. Baker?

21  A.   Sure.  The intermediate class we were a pretty tight group,

22  yup.

23  Q.   And what was Mr. Baker's reputation amongst the community

24  members of Zicro?

25  A.   I mean, his reputation, he was a very nice guy.  He was

Direct Examination - Paul Arnold

1    very chill, relaxed.  He was a character in that I know he was

2    into meditation.  He was into yoga.  A lot of our -- I do a

3    little yoga with my wife.  So a lot of our conversations

4    sometimes were going to yoga and stuff like that.  He was

5    definitely interesting in that, you know, he had talked about

6    living in a tent and he had told us about, you know, he's --

7              MR. FIELDS:  Objection, hearsay.

8              THE COURT:  That's sustained.  You can ask the next

9    question.

10   BY MS. VALLEJO:

11   Q.   Sure.  Would you say that he has a reputation for being

12   peaceful?

13   A.   I would say for sure.  Yeah.  I think most people that make

14   it through -- most people that go into Jiu Jitsu and stick with

15   it are typically pretty -- they don't have a very big ego

16   because I think in part we lose a lot when you start.  I mean,

17   for the first year and a half you're getting beat up kind of

18   like.  You're losing because it's hard.  It's very difficult.

19        So we kind of wash people out that tend to be more

20   egotistical.  We call them meathead kind of thing.  You know,

21   that's not a term of art, but the guys that come in with the big

22   ego want to beat everybody up and then they quickly learn that,

23   okay, this is hard.  And it's not so much, so much physical as

24   it is mental.  And it's like chess.  So, anyway, a lot of the

25   people that stay in Jiu Jitsu, including Dan, we tend to have --

1    we try to focus on being more humble.  And you have no choice

2    but to be humble in there.

3    Q.    Your opinion specifically of his character, would you say

4    that he is peaceful?  Do you know him to be peaceful?

5    A.    Absolutely.  I mean, in my experience at the gym I've never

6    seen him get in a fight with anyone.  I've never seen him be

7    aggressive during, we call them roles when you're wrestling.

8    There is always the possibility for some guys to be a little

9    more aggressive and, you know, slap you a little bit while they

10   are doing it, but it's not part of our thing.  But some, you

11   know, there are a few guys that make it through there that were

12   like that and they typically get washed out.  But Dan was never

13   like that.  We just spent time together talking.  He was a very

14   diligent student, studied a lot.  And, like I said, a lot of our

15   conversations dealt with meditation, yoga.  For a while I tried

16   to get him to do a yoga, instruct a yoga class at the gym.  And

17   he talked about doing that.  He never actually did it, but very

18   chill.  Very, I mean, yeah.

19   Q.    Have you ever witnessed Mr. Baker commit an act of violence

20   at the gym?

21   A.    Never, no.  I mean, just everything was within our roles

22   and never out of control with, you know, everything was just

23   normal.  He was a normal guy at our gym.

24   Q.    Okay.  Thank you, Mr. Arnold.

25           MS. VALLEJO:  Your Honor, I have no further questions.

1          THE COURT:  Okay.  Cross examination?

2                    CROSS-EXAMINATION

3  BY MR. FIELDS:

4  Q.   Good morning.

5  A.   Good morning.

6  Q.   I think you said that you haven't seen Mr. Baker for about

7  two years, was that right?

8  A.   I'm sorry if I don't know exactly.  Yeah, I think it's been

9  two years.  It's been awhile.  It certainly has been awhile.  I

10  would say minimum two years, yeah.

11  Q.   Can you recollect the last time that you saw Mr. Baker, I

12  mean, month and year or just year would be great?

13  A.   I can't.  I'm sorry.  I don't know.  I really don't know.

14  I really don't -- I can't.  I'm sorry.  It was just -- we just

15  see each other at the gym so it wasn't -- there were no life

16  events or anything that paired with a recollection of that.  I'm

17  sorry.

18  Q.   So if it's about two years, we'll say that 2019 is about

19  the last time you saw him?

20  A.   I think so.

21  Q.   Had Mr. Baker ever made comments to you about violence?

22  A.   No comments of violence, no.  Not really.  No, nothing like

23  that.

24  Q.   Did he talk to you about his time overseas?

25  A.   In the military?  Is that what you're talking about?  Or

Cross-Examination - Paul Arnold

1   with the -- no, we never -- he told me about his time in the

2   military and when he left the military, but never anything about

3   Syria or -- if I learned about that through actually the show

4   VICE or the news station VICE about him going over there.

5   Q.    So you knew Mr. Baker was in the U.S. military?

6   A.    Yeah.  At the time I knew Dan it was that he had been in

7   the military.  I knew that part of it.  I didn't learn about the

8   Syria stuff until, like I said, I saw him on VICE one day.

9          And I did know prior to him going over that he had -- he

10  told me he was going to -- that's -- this would be the event

11  that would trigger one of my last conversations.  He had told me

12  he was going to move out of his apartment and get a tent.  And I

13  thought that was strange.  I said why.  He's like, I just want

14  to be prepared and preparing myself.  But that was it.  He had

15  said he was going to move out of his apartment.  So maybe that

16  gives you a better time when the last time I talked to him.

17  Q.    What was he preparing himself for?

18  A.    He didn't say.  Well, he didn't say.  He was like, I just

19  want to be out in nature.  He said, I want to -- implying like I

20  want to get stronger as an individual.  Like, I'm trying to get

21  stronger as an individual.  Which I thought was interesting.  I

22  mean, Dan, he's a character.  But, like I said, I never, you

23  know, --

24  Q.    Now, you said that you most frequently saw him at the Jiu

25  Jitsu gym?

Cross-Examination - Paul Arnold

1  A.    Only.  That's the only time I've seen Dan.

2  Q.    Did you interact with him on social media?

3  A.    Yeah.  On Facebook.  He's been on Facebook.  And, yeah.

4  All of the guys, not all the guys, a lot of us are on Facebook.

5  We cut up there and stuff, yeah.

6  Q.    So you are friends with him on Facebook?

7  A.    Uh-huh.  Yes.

8  Q.    And are you still friends with him on Facebook to this day?

9  A.    No, I don't think so.  I looked and he's not on my friend

10 list.  I didn't unfriend him, but he may have unfriended me I

11 guess.

12 Q.    Do you follow him on Instagram as well or just Facebook?

13 A.    Not Instagram, no.  Just Facebook.

14 Q.    Did you ever see any of Mr. Baker's posts on Facebook that

15 were violent or inciting violence?

16 A.    No.  I didn't -- I was actually -- I was shown some of

17 those this week.  But, no, I didn't see him inciting violence.

18 But I saw his recent posts.  But I never saw him be violent on

19 Facebook or anything like that, no.

20 Q.    And you've testified that your opinion is that he is not a

21 violent person?

22 A.    Yeah.  From my -- yeah.  From my time with him he's not,

23 not a violent person, no.

24 Q.    And that would be due to your interactions with him at the

25 gym --

Cross-Examination - Paul Arnold

1   A.    Sure.

2   Q.    -- which were at least two plus years ago?

3   A.    Sure.  Yeah.  I mean, there's -- very, very rarely we get

4   aggressive guys come to the gym.  But Dan definitely was not.  I

5   would not -- my time with him he was on the other end of the

6   spectrum.  Like I said, we talked about meditation, yoga.  And

7   he was a nice guy.  Always smiling.  Just good dude.

8   Q.    You said aggression.  And indeed I think -- strike that.

9         At a Jiu Jitsu gym somebody could be physically aggressive

10  in the way that they spar or wrestle; is that fair?

11  A.    Right.  That's kind of how we -- yes, that's how you'd

12  assess.  Uh-huh.

13  Q.    But you would agree with me that somebody could be

14  aggressive in other ways, correct?

15  A.    Um, yeah.  I, I don't know -- I don't think I understand

16  your question.  I mean, I interpret someone if I get a bad vibe

17  from them, if they are, you know, in our gym there's a lot of

18  respect among each other.  It sounds really silly for people

19  that don't know Jiu Jitsu, but like if you accidently elbow

20  somebody while you're rolling you'd be like, sorry.  You good

21  and you kind of freeze.  And we keep going.  So when there's

22  aggressive people when you are rolling with them you know it.  I

23  mean, they're getting -- they get red in the face, especially if

24  they are losing.  And they're, you know, they're throwing

25  elbows, you're getting bumped, and they are not, you know,

1  you're not taking care of each other.  But that's a very small

2  percentage of the guys that roll with it at Zicro.  And,

3  honestly, they don't stay long.  But Dan was not one of those

4  guys.  Like, that's what I'm saying, I never got a vibe from him

5  that he was angry or anything like that.  He was very chill,

6  very nice guy.

7  Q.   You would agree with me that somebody who may not spar with

8  you in an aggressive manner, but has firearms and threatens to

9  use firearms could be aggressive as well, right?

10 A.   Yeah.  Sure.  I mean, if they own firearms -- a lot of

11 people I know own firearms.  But, yeah, I think anyone can be

12 aggressive away from it.  Like, you know, I could be aggressive.

13 I don't know.  But, all I can testify to is what I see, what I

14 saw of him.

15 Q.   Certainly.  Now, I'm going to show you what's been admitted

16 into evidence as Government Exhibit 15.  This is a Facebook

17 post.  This is Mr. Baker's Facebook account.  Have you ever seen

18 this message here in the middle where Mr. Baker says, God, I

19 hope the right tries a coup on November third because I'm so

20 fucking down to slay enemies again?

21 A.   No, I have not seen that.

22 Q.   Does it change your opinion about Mr. Baker that he's a

23 nonviolent person now having read this message?

24 A.   That's different.  That tone is different than what I've

25 seen of Dan, yeah.  Yeah.

Cross-Examination – Paul Arnold

1    Q.    So it might change your opinion?

2    A.    I mean, um, yeah.  If you want to slay enemies that sounds

3    aggressive by your definition.

4    Q.    I'm going to show you what's been admitted into evidence as

5    Exhibit 17.  Do you recognize Mr. Baker in this photograph?

6    A.    Yes.  He's on the blue Gi, yes.

7    Q.    Does this seem to be a Jiu Jitsu sparring?

8    A.    A little bit.  Honestly, they're in more a judo position.

9    Jiu Jitsu you are on the ground.  You can do that a little in

10   Jiu Jitsu, but we are definitely drawing from judo in this

11   situation where you're kind of controlling the arm there.

12   Q.    And you see that shotgun on the right of this photograph?

13   A.    Sure.

14   Q.    When you all train at the Jiu Jitsu gym do you train with

15   shotguns on the wall?

16   A.    No shotguns there.

17   Q.    Thank you.

18            THE COURT:  Any redirect?

19            MS. VALLEJO:  No, Your Honor.

20            THE COURT:  Thank you.  You can may step.

21            THE WITNESS:  Thank you very much.

22            THE COURT:  Now a good time for a break, Mr. Murrell?

23            MR. MURRELL:  Yes, sir.  I think this would be a good

24   time.

25            THE COURT:  Ladies and gentlemen, we will take another

1    break.  This one will be shorter than the last, but we'll have

2    that mid-morning break.  We'll see you back in just a moment.

3    Again, do not talk about the case or form any opinions.

4         (Jury out at 10:45.)

5         (Recess taken 10:46.)

6         (Resumed at 10:51.)

7              THE COURT:  Can we talk about jury instructions for a

8    minute again?  If you'll get yours in front of you.  I'll go

9    over a couple of additional changes.  And then I'll print a

10   clean copy for everyone.  The first page, at the bottom we'll

11   take out the line that says, a defendant does not have to

12   testify and if the defendant chose not to testify, et cetera,

13   we'll take out that whole sentence based on his decision to

14   testify.

15            The top of page four we'll take out the impeachment by

16   conviction because that's not been an issue.  And we'll take out

17   the -- we'll keep the second paragraph about the -- because the

18   defendant did testify you should decide whether you believe him,

19   et cetera.  The first two paragraphs on four, the first one will

20   come out and the second one we'll put in and make it final.

21            And then I wanted to, not to revisit what we've

22   already addressed, but I do want to point out that the -- on

23   page five where the government had requested in addition to this

24   to qualify as a true threat statement as to a particular

25   individual or group of individuals, we had added in, and I think

1    that was done without objection.  But then if you go two

2    paragraphs down where we are talking about these things that can

3    be considered, specify a particular victim.  And so there we're

4    talking about a particular victim.  Above we're talking about as

5    to an individual or a group of individuals.

6            And so I think probably the better thing to do would

7    be to put the first one back, what's marked on your draft D

8    proposal 37, just leave that as it is.  And then in the last

9    paragraph there just say, where it says, a communication need

10   not be communicated directly to an intended victim or specify a

11   particular victim or group of victims, add that there.  And then

12   that captures the, or group of, that you wanted Mr. Fields,

13   without the possibility of someone viewing that as inconsistent

14   or redundant.  Inconsistent.  Not redundant.  Any objection to

15   that?

16           MR. FIELDS:  No, Your Honor.

17           THE COURT:  Okay.  Mr. Murrell?

18           MR. MURRELL:  No, sir.

19           THE COURT:  Okay.  So we'll do that.  We'll prepare a

20   clean copy for you all to review.  And then that, I think, will

21   take care of the jury instructions.

22           Okay.  So, we'll take another break.  Are you going to

23   announce rest while he's on the stand then after his testimony

24   is completed?

25           MR. MURRELL:  I think that's what we had talked about.

1    That will be fine.

2            THE COURT:  Okay.  So, Mr. Baker, if there's redirect,

3    when that's over you'll just keep your seat.  And then just stay

4    in the seat at the time.  And I've been telling other witnesses

5    they can step down.  You'll just stay right there.  And then

6    we'll take another break and then proceed to the rebuttal case,

7    if there is one.  And then I think that's when we'll do what I

8    said before, might be kind of a lengthier lunch break for the

9    jury, bring them back maybe, depending on how long this next

10   phase goes, 1:30 or something like that and then have closing

11   arguments and instruct them.

12           I'll tell you now too, what I had intended to do was

13   to do the instructions before the closing arguments, all but

14   that very last paragraph.  That's what I've done in other cases

15   and I think it works well.  Any objection to that?

16           MR. MURRELL:  I'm sorry?  Could you say that again?

17           THE COURT:  I would do the instructions before the

18   closing arguments.

19           MR. MURRELL:  Right.  I understand.

20           THE COURT:  Except for the very last paragraph that

21   just says, you know, head on back.

22           MR. MURRELL:  That's acceptable.

23           THE COURT:  Okay.  All right.  So, just again, I want

24   to -- well, we'll have a sidebar before the next break so that

25   you can, well, not before the very next break, the one after

```
 1   that so we can talk about the scheduling and get the lunch break
 2   thing done.
 3            Anything further before we bring the jury back in?
 4   Mr. Murrell?
 5            MR. MURRELL:  Not from the defense.
 6            THE COURT:  I guess we got to get Mr. Baker in his
 7   seat there, please.  Are you ready, Mr. Kunz?
 8            MR. KUNZ:  Yes.
 9            THE COURT:  Okay.  Bring the jury in, please.
10       (Jury in at 10:57.)
11            THE COURT:  Okay.  Everyone please have a seat.
12   Welcome back.  And we're ready to continue with the defense
13   presentation.  Mr. Murrell?
14            MR. MURRELL:  Judge, I would like to call Daniel Baker
15   as a witness.
16            **DANIEL BAKER, DEFENSE WITNESS, DULY SWORN**
17            COURTROOM DEPUTY CLERK:  For the record, state your
18   full name and spell your last name.
19            THE WITNESS:  Daniel Baker B-a-k-e-r.
20                      DIRECT EXAMINATION
21   BY MR. MURRELL:
22   Q.   Mr. Baker, I'm going to ask you to speak up so that we can
23   hear you all the way in the back here.
24        How old are you?
25   A.   I am 33.  Turn 34 this year.
```

Direct Examination – Daniel Baker

1   Q.   Where did you grow up?

2   A.   I grew up in Jupiter Farms, Florida.

3   Q.   How long have you been in Tallahassee?

4   A.   About the last 10 years.

5   Q.   How is it that you came to Tallahassee?

6   A.   When I became a Yoga teacher I became a vegetarian and I

7   decided to give up accumulating material possessions.

8   Q.   Let me back you up.  You say you became visionary.  Can you

9   tell me --

10  A.   Oh, a vegetarian.

11  Q.   Vegetarian.  I'm sorry.  And you decided to give up what

12  now?

13  A.   Material possessions.

14  Q.   How did that lead you to Tallahassee?

15  A.   I went to live out in the woods with these hippies called

16  The Rainbow Gathering, just to live outside for awhile and to

17  see what their, you know, community was like.  And I found that

18  they were a bunch of dumb hippies so I followed the Hare

19  Krishnas.  I rode with them to different Hare Krishna Yoga

20  temples around the U.S. and I ended up back at the one here in

21  Tallahassee.

22  Q.   Again how long have you been in Tallahassee?

23  A.   About 10 years.

24  Q.   I wanted to ask you about living in Tallahassee.  Over

25  these 10 years, have you been homeless?

Direct Examination - Daniel Baker

1    A.    I have.  Not consistently, but, you know, maybe for a few

2    months every other year, or so.

3    Q.    How is that you were homeless?  How would you explain that?

4    A.    Well, I would be politically verbose at work, or if I had a

5    co-worker who was a woman, or a black co-worker that didn't get

6    paid as much as me, I would say something about it and I would

7    get fired.

8    Q.    What sort of jobs did you have?

9    A.    I worked at the Subway on Lake Bradford.  I worked at the

10   Subway on Tennessee Street, on the strip.  I have worked for C &

11   L Commercial Cleaners cleaning government buildings, all around

12   Tallahassee including the 4-H building and the DBPR building.

13   Q.    Have you worked as a security guard on occasion?

14   A.    Yes.  And also as a concessions stand manager at the

15   football stadium and the civic center.

16   Q.    So when you were homeless how did you get by?  When you

17   were out of work how did you get by?

18   A.    I would hold a "Hungry Veteran" sign and people would take

19   care of me, or I would sell carnations that I bought from Publix

20   to feel like I was working instead of just begging.

21   Q.    You mentioned Yoga.  Tell me about your Yoga experience or

22   your training.

23   A.    I became a certified Yoga teacher when I got out of the

24   Army because that was my natural inclination, and my dad kind of

25   pushed me into the Army.  And I loved it so much that it kind of

Direct Examination - Daniel Baker

1  became the core of my character, and I have been practicing

2  consistently six days a week for over a decade now.

3  Q.   When you say it became the core of your character, what do

4  you mean by that?

5  A.   I mean that, you know, I became a vegetarian.  I would

6  practice meditation and Yoga and mantra repetition.  I

7  eventually became a Hindu, which I'm part of the Hare Krishna

8  group of Hindus.  And, you know, I do the Yoga practice routine

9  and breathing exercises every day to, you know, keep me mellow

10  because when I would be begging or frustrated at work, or

11  because I'm a little guy, people would mess with me a lot and

12  give me a hard time, or they'd say, "You're not really hungry,

13  you're not really a veteran, you're not really homeless".  And I

14  would get upset and I'd be like I'm just going to do my

15  breathing exercises and calm down and go stretch out.

16  Q.   You mentioned Hare Krishna; what sort of role did that play

17  in your life?

18  A.   I spent some time living in their vegetarian temples.  And

19  the majority of like the work you do when you live there you

20  don't really get paid.  You just live like a renounced

21  lifestyle.  And I never became a renounced monk like my friend

22  did, my roommate.  But mostly you distribute spiritual books and

23  vegetarian food.  And, you know, I worked a Krishna lunch here

24  in Tallahassee at FSU.

25  Q.   The view that the material things are not important is that

Direct Examination – Daniel Baker

1    part of the Hare Krishna?

2    A.    Yeah.  It's -- it's basically that, you know, all of this

3    is temporary.  And, you know, the body is very temporary.  And

4    your soul is eternal so it's better to focus on that.

5    Q.    Hare Krishna is based, at least in part, on some Hindu

6    scriptures?

7    A.    Yeah; it focuses on Krishna and Vishnu.  Krishna being an

8    incarnation of Vishnu.  And we also believe that the prophets

9    are representatives of God and that Buddha is an incarnation of

10   Krishna.

11   Q.    You mentioned your military experience.  You were in the

12   United States Army?

13   A.    Yes.

14   Q.    You went in at what rank?

15   A.    Private E 1.

16   Q.    And when you left what was your rank?

17   A.    E 1.

18   Q.    What sort of training did you have in the military?

19   A.    It was infantry training and airborne.  I also trained on

20   the javelin shoulder-fired ant-tank rocket or missile.  It's not

21   like a giant missile.  It's like a fancy RPG.

22   Q.    And was this training any different than anybody else would

23   have gotten in the military?

24   A.    The javelin, you know, they will pick a person out of the

25   unit to go to javelin school.  And I also went to squad

Direct Examination - Daniel Baker

1   designated marksman course to see if I was eligible to go to

2   sniper school and I ended up like halfway in the class so I was

3   not eligible to go to sniper school because of my vision.

4   Q.   Were you ever trained as a sniper?

5   A.   I never -- no, I never went to sniper school.  When I was a

6   kid my dad kinda wanted me to be this great soldier, and this

7   sniper, and he fed me books like *One Shot One Kill* by Carlos

8   Hathcock, who was a Marine Corps sniper in Vietnam.

9        And he took me shooting with his SWAT buddy, Dana, and he

10  would make a one mile shot, and that impressed me as a kid, so I

11  wanted to live up to this expectation.

12  Q.   And your father was a police officer?

13  A.   And he was a military veteran, Coast Guard and National

14  Guard.

15  Q.   And is it fair to say you were a good shot?

16  A.   Yeah.  You know, for having giant glasses.

17  Q.   There has also been a lot of talk about your participation

18  in the YPG.

19       What is the YPG?

20  A.   The YPG is a leftist militia of Kurds who carved out their

21  own autonomous region in northeastern Syria, partially in

22  response to overbearing government policies by the president of

23  Syria, Bashar al-Assad.  He gassed a lot of people using these

24  deadly chemical weapons.  Not like crowd control gas, like

25  chlorine gas.

Direct Examination - Daniel Baker

1  Q.   What role did the YPG have in the fight against ISIS?

2  A.   Well, they took it personally because ISIS has this

3  ideology of enslaving women, institutionalizing rape for people

4  who take a female captive -- she now belongs to this guy.  And

5  the Kurdish people are very feminist.  They come from a

6  matriarchal culture.  And as a result they take it personally

7  when you try to abuse their women.

8       So, the women in the Kurdish culture are also very

9  militant.  The Kurdish women have this habit of like if a

10  husband misbehaves she will take off her shoe, you know, and

11  beat him.

12          MR. KUNZ:  Objection.

13          THE COURT:  What's the objection in a couple of words?

14          MR. MURRELL:  We can move on.

15          THE COURT:  Okay.  The objection is sustained and you

16  can continue.

17          MR. MURRELL:  I'm sorry?

18          THE COURT:  I said the objection is sustained.  You

19  can continue with a different question.

20  BY MR. MURRELL:

21  Q.   ISIS, what sort of organization was that?

22  A.   It's Salafi-Jihadism, which means that they are hardcore

23  right wing fundamentalist Jihadis who believe in the practical,

24  literal application of the Quran.

25          THE COURT:  Just a minute.  I'm sorry?

Direct Examination - Daniel Baker

```
1                MR. KUNZ:  I thought we were talking about YPG.

2                THE COURT:  The question was, what is ISIS.

3                MR. KUNZ:  I'm sorry.

4   BY MR. MURRELL:

5   Q.   Tell me a little more about ISIS.

6   A.   They believe in the literal, practical application of the

7   Quran in the old school sense, and they are known for -- they

8   are known as head-choppers.  They behead their prisoners on

9   video.  Send the videos to their family.  And they use this as a

10  form of intimidation.  They --

11  Q.   Let me ask you this, so did the YPG participate in the

12  fight against ISIS?

13  A.   Yes.

14  Q.   Did the United States participate in the fight against

15  ISIS?

16  A.   Yes.

17  Q.   And what was the role -- I guess I should back up.  You

18  joined YPG.  Let's talk about that.

19       How did you get to Syria to fight with the YPG?

20  A.   A U.S. soldier named Kevin Hodge gave me the contact email

21  for the YPG.  I sent them an email.  They sent me some messages

22  back of reading material.  And I read the material.  I gave them

23  book reports.  They liked my answers.  And they invited me to

24  come join them.  I couldn't --

25  Q.   Let me back you up just a second.  The answers you gave --
```

1  did they expect some fairly radical answers?

2  A.    Well, it's hard to say because one of the people who ended

3  up there in the YPG was a self-proclaimed Italian fascist.  So

4  it's like -- if you just think, okay, this is what they want to

5  hear and you tell them that, then they will let you in.  But

6  some people are answering honestly and they say, no.  And I

7  answered honestly; I was impressed by the ideology because it

8  was very democratic and very feminist and I thought was novel

9  for the Middle East.

10  Q.    So you bought your own ticket to go to Syria?

11  A.    I couldn't afford it at first, so I had moved out of my

12  apartment and I went into a tent in an empty lot between the

13  place that I could beg at, and the place that I could train

14  jujitsu at.  And I had lost my job when my mother died and I

15  requested time off for the funeral right before I left, so I had

16  to do that.

17  Q.    I am going to back you up.  Let's try to keep this a little

18  more concise.  Okay.

19        So you bought a ticket for Syria?

20  A.    Yeah.  I used begging money.  I asked friends on-line if

21  they wanted to help me go and they did.

22  Q.    So you paid for your flight to Syria?

23  A.    Yeah.

24  Q.    When you got to Syria, what -- let me ask you this.  How

25  long were you there in Syria with the YPG?

Direct Examination - Daniel Baker

1  A.   In Syria, about six months.  And I was overseas about 8

2  months altogether.

3  Q.   What sort of training did you get with the YPG?

4  A.   It was mostly language and ideology and history of the

5  Middle East.  And then for a few days, during the course of a

6  month, or two, we fired about five rounds from three different

7  weapons.  Each person would fire, you know, a handful of rounds

8  and they would be like, "Good job.  You're ready to fight".

9  Q.   Was it anything like the training you got in the U.S.

10  military?

11  A.   No.  In the U.S. military we would be firing constantly all

12  day, sometimes all night for days on.

13  Q.   With the YPG you got about five rounds on two or three

14  different weapons?

15  A.   Yeah.

16  Q.   What did you -- you were in combat there with the YPG?

17  A.   Yes.

18  Q.   And that was for how long?  What period of time?

19  A.   I went to the frontline for two weeks.  They say everybody

20  works the frontline and we'd usually only go for two weeks.

21  Some people would go multiple times and I only went once.

22  Q.   So you were there all of these months and you were on the

23  frontline in combat for two weeks.  What did you do the rest of

24  the time?

25  A.   Most of the time we sat around watching TV and movies, or

Direct Examination - Daniel Baker

1  we were volunteering to go help build this hospital, build a
2  school, or help farm and garden.  And, you know, we would be
3  digging like irrigation, digging tunnels in the event that we
4  were attacked and we had to, you know, dodge air raids.
5  Q.  Did you try to impart some military training on the --
6  well, let me back up.  So you are in a training group; is that
7  accurate?
8  A.  Yes.
9  Q.  And how big a group is this training group?
10 A.  Well every few months they would get some volunteers and we
11 would be at the YPG International academy when you first
12 arrived.  And they keep you there to see if you're crazy.
13    They give you a weapon that does not work and you carry it
14 around to get used to it.
15    You are only there for a few months and the training was
16 not impressive.
17 Q.  Well, so how big a group were you with?
18 A.  There would be about -- they would wait for about 20 people
19 to trickle over the course of a few weeks, and then they would
20 begin the training.  And then after it was over you would go to
21 the YPG International base from the academy.
22 Q.  Did you try to impart some of the training, knowledge --
23 some of the military knowledge that you had from the Army on
24 some of the YPG volunteers?
25 A.  No.  I was very careful never to talk about military

1  operations in urban terrain or strategy and tactics because this

2  is a foreign militia and I did not want to get any kind of

3  association with training these guys.

4      I put myself in a submissive position to the Kurds.  I

5  wanted to -- because they have a problem where people come and

6  they are like, "I'm a Marine.  I'm going to tell you guys how we

7  do this in real life.  You guys are" - I'm about to cuss -- "you

8  guys are all jacked up and you are doing everything wrong" so --

9  and they hate those guys.

10 Q.    You didn't want to take that approach?

11 A.    No.  I wanted to go there and ingratiate myself to them

12 because they tend to not let those macho dudes go to the front

13 because they're afraid they're a bunch of white Americans coming

14 to kill brown people.

15 Q.    Did you offer them any training in Yoga or jujitsu?

16 A.    I did offer them training in Yoga because guys would be

17 getting in fights and getting stressed out with each other and I

18 would be like, This isn't the way.  If you feel like fighting

19 let's go wrestle instead, and we'd have this big guy talking

20 trash to me for a few weeks and I'd be like, Come with me, my

21 friend.  Let's wrestle.  And, you know, we'd sit down in the

22 room and put some mattresses -- and these are guys who are

23 already into judo.  It wasn't really teaching them anything new.

24 And we would roll around on the mattresses.  And it wasn't an

25 organized thing with everybody.  It was just a few of my friends

Direct Examination - Daniel Baker

1    who wanted to wrestle -- and specifically a U.S. Marine.

2    Q.    I did want to ask you about jujitsu.  And we had Paul

3    Arnold testify about that.  But what level were you in the

4    scheme of things, in jujitsu?

5    A.    I'm a blue belt.

6    Q.    And in the scheme of things, where is that?

7    A.    It's one above white belt.

8    Q.    Would you say you're a master in martial arts?

9    A.    No.  I would get in a lot of trouble if I said that and it

10   wouldn't be accurate.

11   Q.    Let's go back to the YPG and your time in Syria.  So you

12   were on the frontline in Syria.  And we saw a video from VICE

13   News and that was you portrayed in that video.  You nod your

14   head.  The court reporter can't get that.

15   A.    Yes; I was in that video.

16   Q.    And why don't you tell us what was going on there?

17   A.    That day our translator and our team leader, that Marine I

18   mentioned, were off moving our truck and VICE showed up,

19   unannounced and uninvited and, they decided to start filming us.

20   And they had pulled up in front of the building, and between us

21   and ISIS, and we were yelling at them to come inside.  ISIS saw

22   them --

23   Q.    Where in Syria -- where was this taking place in Syria?

24   A.    This was the Deir ez-Zor town in the region of Baghuz,

25   B-a-g-h-u-z.

Direct Examination - Daniel Baker

1  Q.   So the VICE News crew pulls up and what happens from there?

2  A.   Well, this battle had been grinding on before I got there.

3  It was grinding on when I left -- to some extent it was winding

4  down.  When they pulled up, we got attacked almost instantly.

5  We pulled them into the building and told them, you know, Stay

6  down.  Stay out of the way.  You guys are messing this up.

7       And they got scared and started to freak out.  All the

8  local Arab and Kurdish guys.  And I was mostly on the third and

9  second floor operating as a sniper to try to keep the enemy

10 suppressed and keep them away.

11 Q.   I did want to stop you for a second.  You talk about the

12 five rounds you got.  Did you get trained as a sniper in Syria?

13 A.   No.

14 Q.   So, you are on the second floor.  You've a sniper rifle.

15 What's going on?

16 A.   Forgive me if I get excited talking about this.  It gets me

17 anxious because combat is a very stressful thing and I can

18 feel -- you know, I couldn't sleep for weeks afterwards.  But --

19 I had to get medicated to sleep afterwards.

20      But -- so, when they pulled up I was on the third floor and

21 my buddy Karka (phonetic) was on the second floor.  This

22 Scottish guy was on the third floor with me.  And Karka would

23 run up and down to coordinate --

24 Q.   Who is it -- that's your leader?

25 A.   Karka -- no.  The team leader was gone.  So we did not --

Direct Examination - Daniel Baker

1  we had our head chopped off.  We didn't have our team leader

2  there.  He was a great team leader -- this Marine with lots of

3  combat experience.  But Karka was second in command because he

4  was experienced.  He came from the South Korean Army, which is

5  an ally of the U.S.

6       And -- so, he was running from floor to floor to coordinate

7  fire between us and the local Arab and Kurdish volunteers.  And

8  I would call out targets that I picked out through the scope and

9  through the range finder.  And they would basically funnel

10  themselves -- ISIS -- through this bridge that crosses the

11  Euphrates.  We were right in a row of buildings along the

12  Euphrates.  ISIS was directly in a row of buildings on the other

13  side.  At night they managed to infiltrate onto our side of the

14  Euphrates and had occupied the buildings across the street from

15  us.  So we were --

16  Q.   How long did this shootout go on?

17  A.   I mean, we were fighting up to that building for the course

18  of a week.  VICE showed up for one day.  After we took them out,

19  we went back to that same building and we were there for another

20  week fighting day and night continuously.

21  Q.   Part of what you did there was to get the VICE News crew

22  out?

23  A.   Yeah.  When they started to talk about jumping out of the

24  second floor windows I was like, Don't do that.  You're going to

25  break your legs on the ground and there is poop and barbed wire

Direct Examination – Daniel Baker

1   and broken metal and rusty concrete -- rusty metal and concrete

2   --

3   Q.   So, that was part of what you did, you got the VICE News

4   crew out of there?

5   A.   Yeah.  When they started getting -- climbing out of the

6   window we pulled them down and we were like, Okay, follow us.

7   And Karka stayed behind, along with that Arab machine gunner in

8   the video, and by themselves they held off waves of ISIS while

9   we took the reporters away and then came back to them in the

10  same building.

11  Q.   One of the posts -- and we will talk about your posts some

12  more in a minute -- one of your posts you claim to have killed

13  16 people.  Is that -- is that accurate?

14  A.   There were 16 shots that I made that in the fog of horror I

15  thought, Oh, I think I got that guy.  But the only one that I'm

16  absolutely certain that I got is the one that the FBI said --

17  FBI agent said that I was bragging about where I had seen two

18  Jihadis, one of them holding an AK up in the air while they rode

19  towards us from, you know, ISIS flags side of the field.  And

20  they came right directly towards me, in a straight line for so

21  long, that I was able to shoot them.

22       But other than that there would be waves of them running

23  across an open field, or between buildings, and we'd all be

24  shooting at them and there's 20, 30 people in each building

25  converging fire on this mass of suicidal Jihadis and they are

Direct Examination - Daniel Baker

1  just falling down in rows.  So nobody really knows who killed

2  who.  But the commander on this one day that our team had killed

3  21 Jihadis, as a team.  And, you know, I was counting off my

4  shots one day and when I got to 16 stopped counting because I

5  felt sick to my stomach.

6  Q.   So, this figure of 16 then is it safe to say that was an

7  exaggeration?

8  A.   Yeah; it's probably an exaggeration because, you know, it's

9  something that all of the guys do when you're in the barracks

10  with one other.  And when the guys come back from the front you

11  are like, Oh, did you get them?  Did you get any of them?  And

12  they are like, Oh, yeah.  I got all of them.

13       But, the reality is that you don't really know.  And there

14  was never a point where I went into a room and shot someone

15  face-to-face clearing rooms.  I had never done anything like

16  that.  It was all across the street.

17  Q.   That was in your two weeks of combat?

18  A.   Yeah.  And we also called in a lot of air strikes, and I

19  figure --

20  Q.   I wanted to ask you about that.  In that video, was there

21  an air strike called in?  Was that portrayed in the video?

22  A.   Yeah.  In the video you can see me after the scene where

23  the -- where my Arab machine gun friend -- his name is 'Amrikiin

24  because he was such a badass that they called American, and

25  that's Arabic for America -- 'Amrikiin.  They thought that the

Direct Examination - Daniel Baker

1  Americans are so hardcore they call this guy American because he

2  smokes a cigarette while he shoots his machine gun.  He pulls

3  his head back and the bullet hits the wall, I was standing in

4  the well of the stairs with a tablet putting a point on the

5  exact building that the rocket team and sniper team were

6  suppressing us from.  And then I showed --

7          THE COURT:  I guess the question was, did he call in

8  airstrikes.

9          MR. MURRELL:  I think that's what we are getting

10  around to.

11  A.   And then I showed that to 'Amerkiin and he radioed it into

12  the American Air Force and then the --

13  BY MR. MURRELL:

14  Q.   Let me back up.  So you sort of plot out on some kind of

15  iPad, or something?

16  A.   Yeah.  It was a Samsung tablet.

17  Q.   So you sort of plot out the target.  You pass that along to

18  somebody else.  And then they call it in to -- and somehow get

19  it to the U.S. military?

20  A.   Yeah.  You could see him calling it in when he was on the

21  radio when the bullet hit the wall next to his head.

22  Q.   And then the military bring the planes, or they -- they

23  drop the bombs or shoot the rockets?

24  A.   Usually two jets come in back-to-back and drop two

25  airstrikes and it's --

1  Q.   But that was portrayed in the video, you calling in this

2  airstrike --

3  A.   It's a bone-shaking experience.

4  Q.   I wanted to ask you a little bit about sort of your

5  world-view.

6       Tell me if I'm wrong, but I have the impression you don't

7  have a very favorable view of law enforcement.

8  A.   No.  My dad would come home talking about drop weapons.  He

9  was the first person to tell me, you know, Don't become a cop

10 because I just had to cover for a bad cop.  And he was a good

11 cop but he had to cover for bad cops and he would come home

12 telling me about these things.

13 Q.   So your impression was your father was not, to say the

14 least, an honest police officer?

15 A.   No.  He would, you know, sometimes he would brag about

16 black men's last words --

17           MR. KUNZ:  Your Honor.  I object.

18           THE COURT:  I'm sorry.  Repeat the question, please.

19           MR. MURRELL:  I am asking him his view of law

20 enforcement.

21           THE COURT:  You asked that already.  Then the next

22 question was what?

23           MR. MURRELL:  Something to the effect of, your father

24 gave you -- my impression was you didn't think your father was

25 an honest police officer.

Direct Examination - Daniel Baker

```
 1              THE COURT:  And there is an objection to that, or
 2    there is not an objection?
 3              MR. KUNZ:  Yes.  He is going into it, Judge.
 4              THE COURT:  I'm sorry?
 5              MR. KUNZ:  Yes, sir.  It's going well beyond.  Was he
 6    honest?  Yes or not.  He is going to another tale of who said
 7    what.  It's hearsay.
 8              THE COURT:  Okay.  Why don't you ask a different
 9    question.
10    BY MR. MURRELL:
11    Q.   Why do you think your father was not an honest police
12    officer?
13    A.   Because he would tell me about it and sometimes he would
14    come home from work crying --
15              MR. KUNZ:  Object.  Relevancy number one.  And
16    hearsay.
17              THE COURT:  It's sustained as to hearsay.  And what's
18    the relevance?
19              MR. MURRELL:  We are talking about his views of law
20    enforcement.  We have got a clip, for example, that says, Would
21    you attack a police officer.  So I am exploring his views of law
22    enforcement.  And I am asking him how he came to these views.
23              THE COURT:  All right.  Let's have a brief sidebar.
24        (Following conference held at sidebar at 11:22 AM.)
25              MR. MURRELL:  We're spending more time on this than I
```

Direct Examination - Daniel Baker

1   would have, and had I just finished another question or two --

2           THE COURT:  Well, no one was in the position to know

3   that.  There is a -- if you are saying he is justified in

4   disliking law enforcement, I'm not sure how that's relevant.

5           MR. MURRELL:  I'm not saying he's justified.  I am

6   explaining why he is distrustful of law enforcement.

7           THE COURT:  But why does it matter why he is

8   distrustful of law enforcement?

9           MR. MURRELL:  Because I've got to explain this -- they

10  are painting him as a fellow that is violent, and one of the

11  reasons we know he is violent is he distrusts law enforcement.

12  I think at the very least I can explain why he has these views.

13          THE COURT:  But why is why he has the views relevant?

14          MR. MURRELL:  To explain why he acted.  Why he does

15  what he does.  Why he believes the FBI is infiltrated by white

16  nationalists.  All of that is relevant.

17          THE COURT:  Mr. Kunz?

18          MR. KUNZ:  Judge, I don't think it is.  He can

19  indicate that he is biased against law enforcement, and

20  everything else, but his motivation why -- I don't think it

21  matters.

22          MR. MURRELL:  I just can't explain it?  I can ask him

23  is he biased against law enforcement and leave it at that?  Is

24  that the suggestion?

25          THE COURT:  What I'm struggling to understand is why

Direct Examination - Daniel Baker

1    it would make it more or less likely that he is guilty or not

2    guilty based on whether his father was a good cop, whether he

3    has thought his father was a good cop, whether he is justified

4    in thinking that --

5           MR. MURRELL:  All is not tied to the direct issue of

6    whether he is guilty or not guilty.  I've to explain how he

7    views things, why he thinks the nation or the Capitol was under

8    attack, and why he has some of these fantastic, rather

9    unreasonable views, I think I can explain all that.  I think, as

10   the government would say, it's inextricably intertwined.  It's

11   all part of his story.

12          THE COURT:  Well, talking about inextricably

13   intertwined, that was on the objective side of things.  What I

14   am asking you is -- you are welcome to explore, as you already

15   have, whether he has negative views of cops.  But why -- what I

16   am asking is, how does that -- I guess I haven't heard an answer

17   as to why it's relevant.

18          MR. MURRELL:  We can have him look like a lunatic that

19   just has these irrational views about law enforcement, or we can

20   explain why he has some of these views.

21          I don't know why we -- it doesn't strike me as very

22   controversial.  We are not going to go very far with this.

23          MR. KUNZ:  We've gone pretty far in every detail about

24   --

25          THE COURT:  You've already gone -- he thought his dad

Direct Examination – Daniel Baker

1  was a --

2          MR. MURRELL:  Well, I'd like to proffer it if I'm not

3  going to be allowed to introduce it.

4          THE COURT:  Okay.  You can proffer.

5          I do find it's irrelevant what kind of cop his father

6  was, or whether he's justified in having a negative view of law

7  enforcement.  I do find that's irrelevant.  And you can make a

8  proffer, if you'd like.

9          MR. MURRELL:  Well, do we want to excuse the jury

10 while I make a proffer?

11         THE COURT:  You can proffer right now what you think

12 it would be.

13         MR. MURRELL:  He's going to say his father was a

14 rotten cop.  Like I say, I got about two questions --

15         THE COURT:  He already said that, by the way.

16         MR. MURRELL:  Right.  I'm about done with it.  And

17 then he's going to talk about some of his views of law

18 enforcement.  He's going to tell us how he thinks the FBI is

19 infiltrated by white nationalists.  He's going to tell us that

20 he believes that -- who knows.  The gist of it is he's going to

21 explain why he doesn't trust law enforcement.

22         THE COURT:  Okay.  And we've been mainly talking in

23 the context of the law enforcement, but the infiltrating the FBI

24 and things like that, you have the same objection to?

25         MR. KUNZ:  Yes, sir.

Direct Examination - Daniel Baker

1              THE COURT:  And in other arguments as to why he thinks

2     that the FBI was infiltrated by white notionalists would be

3     relevant to an issue in this case?

4              MR. MURRELL:  Well, yes; because it's going to explain

5     why he thought -- and this is part of his world view.  He

6     believes all of this stuff.  He believes that people were going

7     to attack the Capitol.  These are not reasonable views.  And the

8     argument is going to be, look, Mr. Baker might have thought that

9     there were going to be people attacking the Capitol, but the

10    reasonable person would not have thought that.  And so I need to

11    explain some of his unreasonable views.

12             MR. KUNZ:  Judge, again, I disagree.  I think he can

13    testify about he believed this, or he believed that, but going

14    into every detail --

15             THE COURT:  You said he can or he cannot?

16             MR. KUNZ:  He can, saying I believe the FBI is this or

17    that?

18             THE COURT:  You are saying he can?

19             MR. KUNZ:  Yes, sir.  But not the motivation behind

20    it.  I don't want to spend a lot of time on something that's not

21    an issue in the case.

22             THE COURT:  If the point is that he has irrational

23    views, you don't make them less or more irrational by finding

24    out the genesis of them -- if they are facially irrational as

25    you are suggesting.

Direct Examination - Daniel Baker

1           MR. MURRELL:  Well, I mean -- I don't know why -- I

2    mean, this is -- it just seems to me you get to explain why you

3    think this.  And it can go too far afield, I will concede that.

4    This is just some fairly preliminary stuff.

5           THE COURT:  Okay.  Here's the ruling.  I've given you

6    an opportunity to explain why it would be relevant why he thinks

7    these things about the father, about any of these views.  You

8    can ask whether he has this view, that view.  You've already

9    asked whether he has a negative view of law enforcement.  But

10   going way down the road about why -- how he came to think these

11   things just is not relevant to any issue in this case.  But you

12   can make additional proffer as to any of that.  But I don't want

13   this to turn into --

14          MR. MURRELL:  Well, you know, I assume -- I mean, we

15   can go question by question and see how it goes.  I'm not

16   entirely sure what I can ask.  I mean, I'm going to ask him, Do

17   you think the FBI is infiltrated by white nationalists.  Why do

18   you think that?

19          THE COURT:  I think probably a single question, Why do

20   you think that, with a brief explanation is probably fine.

21   Don't you think, Mr. Kunz?

22          MR. MURRELL:  I think Mr. Kunz is opposed to that.

23          MR. KUNZ:  I am opposed to him going on and on and you

24   continuing to ask additional irrelevant stuff.

25          MR. MURRELL:  I asked two questions about his father.

Direct Examination - Daniel Baker

1          THE COURT:  Well, part of the problem, too, he is not

2    giving concise answers.  I think it would be helpful if you --

3          MR. MURRELL:  He talks.

4          THE COURT:  -- controlled him a little.  Because he's

5    saying a lot of things that are not responsive to the questions

6    which --

7          MR. MURRELL:  I will do my best to control him.

8          THE COURT:  All right.

9          -- which exacerbates the problem.

10         So the ruling is, we are finished with the father.

11   You can ask --

12         MR. MURRELL:  Well, I would have asked more but if

13   that's the Court's ruling --

14         THE COURT:  Right.  That is the ruling.  But if you

15   want to proffer anything else about the father --

16         MR. MURRELL:  No.  I think he would have said that his

17   father often complained about blacks, and that his father

18   planted evidence, that his father would cover for other bad

19   cops.

20         THE COURT:  Okay.  And I do think all of that is

21   irrelevant.  And I also think a lot of this -- he's fighting

22   against races and things like that is potentially problematic.

23   But he has gotten some of that in -- and -- okay.  We can

24   continue.

25         (Sidebar concluded at 11:28 AM.)

Direct Examination - Daniel Baker

1          Thank you for your patience, ladies and gentlemen.

2          We are ready to continue.

3     BY MR. MURRELL:

4     Q.   Mr. Baker, suffice it to say that your experience with your

5     father led to some of your thoughts about law enforcement?

6     A.   That's accurate.

7     Q.   What about the FBI?  Do you think -- tell me what you think

8     about the FBI.

9     A.   I feel like they are infiltrated by white supremacists.

10    One of my dad's friends was this guy Dana, who was a --

11          MR. KUNZ:  Object.

12    Q   (By Mr. Murrell) Well, I guess we can't talk about your

13    father's friends or your father anymore.

14          Can you tell us why, apart from what your father -- what

15    you know about your father -- why you thought that the FBI is

16    infiltrated by white nationalists?

17    A.   Because I've heard of this Operation Paperclip where the

18    U.S. government recruited former Nazi scientists.

19    Q.   So you've read things that led you to believe that they are

20    infiltrated by white nationalists?

21    A.   Yeah; declassified government documents.  Yes.

22    Q.   Do you think, for example, that law enforcement played a

23    role in the assault on a Capitol?

24    A.   If not intentionally then they, you know, looked the other

25    way, took a long time to respond, and they definitely are filmed

Direct Examination - Daniel Baker

1    in multiple videos opening the gates to let them into the

2    Capitol.

3    Q.   So, all of that leads to what I guess is safe to say is a

4    rather negative view of law enforcement?

5    A.   Yeah.  They didn't even object to that one.

6    Q.   Did you -- you think all police officers are corrupt or

7    dishonest?

8    A.   I think that a lot of guys grew up like me wanting to

9    become heroes and they end up having to cover for bad cops like

10   some I'm not allowed to talk about.

11   Q.   What about threats that you feel -- well, tell me this.

12   You've had a lot of social media posts with those on the extreme

13   right wing, is that safe to say?

14   A.   Yeah.  Starting in 2016, after the Charlottesville riots.

15   Q.   And how would you characterize those exchanges?

16   A.   I've been consistently receiving directed harassment --

17   targeted harassment -- from the far right in Facebook,

18   Instagram, on the profile and also on the Messenger itself.

19   Q.   When you say the far right, are there any particular groups

20   that you feel are participating in this?

21   A.   The first one was the Neo-Nazi gang called Republic of

22   Florida, led by Jordan Jereb, here, in Tallahassee, who has

23   claimed --

24   Q.   Any other groups?

25   A.   Yeah.  There's Atomwaffen, that's another group that's

1    based in Florida, that are far right self-proclaimed Neo-Nazi

2    fascists.  And then other less defined far white, white

3    supremacist groups.  Some of them are based out of Jacksonville,

4    like the League of the South.

5    Q.   And what sort of threats have you received in these

6    exchanges?

7    A.   Specifically, from Jordan Jereb and his friends they said

8    they were going to come after me when the power goes out, in

9    that hurricane around 2016.  I think it might have been Michael,

10   or something.  But -- and I reported all of these messages and

11   harassments to the FBI on IC3.com [sic], and nothing happened.

12   Q.   Did you think that these -- did you think this was just

13   talk, or did you think these were real threats?

14   A.   No.  When people tell me they're going to kill me, I

15   believe them.

16   Q.   What -- did you get any of these threats while you were in

17   Syria?

18   A.   Yeah; Jordan Jereb created sock accounts which is like a

19   fake profile name and he sent me messages when I was in Syria.

20        MR. KUNZ:  I'm going to object.  This whole thing is

21   hearsay.  How does he know what type of account was created --

22        MR. MURRELL:  It's not being used to prove the truth

23   --

24        THE COURT:  That's not a hearsay issue.

25        He hasn't said what was said either.  The question is,

1    does he have -- is there a foundation for his saying who set up

2    what account.  It's sustained to that extent.  But you can ask a

3    different question.

4    BY MR. MURRELL:

5    Q.   Well, how did you know that this came from that particular

6    individual?

7    A.   Because he would tell me.  And also because the FBI agents,

8    who interviewed me, when I got picked up confirmed that.  It's

9    in the transcripts.

10              MR. KUNZ:  Object.

11              THE COURT:  That's sustained as to hearsay, the second

12   part.  The last little bit is stricken.

13              You can ask the next question, Mr. Murrell.

14              MR. MURRELL:  My position is it's admissible because

15   we are trying to explain why he believed he had these threats,

16   and that it's not hearsay.

17   Q    (By Mr. Murrell) But, at any rate, so you had these

18   exchanges and you felt like these threats were real?

19   A.   That was just online.

20   Q.   Okay.  Were there face-to-face threats?

21   A.   Yes.  At the protest against Richard Spencer, who

22   instigated the Charlottesville riot in which people died, he

23   came to Gainesville to give a speech --

24   Q.   Let's slow you down.  I want to try to I guess limit

25   your -- going to try to direct your testimony a little bit more.

Direct Examination – Daniel Baker

1      So, you were at the protest there in Gainesville?

2   A.   Yes.

3   Q.   And there was a protest at the University of Florida where

4   Richard Spencer was speaking?

5   A.   He tried to.

6   Q.   And he is a white nationalist?

7   A.   Yes.

8   Q.   Well-known white nationalist?

9   A.   Self-proclaimed white nationalist, white supremacist.

10  Q.   And there was a shooting there?

11  A.   There was a shooting.

12  Q.   People were arrested?

13  A.   Yes.

14  Q.   And you were in the vicinity of the shooting?

15  A.   Yes.  I was with the group, and then me and another person

16  had decided to go back to the protest and half of the group was

17  going to stay at the bus stop.  And I walked from the bus stop a

18  few hundred feet to the traffic light, went across the street,

19  and as I did the shooters had pulled up past me and were glaring

20  at us because we were holding anti-Nazi signs.  They pulled up,

21  shouted "Heil Hitler", and shot at my friends.

22  Q.   So you've had these threats online and there was the

23  incident there in Gainesville?

24  A.   Yes.

25  Q.   You, at one time or another, described yourself as

Direct Examination - Daniel Baker

1  anarchist and a radical leftist.

2  A.    Yes.

3  Q.    What do you mean by that?

4  A.    Anarchist are like left wing libertarians.  We don't

5  believe in total anarchy and burning stuff all the time because

6  that would be impractical.  We believe in community

7  infrastructure, from the bottom up.  People taking care of each

8  other.  Not no government but less government.

9  Q.    And when you say you are a hardcore leftist, what is that

10  all about?

11  A.    Well, I believe that the philosophy of an anarchism leads

12  to socialism.  And I believe that the government should provide

13  for everyone's housing, healthcare, food.  I even believe that

14  the government should distribute weapons to people who are loyal

15  citizens of the American country.

16  Q.    Does any of this hardcore leftist business, or this

17  anarchist, is that -- does any of that involve violence or

18  threats of violence?

19  A.    It involves self-defense.  You know, armed self-defense.

20  But never something like what ISIS did, or like an outright

21  attack or, you know, un-instigated kind of assault.

22  Q.    So self-defense, is that safe to say?

23  A.    Counter-punching.

24  Q.    You're also a member of a group called the Socialist Rifle

25  Association?

Direct Examination - Daniel Baker

1    A.    Yes.

2    Q.    What is that?

3    A.    It's like the left wing version of the NRA.

4    Q.    And what is the philosophy of the Socialist Rifle

5    Association?

6    A.    I don't know exactly.  I haven't read their bylaws in

7    detail, but, in general, we believe that everyone should be

8    allowed to possess firearms, as long as they're following the

9    laws that are currently in place.

10   Q.    I'm going to show you some of these posts that -- I'm going

11   to run through them.  We've already seen the government posted

12   them.  But I think objectively certainly some of them are

13   aggressive and suggest something about violence.

14        We're going to explain some of these, and I think there are

15   explanations for some.  But how do you account for the tone of

16   some of these?  What's your explanation for that?

17   A.    You know, after being harassed continuously for the last

18   five years online I figured that, you know, I'm a little guy and

19   people have been picking on me since I was even smaller, and if

20   I create this kind of presence that looks to be like, you know,

21   the left wing boogie man of what the far right believes is an

22   Antifa super soldier, then they will be less likely to actually

23   come and do a drive-by and shoot at me, again.

24   Q.    I'm going to play for you a clip that I've shown you.  It's

25   a video of an interview -- it's a part of the interview that

1    took place after you were arrested on January the 15th.

2         You've seen the video?

3    A.    Yes.

4    Q.    Is it an accurate representation of what was taking place

5    at the time?

6    A.    Yes.

7              MR. MURRELL:  Judge, at this time, I would like to

8    offer into evidence Defendant's Exhibit Number 3.  It's a CD

9    with a clip of the video.

10             THE COURT:  Yes, sir.  That will be admitted.

11        (DEFENDANT EXHIBIT 3:  Received in evidence.)

12             MR. MURRELL:  May I publish the video?

13             THE COURT:  Yes, sir.

14             MR. MURRELL:  Let's see if we can get this to work.

15             Let me do this, I actually have some transcripts,

16   Judge, I'd like to distribute to the jury.

17             THE COURT:  Of just this portion?

18             MR. MURRELL:  I have a copy for --

19             THE COURT:  Why don't we just play the video?

20             MR. MURRELL:  Well, I think it's hard to hear the

21   video.  And I think that you can -- I think the jury will be

22   better able to follow along if they have a transcript.

23             THE COURT:  Mr. Kunz?

24             MR. MURRELL:  I have one for the Court.

25             MR. KUNZ:  Judge, I'm not sure it's necessary.  I

Direct Examination – Daniel Baker

1  don't think there was any --

2          THE COURT:  Well, let's try it without the things,

3  Mr. -- I could hear it -- I could hear it fairly well yesterday,

4  I think.

5          MR. MURRELL:  Judge, it would be, frankly, much

6  clearer if they can read along with it.  So my request is that

7  the jury get to see a transcript.  If the Court says I can't do

8  that, fine, but --

9          THE COURT:  I'd like to just try the video without it

10  first and then we can do it, if necessary.  The jury can let us

11  know if they can't hear.

12          MR. MURRELL:  Yes, sir.

13  (Video played.)

14  Q    (By Mr. Murrell) I want to ask you about some of the things

15  you said there.

16      One of the things you talked about was Chick-fil-A.  How

17  did that come up?

18  A.   Oh, I read some news articles that -- oh, well, initially,

19  they started on this day I was arrested by banging on my

20  landlady's door next door, and then when she didn't answer, they

21  banged on my door and we were alerted to this person --

22  Q.   And they showed you a Chick-fil-A bag?

23  A.   Yeah.  They were saying, "Hey, this is Postmates.  I have

24  your Chick-fil-A".

25  Q.   So that's how it came up.  And what you said there was that

Direct Examination - Daniel Baker

1    your understanding was that Chick-fil-A was funding some

2    anti-gay operations there in Africa?

3    A.    Yeah.  I had read news articles about that on-line.

4    Q.    You also said something about white nationalists

5    infiltrating the FBI.  You mentioned that earlier.  But you

6    thought that was true?

7    A.    Yes.

8    Q.    You said something there about you were worried about

9    getting shot by white nationalists when you were standing on the

10   corner?

11   A.    Yes.

12   Q.    And you also said something about you were glad that the

13   FBI made the arrest rather than some other federal agencies.

14   What was that all about?

15   A.    Well, the CIA has a reputation for doing dirty things and

16   the FBI tends to follow the letter of the law.

17   Q.    Okay.  I wanted to show you some of these posts that the

18   government put up there.  I think we can publish this, yes,

19   because the government has already introduced these into

20   evidence.

21        I'm going to start with what is Government Exhibit 8 up

22   there, and I think we had some explanation that that was you

23   with the rifle and hand grenades.  Can you tell us briefly what

24   was going on there?

25   A.    Yeah.  The guys were bored and it was raining so we

1   couldn't train or go for runs, and because we were bored

2   everybody was getting antsy so I thought I'd entertain the guys

3   by juggling hand grenades.

4   Q.   That sounds like something pretty dangerous.

5   A.   Yeah; they are all taped down.  The pin at the top is taped

6   onto the grenade and the spoon itself was taped onto the

7   grenade.

8   Q.   So safe to say you were trying to entertain some of your

9   fellow trainees?

10  A.   Yeah.

11  Q.   I am going to show you Government Exhibit 9A.  I am going

12  to enlarge that a little bit.  This was apparently taken from

13  your phone there at the airport.  Maybe it was the one in Tampa?

14  A.   I think so.

15  Q.   Is that where they took the shot of your phone?

16  A.   Yeah.  Either that or in New Jersey when I came back from

17  Iraq.

18  Q.   So, who is that a picture of?

19  A.   That is my friend Hewa (phonetic).  He killed himself when

20  we were surrounded after Trump withdrew the U.S. support from

21  Kurds.

22  Q.   He killed himself over there in Syria?

23  A.   Yes.

24  Q.   It was sort of a dire -- why did he kill himself?

25  A.   Because nobody wants to get captured by ISIS, and he

Direct Examination - Daniel Baker

1    thought there was no way out.  No way to go back home.

2    Q.    What is that in the background?

3    A.    That is the wildfires in Australia where a tornado occurred

4    and sucked the fire up.  I thought it looked cool.  I thought it

5    was also representative of the current state of global warming.

6    Q.    Down there it says the "squad designated sharp shooter at

7    YPG".  I guess that was accurate?

8    A.    Yeah; I wouldn't say sniper really, but, you know...

9    Q.    You were the -- you were one of the better shots?

10   A.    I was probably the second best shot in the group that was

11   there when I was there.

12   Q.    But were you a trained sniper?

13   A.    No.

14   Q.    Also we have got mention of that -- a fighter of blue belt

15   in Brazilian jujitsu.  That's that belt just above the white

16   belt?

17   A.    Yes.

18   Q.    All right.  That was Government Exhibit 8 -- I'm sorry, 9A.

19   I'm going to show you Government Exhibit 9B.  I think we saw

20   that.  It's a Facebook -- it's a picture of your phone taken at

21   the same time.  It says you had 3,032 friends.  How did you have

22   so many friends on Facebook?

23   A.    The Kurds -- when the VICE News video hit the Internet and

24   the Kurds saw it they would Google me and look me up and send me

25   messages and friend requests thanking me for fighting against

Direct Examination - Daniel Baker

1    ISIS for them.  But then as another result of that video, I

2    started to get threats again from white supremacists, from

3    Turkish military members, and also from ISIS.  And -- so I ended

4    up having to delete that profile due to the constant stream of

5    harassment.

6    Q.    I'm going to show you Government Exhibit Number 7.  Tell us

7    what that is.

8    A.    That is after I do Yoga, the Yoga prepares the body for

9    meditation so I had just done Yoga and I sat down to meditate

10   and I kind of wanted to let my teachers know I was still

11   practicing and that I wasn't, you know, going off to become some

12   kind of crazy jerk, so I sat down and meditated.

13   Q.    This is -- this is a post that you made to your Facebook

14   account?

15   A.    And we play a game in the YPG International Academy that if

16   you leave your rifle anywhere, the friends will take it and hide

17   it and then criticize you later on for losing your rifle, so I

18   have to bring it room to room with me, so I had it next to me.

19   Q.    Is that an operational rifle?

20   A.    No.  It had no firing pin.  No bullets.

21   Q.    I want to show you Government's Exhibit Number 10.  Tell me

22   more about this exhibit.  Who is in that exhibit?

23   A.    Well --

24   Q.    Or in that photo?

25   A.    -- earlier the FBI had said that the person crouching was

Direct Examination - Daniel Baker

1   me. And that is not me. That is my dead friend who killed

2   himself. That is Hewa. I am on the top row third from the

3   right.

4   Q. Short fellow in the back that has his face exposed?

5   A. Yeah; the smallest guy there.

6   Q. I said to the -- in my opening statement, we had what

7   looked like a group of terrorists because they have their faces

8   covered. Why are their faces covered?

9   A. Because people don't want to get their family kidnapped by

10  ISIS. And that was something that was going on is they would

11  kidnap people's family and then tell them, if you don't turn

12  yourself into a suicide bomber we are going to cut their head

13  off, make a video, and then send it to the Internet.

14  Q. Tell me this, the sign there, what's the sign all about?

15  How did this picture come to be taken?

16  A. The guy holding the RPG actually is from France.

17  Q. And the RPG is on the left side there?

18  A. Yeah.

19  Q. Some -- RPG is a rocket launcher?

20  A. Yeah. And that is also not a functioning rocket launcher

21  in this picture. It's just one that -- you know, that they kept

22  at the academy for the new people to carry around.

23  Q. Anyway, how did the picture come about?

24  A. He is from an area in France called Zad. It's an

25  autonomous zone. It's like zona autonomous defense -- whatever

Direct Examination - Daniel Baker

1  it is in French -- and that is an area that became like a hippie

2  encampment in a national forest that was supposed to be

3  developed into an airport.  And the locals did not want this

4  airport to be there and against all of the community council

5  voting this airport was going to be developed anyway because of

6  the money involved, so the community --

7         MR. KUNZ:  Your Honor, I object.  It's all hearsay.

8         MR. MURRELL:  We are explaining how it is the picture

9  got taken.  It's not being used to prove the truth of the matter

10 asserted.

11        THE COURT:  The objection is overruled.  But do ask a

12 question, and if you will just answer the question and he will

13 ask another question.

14 Q    (By Mr. Murrell) So this was aimed at a group -- a fellow

15 from France arranged for this photo?

16 A.   Yeah.

17 Q.   And he was trying -- and what does it say there on that

18 sign?

19 A.   It says "From Rojava with love to Zad -- the autonomous

20 zone -- "and all who resist oppression.  Never stop fighting".

21 Q.   And Zad is this autonomous zone in France?

22 A.   Yeah.  And it's a leftist anarchist commune, and they

23 were -- we were expressing solidarity with these people because

24 they were getting --

25 Q.   And they were protesting about the development of an

Direct Examination - Daniel Baker

1    airport there in France.

2    A.    And the cops were beating them up to drive them out.

3    Q.    So that is Government Exhibit 10.

4         Let me show you Government Exhibit Number 11.  This was

5    introduced into evidence.  And this is -- that's you with the

6    rifle?

7    A.    Yes.

8    Q.    And that's a sniper rifle?

9    A.    Yes.

10   Q.    How did this picture come to be taken?

11   A.    The guy who is on the left of the frame is local -- well,

12   he is an international volunteer but he is a local reporter who

13   works for STUR (Phonetic) TV, that's that symbol in the upper

14   left corner, that's a local TV show by the Kurds, for the Kurds

15   and for the local Arabs, and groups.  They -- it's called the

16   New International and they interview the international

17   volunteers and they describe what we're doing there -- what kind

18   of stuff we do.

19   Q.    So this is a picture taken for a news broadcast by a news

20   station?

21   A.    It's a screenshot I took off of the video that the news

22   station was publishing in Syria, in Derik.

23   Q.    That's Government Exhibit Number 11.

24        Let me show you Government Exhibit -- we are going to jump

25   here to Government Exhibit Number 26.

Direct Examination - Daniel Baker

1  A.    Oh, the guy in the background was the team leader, the

2  Marine I went to the frontlines with that I mentioned earlier.

3  Q.    I am going to show you Government Exhibit Number 26.  What

4  in the world is this?

5  A.    That is a screenshot from an episode of the Simpsons.

6  Q.    That's Homer Simpson there sitting there on the building?

7  A.    Yep.

8  Q.    Did you mean this to be a threat to anybody?

9  A.    No.  I thought it was funny because Simpsons tends to make

10 these ridiculous predictions that sometimes come true.

11 Q.    So this again was a screenshot from the TV show the

12 Simpsons.

13 A.    Yeah.  And I did not make this.  I just shared it on

14 Facebook.

15 Q.    All right.  That's Government Number 26.

16       I show you Government Number 27.  We saw this, too.  What

17 is that, Government Number 27?

18 A.    That is a far right wing Call to Arms, calling on far right

19 wing white nationalists to storm all state capitols and go back

20 to the D.C. Capitol and bring guns.

21 Q.    Is this one of the reasons why you thought there might be

22 an attack on the Florida Capitol?

23 A.    That, and the, you know, posted FBI reports and the CNN

24 articles about it.

25 Q.    But this is not something you created.  This was something

Direct Examination - Daniel Baker

1   created by the right wing and that you were letting people know

2   was out there?

3   A.   I was raising awareness, yeah, that if you live in a state

4   capitol you might be in danger because this is what they said is

5   coming.

6   Q.   I am going to show you Government Number 28.  And we

7   already had Ms. Gaddis testify about that.  This is a

8   conversation you had with her about the AK-47, getting one from

9   her father?

10  A.   Uh-huh.

11  Q.   Did you honestly think you were going to get a firearm from

12  her father?

13  A.   No.  Me and Desiree make a lot of dirty jokes, and stuff

14  like that.

15  Q.   This was essentially a joke?

16  A.   Hard jokes for hard folks.

17  Q.   Pardon?

18  A.   Hard jokes for hard folks.

19  Q.   That's Government Exhibit Number 28.

20       I'm going to jump around a little bit.  I am going to show

21  you Government Exhibit Number 13.  Let's see.  The part I want

22  to talk about is -- I think this is the one that got all of the

23  emphasis.  "This is war.  Are you all willing to take up arms

24  with us yet?  Buy guns and join us this November.  We are voting

25  from the rooftops".

Direct Examination - Daniel Baker

1      Let me sort of unpack that a little bit.  What is voting

2  from the rooftops all about?

3  A.   It comes from a meme that the right initially introduced.

4  Q.   When you say a meme, not everybody may know; what is that?

5  A.   Like that Simpsons picture would be a good example of a

6  meme.  It's usually a picture, usually a cartoon with some text,

7  usually in jest.

8  Q.   Okay.  And so where did this voting from the rooftops --

9  you said the voting from the rooftops is some kind of a meme?

10  A.   It's a meme that originated from the April 26, 1992, Rodney

11  King riots, where Korean-Americans defended their businesses by

12  getting on the rooftops with rifles.

13  Q.   This is something that is touted by some of the right wing;

14  is that accurate?

15  A.   They tend to idolize Koreans as like an ideal minority and

16  they use this as an example and this is one of their subtle

17  forms of racism, and I was --

18  Q.   So, were you trying to advocate anything from the roof?

19  A.   No.  I was trying to hold up a mirror because people around

20  this time were saying vote from the rooftops because they

21  weren't accepting the results of the election, and I was holding

22  up a mirror to make fun of them that, this is what you sound

23  like.

24  Q.   This is about buying guns and joining us this November.

25  What do you mean by all that?  Are you serious?

Direct Examination – Daniel Baker

1   A.   Well, no, but at the same time there was a gun shortage and

2   Biden was saying buy shotguns.

3   Q.   Again, this was part of the Socialist Rifle Association, I

4   guess.  You tell me.  But you think guns should be distributed?

5   A.   Yeah.  I think, you know, everybody should be, you know,

6   distributed an electric vehicle, if not a pony, because that's

7   outdated --

8   Q.   Tell me -- tell me about the other part, this is war.  What

9   are you talking about there?

10  A.   Well, I try to operate in, you know, a mindset of what John

11  Keats calls negative capability -- it's like a meditation --

12  where you consider all possibilities, and this is a quote from

13  the far right that I was, again, holding up a mirror, like this

14  is what you say.  Well, if they are not getting in trouble for

15  saying it, then I'm going to say it too.

16  Q.   You had seen people on the far right proclaiming this is

17  war?

18  A.   Yeah.  Including, you know, senators and prominent

19  politicians.

20  Q.   I am going to show you what is Government's Exhibit 15, if

21  I can find it.

22        THE COURT:  Before you do that, Mr. Murrell, could I

23  have a quick sidebar with counsel?

24        MR. MURRELL:  Yes, sir.

25     (Following conference held at sidebar at 11:56 AM.)

1          THE COURT:  I was waiting because I didn't want to

2   interrupt your flow, but I do want to talk about the schedule

3   just because he's been on the stand for a long time --

4          MR. MURRELL:  Sure.

5          THE COURT:  -- and we have been breaking right at

6   noon.  If you are about to wrap up you may, but if you are going

7   to be a lot longer I think it would probably be better to break

8   now on direct, not necessarily right this second, give the jury

9   a long lunch.  The first half of it I have something to tend to

10  and then we can finalize the jury instructions.

11         MR. MURRELL:  Sure.  This is as good a time as any.

12  Sure.

13         THE COURT:  You want to do it right now?

14         MR. MURRELL:  Right now would be fine.  Yes, sir.

15         THE COURT:  Okay.

16     (Sidebar concluded at 11:57 AM.)

17         THE COURT:  Ladies and gentlemen, we are going to

18  break right now for our lunch.  We will continue after lunch.

19  We are going to take a longer lunch than usual.  So why don't we

20  come back at 1:45.  Would that be enough time for you all?

21         Okay.  Again, leave your things here please, or your

22  pads that is, and no one will touch those.

23         Get yourself something to eat and don't talk about the

24  case.  Don't form any opinions.  And then we will see you back

25  at 1:45.

Direct Examination – Daniel Baker

1           Again, thank you for your patience and diligence.

2       (Jury out at 11:57 AM.)

3           THE COURT:  Okay.  Y'all, can have a seat.  You can

4   stay right there for now.

5           I'm going to hand these down.  Ms. Stark, if you will

6   distribute these.  What I am handing you now are potentially the

7   final jury instructions intended to incorporate everything we

8   have talked about.  So y'all can look at those over lunch.  We

9   can deal with those when we get back.

10          I think what I would like to do is come back about

11  1:15 and then see if there is any problem with the jury

12  instructions because if there is we can hopefully deal with it

13  then.  If there is not, then we can continue right on.  And I

14  guess would everybody be ready for closing when both sides have

15  rested?

16          MR. MURRELL:  Yes, sir.

17          MR. KUNZ:  Yes, sir.

18          THE COURT:  All right.  Well, then, anything else we

19  need to talk about before we come back at 1:15?

20          MR. KUNZ:  Not from the government.

21          MR. MURRELL:  Not from the defense.

22          THE COURT:  Okay.

23          We will be in recess until 1:15.

24      (Recess taken 11:59 AM.)

25      (Resumed at 1:20 PM.)

Direct Examination – Daniel Baker

1            THE COURT:  Please have a seat.

2            We have the lawyers.  We have Mr. Baker present.  The

3    reason I wanted to come back out before the jury is here to see

4    if there is anything else we need to talk about on the jury

5    instructions.  I read through what I handed out to you and

6    looked at further issues and typos.  I don't see any.  I think

7    we covered everything.

8            Is there anything he will we need to talk about, Mr.

9    Murrell?

10           MR. MURRELL:  Not from the defense no, sir.

11           MR. FIELDS:  No, Your Honor.

12           THE COURT:  Is there anything else before the jury is

13   supposed to be back at 1:45?

14           MR. FIELDS:  No, sir.

15           MR. MURRELL:  No, sir.

16           THE COURT:  Sorry to get you back here and interrupt

17   your lunch but I wanted to be able to deal with anything if

18   there was anything.

19           We will be in recess until 1:45.

20           (Recess taken 1:21 PM.)

21           (Resumed at 1:46 PM.)

22           THE COURT:  Please have a seat.

23           The lawyers are all here and Mr. Baker is here.

24           Is everybody ready for the jury?

25           MR. MURRELL:  Yes, we need to have Mr. Baker up there

Direct Examination – Daniel Baker

1    in the box.

2              THE COURT:  You ready, Mr. Kunz?

3              MR. KUNZ:  Yes.

4              THE COURT:  We will get Mr. Baker up here and as soon

5    as he is seated we will get the jury.

6         (Jury in at 1:48 PM.)

7              THE COURT:  Please have a seat.  Welcome back, ladies

8    and gentlemen.

9              We will continue now with Mr. Murrell's examination.

10   The witness is still under oath.  And you can proceed whenever

11   you are ready, Mr. Murrell.

12                    CONTINUED DIRECT EXAMINATION

13   BY MR. MURRELL:

14   Q.   Mr. Baker, we were looking at some of these posts that the

15   government relied on.  I am going to show you what is Government

16   Exhibit Number 15.  And I think the issue here was this one that

17   says, "God I hope the right tries a coup November third because

18   I am so fucking down to slay enemies again".

19        What led to that?

20   A.   You know, having been in combat it's not something that

21   comes natural to me.  And it took an entire childhood of bomb

22   proofing to be able to handle it.  And there is a lot of mental

23   gymnastics you have to jump through to get yourself into the

24   mindset of being able to do this kind of thing and survive.  I

25   thought if something does go down I don't want to be caught in a

Direct Examination – Daniel Baker

1    mindset of complacency.  I want to rile myself up and get myself

2    in the mindset of --

3    Q.   This is an effort to sort of rile yourself up?  Would that

4    be fair to say?

5    A.   Yeah.  And I like to, you know, when I'm posting stuff

6    publicly I have my profile on private, so only my friends can

7    see it, and I would encourage them with current events as an

8    excuse to go exercise.  "I am going for a run.  You should

9    probably come for a run".

10   Q.   Again, some of these are going to frankly be harder to

11   explain than others.  But that's Government's Exhibit 15.

12       Government Exhibit 17, that's the one with you and who is

13   that in the picture there?

14   A.   That's my roommate.

15   Q.   And, anything noteworthy about this?

16   A.   Yeah; I have my guns laying around.

17   Q.   Okay.  You got them there for any particular reason?

18   A.   Well, if I had people over who didn't live there I wouldn't

19   leave them out like that.  But I leave them out, laying around,

20   because I have been in the vicinity of shootings based on

21   political ideology and I don't --

22   Q.   Okay.  This is -- I don't want to cut you short, but you're

23   concerned about some of these right wing threats?

24   A.   Yeah.  I want to be able to respond if somebody comes by

25   and shoots at us.

Direct Examination - Daniel Baker

1   Q.   I want to show you Government Exhibit 18.  This is one --

2   this is the one about CHAZ/CHOP.  *I'm banned on the Facebook.*

3   *Can you share this?*  All this stuff about CHAZ/CHOP.  *Bring*

4   *guns.  They are going to shoot at us.  Strike and hold targets*

5   *of value.  Federal agents and civilian enemies are killing and*

6   *kidnapping us.  Enemies using helicopters and drones.  We have*

7   *to go low-tech.*

8        What in the world is that all about?

9   A.   Well, practically I was referring to racist cops who are

10  very active in applying their ideology while at work.  And that

11  kind of thing puts a lot of people at risk, and they

12  particularly don't like when other white people are standing up

13  for black people.

14  Q.   Would you say some of this is over-the-top?

15  A.   Yeah.  I was pretty stressed out after coming back from the

16  CHAZ/CHOP because, you know, I had seen people die there and I

17  had managed --

18  Q.   Let me back up and ask you about CHAZ/CHOP.  What was

19  CHAZ/CHOP?

20  A.   Was allegedly an autonomous zone, but it was really an

21  occupational protest.

22  Q.   What was the protest about?

23  A.   It was about George Floyd's murder.

24  Q.   And, how long were you there?

25  A.   I was there for two weeks.  I had told Eric, my roommate,

1    before that I really -- didn't really want to go, but if we were

2    going to go I only want to spend two weeks there.  And we were

3    there for about that time when it got shut down.

4    Q.    Was there anything there about drones, or cellphone

5    tracking, or federal agents killing people, or anything?

6    A.    Well, there was a lot of rumors and paranoia going on

7    there.  And somebody who was at least dressed like a militant

8    person in fatigues, stole my backpack out of my tent.

9    Q.    That's Government Exhibit Number 18.

10        Let me show you Government Exhibit 19.  All right.  This is

11    one -- we got a drawing there of -- who is that a drawing of

12    there in 19?

13    A.    That is baby Yoda.

14    Q.    Baby Yoda.  And then we have another drawing -- let's see

15    if I can get this to work.  Maybe not.  Bear with me.  Well, at

16    any rate -- no, I went too far.  Let's go back to 19.  There we

17    go.  There is another drawing, what is that drawing?

18    A.    That is Avatar Aang, from *Avatar the Last AirBender.*

19    Q.    Tell me that again.

20    A.    Avatar Aang, from *Avatar the Last AirBender.*

21    Q.    What is that?

22    A.    It's a children cartoon that I enjoyed and --

23    Q.    Okay.  Good enough.

24        It says, up there at the top -- and I guess if you go back

25    to the other page, for that matter, it says something about the

1  artwork is going to be worth more when you go to prison.  And

2  then it says L M A O?  What is that all about?

3  A.    Well, that means laugh my ass off.  But, I was joking but I

4  was referring to two different people, Special Agent Brian King,

5  out of Miami --

6  Q.    Let's just leave it at that.  You were joking, is that safe

7  to say?

8  A.    Yeah.  But they had told me the FBI is definitely coming

9  for me, and they are going to kick my door down and take me to

10  prison because of my ideology.

11  Q.    Okay.  Let me show you Government Exhibit Number 20.  This

12  is that one with the bombs being dropped, and then the next page

13  it says something about "Jacksonville Nazis going to be real sad

14  when this happens to their headquarters".  What in the world was

15  that about?

16  A.    Well, I was joking.  That picture is a screenshot from

17  somebody's combat footage in the Middle East and they apparently

18  took a drone and they took these RPG rounds -- those are smaller

19  rockets that can be shot from an RPG -- and it looks like they

20  put them on a drone with a bottle, like a two liter bottle, and

21  then dropped it from a drone up in the sky.

22  Q.    What was the point of the posts?

23  A.    I was just joking, and -- yeah.

24  Q.    Are there Nazis in Jacksonville as far as you know?

25  A.    As far as I know there is a re-branded far right wing group

Direct Examination - Daniel Baker

1    called the League of the South that used to be the KKK.

2    Q.    Okay.  Were you planning on bombing them?

3    A.    No.  I don't have any drones.  And I definitely don't have

4    access to rocket-propelled grenade ammunition.

5    Q.    I am going to show you what is marked as Government Exhibit

6    Number 21.  There is something there at the top.  "If you can

7    give 2000 we will just buy moargunz", m-o-a-r-g-u-n-z.  What is

8    that all about?

9    A.    That was a joke.  I think there was like some kind of meme

10   to go along with that.  But, yeah, it was also a joke that the

11   far right was posting we don't believe in the corona anyway so

12   if you give us a corona relief check we are just going to buy

13   guns with it, and I was like --

14   Q.    There was a right wing meme talking about stimulus checks,

15   and we're going to buy more guns with these stimulus checks?

16   A.    Yeah.

17   Q.    And this spelling, this comes from those right wing memes?

18   A.    Yeah.  When people use this kind of spelling it's generally

19   indicative of a joke.

20   Q.    Okay.  I am going to show you Government Exhibit 22.  This

21   is the one that says, "Before we continue, I have a few

22   questions.  Would you be willing to assault a cop at a protest".

23   What was that all about?

24   A.    If I'm going to a protest I usually don't go alone and I'm

25   definitely not going to carpool with somebody whose plan is to

Direct Examination - Daniel Baker

1    beat up cops and get us taken to prison for 20 years.

2    Q.   Well, let's back up a second.

3         Who are you talking to here?

4    A.   I don't even know this guy.  He just started messaging me,

5    telling me that he had been in the YPG years ago, and I was

6    like, Okay, I respect that but I don't know you.  And so --

7    Q.   Are you checking him out?

8    A.   Yeah.  Because I have had so many threats that I don't want

9    to just start trusting some random on the Internet.

10   Q.   And when you said, are you willing to assault cops, if you

11   were going to trust him you wanted him to say no?

12   A.   Yeah.  And I like to state questions so that they think I

13   want them to say one thing.

14   Q.   I see.

15   A.   And if they are just trying to tell me what I want to hear

16   I know that they are full of it.

17   Q.   Okay.  23: "I'm a killer my ninja.  Google can Baker ypg

18   sniper".

19        How do you explain that?

20   A.   This guy on Funion (phonetic) started messaging me and I

21   kept trying to disengage and he kept messaging me, and this is

22   the middle part of a very long, you know, thing where he keeps

23   going.  And you can see where I stopped messaging him and he

24   continues to message me.  And I was just trying to get him to

25   leave me alone.

Direct Examination – Daniel Baker

1    Q.    Okay.  All right.  I am going to show you Government

2    Exhibit Number 24.  Oh, this is the one, "It's always fun and

3    cheap to practice with a .22 LR, long rifle I guess, and it's

4    viewed as a sport or practice rounds but it's deadly as fuck", I

5    guess, "it's used as a silenced weapon with subsonic rounds in a

6    water bottle".

7        That's true, I guess.

8    A.    When I was a kid my dad had me shoot the raccoons that were

9    killing the chickens, and he had me silence the weapon because

10   we didn't want to scare the neighbors.  And I thought if there

11   was going to be civil unrest, and some kind of civil war going

12   on over this election, that people might have to be hunting for

13   food and so I ordered this rifle.  I ordered this ammunition.

14   Q.    Tell me this, did you plan to put a water bottle in this

15   rifle?

16   A.    No; I don't think there's a space for that on the shape of

17   the sight.

18   Q.    That is Government Exhibit 24.

19       I am going to show you number 25.  "It's time for you to

20   wake up and realize Trump is going to put up a fight.  Some of

21   your neighbors will shoot at you".  Did you expect that sort of

22   thing to happen?

23   A.    At the time I entertained it as a serious possiblity.  I

24   try to, like I said earlier, maintain the negative capability

25   mindset which is considering multiple possibilities and

Direct Examination - Daniel Baker

1   entertaining them all.  Considering every physical possibility

2   in making different plans.

3   Q.   The idea is if you consider these, it gets you in the right

4   sort of mindset?

5   A.   Yeah; if something happened then I would be able to respond

6   in time to save my life.

7   Q.   I wanted to ask you about this one.  This is Government

8   Exhibit 30.  And this is the one -- this is the day before you

9   get arrested.  You are communicating with Jack.  And this is, "I

10  am encouraging people to either stay in bed and live or come

11  fight if they are not afraid to die at the hands of the enemy.

12  Whatever people decide to do is on them.  If someone joins a

13  protest and gets killed by Nazis that is only the Nazis' fault.

14  Blame the enemy.  Not yourself.  The plan is encirclement.  We

15  need friends to advance from Railroad Square".  And then there

16  is a section in here that says you are not sure you are going to

17  survive the weekend.

18       How do you explain all that?

19  A.   Well, at the time I was using steroids and smoking a bunch

20  of weed and side effects of that are paranoia and delusions of

21  grandeur.  And I was feeling extremely paranoid about everything

22  that was going on.  And going from the top down, this thing

23  about encouraging people to stay in bed and live -- or either

24  come out and fight the enemy or stay in bed and live, that is

25  something cool that I heard a commander say in Syria that I

Direct Examination - Daniel Baker

1  thought was pretty motivational.  So I was trying to sound cool.

2  This encirclement strategy thing would not work if --

3  Q.   We will talk about that more.

4       So, as you sit there today, what's your view of those

5  comments?

6  A.   I feel like Don Quixote or Fyodor Dostoyevsky.

7  Q.   Okay.

8  A.   You know, like fighting windmills.  Or, in the case of

9  Dostoyevsky, he got picked up for his extremist rhetoric talking

10  about the oppressive government, and you know when he was let

11  off the hook, he committed his life to writing about it instead.

12  Q.   I also wanted to show you what I have marked as Government

13  Exhibit 5, and this one that has not been admitted into evidence

14  yet.  Let me see if I can find it here.  So we will need to take

15  it down.

16      Let me show you what's been marked as Defense Exhibit

17  Number 5.  I don't want you to read it just yet.  But what is

18  this about, generally?

19  A.   This is --

20  Q.   The jury can't see it at this point.  We will publish it in

21  a minute.

22  A.   I took a copy of the video from the January 6th

23  insurrection and I posted to my own YouTube channel as my own

24  video, and I put in the comments -- you want me to read it?

25  Q.   So this is some comments about that image that you posted?

Direct Examination - Daniel Baker

1   A.   Yeah.  I was basically playing on the right wing conspiracy

2   theory that --

3   Q.   Let's stop right there.

4        MR. MURRELL:  Judge, I would offer into evidence

5   Defendant's Exhibit Number 5.

6        THE COURT:  That one will be admitted.

7        (DEFENDANT EXHIBIT 5:  Received in evidence.)

8        MR. MURRELL:  Now if we can publish it.

9        THE COURT:  You may.

10  Q    (By Mr. Murrell) Okay.  So I'm going to just -- so, the

11  picture there is taken from the incident at the Capitol on

12  January 6th of this year.

13       Let me just read this to you, part of it. "I have acquired

14  a sponsor, Soros, you know.  The Antifa card was finally

15  approved and I, and my donors, will be offering cash rewards for

16  information leading to the verified identification of any and

17  every individual in this video.  Don't worry, we won't be going

18  to the cops and we've decided to handle this ourselves because

19  the DC cops let them in and all cops are infiltrated.  There

20  will be no faith in law enforcement until every single

21  department is shut down and replaced by new faces".

22       Let's back that up a little bit.  This I suppose is another

23  example of your view of law enforcement?

24  A.   Yeah.  Based on observations.

25  Q.   Let me -- what I want to talk to you about is this part

Direct Examination - Daniel Baker

1   right here.  "Soros, you know, the Antifa card was finally

2   approved".  You are saying that you have got funding from Soros?

3   A.   No.  I was joking because --

4   Q.   I mean, that's what it says on its face that you had

5   funding from George Soros?

6   A.   That's what I wrote as a joke.

7   Q.   Who is George Soros?

8   A.   He is a prominent --

9          MR. KUNZ:  Judge, I want to object to this, Judge.

10         THE COURT:  What's the objection?

11         MR. KUNZ:  Objection is hearsay.  Who George Soros is,

12  and everything else.

13         THE COURT:  He can say if he knows who George Soros

14  is.

15  BY MR. MURRELL:

16  Q.   Who is George Soros?

17  A.   He is someone who has a lot of money and he is Jewish and

18  he makes a lot of charitable contributions to organization he

19  believes in.

20  Q.   Left wing and progressive organizations, is that your

21  understanding?

22  A.   In general.

23  Q.   Is he the subject of a lot of, I suppose I would say,

24  unfounded right wing conspiracies?

25         MR. KUNZ:  Your Honor, speculation.  I object.

Direct Examination - Daniel Baker

```
1              THE COURT:  That's sustained.  You can ask a different
2    way.
3              MR. MURRELL:  Judge, could we approach the bench?
4              THE COURT:  You may.
5         (Following conference held at sidebar at 2:05 PM.)
6              MR. MURRELL:  So I suppose this means we can now call
7    our expert, since I can't get it in this way?
8              THE COURT:  No.  First of all, were you being
9    sarcastic?
10             MR. MURRELL:  When I said -- no.  I am serious.  I
11   mean, we can't tell the jury who George Soros is?
12             THE COURT:  You already told the jury who George Soros
13   is.  The objection was to a separate question.
14             MR. MURRELL:  About is he the object of right wing
15   conspiracies.
16             THE COURT:  Yes.  And he is saying that that would be
17   speculative.  And what I was saying is you can ask it in a
18   different way.  You can ask what he has seen and how he meant
19   it.  You can do that.  But what actually is going on out there
20   in the real world about George Soros is not relevant to this.
21   You are trying to explain what his purpose was in saying this,
22   and you can do that without asking questions which he is not
23   qualified to answer.  He can say what he has seen on the
24   Internet.
25             MR. KUNZ:  Judge, may I ask a question?
```

1          THE COURT:  Yes, sir.

2          MR. KUNZ:  Maybe I misunderstood but I thought counsel

3    wanted to put this in to show this guy -- this was incorrect.

4    That he didn't know what he was saying by doing something like

5    this.  Now he was saying it was a joke.  That's not the same

6    thing that he offered --

7          MR. MURRELL:  I always said it was a joke.

8          THE COURT:  He said it was not a serious thing.  That

9    it was a fanciful thing.  I think this is consistent with

10   what -- my understanding of what Mr. Murrell was always going to

11   do with it.  Your objection is sustained.  You can ask why he

12   said that, or why he picked that name, or something like that.

13       (Sidebar concluded at 2:06 PM.)

14   BY MR. MURRELL:

15   Q.   Based on what you have seen, it's your understanding that

16   George Soros was an object of unfounded right wing conspiracies?

17   A.   Specifically the Antifa card.

18   Q.   Pardon?

19   A.   Specifically the Antifa card.

20   Q.   Well, let's talk about -- we will get to the Antifa card in

21   a second.

22       What you know about George Soros is it is your impression

23   that he is the --

24          MR. KUNZ:  Objection.

25          THE COURT:  He can answer as to his impression.

1    BY MR. MURRELL:

2    Q.   It is your impression that he --

3         MR. KUNZ:  He can ask the witness -- I object because

4    he is leading the witness, number one.  Number two, he can ask

5    the witness his impression.

6         THE COURT:  Ask a different question and I will -- you

7    can ask the question -- you were in the middle of a question is

8    what I am saying, so you can ask a question --

9         MR. MURRELL:  We will skip that.

10        THE COURT:  Okay.

11   BY MR. MURRELL:

12   Q.   Was this a joke?

13   A.   It was a joke that I was arrested upon.

14   Q.   And what was the purpose of this joke?  What were you

15   playing towards?

16   A.   I wanted to make fun of people who thought that this was

17   really going on.

18   Q.   Did you ever get any money from George Soros?

19   A.   No.

20   Q.   Did you ever get an Antifa card?

21   A.   No.

22   Q.   This is a joke?

23   A.   Yes.

24   Q.   Not to be taken seriously?

25   A.   No.

Direct Examination - Daniel Baker

1   Q.   All right.  Let me go on to ask you about the couple of

2   other things.  There was mention of this app, Signal.  What is

3   Signal?

4   A.   As the FBI agent explained, it's an encrypted app that

5   people use as a messenger.

6   Q.   Did you use Signal to any extent?

7   A.   A little bit.  Friends were asking me to use it, but I

8   don't like it because people get the impression that it's secure

9   and I don't really think it is.  And I have nothing to hide.

10  Q.   So, if there is any suggestion you used to to any extent

11  that would be wrong?

12  A.   No.  And that's why I deleted it.

13  Q.   There was a statement, there at the airport you were proud

14  of your service in the YPG; is that a fair statement?

15  A.   Yes.

16  Q.   Do you remember saying anything like there was a thrill to

17  kill, or anything like that?

18  A.   No.

19  Q.   Can you be a little cocky and bold sometimes in what you

20  say?

21  A.   Yes.

22  Q.   But you don't remember saying that?

23  A.   No.

24  Q.   I did want to show you -- well, we've already seen

25  Government 1 A and 1 B, the Call to Arms.  I wanted to ask you,

Direct Examination - Daniel Baker

1   did you expect an armed group to attack the Florida Capitol?

2   A.   At the time I thought it was like 25 percent possible out

3   of a series of potential outcomes.

4   Q.   Now one of the posts early on talks about Call to Arms on

5   January 17th, through January 24th; why did you cover such a

6   long -- such a wide range of time?

7   A.   Those were the dates that the FBI reports outlined.

8   Q.   So, that was what you thought -- that was your thinking

9   that's when this assault might take place sometime in between

10  those dates?

11  A.   On or around Inauguration Day.

12  Q.   Inauguration Day being January the 20th?

13  A.   Yes.

14  Q.   The Call to Arms, was it your intent to -- did you feel

15  like you were threatening anybody in particular?

16  A.   No.  I wanted to inspire the community to defend itself and

17  to defend the Capitol and their country.  I didn't direct it

18  towards the people who would be, in my mind, attacking the

19  Capitol.  It was directed towards people who would be defending

20  it.

21  Q.   Now, one of the FBI agents said that after you got arrested

22  you made the statement that you were trying to scare some of

23  these Neo-Nazis; what do you remember saying after your arrest?

24  A.   I'm not sure.  If anything, you know, hopefully they might

25  be discouraged from actually doing something so stupid as to

Direct Examination - Daniel Baker

1    attack an armed Capitol, and avoid bloodshed altogether.  I

2    think that's a much less violent outcome than --

3    Q.   Do you -- do you remember you saying you were trying to

4    scare somebody, or do you think you could have said that?

5    A.   I could have, but I don't remember.

6    Q.   Okay.  I wanted -- oh, I meant to ask you this earlier.  We

7    did see this video of you shooting that machine -- or the

8    automatic rifle.  Where was that?

9    A.   That was Machine Gun America, just outside of Disney World

10   in Orlando, Florida.

11   Q.   Tourist attraction?

12   A.   Yes.  And they knew all about the YPG and they were big

13   fans.

14   Q.   You did have some firearms, and we -- in fact, we've got

15   them here about us today.  The pistol, how long have you had

16   that?

17   A.   I've had that since I got back from Syria and Iraq.  I

18   picked it up intending to go get an armed security job.

19   Q.   By the way, do you have a concealed weapons permit?

20   A.   Yes.

21   Q.   The shotgun, how long had you had that?

22   A.   Just a few months.  Around the time Biden was talking about

23   he liked shotguns I went and bought one at Walmart when I was

24   getting groceries.

25   Q.   To be fair, you do think it's important for people to have

Direct Examination - Daniel Baker

1  guns?

2  A.    Yeah.  I think if someone is armed, especially if they are

3  in a minority or an oppressed community, that it will empower

4  them to feel protected.  And, you know, being a little guy I

5  feel like even with jujitsu if enough people were to gang up on

6  me I wouldn't stand a chance.

7  Q.    Do you hunt, or was this just for self-protection?

8  A.    No.  I am vegetarian.  So, I don't hunt but if the economy

9  were to crash, for example, I would hunt for my friends who do

10 eat meat, or if I could no longer be a vegetarian and survive in

11 that kind of economy I would hunt.

12 Q.    We had a lot of talk about this AK-17 [sic] style rifle.

13 You did buy that?

14 A.    Yes.

15 Q.    And you bought some ammunition, too?

16 A.    Yes.

17 Q.    The officer said, or the agent said it was hollow point

18 ammunition.  Was there any purpose you got hollow point bullets?

19 A.    No.  It was literally the only .22 ammunition for sale when

20 I Googled .22 ammunition for sale on-line.  And there is a

21 shortage of ammo right now.  Because of the civil unrest people

22 have been buying up all the guns and ammo they can, and that's

23 --

24 Q.    That's what was the available?

25 A.    That was the only one.

Direct Examination - Daniel Baker

1   Q.   As far as the rifle itself, is it an AK-47?

2   A.   No.  It's a replica.  I just bought it because it looks

3   cool.

4   Q.   It's a .22?

5   A.   It's a .22.

6   Q.   Why did you buy it?

7   A.   I am a left-hand left-eye dominant shooter, so the style of

8   the AK makes it easier for me to handle because of where the

9   safety is I can use it with my right hand without taking my left

10  hand off of the hand grip trigger assembly.

11  Q.   Did the appearance of it have anything to do with why you

12  bought it?

13  A.   Yeah.  I thought it looked cool and that's why I picked it.

14  Q.   Did you purchase it in connection with what you thought

15  would be the attack on the Capitol?

16  A.   No.  I thought I have joined this Socialist Rifle

17  Association and I don't even own a rifle -- I have a shotgun and

18  a pistol -- so I should at least have a rifle that I could

19  practice shooting with.  But I didn't intend to pick it up until

20  after all of this drama was concluded, specifically because of

21  the high stakes of this kind of drama.

22  Q.   I did want to ask you about this attack on the Capitol.  In

23  the ad it says you had recruited a group of armed-volunteers --

24  an army of armed-volunteers.  Who was in that army?

25  A.   Me and my roommate.

Direct Examination - Daniel Baker

1   Q.   Anybody else?

2   A.   No.

3   Q.   Did you expect anyone would volunteer?

4   A.   Not really.  When I was -- I was recently fired when the

5   company lost a bunch of contracts, the security guard company,

6   and so I was begging and anyone who gave me a dollar --

7          THE COURT:  If you will just listen to the question

8   and answer the question then he will ask another question.

9   BY MR. MURRELL:

10  Q.   Let's back up.  I'll help you with this.  So you said you

11  did not expect anyone to volunteer.  And so let me ask the next

12  question.  Why didn't you expect anyone would volunteer?

13  A.   Because if it happened it would be dangerous.  And I didn't

14  have any communication with anyone who I had handed a flier to.

15  Q.   If this had come to -- if there had really been an armed

16  group that showed up at the Capitol, what did you think you

17  would have done?

18  A.   If they had just showed up, nothing.  If they had attacked

19  the cops, I would have hung back to see how the thing played out

20  and I would have used that time to scrape up wounded people,

21  with my roommate's car -- we had set up as a mobile ambulance.

22  Q.   By the way, do you have -- some people might think that odd

23  given your posts, and so on, but why would you do that?

24  A.   I am a certified emergency medical responder, and I am also

25  a certified combat lifesaver through the Army, which is now

1   tactical casualty care and combat certification.

2   Q.   So you had the training?

3   A.   Yeah.  And I have saved three people from gunshot wounds so

4   far.

5   Q.   So even if there had been an attack on the Capitol, you

6   weren't planning on engaging in any firefight or anything?

7   A.   Not unless I was fired upon first, or they had actually

8   defeated the whole entire National Guard that was there and they

9   asked for help.

10  Q.   You think that was likely to happen?

11  A.   No.

12  Q.   I wanted to ask you about your arrests.  Officers say it

13  was about 8 o'clock in the morning.  What's your memory of about

14  what time it was?

15  A.   I thought it was a little earlier, like 6 o'clock.

16  Q.   And what happened when -- how did it unfold?

17  A.   I had been laying in bed, kind of awake because I had had a

18  PTSD nightmare about changing magazines, and I got up to switch

19  with Eric, because we'd been sleeping in shifts after receiving

20  death threats from --

21  Q.   Well, let me back up there a second.  Tell me about that.

22  You had decided you needed to sleep in shifts?

23  A.   Yeah.  1 had asked Eric if we could sleep in shifts leading

24  up to the inauguration because I had been receiving death

25  threats from Proud Boys and they've been sharing articles about

Direct Examination - Daniel Baker

1    me.

2    Q.    Did you think that that was more -- you were more likely to

3    have trouble given the environment?

4    A.    Yeah.  I thought if they did attack the Capitol they would

5    also attack individuals who were well-known to be militant

6    leftist.

7    Q.    By the way, there is one more exhibit I meant to show you.

8           MR. MURRELL:  This has not been admitted yet.  Maybe

9    we can go off screen there.

10   Q    (By Mr. Murrell) I'm going to show you what's been marked

11   as Defense Exhibit Number 4.  Can you tell me what that is?  Can

12   you see it on your screen?

13   A.    No.

14   Q.    You can't see it on your screen?  Oh, that's because I

15   haven't hit show.  Can you see it on your screen now?

16   A.    Yes.

17   Q.    Can you tell me what that is?

18   A.    That is the CNN article that I linked on the Call to Arms

19   fliers and event.

20   Q.    So, on the Call to Arms you had a link to a news article

21   from CNN?

22   A.    Yes.

23           MR. MURRELL:  Judge, I would like to introduce that

24   article as Defense Exhibit Number 4.

25           THE COURT:  That will be admitted.

Direct Examination - Daniel Baker

1          (DEFENDANT EXHIBIT 4:  Received in evidence.)

2     BY MR. MURRELL:

3     Q.   Was that article one of the things that led you to believe

4     that there might be an attack on the Capitol?

5     A.   Yes.

6     Q.   Let me see if I can do this.  I'm going to ask you -- I'm

7     going to read some of this to you here.

8          Give me one second here.

9          All right.  I have drawn a square around this box.  It

10    says, "Trump or War Today.  That Simple".  It's a quote.  "If

11    you don't know how to shoot, you need to learn now".

12         Next paragraph, "We will storm the government buildings.

13    Kill cops.  Kill security guards.  Kill federal employees and

14    agents and demand a recount".

15         And then it goes on to say, "In the weeks and days ahead of

16    Wednesday's siege on the Capital by President Donald Trump's

17    zealous supporters, the warning signs were clear, on-line posts

18    from hate groups and right-wing provocateurs agitating [sic] for

19    civil war.  The deaths of top lawmakers and attacks on law

20    enforcement".

21         Was that the kind of thing that had caused you concern?

22    A.   Yes.

23    Q.   There is another excerpt I thought we might read.  The next

24    page -- see if I can get this to work.  Here is another one --

25    if I can get it to work.

Direct Examination - Daniel Baker

1      Here is another one: "Trump will be sworn in for a second

2   term on January 20th, said a commentator on the Donald.Win, a

3   pro-Trump on-line forum on Thursday.  The day after the siege we

4   must not let the communist win.  Even if we have to burn DC to

5   the ground tomorrow we take back DC and take back our country".

6      Another one of the sort of things that caused you some

7   concern?

8   A.   Yeah; I've been called a communist by the far-right wing

9   people who have been --

10  Q.   But these would have been -- that article, at least in

11  part, led to your Call to Arms.  Is that safe to say?

12  A.   Yeah.

13  Q.   All right.  So, let's go back to your arrest.  It's

14  whatever time it is in the morning, whether it's 6 or 8.  You

15  say you're awake because you were -- you and Eric were sleeping

16  in shifts because you were concerned about this threat to maybe

17  your safety.  So, what happens from there?

18  A.   We had switched.  Eric had gone into the main bedroom area

19  to lay down and I went into the kitchenette area.

20  Q.   Can I stop you there, too.  I wanted to ask you this.

21  There was some emphasis on the fact that there wasn't any beds,

22  or any belongings, or any furniture in there.  But that's the

23  way it was?

24  A.   Yes.

25  Q.   How long had you lived there?

Direct Examination - Daniel Baker

1    A.   Since October, I believe, of the previous year.

2    Q.   And you lived a spartan existence, I guess?

3    A.   Yes.

4    Q.   All right.  So, it's your shift and what happens?

5    A.   I had gone into the kitchenette area and I sat down to

6    smoke some weed, because I was stressed out about the nightmares

7    I was having, and then I heard banging that, you know, in my

8    opinion sounded like the way a cop bangs on the door next door,

9    and I was like, what's this.  And -- but they weren't banging on

10   my door so I didn't respond initially.  And then they started

11   banging on my door.  And I asked Eric if he was expecting

12   someone and he said no.  And so I picked up my pistol and I held

13   it back behind my back because I was --

14   Q.   And why did you do that?  Not just anybody would have

15   answered the door with a pistol in their hand.

16   A.   Because I've been around a lot of shootings that happened

17   in America.

18   Q.   Okay.  This goes back to your fear of this right-wing

19   threat?

20   A.   Yes.

21   Q.   Okay.  So you pick up the pistol.  You go to the door.

22   What happens?

23   A.   I unlocked the door and put my foot against it and I opened

24   it a little bit and looked outside and was like, what, and there

25   was this guy dressed in civilian clothes holding a Chick-fil-A

Direct Examination - Daniel Baker

1  bag and he said, It's Postmates, I have your Chick-fil-A".

2  Q.   He said what now?

3  A.   "This is Postmates -- I'm with Postmates and I have your

4  Chick-fil-A".

5  Q.   Postmate [sic] is a delivery service?

6  A.   Yeah.

7  Q.   And he says he got a Chick-fil-A bag for you.  What happens

8  from there?

9  A.   I said, "I don't eat meat".  And he said, "Are you Dan

10  Baker", and I thought this guy might be some crazy dude that's

11  hunting me down, and I slammed the door shut and I locked it.

12  Q.   Now, at that point had you heard them say anything about

13  the FBI?

14  A.   I had not.

15  Q.   Okay.  So you shut the door and locked it.  What did you

16  do?

17  A.   I shut the door and locked it and I turned to Eric and I

18  was like, you know, worried and I was telling him to grab the

19  shotgun.  And then they started banging on the door and yelling

20  "FBI".  And I said, "Oh, it's just the FBI".  And I looked at

21  him and I was like, "Put the shotgun down", because the bullets

22  will go right through a wall into the neighbor's and I threw my

23  pistol away and it hit the wall by the refrigerator and fell.

24  And I was standing between the stove and the door.

25  Q.   This is -- by the way, this is a pretty small apartment?

174

Direct Examination - Daniel Baker

1   A.   Yeah.

2   Q.   How many rooms in the apartment?

3   A.   There's two.  Well, including the bathroom there's three

4   and a closet.

5   Q.   All right.  So, anyway, you are standing by the door.  They

6   have announced they are the FBI.  What happened from there?

7   A.   I was yelling at the door like, "Hey, I understand you're

8   the FBI.  Let me open the door and I will let you in".  And they

9   were yelling over me, "This is the FBI.  This is the FBI",

10  repeatedly --

11  Q.   Could it be that they never even heard what you were

12  saying?

13  A.   I was yelling pretty loud with my war voice so I think they

14  were ignoring me because they were all worked up and they wanted

15  to kick the door down.

16  Q.   Well -- but at any rate they were knocking on the door at

17  this point?

18  A.   Yeah.  And then the door started to move and I realized

19  they were hitting it with the battering ram, so I stepped back

20  away from the door but I was directly in front of it, and I got

21  down on my knees and I put up my hands and I got down in what is

22  called "child pose" in Yoga, where your forehead is on the

23  ground, your knees are bent, and your butt is sitting on your

24  heels, and I had my hands down like if you were in a worshipful

25  posture.

Direct Examination - Daniel Baker

1   Q.   Let me stop you.  Why didn't you just go open the door?

2   A.   Because I assumed that they were gonna come in with guns

3   blazing like the FBI agent had told me they were gonna do.

4   Q.   All right.  So, I will ask you about that.  A FBI agent

5   told you the FBI was going to come after you?

6   A.   Yes.

7   Q.   And, so at any rate you're on the floor and what happens

8   from there?

9   A.   The door flew open and they threw a flash-bang and it

10  bounced off of me and it hit the wall and then --

11  Q.   The flash-bang hit you?

12  A.   Yeah.

13  Q.   Bounced off you and hit the wall?

14  A.   Yeah.

15  Q.   The officer told us something about a flash-bang grenade,

16  but what happens?

17  A.   He announced -- it went off and I brought my hands back to

18  cover my ears and the flash-bang went off.  And then they piled

19  on me like a dog pile, knees and elbow on me, and they pulled my

20  hands behind my back, cuffed me, and dragged me across the

21  doorway threshold and I have a scar on my left knee now where my

22  skin was scraped off.  And then they held me outside.  And my

23  glasses had come off and been broke a little -- like the lens

24  fell out and they popped it back in.  And I was standing there

25  barefoot, shivering in the rain, and they brought my sandals out

1    for me.  And, you know, we were talking shit to each other, and

2    then they threw me in the truck and told me not to turn around

3    and look at my apartment.

4    Q.   Let me back you up.  You said they did bring a sandwich for

5    you?

6    A.   Sandals.

7    Q.   Oh, sandals.

8    A.   My sandals.  I asked them if I could get my sandals because

9    I was shivering in the cold and the shock.

10   Q.   I see.  Was there anything said about the Chick-fil-A bag?

11   A.   Not right then -- oh, yeah, yeah.  When I -- when I got

12   into the truck, yeah.  I told him, you know, leftists, in

13   general, respect honesty.  And if you had just come to my door

14   and told me, turn yourself in, I would have because you've come

15   to my door before and said, Hey, you should tone down your

16   on-line rhetoric and I did at that time, with that agent I

17   referenced earlier.

18   Q.   Tell me -- what was said about Chick-fil-A?

19   A.   I told him, you know, you should have done your homework

20   about me.  You didn't even know that I'm a vegetarian.  And I'm

21   such a vegetarian that I put that on my social media profile.

22   And, so I told them, you know, in the leftist groups we offer

23   criticism and self-criticism, and I offer you this criticism

24   that you didn't even do your homework and figure out I'm a

25   vegetarian.  And he said, I accept your criticism and, you know,

1    sorry for lying to you about that dude.

2            MR. MURRELL:  Thank you.  That's all I have.

3            THE COURT:  Thank you, Mr. Murrell.

4            Mr. Kunz?

5            MR. KUNZ:  Thank you.

6                    CROSS-EXAMINATION

7    BY MR. KUNZ:

8    Q.   Mr. Baker, you just told the jury, I think, a few minutes

9    ago that your plan was on a Call to Arms not to go out and fight

10   people and encircle the police but you were going to wait and

11   see if the police needed help if they couldn't calm the

12   situation; is that correct?

13   A.   While driving in a circle around the Capitol.

14   Q.   Right.

15   A.   To check on the situation.

16   Q.   Did you not say that your plan was to wait and then assist

17   the police?  Isn't that what you just told the jury?

18   A.   If they wanted help.

19   Q.   If they wanted help.  Well, your post didn't say anything

20   like that, did it?  Your post -- let me show you Exhibit 1B.

21       Mr. Baker, your post said, "Remember cops won't protect us

22   because the cops and the Klan go hand-in-hand".

23       You're telling us today that you were going to be the nice

24   guy and help the law enforcement, if they had a problem.  But,

25   in fact, your posts on January 12th, and again on the Call to

1    Arms on January 14th, indicate you had no use for the police.

2    A.   Well, my friends on my social media don't like cops and I

3    don't think that they would be willing to actually go defend the

4    Capitol if they felt like we were cooperating with police.

5    Q.   Which is it?  What you told the jury today, or what you put

6    in the posts about your --

7    A.   I also contradict myself in the post, wherein the one post

8    I say encircle and in the other post I say, drive them down

9    Apalachee.  So which is it?

10   Q.   That's not my question.  What is the truth today?  Is the

11   truth what you told the jury today or what you put in your posts

12   about your feeling about law enforcement officers?

13   A.   It was what I told the jury today.

14   Q.   Okay.  And, you also told Mr. Murrell something about

15   asking if someone would assault the police.  And your response

16   was, yeah, you intended to just smoke them out, basically?

17   A.   Yes.

18   Q.   Why didn't you ask them straight up, if you're suspicious

19   of him, about the police, because that question a reasonable

20   person would read that not the way you are saying it is.  You

21   know that, right?

22   A.   It's a loaded question for the purpose of seeing if

23   somebody just wants to tell me what they think I want to hear.

24   Q.   Okay.

25   A.   I also asked him if they wear masks --

Cross-Examination – Daniel Baker

1   Q.   Thank you.

2        THE COURT:  If you will answer his questions and he

3   will have another one.

4   BY MR. KUNZ:

5   Q.   Now, on your response to the WTXL post -- and you did make

6   that post, that Call to Arms response, your comment to it; is

7   that correct?

8   A.   Yes.

9   Q.   Sir, looking at Exhibit 2A, look at that profile -- the

10  picture.  That's you, isn't it?

11  A.   Yes.

12  Q.   And it's a firearm and a mask?

13  A.   Yes.

14  Q.   Your phone, when you let the FBI in Tampa take some

15  pictures of it, Exhibit 9A, this is what the screenshot looked

16  like; is that correct?

17  A.   Yes.

18  Q.   And your phone says, "We are militants.  We are not paid to

19  make war.  We are partisans of revolution", and then you mention

20  someone's name.  You believe that; isn't that correct?

21  A.   Yeah.

22  Q.   Okay.  And below this you list squad designated

23  sharpshooter at YPG.

24  A.   Yes.

25  Q.   Is that true?

Cross-Examination – Daniel Baker

1   A.    Yes.  It was at the time.  It was when I was in Syria.  I
2   am no longer --
3   Q.    That's right.  2020, in January, was that a true statement?
4   A.    I guess not really because I was not in the YPG when I was
5   in America.
6   Q.    In fact, that statement was part of your bonafides, right,
7   to tell people that you're a big foreign military guy, you can
8   handle weapons and do stuff, is that true?
9   A.    It's part of my left-wing caricature; yes.
10  Q.    Now, Mr. Murrell, I think before lunch, talked to you about
11  Government's Exhibit 13.  That's -- here, I have highlighted
12  this thing: "This is war.  Are you willing to take up arms with
13  us yet?  Buy guns and join us this November.  We are voting from
14  the rooftops".  And I think your response was, it was a joke?
15  A.    It was.
16  Q.    Okay.  You're indicating to people, this is a war, we are
17  going to take up arms, and voting from the rooftops; you
18  understand that meant people on rooftops with rifles, maybe
19  sniper rifles; right?
20  A.    Yes.  And I was quoting right-wing politicians.
21  Q.    You are quoting what?
22  A.    Right-wing politicians.
23  Q.    That's what you are saying.  You posted something that a
24  right-wing politician did.  But you didn't attribute it to them.
25  This is you.  This is Daniel Baker on October 2, 2020 posting

Cross-Examination – Daniel Baker

1  this to other individuals; isn't that true?

2  A.   Yes.

3  Q.   And right below it you are indicating, "I am America.  I

4  can buy firearms at the grocery store so I just did".

5       Exhibit 15 I think counsel may have asked you about.  Is it

6  your testimony today that this was another joke?

7  A.   I was trying to, you know, encourage my friends to get out

8  and train.  But, yes.

9  Q.   So your friends are going to get out and train by you

10  saying, listen, I hope there is a coup on November 3rd.  I want

11  to slay enemies.  This is going to encourage your friends to

12  train?

13  A.   Yeah.  People took that seriously when they said they were

14  going to overthrow the election results and a lot of people felt

15  like they would have to run for their lives.

16  Q.   You took it seriously, too, didn't you?

17  A.   At the time, I did -- like Don Quixotes.

18  Q.   So at the time you were anxious to post anything you could

19  to scare other people, or thwart other people from having these

20  armed protests, is that true?

21  A.   My profiles are set to private, so I was only talking to

22  leftists, who I screen, who are my friends, that I was

23  encouraging to defend themselves.

24  Q.   Okay?

25  A.   That's why you had to get the --

1   Q.   Now, on Exhibit 18, Mr. Baker, I know counsel asked you

2   questions about this thing, but you're talking about things a

3   revolutionary learned from CHAZ/CHOP.  This is what you are

4   indicating to people basically lessons learned.  Isn't that

5   true?

6   A.   Yes.

7   Q.   And, specifically, you're talking what they should do in

8   such a situation.  This is supposedly a protest, but it was more

9   than that; right?

10  A.   No.  It was a protest.  And they were passionately angry

11  about watching someone get murdered by a cop in the street.

12  That's why they occupied the police station, which I criticized

13  them for.

14  Q.   Mr. Baker, you are urging other people to, "bring weapons.

15  There is going to be a shootout".  You give them some advice as

16  to tactics about striking and holding targets --

17  A.   Of little value.  Not police stations.

18           THE COURT:  You need to just wait for him to finish

19  the question and then you will answer it.  That way the court

20  reporter can get everything down, please.

21  BY MR. KUNZ:

22  Q.   Is it not correct that you said, number one, "Bring guns.

23  They are going to shoot at us whether we're armed, unarmed, or

24  peaceful anyway"?

25  A.   I said that.

Cross-Examination - Daniel Baker

1   Q.   And that's your true feeling about police; right?

2   A.   No.

3   Q.   No?  So this was a lie when you posted this?

4   A.   No.  I was referring to far right-wing people, some of them

5   are police but not to all police.

6   Q.   Okay.  I thought you just indicated that they should bring

7   guns because the police had guns and they shot somebody?  Didn't

8   you just say that?

9   A.   It was not that they shot somebody.  I was referring to far

10   right-wing people like Kyle Rittenhouse.

11   Q.   Okay.  And there's no doubt that you gave this advice; is

12   that correct?

13   A.   I did.

14   Q.   Was this Ms. McDonald?

15   A.   Yes.

16   Q.   And you indicated the -- these two items in Exhibit 19 that

17   you posted saying you want to sell them for $10 apiece.  This

18   one and the next one.  And then you indicated, "they are going

19   to be valuable when I'm in prison".  You understood what you

20   were doing and you understood that you may go to prison; isn't

21   that correct?

22   A.   I was under the belief that no matter what I did I was

23   going to be taken to prison for my beliefs because that's what a

24   nice agent, an FBI agent told me, in South Florida, because I

25   had posted protesting against the way ICE treats children.

1    Q.    But, in Tallahassee you are posting these items and you're

2    indicating, and on this date, of December 13th, this is a month

3    before you do your Call to Arms, you are indicating you may go

4    to prison.  Didn't you say that?

5    A.    I did say that.

6    Q.    So we can understand, I think you said, as to Exhibit

7    Number 23, where you posted this, "I'm a killer my ninja" --

8    this is on your Instagram -- "Google can Baker ypg sniper".

9    That was your post?

10   A.    That was my post.  I believe that was a private message

11   between me and this guy who just started messaging me out of the

12   blue.

13   Q.    Okay.  And then on the second page you indicate about your

14   16 kills.  Was that true or did you make that up?

15   A.    I made that up.  And I was just talking big because I

16   wanted him to stop bothering me and for the last five years

17   these people have been bothering me on a daily basis.  And I

18   have been reporting that to the FBI and there's been nothing

19   done about it.

20          THE COURT:  Mr. Baker, you need to just focus on just

21   answering the question and then he may have another question and

22   then your attorney may have some follow-up questions as well.

23   BY MR. KUNZ:

24   Q.    Now, I think counsel had asked you about a .22 rifle.  This

25   is Exhibit Number 24.  Now, you indicated "It's deadly.  It's

1  used as a silenced weapon with subsonic rounds and a water

2  bottle".  You said that, right?

3  A.   Yeah.  I have killed raccoons and squirrels when I was a

4  kid --

5  Q.   It's your testimony today that that was referencing killing

6  squirrels and stuff as being deadly?

7  A.   Yes.

8  Q.   And that's why you bought, with virtually no money to your

9  name, that's why around January 14th you purchased this Mauser,

10 for four hundred some odd dollars, to shoot squirrels?

11 A.   Because I had just joined the Socialist Rifle Association.

12 And I thought the economy was going to be jacked up if there was

13 civil unrest.  And if I had to eat meat then I would, but I

14 could provide meat for my friends in the event that they

15 couldn't get any.

16 Q.   Now, counsel had asked you about one of these posts,

17 Exhibit Number 25, but I don't think he read the last part of

18 it.  So, let me ask you this, this is your post on January 12th,

19 the same day that you posted the initial Call to Arms, and you

20 indicate "Death to America", and spelling of that is the

21 spelling that anarchists use; isn't that correct?

22 A.   It's a spelling somebody uses when they are referring to

23 KKK culture in America.

24 Q.   Anarchists use that?

25 A.   Not -- the person who showed me that first spelling of

1   America the first time was an FBI informant who is not an

2   anarchist.

3   Q.   Okay.  Anyway, here you indicated not just a problem with

4   the former president, but you indicated both the current and the

5   elect.

6   A.   Yeah; I wanted Biden -- or I wanted Bernie.

7   Q.   So, it's fair to say that this was not all one thing about

8   a right-wing conspiracy.  You were upset with any of the

9   government as an anarchist would be; is that correct?

10  A.   No.

11  Q.   You weren't?

12  A.   No.  I was talking about the KKK culture because cops and

13  Klan do go together in a lot of cases.

14  Q.   You said, F the present current and elect.  You are not

15  talking about anything else.

16  A.   I can obey the law in a country whether or not I like the

17  president.

18  Q.   Okay.  That's why you said death to America?

19  A.   Death to the KKK culture in America.

20  Q.   Okay.

21  A.   And that's also a reference to meme where it's these guys,

22  Jihadis, on this show called Memory TV in the Middle East.  And

23  every time they open up the show they say, "Death to America, of

24  course".  And because a bunch of people call Antifa terrorist,

25  it's a joke that we say this kind of thing when we get off of a

1    band.  It's a long running joke.

2    Q.   Mr. Baker, you did a lot of joking on your Facebook and

3    Instagram; is that what your testimony is?

4    A.   Almost exclusively jokes.  As an ironic parody of a

5    left-wing caricature.

6    Q.   Now, your Call to Arms was serious and you intended to

7    scare anybody who may think they want to come to Tallahassee and

8    attack the Capitol.  Is that true?

9    A.    No.  I wanted to encourage people who are in my community

10   to defend themselves.

11   Q.   Did you not tell Special Agent Marti and Special Agent

12   McNair after you were arrested that you posted these items to

13   scare off individuals from coming?

14   A.   I don't think so.

15   Q.   You don't think so?  You heard Agent Marti testify

16   yesterday.  That's what he said you said.  Did you say it or

17   not?

18   A.   I don't think so, no.  They also said that --

19   Q.   So he's wrong?

20   A.   -- they also said they announced themselves before they --

21   Q.   My question, sir, did you say that?  Yes or no?

22   A.   No.

23   Q.   I think you told Mr. Murrell that based on a lot of stuff

24   that was put out there by the right that you believed a lot of

25   these things were going to happen; is that correct?

Cross-Examination – Daniel Baker

1    A.    At the time I did.

2    Q.    But you want the jury not to believe when you post a threat

3    towards people other than your ideology, isn't that what you are

4    doing?

5    A.    Which threat are you referring to?

6    Q.    I am talking about your Call to Arms you put out there.

7    Are saying, Oh, I didn't mean that, and that wasn't anything,

8    but you believe -- you want the jury to believe that you were

9    serious, or you believed the right, or other folks -- extremist

10   who posted items, but when you post an apparent threat you

11   weren't serious?

12   A.    When I posted the Call to Arms I was serious about

13   encouraging people to defend the Capitol from insurrectionists,

14   but I wasn't directing it towards those insurrectionists.

15   Q.    You intended anyone who read that to understand that there

16   was somebody by the name of Dan Baker, who was going to defend

17   the Capitol in Tallahassee and he was getting other people to do

18   it.  Isn't that why it was posted?

19   A.    Yeah.  I wanted to defend the Capitol from

20   insurrectionists.

21   Q.    And you wanted everyone to know about that; didn't you?

22   A.    Not everyone.  Just the friends who were able to see my

23   private profile.

24   Q.    Right.  When you added that Call to Arms post at WTXL

25   that's not just your private friends.  That's for everybody to

Cross-Examination – Daniel Baker

1   see.

2   A.   Yeah; I didn't think that the police were actually prepared

3   because the Capitol police let people in.  So I thought that the

4   police might not actually be inclined to defend the Capitol, and

5   I didn't know at the time that the National Guard was going to

6   be there because I had read that the National Guard was being

7   sent to defend the DC Capitol.  But if I had known that the

8   National Guard would be here, I probably wouldn't have bothered

9   with that flier at all.

10  Q.   Again, you posted that to let the world know that there was

11  going to be somebody there defending Tallahassee besides law

12  enforcement; didn't you?

13  A.   Yes.

14  Q.   Now I think you told the jury earlier, sir, that some of

15  the things about the YPG that have been indicated here in court,

16  either in posts, or from what you may have said to people, may

17  not have been correct; is that right?

18  A.   What are you specifically referring to?

19  Q.   Let me start -- I think you told the jury before lunch that

20  you didn't do any training of any people at the YPG.

21  A.   Not military training with firearms.  No.

22  Q.   Did you not tell Special Agent Biehn that when you were

23  interviewed in early 2019 that, in fact, you had gone over and

24  you had actually trained some of these individuals?

25  A.   No, I did not tell them that, and if they said that, there

Cross-Examination – Daniel Baker

1   are other discrepancies in that transcript.

2   Q.    The question was, you deny saying that to the FBI agent?

3   A.    Yes.

4   Q.    And it's fair to say that you consider the FBI, at least as

5   of January 15th of 2021, the FBI had been -- I am not sure the

6   right word -- invaded by or taken over by Neo-Nazis?

7   A.    Infiltrated.

8   Q.    Infiltrated.

9   A.    To a lesser extent than other agencies, yes.

10  Q.    What's that, sir?

11  A.    To a lesser extent than other less-professional agencies.

12  I consider them to be less corrupt than the CIA or local law

13  enforcement.

14  Q.    Didn't you say that the FBI was infiltrated by Neo-Nazis?

15  A.    Yes.

16  Q.    I think on that recording, that was played for a few

17  minutes, when you were with the FBI, I think you indicated that

18  you were glad that they came for you and not somebody else.

19  A.    A lesser of evils.

20  Q.    How do you know they weren't Neo-Nazis?

21  A.    I didn't know.  But when they were kicking my door down

22  they were yelling FBI, and I figured it was worth the tactical

23  risk to throw down my weapons and surrender because I don't want

24  to get into a shootout with the authorities.

25  Q.    Sir, when you were stopped going through the Tampa airport,

Cross-Examination – Daniel Baker

1  in January of 2006 -- excuse me, January of 2020, you told the

2  security supervisor there that you liked to kill?

3  A.    I did not say that.

4  Q.    Okay.  So you deny that, too?

5  A.    I do.

6  Q.    Okay.  So all the agents that have come in here and said

7  specific statements that you have made, you deny that they

8  just -- you haven't said any of those things, is that correct?

9  A.    In circumstances where it makes their case stronger, they

10  have lied in order to make me look worse.

11  Q.    All right.  So they are lying about you to the jury?

12            MR. MURRELL:  I object.

13            THE COURT:  That one was -- what's the objection?

14            MR. MURRELL:  Characterization.

15            THE COURT:  It's sustained.  It was asked and

16  answered.  You can ask your next question.

17  Q    (By Mr. Kunz) Now, you remember you were interviewed at one

18  point about the CHOP; isn't that correct?

19  A.    No.  Actually that person posted this stuff and maybe they

20  heard me talking to somebody else.  At one point I made public

21  speech in the CHAZ/CHOP where I criticized them for taking a

22  police station, and I think this person heard that and twisted

23  my words and wrote an article.  But I never spoke to that

24  person.  And I was in the process of trying to retain a lawyer

25  in order to get that take down.

Cross-Examination – Daniel Baker

1    Q.    But you never did; did you?

2    A.    No.

3    Q.    And so you never said in the CHOP "if they really want a

4    revolution they need to get AKs and start making bombs"?

5    A.    No.  I told them that they should not have taken over a

6    police station because this wasn't Vietnam.

7    Q.    That's not my question.  Did you say that?

8    A.    No; I did not say that.

9           MR. MURRELL:  Objection.  I think he can explain what

10   he said.

11          THE COURT:  The question was, did he make that

12   statement.

13          MR. MURRELL:  All right.

14          THE WITNESS:  No, I never said that.

15   BY MR. KUNZ:

16   Q.    Now, you mentioned, sir, that you're greatly influenced by

17   the Hare Krishna.  I'm not sure -- did you say you were a member

18   of them?

19   A.    Yeah.  It's my religion.

20   Q.    Your religion.  Do they normally promote the possession and

21   use of firearms?

22   A.    They do believe in a caste system which involves a warrior

23   case, and I was born into a family where the patriarch of the

24   family was a military service member, police officer, and he

25   trained me since I could walk to run, jump, shoot, and hunt.

Cross-Examination – Daniel Baker

1  Q.   So other Hare Krishnas may have two, or three, or four, or

2  five firearms and be members of the Socialist Rifle Association;

3  is that what your testimony is?

4  A.   Probably not all of those things combined.  But some of

5  them do own firearms, I imagine.

6  Q.   I thought they were for peace?

7  A.   For inner peace.  And they are yogis, but that means

8  encompassing everything that goes on and spiritualizing it.

9  Q.   Were Hare Krishnas going to join your Call to Arms and

10  defend Tallahassee?

11  A.   I hope not.

12  Q.   Well you know they wouldn't because they don't use firearms

13  and violence.  You know that; right?

14  A.   I'm sorry.  Are you an expert on Hare Krishna spirituality?

15  Q.   Sir, my question, you know they would not do that.  Isn't

16  that correct?

17  A.   Hare Krishnas have been documented cutting people's heads

18  off with a Samurai sword.  That happened.

19  Q.   They are using firearms and AK-47-type weapons?

20  A.   I imagine that some of them are firearm users.  Hare

21  Krishnas tend to be more conservative.  Hindus, in general, are

22  more conservative, at least as conservative, as conservative

23  Christians.

24  Q.   Sir, counsel asked you about the video in which you're

25  firing a machine gun.  You took that video yourself; is that

Cross-Examination - Daniel Baker

1    correct?

2    A.    I took a video of myself firing an assault rifle.  A

3    belt-fed machine gun would be like the Arab guy shooting in the

4    combat footage.

5    Q.    That weapon.  Had an automatic?

6    A.    It did.  Yeah.

7    Q.    You were enjoying firing it; is that true?

8    A.    Yeah.

9    Q.    And in the video that you made of yourself doing this you

10   made sure at the end you indicated that you "can't wait to get

11   back to Syria to kill some Jihadis or Turks".  Is that what you

12   said?

13   A.    No.  I said "I am going back to Syria".  I didn't say I

14   can't wait.

15   Q.    After you said you're going back, and I guess you were

16   going to kill some Jihadis and Turks; is that what you said?

17   A.    I said that.  The Turkish government supports ISIS.

18        Many of the Jihadis are Turks.

19            THE COURT:  Mr. Baker, I've asked you several times.

20   You just need to listen to the question and just answer the

21   question.  There is not a question pending right now.

22   BY MR. KUNZ:

23   Q.    You told the jury earlier, with respect to some questions

24   about your blue belt, that you can get in a lot of trouble if

25   you wore one and you didn't deserve to have one.  Is that what

Cross-Examination - Daniel Baker

1  you said?

2  A.   That sentence doesn't make sense.

3  Q.   I think you said you would get in a lot of trouble to say

4  you were a blue belt when you weren't.

5  A.   No, I am a blue belt.  I would get in trouble to say that I

6  was a black belt or a jujitsu master.

7  Q.   If you were what?

8  A.   If I was a black belt or a jujitsu master.

9  Q.   Okay.  So, you understand that -- you know the difference

10 between crossing the line and doing things that are right and

11 things that are wrong; don't you?

12 A.   Of course.

13 Q.   Now, you also told the jury -- let me see if this is

14 correct.  Your testimony was that the U.S. military depended

15 upon you using a Samsung tablet to call in strikes to assist the

16 Kurds.

17 A.   That happened.

18 Q.   So that's your testimony?  Military received

19 communications, electronically, from you from a Samsung tablet?

20 A.   Yeah.  Special forces and Marines hung back two kilometers

21 and they let the internationals and the locals do the actual

22 dying and fighting.  So we would call in targets.

23 Q.   Now, it's fair to say you didn't have too much money in

24 January; is that correct?  January of this past year?

25 January 2021?

Cross-Examination - Daniel Baker

1    A.    Yes.

2    Q.    Things were tight?

3    A.    Yes.

4    Q.    Yet you paid four hundred some odd dollars for that Mauser

5    long rifle; didn't you?

6    A.    Yes.  After rent was paid.

7    Q.    In fact, someone provided you $500 to buy that; isn't that

8    correct?

9    A.    Yes.

10   Q.    Sir?

11   A.    Yes.

12   Q.    And who gave you that money?

13   A.    Jackson Perkins.

14   Q.    And who is he?

15   A.    He is a friend who helped me pay for my first plane ticket

16   to Iraq.  And if I need help for rent, or food, or, you know,

17   even if he just has some extra money to give me sometimes he

18   sends money.

19   Q.    And, you also, at that same time, bought a 3D printer; did

20   you not?

21   A.    I did.

22   Q.    And 3D printers can be used to do what?  To make a gun,

23   right?

24   A.    Theoretically.  I wanted to make an OPA and MPA,

25   oropharyngeal airway adjunct which you use when someone is

1  unconscious to keep them from swallowing their own tongue.  You

2  can also put the MPA up their nose.  But you can 3-D print

3  those.  And if I went back to Syria I wanted to bring these to

4  give out because they are not part of medic kits I saw there,

5  and I also wanted to 3-D print tourniquets.  And I was also

6  going to gift it to my roommate, because he is an artist and you

7  can make all kinds of things.

8  Q.   So, in January of this year, 2021, you bought this 3-D

9  printer, a two hundred plus dollar 3-D printer, so that you

10  could have something to take back to Syria whenever you may go

11  there.  Is that what your testimony is?

12  A.   I still intend to go back, yes.

13  Q.   Now, both your posts of January 12th and on January 14th,

14  both of them was a message by you for any people who plan to

15  come to Tallahassee and protest in an armed fashion to be aware

16  and stay away; is that true?

17  A.   No.  Not any people.  It would be -- and not protesters.

18  It would be if armed insurrectionists came and engaged the cops

19  and defeated them, and then, you know, we would step in if we

20  could.  But I would rather act as a street medic like I've done

21  in the past.

22  Q.   That's right.  But what you are telling the jury today is

23  not what you posted in those two posts of January 12th or

24  January 14th; is it?

25  A.   I'm sorry.  Can you clarify that?

Redirect Examination – Daniel Baker

1   Q.   You just said that you would wait and see if they

2   overpowered the police and then you guys would step in.  That's

3   not what you put in the post on January 12th and January 14th;

4   was it?

5   A.   That is what it says on the flier.

6   Q.   If the police get overcome then you are going to move in?

7   A.   It says --

8   Q.   And then you will provide medical aid?

9   A.   -- cops.

10  Q.   Sir?

11  A.   It says let them fight with the cops.  The plan was to see

12  how it turns out.

13          MR. KUNZ:  I have nothing further of this witness.

14          THE COURT:  Okay.  Thank you.

15                      REDIRECT EXAMINATION

16  BY MR. MURRELL:

17  Q.   Mr. Baker, did you get that 3-D printer to print firearms

18  to take back to Syria?

19  A.   Not firearms, no.  Medical supplies.  And I never received

20  the 3-D printer.

21  Q.   Medical supplies?

22  A.   I don't think it ever came in the mail.  I had been waiting

23  for it for a while.

24  Q.   That was that post, "Death to America, of course", and then

25  you made the comment about the past and current president.  Was

Redirect Examination – Daniel Baker

1    that intended to be some kind of serious comment on the country

2    and the president?

3    A.    No.  It was a joke based on this meme about Jihadis with

4    their own version of Fox News where they stand there, and when

5    they open up the guy says, "Death to America, of course.  I am

6    back on air".  And you know, we've made memes about that because

7    the show is so ridiculous that you could screenshot whatever

8    they say and it turns out funny.  And -- so because people view

9    Antifa as terrorists, we joke about it because what else can you

10   do when someone calls you a terrorist.  I am not going to engage

11   in that conversation.

12   Q.    These statements that you did, or did not make to the

13   officer after your arrest, that would have been a few months ago

14   back on January the 15th?

15   A.    Yes.

16   Q.    Do you remember precisely what you said?

17   A.    No.  I was pretty stoned at the time.  And it's been a few

18   months since then.

19   Q.    And, you had just been -- they had just broken down your

20   door and threw in a flash-bang grenade and dragged you out?

21   A.    I had a smoking weed in my hand, yes.

22   Q.    I want to -- I asked you this before, but I did want to

23   make this clear.  So you certainly thought that there could be

24   an attack on the Capitol on some time around January 20th?

25   A.    I thought that could happen.

Redirect Examination – Daniel Baker

1    Q.   But you mentioned earlier a specific percentage.  Did you

2    think that was certain -- a certainty?

3    A.   Yeah.  I said 25 percent because I was thinking they do, or

4    don't, or they show up and it doesn't work, or some unknown

5    variable.

6    Q.   Again, Mr. Kunz asked you if what you said in that Call to

7    Arms was accurate, or true, and that's what you intended.  Tell

8    me again how big was this army that you had recruited to help

9    you defend the Capitol?

10   A.   One car with my roommate and myself as a mobile ambulance.

11   Q.   By the way, this idea of defending the Capitol, did you

12   think that lawfully you could do that?

13   A.   I thought that as a former U.S. soldier, when we swear an

14   oath to defend the country that that's what that meant.

15   Q.   Did you feel like you had a duty to defend the Capitol?

16   A.   I did.

17   Q.   Do you feel like that if you did so it would be a lawful

18   thing to do?

19   A.   I did, even though it would contradict my ideology and a

20   lot of the leftist and Antifa types, I thought that this is

21   something that I have to do and I'd be willing to die to defend

22   my community.

23           MR. MURRELL:  Thank you.  That's all I have.

24           THE COURT:  Okay.  Ladies and gentlemen, we have gone

25   about an hour and some change.  So we will take a mid-afternoon

1    break now and then we will continue the case.  Will be a short

2    break, probably about 10-minutes.  Do not talk about the case.

3    Don't form any opinions.  And we will see you back in 10 minutes

4    or so.

5         (Jury out at 2:59.)

6              THE COURT:  Please be seated.  You can head back to

7    your seat, please.  And you do not have any more witnesses,

8    Mr. Murrell; is that right?

9              MR. MURRELL:  That's all the testimony we have.  The

10   defense would rest.  And I would renew my motion for judgment of

11   acquittal.

12             THE COURT:  Do you have any additional argument on it?

13             MR. MURRELL:  No additional argument.

14             THE COURT:  All right.  The motion for judgment of

15   acquittal is denied.  So you'll rest in front of the jury when

16   they come back out?

17             MR. MURRELL:  Yes, sir.

18             THE COURT:  And then do you have a rebuttal case?

19             MR. KUNZ:  We have no rebuttal.  We'll rest too.

20             THE COURT:  Okay.  Then what we'll do, if you both

21   rest on your entire case and then I'll tell the jury that we're

22   going to begin with the jury instructions.

23             I'll read the jury instructions we have here all the

24   way to the last little section.  And then we'll begin, go right

25   into closing arguments.

1              How much time would you request for your closing

2      argument, Mr. Kunz?

3              MR. KUNZ:  If it's all right, Judge, I was going to

4      have Mr. Fields do the initial close and I was going to do the

5      rebuttal.

6              THE COURT:  How long for the initial portion?

7              MR. KUNZ:  Maybe about 20-minutes; 15, 20-minutes.

8              THE COURT:  Mr. Murrell, how long do you anticipate?

9              MR. MURRELL:  I suppose the total could be 30-minutes,

10     but somewhere 20, 30-minutes, in that range.

11             THE COURT:  Why don't we have a target for no more

12     than 30-minutes a side.  Again, there won't be a buzzer that

13     goes off or anything, but the 30-minutes will be inclusive of

14     the rebuttal.  Anything else?

15             MR. KUNZ:  No, sir.  Nothing.

16             THE COURT:  Okay.  We'll take a quick break then.

17             MR. MURRELL:  Can I do one thing?  You know, we had

18     the business about the transcript.  I did want to make sure the

19     record included a copy of the transcript I hadn't intended to

20     give to the jury.  So, I guess, in a sense, it's a proffer.  But

21     I did want to, maybe we could just mark that as Defense Exhibit

22     A.  And this will not go to the jury.

23             THE COURT:  Okay.  I have no problem with that.

24             MR. MURRELL:  I'll write on it Defense A.  How about

25     that?

1          THE COURT:  Mr. Kunz, any issue with the transcript or

2    anything?  I'm sorry?

3          MR. KUNZ:  No objection.

4    (DEFENDANT EXHIBIT A:  A received in evidence.)

5          THE COURT:  Okay.  We'll take a short recess.

6    (Recess taken 3:02.)

7    (Resumed at 3:12.)

8          THE COURT:  Please have a seat.

9          Okay.  So, again, when the jury comes out I'll ask if

10   you have anything further.  You can rest.  And the government

11   can rest on the whole case.  And then I'll tell the jury we'll

12   do the instructions and have arguments.

13          What I would like for each of you to do, does everyone

14   have the clean final copy that I gave you of the instructions?

15   Y'all follow along.  And then what I'll do when I finish, rather

16   than asking for objections I'll ask if anyone needs a sidebar.

17   And that's your invitation to let me know if there is anything I

18   have misread or anything like that.  If you say no, then we'll

19   go into closings.  And I'll take that to mean there were no

20   objections to the manner in which they were read.

21          We do have extra copies to go back to the jury.

22          The then the other thing I was going to tell them is

23   our alternate, who is Miss Milburn, I was going to retain her

24   while the deliberations go on.  So we'll excuse all the others

25   and instruct her to not speak about the case.

```
 1              Anything else we need to talk about before we bring
 2    everyone back in?
 3              MR. MURRELL:  Not from the defense.  No, sir.
 4              THE COURT:  Mr. Kunz?
 5              MR. KUNZ:  No, sir.
 6              THE COURT:  Bring in the jury.
 7         (Jury in at 3:15.).
 8              THE COURT:  Please have a seat.  Welcome back.
 9              Mr. Murrell, is there anything further from the
10    defense?
11              MR. MURRELL:  Judge, at this time the defense would
12    rest.
13              THE COURT:  Okay.  Ladies and gentlemen, that
14    completes -- the defense has rested so that completes their
15    presentation of evidence.  The government?
16              MR. KUNZ:  We have nothing further either, Your Honor.
17              THE COURT:  The government rests on its entire case?
18              MR. KUNZ:  Yes, sir.
19              THE COURT:  And the defense does as well.
20              Ladies and gentlemen, that completes the submission of
21    all of the evidence.  What remains of the trial is for me to
22    read you the instructions and then you'll hear closing arguments
23    from the counsel.  And then you'll be ready to begin
24    deliberating.
25              So I'm going to read you the bulk of the instructions
```

1  now.  At the beginning, I'll be reading from a sheet and it will

2  take several minutes because they are somewhat lengthy.  You

3  will have copies of these jury instructions back in the jury

4  room with you later.  So I'm going to read the bulk of them now

5  and then we'll hear from the lawyers and then a few final

6  remaining instructions.

7       Ladies and gentlemen, it is now my duty to instruct

8  you on the rules of law that you must use in deciding this case.

9  After I've completed these instructions, and after hearing

10  argument from counsel, you will go to the jury room and begin

11  your discussions, what we call your deliberations.

12       You must decide whether the government has proved the

13  specific facts necessary to find the defendant guilty beyond a

14  reasonable doubt.

15       Your decision must be based only on the evidence

16  presented during the trial.  You must not be influenced in any

17  way by either sympathy for or prejudice against the defendant or

18  the government.

19       You must follow the law as I explain it, even if you

20  do not agree with the law, and you must follow all of my

21  instructions as a whole.  You must not single out or disregard

22  any of the Court's instructions on the law.

23       The indictment or formal charge against a defendant

24  isn't evidence of guilt.  The law presumes every defendant is

25  innocent.  The defendant does not have to prove his innocence or

produce any evidence at all.  The government must prove guilt

beyond a reasonable doubt.  If it fails to do so, you must find

the defendant not guilty.

The government's burden of proof is heavy, but it

doesn't have to prove a defendant's guilt beyond all possible

doubt.  The government's proof only has to exclude any

reasonable doubt concerning the defendant's guilt.

A reasonable doubt is a real doubt, based on your

reason and common sense after you have carefully and impartially

considered all the evidence in the case.

Proof beyond a reasonable doubt is proof so convincing

that you would be willing to rely and act on it without

hesitation in the most important of your own affairs.  If you

are convinced that the defendant has been proved guilty beyond a

reasonable doubt, say so.  If you are not convinced, say so.

As I said before, you must consider only the evidence

that I have admitted in this case.  Evidence includes the

testimony of witnesses and the evidence, excuse me, and the

exhibits admitted.  But anything the lawyers say is not evidence

and isn't binding on you.

You shouldn't assume from anything I have said that I

have any opinion about any factual issue in this case.  Except

for my instructions to you on the law, you should disregard

anything I may have said during the trial in arriving at your

own decision about the facts.

1          Your own recollection and interpretation of the

2   evidence is what matters.

3          In considering the evidence you may use reasoning and

4   common sense to make deductions and reach conclusions.  You

5   shouldn't be concerned about whether the evidence is direct or

6   circumstantial.

7          Direct evidence is the testimony of a person who

8   asserts that he or she has actual knowledge of a fact, such as

9   an eyewitness.

10         Circumstantial evidence is proof of a chain of facts

11  and circumstances that tend to prove or disprove a fact.  There

12  is no legal difference in the weight you may give to either

13  direct or circumstantial evidence.

14         When I say you must consider all of the evidence, I

15  don't mean that you must accept all of the evidence as true or

16  accurate.  You should decide whether you believe what each

17  witness had to say, and how important that testimony was.  In

18  making that decision you may believe or disbelieve any witness,

19  in whole or in part.  The number of witnesses testifying

20  concerning a particular point doesn't necessarily matter.

21         To decide whether you believe any witness I suggest

22  you ask yourself a few questions:  Did the witness impress you

23  as one who was telling the truth?  Did the witness have any

24  particular reason not to tell the truth?  Did the witness have a

25  personal interest in the outcome of the case?  Did the witness

1    seem to have a good memory?  Did the witness have the

2    opportunity and ability to accurately observe the things he or

3    she testified about?  Did the witness appear to understand the

4    questions clearly and answer them directly?  Did the witness's

5    testimony differ from other testimony or other evidence?

6          You should also ask yourself whether there was

7    evidence that a witness testified falsely about an important

8    fact.  And ask whether there was evidence that at some other

9    time a witness said or did something, or didn't say or do

10   something, that was different from the testimony the witness

11   gave during this trial.

12         But keep in mind that a simple mistake doesn't mean a

13   witness wasn't telling the truth as he or she remembers it.

14   People naturally tend to forget some things or remember them

15   inaccurately.  So, if a witness misstated something, you must

16   decide whether it was because of an innocent lapse in memory or

17   intentional deception.  The significance of your decision may

18   depend on whether the misstatement is about an important fact or

19   about an unimportant detail.

20         A defendant has a right not to testify.  But since the

21   defendant did testify, you should decide whether you believe the

22   defendant's testimony in the same way as that of any other

23   witness.

24         You've been permitted to take notes during the trial.

25   Most of you, perhaps all of you, have taken advantage of this

1  opportunity.

2          You must use your notes only as a memory aid during

3  deliberations.  You must not give your notes priority over your

4  independent recollection of the evidence.  You must not allow

5  yourself to be unduly influenced by the notes of other jurors.

6          I emphasize that notes are not entitled to any greater

7  weight than your memories or impressions about the testimony.

8          The indictment charges two separate crimes, called

9  counts, against the defendant.  You'll be given a copy of the

10  indictment to refer to during your deliberations.

11          Count one charges that on or about January 12, 2021,

12  the defendant did knowingly transmit in interstate commerce a

13  communication containing a true threat to kidnap and injure the

14  person of another, namely, the communications referenced in

15  paragraph 1(c) of the indictment, with the intent that his

16  communication be perceived as a true threat.

17          Count two charges that on or about January 14, 2021,

18  the defendant did knowingly transmit in interstate commerce a

19  communication containing a true threat to kidnap and injure the

20  person of another, namely, the communication referenced in

21  paragraph 1(e) of the indictment, with the intent that his

22  communication be perceived as a true threat.

23          It is a federal crime to knowingly send in interstate

24  commerce a true threat to kidnap or injure any person.

25          The defendant can be found guilty of this crime only

if the following facts are proved beyond a reasonable doubt:

One, the defendant knowingly sent a message in interstate commerce containing a true threat to kidnap any person or injure the person of another; and

Two, the defendant sent the message with the intent to communicate a true threat or with the knowledge that it would be viewed as a true threat.

The government does not have to prove that the defendant intended to carry out the threat.

To transmit something in interstate commerce means to send it from a place in one state to a place in another state, including over the Internet.

A true threat is a serious threat, not idle talk, a careless remark, or something said jokingly, that is made under circumstances that would place a reasonable person in fear of being kidnapped or injured or another person being kidnapped or injured.

To qualify as a true threat, a communication must be a threat to commit an unlawful act.

In determining whether a communication would place a reasonable person in fear of being kidnapped or injured or another person being kidnapped or injured, you may consider the language, context, and circumstance of the communication.

To be a true threat, a communication need not be communicated directly to an intended victim, or specify a

1  particular victim or group of victims, or specify when it will

2  be carried out.  A true threat can be a conditional threat, and

3  it need not be an imminent threat.  However, these are factors

4  that can be considered in determining whether a communication is

5  a true threat.

6        You are not to concern yourself regarding whether the

7  alleged communications are protected by the First Amendment.

8  You are to determine whether the defendant is guilty or not

9  based only on these instructions.

10        Where a statute specifies multiple alternate ways in

11  which an offense may be committed, the indictment may allege the

12  multiple ways in the conjunctive, that is, by using the word

13  "and".  If only one of the alternatives is proved beyond a

14  reasonable doubt, that is sufficient for conviction, so long as

15  you agree unanimously as to that alternative.

16        Here, the indictment references quote, a communication

17  containing a true threat to kidnap and injure, but the

18  government need only prove beyond a reasonable doubt a true

19  threat to kidnap or injure.

20        You'll see that the indictment charges that a crime

21  was committed on or about a certain date.  The government

22  doesn't have to prove that the crime occurred on an exact date.

23  The government only has to prove beyond a reasonable doubt that

24  the crime was committed on a date reasonably close to the date

25  alleged.

1        The word knowingly means that an act was done

2   voluntarily and intentionally and not by mistake or by accident.

3   And not because of a mistake or by accident.

4        Each count of the indictment charges a separate crime.

5   You must consider each crime and the evidence relating to it

6   separately.  If you find the defendant guilty or not guilty of

7   one crime, that must not affect your verdict for any other

8   crime.

9        I caution you that the defendant is on trial only for

10  the specific crimes charged in the indictment.  You are here to

11  determine from the evidence in this case whether the defendant

12  is not guilty or, excuse me, whether the defendant is guilty or

13  not guilty of those specific crimes.

14       You must never consider punishment in any way to

15  decide whether the defendant is guilty.  If you find the

16  defendant guilty, the punishment is for the Judge alone to

17  decide later.

18       Your verdict, whether guilt or not guilty, must be

19  unanimous.  In other words, you must all agree.  Your

20  deliberations are secret, and you'll never have to explain your

21  verdict to anyone.

22       Each of you must decide the case for yourself, but

23  only after fully considering the evidence with the other jurors.

24  So you must discuss the case with one another and try to reach

25  an agreement.  While you're discussing the case, don't hesitate

1  to re-examine your own opinion and change your mind if you

2  become convinced that you were wrong.  But don't give up your

3  honest beliefs just because others think differently or because

4  you simply want to get the case over with.

5          Remember that, in a very real way, you are judges,

6  judges of the facts.  Your only interest is to seek the truth

7  from the evidence in this case.  Thank you for your attention to

8  that.

9          Just give me one moment.  Do we need a sidebar before

10  we begin with the arguments, Mr. Murrell?

11          MR. MURRELL:  No, sir.

12          THE COURT:  Mr. Kunz?

13          MR. KUNZ:  No, sir.

14          THE COURT:  Okay.  Then what will happen next, ladies

15  and gentlemen, is there will be closing arguments.  The

16  government will go first.  And then Mr. Murrell will go second

17  or the defense will.  And then there will be a rebuttal

18  opportunity for the government.  After all of that I'll have

19  some final instructions for you and then you'll begin your

20  deliberations.

21          So, Mr. Fields, whenever you're ready.

22          MR. FIELDS:  Thank you, Your Honor.  May it please the

23  Court.

24          Accountability.  That's why we're here.

25  Accountability.  Years' worth of an inflammatory rhetoric all

1    came to a screeching hault on January 15th, 2021.

2            Ladies and gentlemen of the jury, in a few short

3    minutes you will retire to the deliberation room and begin your

4    deliberations.  There are three tools that you'll need to take

5    back there with you.  First, it's the law, as the Court has

6    instructed you.  We'll talk about the law in a second.

7            Second, the evidence as you've heard it here in Court,

8    the exhibits that have been admitted, some of which will go back

9    with you to the jury room.

10            But, third, and most importantly, your own common

11    sense.

12            I would like to talk to you for a little bit about the

13    law.  As the Judge mentioned, the defendant is charged in a two

14    count indictment.  And both counts, the government alleges, are

15    under the same statute, which means you're going to be applying

16    these two elements to each communication that the government

17    alleges the defendant violated.  The first one on January 12th,

18    the second one on January 14th.

19            Now, with respect to the first element, I don't think

20    there's much dispute about it.  Frankly, Mr. Murrell, in his

21    opening statement, told you this isn't a who done it.  So, when

22    you read the first element it says, the defendant knowingly sent

23    a message in interstate commerce containing a true threat to

24    kidnap any person or injure the person of another.  In fact, the

25    defendant testified that he did send those messages.  And you

1    heard from Special Agent Marti that when things get posted on

2    the Internet, on Facebook they go through other states.  That's

3    what we call interstate commerce.

4              So, when you look at the first element there shouldn't

5    be much discussion or dispute about it.  Where the rubber will

6    meet the road is the second element.

7              The defendant sent the message with the intent to

8    communicate a true threat or with the knowledge that it would be

9    viewed as a true threat.

10             That "or" is very, very important.  Why?  Because it's

11   almost like a 2A and 2B.  There is an or between them.  So if

12   you find that that government has proven its case, let's say on

13   A, the defendant sent a message with the intent to communicate a

14   true threat, you can convict the defendant just based on that.

15             Now, let's say you don't, although the government

16   submits there is enough evidence, but let's say you don't, you

17   can still convict the defendant if you find that there's enough

18   evidence to prove beyond a reasonable doubt that he sent the

19   message with knowledge that it would be viewed as a true threat.

20             Now, true threat, sounds like legal ease.  The

21   definition says it's a serious threat, not idle talk, a careless

22   remark, or something said jokingly that is made under

23   circumstance that would place a reasonable person in fear of

24   being kidnapped or injured or another person being kidnapped or

25   injured.  This is a real threat, ladies and gentlemen.

1          To qualify as a true threat it must be a threat to

2    commit an unlawful act.  And what the government alleges, and we

3    submit the evidence has shown, is the defendant's two

4    communications on January 12th and January 14th, he was

5    intending to encircle people, kidnap people by encircling them,

6    and to drive them out with every caliber available, with

7    firearms.

8          Now importantly, at the bottom here, to be a true

9    threat a communication need not be communicated directly to an

10   intended victim or specify a particular victim or group of

11   victims, or even specify where it will be carried out.

12         A true threat can be conditional and it need not be

13   eminent.  Although, we would submit to you, ladies and gentlemen

14   of the jury, that on January 12th the defendant sent that

15   communication.  And I'll show you here in a moment.  And he

16   intended it to be a true threat.

17         How do you know that?  Well, let's talk a little bit

18   about who Mr. Baker is.  That's going to help you determine

19   whether he intended to communicate a true threat or if he knew

20   that it would be viewed as a true threat.

21         Who is Mr. Baker?  Well, you've heard evidence that he

22   served some time in the U.S. military before his discharge.

23   Went overseas.  Served with the YPG in Syria.  You heard from

24   himself, Mr. Baker, he said he was trained in infantry.  When he

25   went overseas had more training.  Now, importantly, the training

he got overseas, it wasn't that impressive to him.  Why?
Because he was well trained here.  He knew how to operate
firearms, explosives.  He was standing around with grenades in
his hand.  Ladies and gentlemen of the jury, who does that?

      You heard from Special Agent Biehn when she interviewed him
in Iraq.  He raved about the battle of the bridge.  And you saw
some footage about that.  You saw the defendant, he was a
leader, people were following him.  He knew what he was doing.
This wasn't a joke.

      He talked about that VICE news video.  You saw and heard
that he posted it on Facebook.  He was proud of that.  What does
that tell you?  He knew exactly what he was doing because he
knew his capability.

      Now, we've talked about his social media posts.  And in
this day and age you can tell a lot about somebody by their
social media posts.  Government Exhibit 1A, this is his defend
Tallahassee event.

      By the way, you heard testimony from Mr. Baker about his
Facebook being private because he didn't want people he didn't
agree with to follow him or communicate with him.  This was a
public event.  Anybody in this whole wide world could have seen
this event.

      Now, this is what the government alleges in count one
violates federal law.  And there is some important verbiage
here, ladies and gentlemen.  First of all, armed racist mobs,

1    you heard from Mr. Baker about those are people on the far

2    right.  The government would submit to you, ladies and

3    gentlemen, Mr. Baker's enemies are anybody who doesn't agree

4    with him.  Not just people on the right, not just people on the

5    left.  Later on you'll see exactly what I mean when he says,

6    fuck the president, excuse my words, but they are not mine,

7    current and elect.  This isn't about politics, ladies and

8    gentlemen.  This is about anarchy.  That's what he wants.

9    Anarchy.  We will fight back.  We will circle the state capitol

10   and let them fight the cops and take the building.  Then we will

11   encircle them and trap them inside.  Kidnapping.  And we will

12   drive them out of Tallahassee with every caliber available.

13       Only an armed community can stop them.  We are a chaotic

14   nation of willing hands.  Remember that the cops won't protect

15   us because the cops and clan go hand in hand.

16       He was waiting for law enforcement to show up on

17   Inauguration Day to help them out?  Ladies and gentlemen, I

18   would submit to you that's not credible.  It's not credible

19   because he said the cops and the clan go hand in hand.  And the

20   clan are part of his enemies.

21       Now, this is the second post that the government alleges

22   violates federal law.  This is count two.  And I know it's hard

23   to see there, but in 2B you can get a better view of this post.

24   Again, let them take the capitol and fight with the cops,

25   surround them, trap them inside.  This is an armed coup and can

1    only be stopped by an armed community.  If you are afraid to die

2    fighting the enemy stay in bed and live.  Who says that if they

3    don't mean it?

4         Government Exhibit 7, you heard testimony from Mr. Baker

5    that this firearm just so happened to be there because there is

6    a running joke that people shouldn't be leaving their firearms

7    around.  Well, I would agree with him that people shouldn't just

8    leave their firearms thrown around, but what I would submit to

9    you is he could have had this firearm outside the photo, it

10   could have been on the floor, it could have been in front of

11   him.  It's there for a reason.  And he says it's unloaded.

12   Well, ladies and gentlemen of the jury, when law enforcement

13   went to his house to arrest him he had two fully loaded guns in

14   his home.  I would submit to you his testimony is not credible.

15        Government Exhibit 8, it's really difficult to see, but

16   there's grenades in his hand.  Why would somebody post pictures

17   with grenades in his hand?  It's done for a reason.  To scare

18   people.  And that's what he told the agents when he was

19   arrested.  Although, he disputes that now.

20        I mean, you've seen plenty of this.  This is war.  Are you

21   willing to take up arms with us yet.  We are voting from the

22   rooftops.  Ladies and gentlemen, this isn't about voting.

23   Again, this is not about politics.  This is about violence.

24   Shooting from the rooftops.

25        You've heard ad-nauseam, Government Exhibit 15, is about

1    slaying enemies.  Again, military slaying.

2         Government Exhibit 17, a video that the defendant posted

3    doing Jiu Jitsu.  Now, there is nothing wrong with Jiu Jitsu or

4    self-defense.  That's important.  But I think it's important to

5    ask yourself too, why is that shotgun posted up against the wall

6    like that, just like it was in that last photo where that AK-47

7    was there.  How about that pistol right in the middle, right in

8    front of that red book between the two individuals in that

9    photo?  It's there for a reason.  It's there to scare.

10        Government Exhibit 20, a joke about dropping bombs on

11   Jacksonville?  There are people that serve in the U.S. military

12   who have died overseas because bombs have been dropped.  And

13   he's joking about dropping bombs on a place a hundred miles away

14   from here?  That's not a joke, ladies and gentlemen.

15        Now, you heard testimony that Mr. Baker's home was petty

16   baron.  And there is no doubt, ladies and gentlemen, we all go

17   through rough times in life.  But let me ask you, if you had

18   been gifted $500 would the first thing that you would do or any

19   reasonable person do is go out and buy a military style assault

20   rifle?  I don't think so.  Perhaps groceries or furniture,

21   somewhere to sleep, be able to pay rent, those would be more

22   reasonable things you would do with that money.  Not go out and

23   buy guns.

24        Now Government Exhibit 22.  His message with another

25   individual, before we continue, would you be willing to assault

1  a cop at a protest.  Mr. Baker told you that he just wanted to

2  make sure he wasn't interacting with the wrong folks who might

3  get him in trouble.  Well, I suppose that's why he also asked

4  further down in Government Exhibit 22, do you wear masks in

5  public, you know, because he probably was worried that wearing a

6  mask could be a problem for him.  I don't think so.

7         Government Exhibit 26.  I think this is particularly

8  reflective, ladies and gentlemen, of the evidence that you've

9  seen in this case.  This captures the essence of who Mr. Daniel

10  Baker really is and especially what he wanted to occur on

11  January 20th, 2021, Inauguration Day, one of the most sacred

12  days in our American form of government.

13         Everything is burning around Homer Simpson.  And he told

14  you that this was just a joke too.  Homer Simpson is holding a

15  rifle.  He's sitting on top of the building and everything is

16  burning around him.

17         Ladies and gentlemen, I would submit to you that that is

18  exactly what Mr. Baker wants for him to be sitting on the top of

19  this building and for everything to be burning around him.  And

20  that's why he submitted those two threats because that's what he

21  wanted.

22         These messages with Ms. Gattis, who you heard testify, does

23  this look like a joke to you?  Is this what people joke about?

24  People don't joke about buying AK's or pistols.  This comes down

25  to your common sense.  Don't check your common sense at the

1    door.  Very important.  This isn't a joke.

2         Something important that I think you should also consider

3    when you're deliberating, you heard from Mr. Arnold who was a

4    defense witness.  He had sparred with Mr. Baker at the Jiu Jitsu

5    gym.  He knew him, about two-years ago was the last time he kind

6    of interacted with him.  But when I showed him one of

7    Mr. Baker's posts, he's like, yeah, that would change my opinion

8    about his violence or non-violence, which is why I think

9    that Ms. Gattis' testimony was particularly not very credible.

10        We all have friends.  And our family and friends will vouch

11   for us in the toughest of times.  And that's important.  But

12   Mr. Arnold was very, very important for you because in the last

13   two-years Mr. Baker's rhetoric has gotten out of control and

14   it's gotten to a point where law enforcement had to step in.

15   And that's what law enforcement did.

16        Mr. Baker's posts on January 12th and January 14th, we

17   submit to you, were sent with the intent to communicate a true

18   threat.  They weren't a joke.  They were real.  And you know

19   that they were real because you know all about Mr. Baker's

20   propensity for military violence and enjoyment of weapons.  And

21   in addition to that, he knew that it would be viewed as a true

22   threat.  You can convict him on either of those two if you find

23   that the government has shown you enough evidence to prove this

24   case beyond a reasonable doubt.  And we submit to you that we

25   have.

1    And so I would ask you to please return a verdict that's

2    consistent with the law and the facts in this case, the only

3    verdict, and that's that the defendant is guilty.  Thank you.

4         THE COURT:  Thank you, Mr. Fields.  Mr. Murrell,

5    whenever you are ready?

6         MR. MURRELL:  Make sure we are operational here on the

7    electronics.

8         THE COURT:  Yes, sir.  Take your time.

9         MR. MURRELL:  Ladies and gentlemen, the question

10   before you now is has the government proven beyond a reasonable

11   doubt that Mr. Baker is guilty of these offenses.  If you use

12   your common sense, if you think about the evidence that's been

13   presented, and if you follow the law as the Judge gave it to

14   you, you will see the answer to that question is no they have

15   not proven this case beyond a reasonable doubt.  And there are

16   really two reasons.

17        One, Mr. Baker thought what he was doing was lawful

18   defending the capitol against armed racists.  And, two,

19   objectively it was not a true threat.

20        Now, I'm going to explain that to you in a minute, but

21   it's important for you to understand there are really two

22   questions for you.  And I have to say I couldn't disagree with

23   Mr. Fields' representation of some of this any more than I do.

24   But, here are the two questions.

25        One is, did Mr. Baker intend this to be a true threat

1   or did he think others would see it as a true threat.  That's

2   the first one.  Did Mr. Baker intend this as a true threat or

3   did he think others would see it as a true threat.

4           But here is the second one, and it's one that

5   Mr. Fields missed all together.  Objectively, is this a true

6   threat.  Would a reasonable person see this as a true threat.

7           And I want to show this to you real quickly up here on

8   the document camera.  I heard Mr. Fields say, well, there's no

9   dispute about this first count, defendant sent a message in

10  interstate commerce containing a true threat to kidnap any

11  person or injure the person of another.  We're not debating that

12  according to Mr. McNeely and what matters is only what

13  Mr. Baker's subjective intent, what he intended, could not be

14  more wrong.

15          This first sentence that says that he in fact sent a

16  true threat.  Okay.  That's what's critical.  You have to ask

17  yourselves, regardless of what Mr. Baker thought, is this a true

18  threat?  If you have any question about that you can ask the

19  Judge.  There are two tests; one is subjective, what did

20  Mr. Baker think.  The other is objective, would a reasonable

21  person have seen this as a true threat.  All right.  So you've

22  got those two questions.

23          Now if you'll bear with me one second I am going to

24  switch the camera here.  And the question is, is it a true

25  threat.  And that's up there for you.  You saw it earlier.  And

225

1    the point is, it's a serious threat.  It's not a joke.  It's

2    something that the reasonable person would think was real.  A

3    reasonable person having read this Call to Arms would think

4    somebody was going to be kidnapped or injured.  And that's key

5    to this case.  So those are the two questions.

6            You know, if you think about it, we spent about

7    95 percent of this case on this subjective test.  What did

8    Mr. Baker think.  That's what it was all about.  I mean, I think

9    that the government's theory is, A, he's a dangerous person.  He

10   is aggressive.  He is violent.  He knows how to handle guns.

11   So, therefore, given that, these must have been true threats.

12   He's the kind of person that would pose a true threat.  That's

13   their claim.

14           On the other hand, what we said is, yes, he has posted

15   some pretty reckless, careless statements online and, yes, he

16   knows how to handle firearms, and, yes, he has been in combat,

17   but he's not a really violent person, he's not the kind of

18   person that would post a true threat.

19           So, and, you know, it's hard to figure out maybe what

20   another person intended.  It's probably even harder to decide

21   what Mr. Baker thought someone else might think if they saw the

22   posts.  So, these are not easy questions.  And, again, but the

23   approach here has been, hey, here is who Mr. Baker is, therefore

24   this must have been a true threat or maybe it wasn't, as we

25   contend.

1           So, what is the evidence?  Well, we spent a lot of

2    time talking about him being a member of the YPG.  You got the

3    closeup of a patch there at his house.  We had videos, we've got

4    pictures of him posing with some of his colleagues there in the

5    YPG.  I think if you could say anything about Mr. Baker's

6    participation in the YPG is, it was heroic.  That term hero gets

7    thrown around a lot these days, but it was heroic.  He went to

8    another country, paid for a trip over there, and risked his life

9    to fight ISIS.

10          I think everybody could agree ISIS is a terrible group

11   of people.  They are terrorists.  They are known for beheading

12   people.  It's a terrible group of people.  And that's what he

13   did.  And the United States Government thought it was enough of

14   a risk, that ISIS presented enough of a risk that we fought the

15   war against them as well.  We fought them from the air and

16   relied on people like Mr. Baker and the YPG to do the fighting

17   on the ground and take the casualties.

18          So I would suggest it's wrong.  I don't think it's a

19   black mark.  I don't think that means he's more likely to post a

20   threat.

21          Now, he did -- he does know how to handle firearms, no

22   question about that.  But his training is not any different than

23   any other individual that served in the Army.  I mean, he got

24   the basic.  He was a private.  He was in there for less than two

25   years.  He came out a private.  He did, he took two-weeks of

combat in Syria.  He fired a round in the training, what
amounted to firing about five rounds with the use of different
guns.  So you can say that about anybody that had military
training.  Does that make them more likely to pose a threat?  I
don't think so.  I don't think so.

          You know, I guess there might be some question of why
Mr. Baker did this.  Maybe he thought it was simply the right
thing to do.  Again, ISIS was a terrible group of people.  Maybe
he just thought he needed to prove himself.  You know, men have
been going to war for a long, long time thinking that that would
be a way for them to prove themselves.

          Maybe he's just acting out this military fantasy.  But
whatever the reason, I would suggest it doesn't tell you whether
or not he intended to pose a true threat.

          Now, I would suggest maybe the most important evidence
are these posts themselves.  You saw the posts.  And, you know,
I can't say I agree with Mr. Fields on most 0of this.  He posted
a picture of Homer Simpson which was a shot from a TV show and
this tells you all about Mr. Baker.  I don't think so.

          A lot of these were jokes.  A lot of these were
clearly over the top.  And he says this conversation with
Ms. Gattis was, must have been the real thing.  Well, Ms. Gattis
starts it off by saying her father owns a third of the firearms
in the state of Florida.  She told you it was a joke.  She was
just making that up.  Mr. Baker told you it was a joke.

1           Now, stuff like death to America, well, it sounds

2     terrible, but he says, no, this was the broadcast.  When we were

3     over there the Jihads started every broadcast with death to

4     America.  And he's just repeating this.  Shooting from the

5     rooftops, it's a meme, it's a play on a right wing meme is what

6     it is.  And, you know, they showed you all of these posts, but

7     they didn't show you the one about George Soros.  Because if

8     anyone shows -- if any post shows you how serious these things

9     are that was it, but they didn't want to show you that.  We had

10    to show it to you.

11          He didn't get money from George Soros.  George Soros

12    is the favorite target of right-wing conspiracy theorists.  He's

13    playing on their stereotypes.  So, yeah, there were some things

14    that were questionable, some things that were pretty stupid that

15    he should have never posted.  We can all agree on that.  But to

16    say this shows you that he's a dangerous individual who must

17    have intended a true threat I would suggest is simply stretching

18    things.  That's pretty farfetched.

19          And think about some of these other posts.  I wanted

20    to show you this.  We did this CNN article that we had up there.

21    You can see this right there.  That's the one I showed to you

22    earlier.  Let's see, I gotta show it.  There's the CNN article.

23    That's the one that talks about -- and this is the other side

24    posting these.  Trump or war today, that's simple.  If you don't

25    know how to shoot you need to learn now.  We will storm the

1  government buildings, kill cops, kill security guards, kill

2  federal employees and agents and demand a recount and so on and

3  so on and burning down Washington D.C.  Look, this was the

4  rhetoric of the day.  Did anybody really read those things and

5  think that they were going to burn down Washington D.C.  No.

6         Now, Mr. Baker took it all in.  He thought it was

7  probably real.  When you are measuring his comments think about

8  the rhetoric of the day.  It was inflamed.  It was all over the

9  top.  And, you know, one thing when he was interviewed by the

10  FBI agent, what did the FBI agent say?  You can't believe

11  everything you read on the Internet.

12         So you've got to discount this, A, because it's on the

13  Internet to begin with, and B, because this was the rhetoric of

14  the day.  So think about that if you're trying to figure out how

15  important these posts are.

16         What about, we got a shot of him shooting this

17  automatic rifle.  He's a tourist attraction at Disney World.

18  Does that tell you he's the kind of person that would post a

19  true threat?  I don't think so.  It just doesn't tell you much

20  of anything.

21         He's a trained sniper according to what he puts on his

22  posts.  We know that's not true.  He's a pretty good shot, but

23  he's not a trained sniper.  He talks about Jiu Jitsu in one post

24  and makes it look like he's a real threat because he's a blue

25  belt in Jiu Jitsu.  It's the next level up from beginners.  He's

1    not a master of martial arts.  He hasn't mastered the martial

2    arts.  He's at the lower level.

3           And maybe the biggest overstatement of all is in that

4    Call to Arms, the part that Mr. Fields never read to you.  He

5    liked to read the part about them encircling the capitol and

6    driving the armed racists, driving them away with every caliber.

7    He didn't read to you about the fact that Mr. Baker said he

8    recruited an Army of combat veterans.  Well, who was in that

9    Army of combat veterans?  Mr. Baker and his roommate.

10          So, if you want evidence that these things are

11   overstatements, it doesn't tell you a lot about Mr. Baker other

12   than he tends to exaggerate things and he's a real character.

13   All you have to do is look at the Call to Arms.

14          So that's part of it.  The other part of this is, oh,

15   he owns guns.  He does own guns.  And a lot of people in this

16   country think they need to own guns for one reason or another.

17   If I remember right, when President Obama was elected people

18   went out and bought a lot of guns.  When President Trump got

19   elected people went out and bought a lot of guns.  When

20   President Biden got elected people went out and bought a lot of

21   guns.  For whatever reason, and maybe some of you have a lot of

22   guns, but a lot of people think they need guns.  Does that mean

23   that these were true threats?  I'd suggest not.

24          But here is one thing I really want to stress, let's

25   see if I can find it for you.  Oh, before I do, we heard a lot

 1    about this AK-47 that he purchased.  He hasn't picked it up, but

 2    he ordered it from the pawn shop.  Oh, we heard about the hollow

 3    point bullets too.  Oh, gee, they are kind of lethal.  Well,

 4    Mr. Baker explained the hollow point bullets were the only ones

 5    he purchased.  There had been a big run on ammunition given all

 6    this insurrection at the capitol and so on and that's all he

 7    could buy.

 8         But, anyways, we heard a lot about this AK-47 he

 9    bought.  And I didn't count the number, but between the agent

10    and Mr. Fields I bet they talked about the -- they mentioned the

11    AK-47 about 10 times.  And an AK-47 is a terribly lethal weapon.

12    People use it in war.  And so, yeah, if he bought an AK-47 that

13    might be important.  But here is what they forgot or here's -- I

14    don't know if they forgot, but they didn't tell you.  Here is

15    the receipt.  If you read that what does it say?  A Rimfire

16    Replica, AK-47 22LR Rimfire Replica.  I hate to be too critical

17    of my colleagues, but I think this is emblematic of my friends

18    across the table here.  But I think this is emblematic of the

19    whole case.  There is not as much to it as they claim.

20         This wasn't an AK-47.  It was a 22 dressed up to look

21    like an AK-47.  And you would have never known that had I not

22    gotten up here and pointed that out.  You would have never known

23    it.  They wanted you to believe this was a real live AK-47

24    because they think that makes Mr. Baker look dangerous and,

25    there again, that fits into their theory that he must have

1    intended these threats.

2           So I couldn't pick a better point to show you it's not

3    as much to this case.  But, yes, he owned firearms.  Many people

4    own firearms.  He has a concealed weapons permit.  All of this

5    is lawful, by the way.  It doesn't tell you that he intended a

6    true threat.

7           Now, on the other side of things, we did present a

8    couple of witnesses that know him.  And they said, well, no,

9    he's really not a violent person.  He, I think one witness was a

10   little surprised when he saw the post.  Ms. Gattis wasn't

11   especially surprised.  What did she say?  He's a little dog with

12   a big bark.  Maybe that ought to be the theme of the case.

13   We've got a little dog with a big bark.  He's five-three,

14   130 pounds, talks tough, sounds aggressive to offset the size

15   disadvantage.

16          So, again, I would suggest that in these posts some of

17   this tough talk, some of this aggressive talk, does it really

18   tell you whether or not he intended a true threat?

19          Now, it is hard, as I said, to sometimes fathom what

20   somebody else intended.  He says, well, I was just trying to

21   inspire or encourage others to defend the capitol.  I didn't aim

22   this at anybody.  I didn't think of it as a threat.  I'm not

23   sure how much thought he put into this, to tell you the truth.

24          But it is hard to figure out what somebody intended.

25   There was this talk about why.  The agent said he said something

1    about trying to scare people.  And who knows, you know, he

2    probably said something like this.  It was after he had been --

3    they broke down his door and threw the flash bang grenade and

4    dragged him out and put him in handcuffs.  Said he had been

5    smoking marijuana as well.  So I don't know how much stock you

6    can put into that statement.

7              But here is what I think is really critical.  To be a

8    true threat, for him to believe it was a true threat he must

9    have believed what he was urging was unlawful.  To be a true

10   threat it has to be unlawful.

11             And what was his true threat?  He wanted to defend the

12   capitol.  We can argue about the tactics, was that the right way

13   to go about it to let the armed racists overrun the police and

14   encircle.  We can argue about whether those were the right

15   tactics.  And, of course, it was all fantasy.  But we can argue

16   about that.  But his goal was to defend the capitol.  And he

17   thought it was lawful.  Is that so farfetched?  People attack

18   the capitols?  He says he thinks citizens have the right to

19   defend the capitol.  Doesn't sound farfetched at all to me.

20             So, that's all the first question.  Okay.  That's the

21   first question.  What did he intend?  And, you know, some of

22   this might be a close call for you.  I don't doubt it.  But bear

23   in mind, it's not, you know, is it more likely or not.  It's

24   proof beyond a reasonable doubt.  I would suggest they have not

25   proven, they have not answered beyond a reasonable doubt, this

1    first question about his intent, what he intended.  And,

2    particularly so, if you think about the fact that he had to

3    think it was unlawful.  He thought it was lawful.  He thought he

4    was, in fact, I think if you look at this thing, he says we have

5    a duty to defend the capitol.  He thought what he was doing was

6    lawful.

7           So, for that reason, the answer to the first question

8    is no, they have not proven beyond a reasonable doubt that he

9    intended a true threat or that he thought others would see this

10   as a true threat.

11          But, you know, they've got to -- and that really,

12   that's the end of it.  If you answer no to either one of these

13   questions the verdict is not guilty.  But I would suggest, if

14   anything, maybe the answer to the second one is even clearer.

15   That's the objective test.  Would a reasonable person have seen

16   this as a true threat?  It's a serious threat.  Would they have

17   felt threatened, feel like they or somebody was going to get

18   kidnapped or injured.

19          Well, think about it.  It's all based on if, okay.  If

20   an armed group of racists show up at the capitol.  I heard, I

21   heard Mr. Fields say something about, well, he is not concerned

22   about armed racists, he's just talking about people that see the

23   world differently than he does.  That's not what the flier says

24   when he's talking about these armed racists.  So, it's based

25   upon if, if armed racists come to the capitol.  If they decide

1  to attack the capitol.  And if they overrun the police.  All

2  things that are very, very unlikely.

3          Now, you know, one of the things I'm sure Mr. Kunz

4  will be attempting to say when he gets up here is, well, what do

5  you mean this wasn't so unlikely.  Mr. Murrell read you those

6  quotes from the CNN and all of those comments by those right

7  wing radicals.  Of course, it wasn't so unlikely.

8          Well, remember, that was early on.  And, it may have

9  been compelling to Mr. Baker.  But Mr. Baker is a fellow that

10  believes that the FBI is infiltrated by white nationalists.  He

11  believes Chick-fil-A is funding some anti-gay efforts in Africa.

12          He was grateful that the FBI got him instead of some

13  other federal agency.  He has a unique view of things.  And I

14  would suggest it's not the view of the average person, probably

15  not the view of the reasonable person.

16          So, maybe Mr. Baker thought there was a real threat.

17  But the fact of the matter is, it's all pretty farfetched.  You

18  know, we did have the incident in Washington D.C. on January the

19  6th.  Nobody expected that.  And if I have it right, that was

20  the first time that happened since the War of 1812 when the

21  British burned down the nation capitol.  So, it's not something

22  that happens very often.  And I don't think the Florida Capitol

23  has ever been attacked.

24          So to begin with, it's all pretty farfetched.  But

25  it's based on some other events that are farfetched; an armed

1    racist mob showing up deciding to overrun the police and then

2    doing so.

3            Let me give you an example of what I'm talking about

4    here.  I have here a picture of Fidel Castro and some of his

5    colleagues.  If this thing had said, hey, help me defend the

6    capitol against armed Cuban communists would anybody have taken

7    that as a serious threat?  Nobody would have taken that as a

8    serious threat.  Now, this may not be quite in the same league,

9    but it's the same idea.  It's farfetched.  And it's particularly

10   farfetched if you consider some of the other evidence we

11   introduced.

12           You know, one of the things we introduced was an

13   exhibit from the Tampa Bay Times dated January 12, the very day,

14   the very day that Mr. Baker posted his Call to Arms.  And so

15   this is the reasonable person.  This is the news that's out

16   there.  And it says, yes, there's some threats.  But what it

17   says is, so far they say they are not, this is law enforcement,

18   they aren't aware of any credible threats directed toward

19   Tallahassee or elsewhere in the state.

20           So, what is the likelihood of armed racists showing up

21   and overrunning the police when nobody seems to know of any

22   particular threats against the capitol.  And that's not all.

23           So then the next day, next day, Tallahassee

24   Democrat -- now he posted one threat on the 12th, he posted the

25   next threat on the 14th.  So in between what are the headlines?

1    TPD Chief Revell, no specific threat against Tallahassee amid

2    warnings of violence.  So, sure enough, the officers had reason

3    to be on alert.  There was reason to be careful, but there were

4    no specific threats known to the capitol.  So you see it was all

5    pretty farfetched.  There was no reason to take this seriously.

6            But there is more.  There is more.  Did this group

7    even exist?  Well, if you read these articles from the paper law

8    enforcement didn't know of them.  As far as I know, nobody ever

9    took over the capitol or attacked the capitol.

10           So, what you have here is, you have a communication

11   that talks about things that are very unlikely to occur

12   involving a group that probably doesn't even exist.  Is anybody

13   going to take this as a serious threat?  No.  They are not.

14   Certainly a reasonable person is not.

15           So, the test here is that a proof beyond a reasonable

16   doubt.  And it's a tough standard.  The Judge is going to tell

17   you about it.  But essentially proof beyond a reasonable doubt

18   is evidence that is so convincing that you would rely without

19   hesitation, without hesitating in the most important of your

20   affairs.  Maybe deciding on surgery or maybe surgery for a child

21   or maybe buying a house or something expensive.  And you would

22   rely on it without hesitation.  So, it's a pretty tough

23   standard.  So ask yourselves, did Mr. Baker think what he was

24   doing was lawful.  Has the government proved that he thought

25   what he was doing was unlawful?  Have they proven that beyond a

1    reasonable doubt?

2           Have they proven beyond a reasonable doubt that

3    objectively this was a serious threat?  You know, a long time

4    ago we decided in this country that, I mean, it's not a good

5    thing to let guilty people go free.  I think we all recognize

6    that.  But a long time ago we decided there is something worse

7    than that.  And what's worse than that is convicting an innocent

8    person.  So that's why we have that tough standard.  That's why

9    I urge you to apply that tough standard.  And if you do, you

10   will see there is only one right verdict in this case, and it's

11   the one I urge you to bring back, and it's a verdict of not

12   guilty.  Thank you.

13          THE COURT:  Thank you, Mr. Murrell.  Ladies and

14   gentlemen, now the government has the opportunity for rebuttal

15   argument.  And we'll hear that now.

16          MR. KUNZ:  Thank you, Your Honor.

17          Ladies and gentlemen, so you can hear me better.

18   Counsel spent some time indicating that this can't be a true

19   threat because Mr. Baker is not really a dangerous individual.

20   You're not going to see any instruction in the law that says you

21   have to find a true threat is based on whether someone is a

22   dangerous individual or not.  It's the intent in filing of that

23   communication what they intended to be a threat or not.  And, or

24   has it been viewed as a threat by -- or would it be viewed by

25   reasonable people such as yourselves.

1              Despite all of the posts and all of the evidence in

2       this case it may well be, as counsel has conceded, that Mr.

3       Baker can be perceived as a dangerous person, but that's not an

4       element of the crime.  And the government is not saying you need

5       to find the threats here because he's a dangerous person.

6              All of these posts were put in to give you the

7       complete picture and see the training.  This is not somebody who

8       is in a basement of a house living with their mother or

9       grandmother, never going out, and is mad about something one day

10      and puts a post out there.  They don't have the means.  They

11      don't have the opportunity.  They don't have any ability or the

12      knowledge to mean what they say in a post.  That's not what this

13      case is like.

14             This case is a defendant who has a lot of training, a

15      lot of experience, a lot of hatred of a different ideology than

16      himself and continually posts items that, of course,

17      conveniently comes in and tells you, oh, these things were a

18      joke or this was a joke or this and that.

19             But what's -- counsel talked about, put the word if

20      up.  When you look at Exhibits 1A and 1 and 2 both of those

21      threats, the only word, the only if, the only if in the entire

22      thing is, you know, if you want to stay alive then stay home.

23      That's the only word, if.  There is no if up above, if they come

24      an attack the capitol, if the police don't do this, if this

25      doesn't happen, it's not a conditional threat.  The only word

1    if, again, in both of those posts is, if you want to stay alive

2    then don't come, stay home in bed.

3            You easily can find that this document, both of these

4    communications, these threats were threats because they

5    specified a Call to Arms to get together, what was going to be

6    done, how it was going to be done.  And as the Court has

7    instructed you, and you'll have the instructions, you need to

8    look at intent based on circumstance and what somebody does.

9    It's inferred by things that people do or not do sometimes.  We

10   draw inferences every day in all of our activities to see what

11   someone's intent is based on all of the facts and circumstances.

12   And in this case, you have plenty of information to indicate

13   what the defendant was doing and what his intent was.

14           We showed you videos about him fighting, having

15   knowledge of this stuff, training as a sniper, had the

16   inclination that he could do that.  Very proud of the fact that

17   he could kill people.  He wanted to do that, wanted to return.

18   Even admitted today on cross examination he wanted to go back to

19   Syria.  And in that video, take a look at that video where he's

20   firing that semi-automatic weapon, in both semi-automatic and

21   automatic phase.  He's videoed himself.  And then he posted that

22   YouTube video.  And at the end he's talking about going back to

23   Syria and killing, not only Jihads, but Turks.

24           He had means.  The evidence we brought in clearly

25   shows you that he had a means to carry out his threats and it's

1    more likely that he intended his message as threats.

2            In purchasing the Mauser, it was a replica.  Of

3    course, it's a replica.  And it's in the document that we put

4    in.  It's an AK-47 type weapon.  And even though it's a 22 he

5    himself in his own posts says it's deadly.  But now he's saying,

6    oh, maybe it's deadly for squirrels.  That's not what he said.

7            And conveniently, his testimony, you can consider the

8    credibility of the defendant, like any other witness.  His

9    statements, were they reasonable in light of the other evidence

10   that you have.  Did it conflict with individuals?  And you can

11   consider, and what counsel has stayed away from, the credibility

12   of Mr. Baker with respect to his statements that he's denied

13   making specific statements to the agents that the agents came in

14   and said he did.  He denied the agent from Erbil, FBI Agent who

15   is in Erbil, he denied saying he had any training.  You heard

16   her.  She said he did.  He was very proud of everything he did

17   with the YPG.

18           He denied making statements to Agent Marti and McNair

19   when they were transporting him to the FBI about he had done

20   these posts to scare people.  Of course, now he's telling you

21   that because he knows that's a problem for him because that

22   means he intended to scare folks with the posts that he did.

23           He cannot get by all of his posts where he's talking

24   about this is war, we're going to take up arms, we're going to

25   vote from the rooftops, all of these things.  Now today before

1    you in trying to explain this he says, oh, this is a joke.

2          And he also indicated, contrary to what obviously his

3    counsel wanted him to say, let me strike that.

4          Counsel for Mr. Baker, after I cross examined him and

5    he indicated that he, A, he first said he couldn't remember what

6    he told the agents.  And then next he went and said well, I

7    didn't say all of those things and they are making up things to

8    frame me for the case, to build a better case, or what have you.

9    Counsel on redirect tried to ask him about, okay, you may not

10   remember, and all of this other stuff.  But he remembered.  He

11   remembered.  He remembered enough to say that the agents weren't

12   telling you the truth.  And you can consider motivation to lie

13   and the motivation to make false statements.  And who has the

14   motivation here?  The agents that we brought in, you heard Agent

15   Marti here from Tallahassee.  Agent Biehn was from, she's

16   overseas in Victoria.  She had been over in Erbil.  There is no

17   relationship to these.

18          Agent Hill, from Tampa, you know, who goes to the

19   airport whenever there's issues there.  These people -- and

20   there is a TSA officer who came in and the defendant talked to

21   him about liking kills and stuff like that.  None of these

22   people, what, did they get together somehow and say, listen,

23   Baker is the one we got to -- the way to make sure we shape our

24   testimony.  That's ridiculous.

25          You can consider in detail, as we had indicated all of

1  these posts of how they fit in with everything.  If these posts

2  were not so significant to Mr. Baker why did he make another

3  YouTube video of printing those Call to Arms?  We put that in.

4  It's a very short one, if you remember.  Just a picture of a

5  printer printing the Call to Arms.  Well, he did that.  And he

6  was printing lots of copies of fliers.

7        Now, if he didn't intend to mean what he said why

8  would you plan on distributing them?  Why are you making copies

9  of this flier?  Why did you print the printer printing these

10  things unless this is a message you're sending saying, hey,

11  we're getting ready here, we're ready for folks coming down

12  here.  And these sort of protesters, armed protesters, whether

13  it be right-wing or anybody, I'm ready for you.  And that's what

14  he's doing.

15        Counsel has argued that there was no intent to commit

16  an unlawful act.  Clearly, there was here.  With respect to his

17  plan, it was not here, contrary to what he initially told you,

18  and I think he still maintained on cross examination that he was

19  there to help the police.  And he was just in a wait thing and

20  coming here to do medical assistance.  That's not what the Call

21  to Arms talked about.  And that's not what the situation was.

22  You need to take a look at everything.

23        And again, ladies and gentlemen, we'd ask you to use

24  your common sense.  We took a lot of time in jury selection

25  picking you all from all different types of walks of life and

1     different activities, what you do.  But what you all have in

2     common is you know how life is and how experiences are and you

3     have common sense.  We ask you to use that common sense in

4     evaluating the evidence and evaluating the threats that were

5     made here.  And it's our position and we respectfully ask you to

6     consider the evidence carefully and when you do return a guilty

7     verdict with respect to making the threats in this case.

8     Because they clearly, a reasonable person such as yourselves

9     would find that these were in fact true threats made to

10    intimidate this group that he was concerned and he was sure,

11    Mr. Baker was sure was coming down to Florida to attack the

12    state capitol.

13              Thank you, ladies and gentlemen, for your time.  And

14    we appreciate your service in this case.  Thank you.

15              THE COURT:  Thank you, Mr. Kunz.

16              I do now have some final instructions.

17              When you go to the jury room, chose one of your

18    members to act as foreperson.  And the foreperson will direct

19    your deliberations and speak for you in Court.

20              A verdict form has been prepared for you.  And it

21    looks like this.  And it will come back with you.

22              When you have all agreed on the verdict, your

23    foreperson must fill in the form, sign it, date it, and carry

24    it.  Then you'll return to the courtroom.

25              If you wish to communicate with me at any time, please

 1   write down your message.  We'll have some forms for you to write

 2   those, any questions on.  That will be sent back with you as

 3   well.  Write down your question or message and give it to the

 4   deputy clerk or a court security officer.  That person will

 5   bring it to me.  I will respond as promptly as I can, either in

 6   writing or by talking to you in the courtroom.  I do caution you

 7   not to tell me how many jurors have voted one way or the other

 8   at any time in those communications.

 9          Before you go back to retire, I will tell you why, as

10   I indicated at the outset, we have 12 jurors and one alternate.

11   Miss Milburn, you are the alternate.  And so you will not be

12   beginning the deliberations with the others.  I'll have some

13   additional instructions for you after they go back and begin.

14          Ms. Milburn, do you have any things in the jury room?

15          JUROR:  Yes, I do.

16          THE COURT:  Would you mind going back and just

17   gathering those and then come in back here so that you can leave

18   the room when the others go to the jury room?  Would that be all

19   right?

20          A JUROR:  Certainly.

21          THE COURT:  If you could just do that now.  Thank you,

22   Ms. Milburn.

23          Anything further before the jurors go back to

24   deliberate, Mr. Murrell?

25          MR. MURRELL:  Not from the defense.  No, sir.

1          THE COURT:  Mr. Kunz?

2          MR. KUNZ:  No, sir.

3          THE COURT:  Ladies and gentlemen, other than Ms.

4   Milburn, now you will gather your things, please.  Now you may

5   take your notepads.  And I told you all along not to discuss

6   anything until you begin your deliberations.  You'll now begin

7   your deliberations.  I'll have some more information for you in

8   a little bit.  But we'll all now stand as the jury leaves and

9   begins its deliberations.

10        (Jury out at 4:27.)

11          THE COURT:  Please have a seat.  Ms. Milburn,

12  obviously we have alternates in case we need them.  And I

13  certainly appreciate your diligence and your participation in

14  this case.  Sometimes people are relieved to find out they are

15  alternates, sometimes they are disappointed.  I don't want you

16  to tell me which is the case with you.  But I will say this,

17  there are instances where a juror who has begun deliberations

18  can't continue.  And so it is possible that we would still need

19  you.  And so until the case is over I would ask for you not

20  to -- same instructions as before, don't talk to anyone about

21  the case, don't view any news reports, don't seek out any news

22  reports, no investigation or things like that.  And if Ms. Stark

23  has your contact information -- do you have that, Ms. Stark?

24          THE COURTROOM DEPUTY:  Yes, I do.

25          THE COURT:  She will call you and let you know whether

1    we need you or if the case is over.  And then you'll be released

2    from all those.

3           But, again, thank you very much for being here and you

4    can gather your things.  Thank you.  Please leave your pad here.

5           THE COURTROOM DEPUTY:  Thank you.

6           THE COURT:  Everyone can have a seat.

7           What I would like you all to do when we finish here in

8    a minute is look at all the exhibits, make sure everyone is in

9    agreement about what's in and what's not.  And the paper

10   exhibits can go back.  The verdict form, Ms. Stark you have the

11   verdict form, correct?

12          THE COURTROOM DEPUTY:  Yes, sir.

13          THE COURT:  We'll send back about four copies of the

14   jury instructions that I have here.  My thought was around 5:30

15   I would send a -- if they are still deliberating -- send a

16   letter saying they can stay or leave and begin tomorrow.  And to

17   just let us know either way.  And that we'll provide dinner.  I

18   have a letter I've used in other cases that I was looking for

19   here.  I can find it and read it into the record.  If anyone has

20   any other suggestions or thoughts I'll hear them.

21          And then my thought too was with the actual weapons

22   that are in evidence we'd wait and see if anyone asks for those.

23   But, obviously, they can't go back with the ammunition and so

24   forth.

25          But any objection to leaving those out here unless

1    they are requested?

2              MR. KUNZ:  No, sir.

3              THE COURT:  Okay.  So it will be just the paper

4    exhibits then and the videos.

5              Yeah.  You can start looking at the exhibits.  And

6    I'll get this letter together.  I'm sorry.  And then here, you

7    have the verdict form?

8              THE COURTROOM DEPUTY:  I have the verdict form.  Do

9    you have extra copies of the jury instructions?

10             MR. MURRELL:  Looks like they are all good, Judge.

11             THE COURT:  We had talked earlier about redacting the

12   indictment and said that there didn't need to be any redactions.

13   There is a forfeiture provision in there.  Do you want to redact

14   that?  We probably should.

15             MR. MURRELL:  I suppose we should.  Yes, Your Honor.

16             MR. KUNZ:  I think we should, Judge.

17             THE COURT:  Can you do that, Ms. Stark?

18             THE COURTROOM DEPUTY:  Uh-huh.

19             THE COURT:  Thank you for catching that.

20             Counsel, if you step up I would show you this letter I

21   would send and see if you have any objections to it.  I can just

22   hand it down.  Take a look at these letters.  And if there is

23   a -- is there going to be a request for a jury determination on

24   the forfeiture if there is a conviction, Mr. Murrell?

25             MR. MURRELL:  I'm sorry?

1            THE COURT:  Is there going to be a request for a jury

2  determination on the forfeiture if there is a guilty verdict?

3            MR. MURRELL:  We'll ask the jury -- will we poll the

4  jury?

5            THE COURT:  No, on the forfeiture.

6            MR. MURRELL:  Oh, I'm sorry.  If there is a guilty

7  verdict I think I may.

8            MR. KUNZ:  Judge, I think if that does happen we have

9  to have -- counsel will probably waive a jury and let the Court

10 decide.

11           THE COURT:  You will do that?

12           MR. MURRELL:  That would be agreeable, yes.

13           THE COURT:  Okay.  Thank you.

14           MR. MURRELL:  I think the letter is just fine.

15           MR. KUNZ:  Fine with us too, Judge.

16           THE COURT:  All right.  And then if you'll look at

17 this while you are there, the redacted indictment here.

18           MR. KUNZ:  Looks good, sir.  We both agree that's

19 fine.

20           THE COURT:  All right.  So the redacted indictment is

21 ready.  We have a verdict form.  The jury instructions.  The

22 exhibits are all ready.  And then that letter that I showed you

23 I'll send back about 5:30.  So you can all stay or leave.

24           MR. KUNZ:  Okay, sir.

25           THE COURT:  Okay.

```
 1              MR. KUNZ:  Judge, what would you like us to do with

 2    the firearms?

 3              THE COURT:  The courtroom will be secure.  Yes, sir.

 4              MR. KUNZ:  I didn't know if we want to make some

 5    arrangement.

 6              THE COURTROOM DEPUTY:  Not right now.  In case they

 7    need it.  And I will need phone numbers.

 8              THE COURT:  Okay.  I'm going to step out.  We'll take

 9    a recess.  But y'all are welcome to stay here and I will let you

10    know if we hear anything further.

11         (Recess taken 4:42.)

12         (The Jury will resume deliberations on the morning of

13    5/6/2021 and proceedings concluded at 5:32 on Wednesday, May 5,

14    2021.)

15                        * * * * * * * *

16              I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
17    Any redaction of personal data identifiers pursuant to the
      Judicial Conference Policy on Privacy are noted within the
18    transcript.

19    /s/ Lisa C. Snyder                 11/23/2021

20    Lisa C. Snyder, RPR, CRR           Date
      Official U.S Court Reporter
21                         I N D E X

22    GOVERNMENT'S WITNESSES                      PAGE

23    DANIEL MCNAIR
      Direct Examination By Mr. Kunz               18
24    Cross-Examination By Mr. Murrell             35
      Redirect Examination By Mr. Kunz             38

25
```

## **E X H I B I T S**

| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 31A-31K Photographs | 21 | 21 |
| 32A-32B Handgun and ammunition | 26 | |
| 33A-33B Shotgun and ammunition | 27 | 27 |
| 34      Emails | 29 | 29 |
| 35A-35C Photograph, firearm and purchase order | 32 | 32 |
| 36      Rifle | 34 | 34 |
| 32A-32B | | 26 |


| DEFENDANT'S WITNESSES | PAGE |
|---|---|
| KASSANDRA PEREZ | |
| Direct Examination By Mr. Murrell | 63 |
| Cross-Examination By Mr. Fields | 67 |
| DESIREE GATTIS | |
| Direct Examination By Ms. Vallejo | 68 |
| Cross-Examination By Mr. Fields | 77 |
| PAUL ARNOLD | |
| Direct Examination By Ms. Vallejo | 82 |
| Cross-Examination By Mr. Fields | 88 |
| DANIEL BAKER | |
| Direct Examination By Mr. Murrell | 98 |
| Cont. Direct Examination By Mr. Murrell | 147 |
| Cross-Examination By Mr. Kunz | 176 |
| Redirect Examination By Mr. Murrell | 198 |


| DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| A      Transcript | 202 | 202 |
| 1      Tallahassee Democrat news article | 65 | 65 |

| DEFENDANT'S EXHIBITS | | OFFERED | RECEIVED |
|---|---|---|---|
| 2 | Tampa Bay news article | 64 | 64 |
| 3 | Video | 131 | 131 |
| 4 | News article | 169 | 169 |
| 5 | Article | 156 | 156 |

| OTHER RECORD MADE | PAGE |
|---|---|
| Jury Instructions Read By the Court | 204 |
| Closing Argument By Mr. Fields | 213 |
| Closing Argument By Mr. Murrell | 223 |
| Rebuttal Closing Argument By  Mr. Kunz | 238 |
| Final Jury Instructions Read by the Court | 244 |