1

2                 **UNITED STATES DISTRICT COURT**
                  **NORTHERN DISTRICT OF FLORIDA**
3                    **TALLAHASSEE DIVISION**

4                                  )
     UNITED STATES OF AMERICA,     )
5                                  )
                   Plaintiff,      ) Case No: 4:21cr10
6                                  )
             v.                    ) Tallahassee, Florida
7                                  ) October 12, 2021
     DANIEL ALAN BAKER,            )
8                                  ) 1:04 PM
                   Defendant.      )
9    _____)

10              **TRANSCRIPT OF SENTENCING HEARING**
              **BEFORE THE HONORABLE ALLEN C. WINSOR**
11               **UNITED STATES DISTRICT JUDGE**
                    **(Pages 1 through 69)**

12
     APPEARANCES:
13

14   For the Plaintiff:      United States Attorney's Office
                             By:  STEPHEN M KUNZ
15                                LAZARO FIELDS
                                  Asst. U.S. Attorneys
16                                Stephen.Kunz@usdoj.gov
                                  Lazaro.Fields@usdoj.gov
17                           111 N. Adams Street, Fourth Floor
                             Tallahassee, Florida 32301
18
     For the Defendant:     Federal Public Defender
19                          By:  RANDALL MURRELL
                                 ELIZABETH VALLEJO
20                               Attorneys at Law
                                 randolph_murrell@fd.org
21                               elizabeth_vallejo@fd.org
                            227 N Bronough Street, Suite 4200
22                          Tallahassee, Florida 32301

23                    ***LISA C. SNYDER, RPR, CRR***
               **Official United States Court Reporter**
24         **111 North Adams Street, Tallahassee, FL 32301**
               **(850)567-1374 * lisasnydercr@gmail.com**

25

|   |   |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Call to Order of the Court at 1:04 PM on Tuesday, October |
| 3 | 12, 2021.) |
| 4 | THE COURT:  Have a seat, please. |
| 5 | We are here for the sentencing in United States versus |
| 6 | Daniel Baker.  It's 4:21cr10. |
| 7 | Mr. Murrell and Ms. Vallejo are here on behalf of |
| 8 | Mr. Baker, who is also here.  Good afternoon to all of you. |
| 9 | For the government we have Mr. Kunz and Mr. Fields. |
| 10 | Is everybody ready to begin? |
| 11 | MR. FIELDS:  Yes, Your Honor. |
| 12 | MR. MURRELL:  Yes, sir; we're ready. |
| 13 | THE COURT:  Mr. Baker, let me start by asking you if |
| 14 | you had a chance to review the presentence investigation report |
| 15 | and the addendum that went with it? |
| 16 | THE DEFENDANT:  Yes, Your Honor. |
| 17 | THE COURT:  Have you gone through those with Mr. |
| 18 | Murrell? |
| 19 | THE DEFENDANT:  Yes. |
| 20 | THE COURT:  Was he able to answer any questions you |
| 21 | had about them? |
| 22 | THE DEFENDANT:  Yes, Your Honor. |
| 23 | THE COURT:  You do, Mr. Baker, have the right of |
| 24 | allocution.  That means you have the right to address me |
| 25 | directly, and say what you'd like in mitigation of your |

1    sentence.  You don't have to do that, but will have that

2    opportunity a little bit later in the hearing.  Okay.

3           Let's talk a little bit about logistics.  We have a

4    lot to cover.  I don't know if there is going to be evidence

5    presented on either side.

6           I will start with you, Mr. Kunz.

7           MR. KUNZ:  Judge, we -- I spoke to Mr. Murrell and we

8    don't need to put a witness on with respect to the number of

9    posts that were made.  He indicated he is not challenging the

10   number of posts.

11          THE COURT:  Okay.

12          MR. KUNZ:  So having said that, Judge, we have no

13   witnesses to present.

14          THE COURT:  Mr. Murrell?

15          MR. MURRELL:  Mr. Kunz is right about that.  I do have

16   one witness I would like to call.

17          THE COURT:  Okay.  Let's do this.  Let's go through --

18   we have a couple different issues.  I want to start with the

19   forfeiture.

20          Ordinarily, we would have a separate hearing on that,

21   if it's contested, which it is.  I thought it would be more

22   efficient, especially since we have had to postpone this one, to

23   talk about this at the same time.

24          You have asserted two different bases for the

25   forfeiture, Mr. Kunz.  The first one doesn't seem to work for

1    you because it's limited to proceeds, and these aren't proceeds

2    of anything.  Do you have any additional argument on the first

3    basis?

4            MR. KUNZ:  Mr. Fields would argue that, if that's okay

5    with Your Honor.

6            THE COURT:  Yes, sir.  That will be fine.

7            MR. FIELDS:  Your Honor, good afternoon.

8            THE COURT:  Yes, sir.

9            MR. FIELDS:  As to the first argument with regard to

10   proceeds, I think -- you know, the government's motion outlined

11   the way the proceeds are defined, and there is two ways to

12   define proceeds under the statute:  First, property of any kind

13   obtained directly or indirectly as a result of a commission of

14   the offense.  And second, any property traceable thereto.

15           The government's position, with regard to obtain

16   directly or indirectly, specifically the rifle that was

17   purchased, and the Court heard trial testimony about that rifle,

18   the government's argument is that that was purchased directly as

19   a result of the commission of the offense, the threat that

20   was -- ultimately was consummated.

21           THE COURT:  You are saying it has to be traceable to

22   the -- your brief does blend, I think, some language from a case

23   that's talking about two different statutes.  But at the end of

24   the day, these aren't proceeds of the offense; correct?

25           Your argument, as I took it, is that it is traceable

1    to the offense, but I think it has to be traceable to the

2    proceeds; in other words, if you rob a bank, you run out with

3    money, those are your proceeds.  If you use those proceeds to

4    buy something else, that something else is traceable to those

5    proceeds; right?

6            MR. FIELDS:  Certainly.  Although, I do think that

7    that also could be encompassed within the first part of that

8    statute.  Obtain directly or indirectly, I guess --

9            THE COURT:  As a result of?

10           MR. FIELDS:  Right, as a result of the commission of

11   the offense, but I think the traceable part of that statute

12   broadens it, and that case that I noted, Your Honor, discusses

13   that somewhat.

14           THE COURT:  But that's doing it in the context of two

15   different statutes, one of which doesn't apply here.

16           MR. FIELDS:  Yes, Your Honor.

17           That's the government's argument as to Section 981.

18           THE COURT:  Any response on that?  I know you filed a

19   response, Mr. Murrell; I have looked at that.

20           MR. MURRELL:  Yes, sir.  Common sense of the language,

21   the firearms were not proceeds.

22           THE COURT:  As to the 981, the Motion for Forfeiture

23   is denied.  I don't think it fits within the text of this

24   statute, for the reasons I talked about, and in Mr. Murrell's

25   response.  It's not proceeds and it's not traceable to proceeds.

1          The second statute does appear, the text of it, to

2    apply.

3          Mr. Murrell, you have not asserted any sort of --

4    rebutted the argument that it wasn't charged in the indictment.

5    That's not an argument you are making, Mr. Murrell, or is it?

6    On the 3665?

7          MR. MURRELL:  No, sir.  That's not part of my

8    argument.

9          THE COURT:  What's the -- is the argument on 3665 just

10   that it's -- I should exercise discretion not to do it?  I mean,

11   you agree it fits within the statute; right?

12         MR. MURRELL:  No.  The question is, did he use these

13   firearms to commit the offense.  And he didn't.  The offense was

14   posting this Call to Arms.  He didn't use a firearm to do that.

15   I mean --

16         THE COURT:  I agree with you about that, but the

17   statute has a couple different categories; one of them is any

18   offense perpetrated by the use of firearms, but then another

19   category, as I read the statute, is any felony in violation of

20   the law of the United States involving the use of threats,

21   force, or violence.

22         MR. MURRELL:  I think you have to read that -- I think

23   firearms applies to the whole sentence.  A felony in

24   violation -- any law of the United States involving the use of

25   threats, force, or violence perpetrated.

1          THE COURT:  No.  Or perpetrated.  You skipped over the

2  second "or" there.

3          MR. MURRELL:  Felony in violation of any law of the

4  United States involving the use of threats, force, or

5  violence -- I have got "perpetrated in whole or in part by the

6  use of firearms."

7          THE COURT:  The statute says, threats, force, or

8  violence, or perpetrated in whole or part."

9          MR. MURRELL:  Or perpetrated.  If there is an "or" in

10 there I didn't get it in my memo.

11          THE COURT:  Well, that's how I understood the argument

12 to be limited to that.  I am looking at the version I look at.

13 Do you have an "or" in yours as well?

14          MR. FIELDS:  Yes, Your Honor.

15          THE COURT:  You are not, Mr. Fields, arguing that it

16 was perpetrated by the use of firearms.  I guess you do make

17 that argument, but I take it your position is it doesn't have to

18 be -- the crime doesn't have to be perpetrated by the use of

19 firearms if it is a violation involving the use of threats?

20          MR. FIELDS:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. MURRELL:  So just to make sure I have got this,

23 and again I am --

24          THE COURT:  Yes, sir.  Take your time.

25          MR. MURRELL:  I am looking at my memo.  If I

1  understand the Court correctly, the statute says, "A felony in

2  violation of any law of the United States involving the use of

3  threats, force, or violence, or perpetrated in whole or in part

4  by the use of firearms."

5          THE COURT:  Yes, sir.

6          MR. MURRELL:  Okay.  Well, certainly it was not -- the

7  offense did not involve force or violence.  And I guess the

8  question then would be whether the offense involved threats, and

9  again our position all along has been that this was not a

10  threat.

11          I assume that this would have to be a true threat,

12  just as the crime itself.  Of course, the jury found it was.

13          But the other thing is -- that would be my position

14  that this crime was not perpetrated through the use of force or

15  violence or threats for that matter.

16          THE COURT:  The whole conviction is that he made a

17  threat.  I don't see, in light of the jury's verdict, how I

18  could conclude that this is not a violation of the law involving

19  the use of threats.

20          MR. MURRELL:  Yes, sir.  That was the jury's verdict.

21  Of course, the other thing was whether or not the firearm was in

22  the defendant's immediate --

23          THE COURT:  As to one of them, yeah.  I think you have

24  a strong argument as to the .22 rifle that was --

25          MR. MURRELL:  Right.  That would leave the shotgun and

1    pistol based on the Court's reading of the statute and

2    interpretation of the evidence.

3                THE COURT:  Okay.  Any argument, Mr. Kunz, on the .22,

4    the AK-style rifle?

5                MR. FIELDS:  Your Honor, just the standard

6    constructive possession that the Court -- I cited the Eleventh

7    Circuit law and footnote two.

8                THE COURT:  Yeah.  But, isn't the statute talking

9    about things that are in their immediate control?  By that

10   logic, if someone had a whole collection that was a thousand

11   miles from them when they were arrested, it would be seizable;

12   right?

13               MR. FIELDS:  I suppose that would be a tougher case

14   for the government.

15               THE COURT:  It would be the same case, under that

16   interpretation.  That person would have constructive possession.

17               MR. FIELDS:  Perhaps, Your Honor.

18               The language in the statute says "possession or

19   immediate control" so it doesn't say immediate possession or

20   immediate control.  I think the fact that Mr. Baker ordered this

21   firearm -- the only person who could have picked up the firearm

22   would be Mr. Baker himself from the local pawn shop; that

23   satisfies the constructive possession aspect of the statute.

24               THE COURT:  But, again, that would be true of a gun

25   collection a thousand miles away; right?

1          MR. FIELDS:  Yes, Your Honor.

2          THE COURT:  Okay.  Under 981, I have already said they

3  are not forfeitable.  Under 3645 they are, with the exception of

4  the .22 rifle that was not in the apartment, so that -- the

5  motion will be granted as to the remaining guns that were in the

6  immediate possession in the apartment.

7          Is there clarity in the motion about what that is?

8  Was there ammunition as well?

9          MR. KUNZ:  Yes, sir.

10         THE COURT:  I mean, the subject of the motion?

11         MR. FIELDS:  The ammunition was only found in the

12  apartment, Your Honor.  The .22 rifle was on its own.  There was

13  no ammunition --

14         THE COURT:  The motion does not address -- well, the

15  motion addresses 13 rounds of nine millimeter.  Where was that?

16         MR. FIELDS:  In the apartment, Your Honor.

17         THE COURT:  Not right around him?

18         MR. FIELDS:  Yes.  It was loaded.  Firearms were --

19         THE COURT:  Okay.  So same as the 1.12 gauge shotgun

20  shells.

21         So, the ruling about the immediate control, that would

22  only affect, Mr. Murrell, what's letter E in the motion?

23         MR. MURRELL:  Yes, sir.  That would seem to be the

24  case.

25         THE COURT:  Okay.  So A through D will be forfeited.

1   That will be part of this judgment.

2          What I will do, I will do what would be a standard

3   preliminary forfeiture order before the written judgment goes in

4   and it will note that it has already become final as to this

5   defendant.  So, that resolves the forfeiture.

6          I should have said at the beginning, I wanted to note

7   for the record what I have reviewed:  I have reviewed the

8   objections from both sides and the government's reply.

9          I did review your sentencing memorandum, Mr. Murrell,

10  that you submitted.

11         I got the government's motion for a variance.

12         You have delivered two sets of letters; I got both of

13  those, Mr. Murrell.  There was some overlap there, but I got all

14  of them.

15         Some other letters that came in the mail that

16  probation I think has provided to you all.

17         And then the motion for the obstruction of justice

18  enhancement.

19         The government's motion for a variance and the

20  government's motion for a forfeiture that we just talked about.

21         Is there anything else I should have seen or that you

22  know of, Mr. Murrell?

23         MR. MURRELL:  You saw my responses to the government's

24  motion for --

25         THE COURT:  Not as to the variance, but I did see your

```
 1   response to the --

 2           MR. MURRELL:  Right.

 3           THE COURT:  Well, the ones for the forfeiture I

 4   reviewed that.  And we talked about that.  And the obstruction

 5   of justice, I did see the response as well.

 6           Anything else?

 7           MR. MURRELL:  No, sir.

 8           THE COURT:  Mr. Kunz, anything from your side?

 9           MR. KUNZ:  No, sir.

10           THE COURT:  Any objection to the supervised release

11   proposed conditions, Mr. Murrell?

12           MR. MURRELL:  No, sir.

13           THE COURT:  Next I want to talk about the obstruction

14   of justice issue in 3C1.1.  You have raised that in two places:

15   one, in the motion, Mr. Kunz, and then also in your objection to

16   the PSR.  There you had four items, in the motion you have

17   three; are you abandoning the one or --

18           MR. KUNZ:  Your Honor, we did the three based on our

19   motion for the application of obstruction.

20           As for the motion for upward variance, there is a lot

21   of factors that you can consider under 3553, which we thought

22   was relevant to the upward variance, Judge, that there is an

23   overlap, Your Honor, but the basis for our motion for

24   application of the obstruction is essentially the same bases

25   that we put in our motion.
```

1          THE COURT:  Okay.  Mr. Murrell, I did read your

2    response.  I want to give you a chance to respond.  I think the

3    strongest of the three points is the testimony about the intent

4    the day of, and the ambulance, and things like that.

5          I do think that's --

6          MR. MURRELL:  I'm sorry.  The strongest point is?

7          THE COURT:  Of the three is the point about the

8    ambulance.  That gets raised as -- I forget which sequence they

9    raised them in here.

10          MR. MURRELL:  About when -- his arrest?  Is that --

11          THE COURT:  I guess it's encompassed in the second

12    one, the Call to Arms.

13          MR. KUNZ:  The second one.  Page six of our motion.

14          THE COURT:  It's specifically the testimony that his

15    intent was just to -- his plan was to drive around in circles

16    and provide sort of an ambulance service to any injured people.

17          I think of the three -- and, of course, I think one

18    would be sufficient, but of the three I think that's the

19    government's most strongest footing.

20          I wonder if you have any additional response to that?

21          MR. MURRELL:  I did want the Court to know I did have

22    testimony regarding what he -- what happened on the day of the

23    arrest, if that's an issue for the Court.

24          THE COURT:  Well, I think it may or may not be.  I

25    guess, we will address this one first, and then --

1          MR. MURRELL:  Well, I mean --

2          THE COURT:  But the day of the arrest, you mean the

3    disagreement about whether he said, You can come in.  I mean,

4    there is a lot of agreement -- I went back and did review his

5    testimony and there is a lot of agreement about what happened

6    that day.

7          MR. MURRELL:  Yes, sir.

8          THE COURT:  He is not saying he opened the door.  He

9    is not saying he welcomed them in.  The government's position

10   is, as I understand it, he was dishonest when he testified that

11   he shouted, "back off and I will let you in" or something like

12   that.

13         MR. MURRELL:  Right.  That's what -- I mean, I have

14   his landlord was there, Ms. Matthews, and she can talk about how

15   the FBI knocked on the door.  How quickly they broke into the

16   apartment.  If that's an issue, I am prepared to present her

17   testimony.

18         THE COURT:  Okay.  It would not be an issue if I were

19   to find in the government's favor on this other issue where I am

20   saying they have the strongest position of the three.

21         MR. MURRELL:  Well, I understand it -- as I understood

22   the government's memo it was primarily that he testified falsely

23   when he said his -- he was not really trying to scare anyone.

24   He was simply trying to encourage others to come and defend the

25   Capitol.  That's what I thought was the thrust of it.

1          He went on to say that, Yes, he had only recruited his

2    roommate.  And that there was only the two of them.  And he

3    thought that if worst came to worst that's what he would end up

4    doing, driving around and helping others that might have been

5    injured.

6          Again, there is certainly no evidence that that was

7    not his intention.  The evidence is he hadn't recruited anybody.

8    And I think it's entirely consistent with the evidence that was

9    presented.

10          I mean, they can speculate as to what would have

11    happened if people had shown up, and if there had been a riot

12    and if they had overrun the police, but that's awfully

13    speculative.  And I don't think there is any evidence that he

14    had any intent of doing anything otherwise.

15          THE COURT:  Any evidence of doing other than doing an

16    ambulance service?

17          MR. MURRELL:  Well, if all this came to pass, if it

18    was just he and his roommate, and the rioters had overrun the

19    police, I think he was saying, If that's what happened that's

20    what I would end up doing.

21          THE COURT:  Okay.  Mr. Kunz or Mr. Fields?

22          MR. KUNZ:  Your Honor, we would respectfully disagree

23    with counsel's assertion.  It's clear that he was telling a

24    story to the jury with respect to the circumstances surrounding

25    his posts.  And, in fact, Judge, he indicated that he would

1    not -- he was going to sit back and wait until the protesters,

2    counter-protesters attacked law enforcement, and then he'd hang

3    back and wait and see how things played out and help wounded

4    people.  And the evidence is to the contrary, Judge.

5          In fact, his own Call to Arms contradicts this.  He

6    made the statement he wasn't going to engage anything until the

7    National Guard was defeated and asked for help.  And Defend

8    Tallahassee, he indicated clearly in that post, that the cops

9    won't protect us because the cops and the klan go hand and in

10   hand.

11         It's clear, Judge, that what he was trying to tell the

12   jury was:  I really didn't mean this.  I meant that.

13         Our position, Judge, is he was making false statements

14   to the jury, and a story, in an effort to get him acquitted with

15   respect to this, Judge, and that's a basis for you to make a

16   finding that he lied with respect to that, at least that second

17   area that we have raised as a basis for obstruction.

18         You have heard all of the testimony, Judge, and all of

19   the circumstances.  We would submit that obstruction is

20   appropriate for his testimony as to the second -- our second

21   argument concerning the Call to Arms and his explanation for it.

22         MR. MURRELL:  You know, I was there, too.  I mean, he

23   said he was prepared to defend the Capitol.  He said that if it

24   came to that, he would do it.  I think what he was explaining

25   was that, Hey, if nobody showed up, if it was just he and his

1    roommate, all he would do is drive around and see if he could

2    help.

3              I mean, I don't think he was saying, I didn't intend

4    to defend the Capitol.  I wasn't serious about this defending

5    the Capitol.  But I think he was explaining that if none of this

6    came to pass, if it was just he and his roommate, that's all he

7    was going to do.

8              I don't think that's inconsistent with any of the

9    other -- and, again, he certainly said, I was prepared to defend

10   the Capitol.  He said he thought the threat might be real.

11             THE COURT:  Okay.  I do find as to that aspect of

12   things that he willfully testified untruthfully, so I am going

13   to apply the plus two.

14             Here is the situation:  The testimony was that if

15   there was violence there, he was going to hang back and try to

16   help people using this ambulance setup that he was doing with

17   the roommate.  I do find that that's not true.  I do find it was

18   done -- you've made some arguments in the memo, Mr. Murrell,

19   about materiality.  I disagree with you about the materiality of

20   all of these things.  The intent, and what the actual plan was,

21   I think was material to whether it was a true threat, which was

22   the defense was it wasn't.  And so I do think the testimony

23   there given, specifically on pages 70 to 72 or 73 of the --

24   largely on 71 of the transcript -- meet the standard and provide

25   a justification for obstruction of justice enhancement.

1           As for the other two bases that the government
2    asserts: the Tampa situation with the FBI agent, I do think it's
3    plausible that he was lying about that, too, on the stand.  But
4    I also find it's plausible that he wasn't.  I do think there was
5    some -- had been some time that has passed, and it wasn't
6    crystal clear what the FBI agent said he said.  And it wasn't
7    clear what he was denying.  And so I think that's one where
8    it's, you know -- I don't want to say a 50-50 proposition, but I
9    can't find it's more likely than not that he was lying about
10   that.
11          Then similarly, as to the specifics about how the
12   arrest unfolded, I make a similar finding that that was not
13   sufficient to justify the enhancement, largely for the reasons
14   you said.  Not on materiality; I do think it was material, but
15   there is a lot going on at that moment and it's plausible that
16   he was being untruthful.  It's plausible that he was being
17   truthful.  The government has the burden on that one and I find
18   they haven't met it, as to that aspect of things.  Overall I
19   find the plus two is appropriate for the obstruction for the
20   reasons I stated, so that's the obstruction.
21          We have the more than two threats.  I understand that
22   you would agree there were multiple things said.  I didn't know
23   if that left you with a legal argument or if -- I know your
24   objection was based on sort of a different set of facts, Mr.
25   Murrell, that we ended up with, but do you still have an

1  objection to that?

2          MR. MURRELL:  Yes, sir.

3          THE COURT:  It's a legal objection, too.

4          MR. MURRELL:  Yes, sir.  The facts are not in dispute.

5          THE COURT:  The facts are that he -- I saw somewhere

6  in the record, and maybe there was testimony, there were 87

7  printed flyers and then there were 87 electronic transmissions.

8  Is that just a coincidence, or do I have the number of flyers

9  wrong?

10         MR. MURRELL:  I will defer to Mr. Kunz on that.

11         MR. KUNZ:  There were not 87 printed flyers.

12         THE COURT:  There were some printed flyers?

13         MR. KUNZ:  There were some printed, but not 87.  The

14 87 we mentioned, asking for this enhancement, is actually the --

15         THE COURT:  I know that -- I didn't know if it was

16 both.  You are saying there were 87 separate transmissions,

17 counting so many on this media platform, and so many on this

18 other one, and they total 87.

19         MR. KUNZ:  Right.

20         THE COURT:  And you don't disagree with that as a

21 factual matter, Mr. Murrell?

22         MR. MURRELL:  No, sir.

23         THE COURT:  So it's a legal issue about whether

24 transmitting the same kind of flyer electronically multiple

25 times counts as multiple offenses?

1          MR. MURRELL:  Yes; that's exactly it.

2          THE COURT:  The argument is what?

3          MR. MURRELL:  The guideline talks about if there is

4    more than two threats.  And I would suggest this Call to Arms

5    was one threat.  Now, it would be one thing if he was calling

6    the victim again and again and saying, "Eric Holder, I'm going

7    to shoot you.  Eric Holder, I'm going to shoot you" and you do

8    that multiple times.  That would certainly be more than one

9    threat.  This as --

10          THE COURT:  What if you had a letter that said, "I'm

11    going to kill so and so", and you mailed it to five different

12    people, the same letter?

13          MR. MURRELL:  I think that's a little different.

14    Although in the sense -- I would suggest there is a difference

15    there as well.  That's saying that a particular person.  But I

16    would say this is similar to his -- he's got his Call to Arms,

17    and he goes around distributing the Call to Arms across the

18    neighborhood -- knocks on doors, hands this flyer out.

19          It is -- I would suggest that's one threat.  It's

20    handed to different people.  It's not delivered to the victim

21    multiple times.  It's just the same threat that's published

22    repeatedly.

23          The example the Court gives -- I guess my answer is

24    that's just a lot more pointed than this.  This, if it is a true

25    threat, we have contended all along it's not, but even if it is,

1    it's certainly on the low scale of true threats.  And, again,

2    it's just a publication of the same document repeatedly.

3            And, again, the guideline talking about more than two

4    threats.  I think there was the threat that he posted to the

5    news station that was slightly different.  Arguably it was

6    really the same thing, but intent and the language was very much

7    the same.  But the wording was a little different.

8            Then we have the Call to Arms; the wording is exactly

9    the same.  It's the very same document.  It was just distributed

10   widely.  So, the guideline doesn't say if the same threat is

11   distributed widely more than twice you get the increase.  It

12   says, if there is more than two threats.  And our position is

13   that that's what they were; there were two threats in this case

14   and no more than two.

15           THE COURT:  From a perspective of where the

16   guidelines -- obviously, I assume you would agree that if you

17   have one threat that you make copies of and distribute to

18   multiple people, that that is a worse situation than someone who

19   just sends it to two people.

20           MR. MURRELL:  Well, that sort of depends on the nature

21   of the threat.  Here again -- it might be worse if it was a

22   little more pointed, but I would suggest this is no worse here

23   than if -- I just -- in my view, it doesn't make it any worse.

24   And, again, it's just the republication of the very same threat.

25   It's not multiple threats.

1          THE COURT:  Mr. Kunz or Mr. Fields?

2          MR. KUNZ:  Yes, sir.

3          Your Honor, this guideline prohibits, or adds points,

4   for the transmission -- the number of transmissions that are

5   involved with respect to the threat.  And, in this case, Judge,

6   it's way over the number that would -- it had to be more than

7   two to apply this enhancement, and, Judge, clearly it's here.

8          The whole purpose behind the guideline, and why I

9   think they would have an enhancement here, is the multiple

10  posting of the threats to different individuals.  And that's the

11  purpose, I think, Judge, would be that the more these threats

12  were posted, the number of times, the worse it is, as the Court

13  noted, with multiple people getting it.

14         So our position is, Judge, that the transmission here

15  is the accounting -- how many things are a transmitted threat.

16  And this Call to Arms threat, even though it may have been the

17  same one transmitted 87 times, it was posted on Facebook,

18  Instagram, and there are some texts and email with the same

19  threat.  And we think it squarely fits within this 2A61.1(2)(A),

20  Judge, and we think this enhancement is appropriate.

21         MR. MURRELL:  My only response is the guideline says

22  nothing about transmission.

23         True; you can find cases that talk about letters being

24  sent.  But, again, I would suggest this is different.  It says

25  "involved more than two threats" not transmission of more than

1    two threats.

2          MR. KUNZ:   Your Honor, I think *US versus Scott* --

3    which I think the probation officer had provided that in the

4    PSR, and, of course, we had likewise based our request for this

5    enhancement on that.  The transmitting, again -- transmission of

6    threat is what this guideline is applicable to.

7          THE COURT:  Right.  Just one moment.

8          I do find, for purposes of this guideline, that each

9    transmission of it constitutes a threat and so we have more than

10   two -- far more than two.  I think *United States versus Scott*

11   does support that.  But I also think that the plain text of the

12   guidelines supports that.  And, also I think it's -- certainly a

13   defendant who transmits the same threat multiple times is more

14   culpable than one who doesn't, all else being equal.  So I do

15   think that's appropriate and so that objection overruled as to

16   the more than two threats.

17         So then we have the plus six for the intent to carry

18   out 2A6.1(b)(1).  So the issue is whether the offense involved

19   conduct evidencing an intent to carry out the threat.  And I

20   have read both sides' submissions on that.

21         Do you want to add anything to that, Mr. Murrell?

22         MR. MURRELL:  Again, the commentary says that if you

23   want to "rely on conduct prior to the offense it must be

24   substantially and directly connected to the offense."

25         THE COURT:  Right.

1          MR. MURRELL:  As I read the government's memorandum,

2   mostly they are talking about the firearms.  Two of the firearms

3   he possessed all along for some time.

4          THE COURT:  Well, there are two sets of that.  They

5   have that and then they have the new one that was bought, that

6   we were just talking about, the one that never arrived that was

7   bought in the run-up to this.

8          MR. MURRELL:  Right.  That's all true.  Of course, he

9   testified that the firearm had nothing to do with the offense.

10         The case we rely on is *Barbour,* talks about --

11  B-a-r-b-o-u-r -- Eleventh Circuit, 1995, it says you have to

12  consider the proximity in time.  And I will concede that there

13  is certain proximity, particularly with regard to the .22 rifle.

14  But our position is that they fail on the other two counts.

15  "The seriousness of defendant's prior conduct" -- again, what we

16  pointed out was there are a lot of gun owners already in this

17  state.  He has a license to carry a concealed firearm.  And if

18  you look at the time span in which he bought the .22, record

19  number of firearms were being purchased around the country, all

20  in response to the attack on the Capitol of January 6th.

21         Given that, I think that certainly diminishes the

22  value of the purchase of that .22.

23         Finally it says in *Barbour*, "the extent to which the

24  pre-threat conduct had progressed towards carrying out the

25  threat."  I would suggest there had been no progression.  His

1  testimony was he'd recruited -- and his roommate.  There was no

2  other progression.  It got posted and there was no progression.

3         THE COURT:  Wasn't there an attempt to -- that was the

4  whole point of this thing was to recruit other people. he said

5  that himself when he testified.  It wasn't where it was just

6  going to be him and his roommate.  It's the intent to carry it

7  out, not just what's likely to happen.

8         MR. MURRELL:  Well, "pre-threat conduct had

9  progressed"; I mean, I don't think there was any progression in

10  the pre-threat conduct.  Other than having these firearms there

11  was no progression.  There was the act itself, but in terms of

12  the pre-conduct -- or pre-threat conduct, there wasn't anything

13  else.

14         *Barbour* talks about some things that qualify; such

15  things as showing the defendant has a pattern of targeting or

16  seeking out his victims by showing repeated threats against the

17  same victim over a long period of time, or by showing the

18  defendant was surveilling or seeking out the victim.  I would

19  suggest that's a far cry from what we have here.

20         So, our position is that under *Barbour*, and under the

21  commentary, the conduct here falls far short of the taking of

22  any kind of step towards commission or carrying out of the

23  threat.

24         THE COURT:  Thank you.

25         Mr. Kunz?

1          MR. KUNZ:  Yes, sir.  Your Honor, counsel is

2    overlooking the fact that this defendant sought out an AK-47

3    from a female friend about her father -- did she have and what

4    have you.  And, counsel is trying to pull this one situation

5    away from everything else that the defendant did with respect to

6    his interest in violence, endorsing violent means to advance his

7    beliefs, endorsing making bombs, revolution, stabbing, and

8    everything else -- voting from the rooftops as a sniper, which

9    he had experience being a sniper, Your Honor.  And all of this

10   other conduct which we think indicates, Judge, that he

11   definitely had a progression with respect to what he was doing.

12   And this Call to Arms included something that was well-thought

13   out with respect to detailing the specific plan, the roads and

14   intersections, and instructions as to how this was going to

15   happen, and encircling and trapping those corridors in the

16   Capitol building.  All of those circumstance, Judge, we think

17   support this defendant's characteristic which evidence an intent

18   to carryout such a threat, based on the totality of the

19   evidence, and the preponderance of the evidence, Judge.

20          Counsel keeps referring to what the defendant said.

21   That was his explanation, Judge, but I think the jury properly

22   rejected his story as to that.

23          MR. MURRELL:  Number one, I don't think there is any

24   evidence that the jury rejected his claim that the firearms had

25   nothing to do with it.

1          Number two, the business about the social messaging --

2     we had testimony about that as well.  Nobody intended that to be

3     a serious comment.

4          Finally, Mr. Kunz wants to fall back on some of these

5     posts -- what *Barbour* talks about is how his pre-threat conduct

6     has progressed.  I would suggest that the pre-threat conduct we

7     are talking about is the possession of the firearms, not what

8     happened prior to the purchase of the .22.

9          THE COURT:  But pre-threat conduct is only part of it.

10         You also have the situation where he is testifying

11    that he was going to go down there, that this was real -- he was

12    trying to get people to come defend the Capitol.  And the

13    defense argument was, this was sort of idle, you know, just big

14    talk that didn't mean anything.  And I think that's where this

15    would not apply if someone threatened their -- an enemy and

16    said, "Hey, I'm going to get you", but there was never any

17    indication that they were going to do anything at all.  It was

18    just a threat.  Here there was certainly evidence that he was

19    going to do something.

20         MR. MURRELL:  I don't want the Court to misunderstand

21    me.  I think he was -- I think that's true, had it come to it,

22    he would have defended the Capitol.  He thought that was

23    important.  But the question is, did he take any step toward

24    doing that, either before or after he posted the threat, and I

25    would suggest he certainly did nothing after posting the threat.

1          The government's claim is, Well, gee, we've all of

2    this -- he bought this gun.  He had some guns beforehand.  And I

3    would suggest that's their evidence.

4          But, again, particularly given the fact that he had

5    the guns for some time, with the exception of the .22, given the

6    number of guns purchased during this period of time, I just

7    don't think you can draw that conclusion that this was any

8    effort towards carrying out the threat.

9          THE COURT:  Well, I understand your overall view that

10   it wasn't a threat, and that issue has been resolved by this

11   jury at least here, right?  But it seems like the argument then

12   is, Well, he was going to actually do something, but it was

13   something other than what he was threatening.  In other words,

14   this isn't a situation where someone makes a threat and then

15   sits back and plans to do nothing.  Nobody is arguing that.

16         MR. MURRELL:  The question is not really what his

17   intent was --

18         THE COURT:  That's exactly what the question is.  It's

19   whether there was conduct evidencing an intent to carry out the

20   threat.

21         MR. MURRELL:  Right.  Whether there was conduct.

22         THE COURT:  Evidencing an intent.

23         MR. MURRELL:  Right.  That's what my point is; yes, he

24   intended to defend the Capitol, but there was no conduct that

25   supported that after he posted the threat.  I mean, all of these

1   things involve threats, and all of these cases involve threats,

2   but you only get the enhancement if you take some step to -- you

3   undertake some conduct towards carrying it out.  And, he had the

4   intent to defend the Capitol.  But once he posted the threat,

5   there was no evidence -- he did not engage in any conduct

6   showing that he intended to follow through on it.

7           THE COURT:  Okay.  Well, I do find that the

8   enhancement applies in this case looking at all of the facts.

9           I do think there was conduct evidencing an intent to

10  carryout the threat.  First, there was some detail about what

11  the threat was and how it was going to be carried out.  But more

12  importantly there was the gun situation.  And including a gun --

13  I believe it was a shotgun was purchased within a couple of

14  months.  But the biggest issue to me is the rifle that was

15  purchased almost immediately before this with the hollow tip

16  bullets.  I know you have offered an alternate explanation for

17  why there weren't other bullets available, and things like that,

18  but I do find that, based principally on the rifle and the

19  bullets, that that was conduct evidencing an intent to carry out

20  the threat to go down there and do something.

21          The timing is very close.  It was right beforehand.  I

22  also note this is someone, as we heard at trial, with very

23  limited financial means.  And so the fact that what limited

24  resources he had were to go out and buy this rifle and hollow

25  tip bullets almost immediately before this threat and the event

1    that the threat was directed at, or the date that the threat was

2    directed at, I think is important.

3            There is also evidence that he was seeking still

4    additional firearms -- some that he did not get.  So I do find

5    that there was this accumulation, and attempted accumulation of

6    weapons does have a direct connection to the threat.

7            I understand your argument, Mr. Murrell, but there are

8    a lot of people buying a lot of guns at that time and that may

9    be so, but I find this purchase, in this case, was directly

10   related to the threat.

11           I am going to overrule that objection also and that

12   six point enhancement with apply.

13           I think in terms of the guideline scores that resolves

14   everything.

15           Is there anything else on the guideline score that's

16   outstanding, Mr. Murrell?

17           MR. MURRELL:  Not from the defense, no, sir.

18           THE COURT:  Mr. Kunz?

19           MR. KUNZ:  No, Your Honor.

20           THE COURT:  So that leaves us with the PSR had it at

21   20, that was without the obstruction.  That's two points more.

22   So that's 22.  Criminal history category of I, which I think is

23   41 to 51 is where that ends up.  Let me doublecheck that.

24           PROBATION OFFICER:  That's correct, Judge.

25           THE COURT:  41 to 51 months.

1          Are there any other objections?  I know there were a

2    lot of things written about the PSR and a lot of adjustments

3    made to the final one.  It looks like it resolved a lot of the

4    issues.  We will talk about the variance request in a second.

5          Any objections at all to anything in the PSR, other

6    than what we have covered already, Mr. Murrell?

7          MR. MURRELL:  Well, again, we don't agree with all of

8    the facts.  We would simply rely on the facts presented at trial

9    if they are in conflict with what's in the PSR.  They don't

10   alter the scoring.

11         THE COURT:  Do you have any specific factual

12   objections to the PSR?

13         MR. MURRELL:  Well, probably do.  Give me a minute.

14         Well, for example, there is a June 2020 post to

15   Mr. Baker:  "I don't give a shit.  I am an anarchist and want to

16   watch capitalist society burn."  Mr. Baker, contrary to the

17   claim in the PSR, did not make that comment.  It was -- he

18   reposted a meme of an older lady who supposedly made the

19   statement.

20         THE COURT:  I thought that was addressed in the -- was

21   it not?  What paragraph was that?

22         MR. MURRELL:  It wasn't resolved.  It was mentioned

23   but if you are asking me do we have any disagreement with some

24   of the factual representations, we do.  But, these were all

25   objected to, and for the most part addressed in the PSR.

1           THE COURT:  Okay.

2           MR. MURRELL:  I don't want it to be said that we agree

3    with all of the facts in the PSR because we don't.

4           THE COURT:  If there is any specific fact that you

5    want me to resolve, then we can do that.

6           MR. MURRELL:  Well, I talked about the business about

7    the Turkish pilots.  Here again, it's a claim -- and, of course,

8    this is the government's claim, too, was that he was sincere

9    about that.  I think the best evidence is he was not; 22 months

10   passed from the time he admitted to making the statements, and

11   no evidence that he ever threatened or took any action to harm a

12   Turkish pilot.  Here again, he explained that.

13          The PSR talks about the comments at the airport with

14   the TSA agents.  We disputed that.

15          Again, I suppose those are the primary ones.

16          THE COURT:  Okay.  Mr. Kunz, what do you want to do

17   about those?  They don't affect the guidelines, but do you want

18   to address any of those?

19          MR. KUNZ:  What specific paragraphs is he objecting

20   to?

21          THE COURT:  Mr. Murrell?

22          MR. MURRELL:  Well, 32 and 33 were -- and also 11 was

23   about the anarchist.

24          MR. KUNZ:  Judge, 33, there was testimony at trial

25   about that, Judge.  I think the TSA officer testified about

1   that.  I know the defendant denied that.

2            THE COURT:  What about 32?

3            MR. KUNZ:  It lists the finding by a magistrate judge

4   with respect to him killing, making the statement about it,

5   Judge.  I don't think he has denied he made the statement and he

6   told agents, as we advised the defense, that he never had any

7   intention of carrying it out.  That's true, Judge.  That's what

8   he told the agents.

9            THE COURT:  You don't dispute that?

10           MR. MURRELL:  No.

11           THE COURT:  You are just -- you're basically asking

12  for additional facts that he didn't mean it.

13           MR. MURRELL:  Well, to read the PSR you'd think that

14  he made those threats, and...

15           THE COURT:  But if I adopt that fact in 32, the fact

16  is that he said this.

17           MR. MURRELL:  Right.

18           THE COURT:  And he did say it, right?

19           MR. MURRELL:  Yes, sir.

20           THE COURT:  And same in -- well, 33 is different.

21  There is a dispute about that.  But we have trial testimony from

22  the agent about what he said.  And the disagreement there is

23  just that he didn't say what the agent attributed to him at

24  trial?

25           MR. MURRELL:  Yes, sir.  I am not saying these are

1    disputes that the Court needs to resolve, but you asked me if we

2    had any disagreements and we do.

3         THE COURT:  They may be things that need resolving,

4    but I think we got what we need to resolve those.

5         Anything else?

6         MR. MURRELL:  No, sir.

7         THE COURT:  Okay.  All right.

8         So the guidelines range then is 41 to 51 months.  You

9    said you had a witness, Mr. Murrell.  Was that the one that you

10   already mentioned that was about the apartment that you don't

11   need to put on now, or do you have an additional witness?

12        MR. MURRELL:  Yes, sir.  No; that was the only witness

13   I had.

14        THE COURT:  Then I think what makes sense, rather than

15   arguing the variance motion separately as a motion, we will do

16   the usual course where I will hear whatever you'd like to say,

17   Mr. Murrell.  And then we will hear from Mr. Baker, if he wishes

18   to be heard.  Doesn't have to, of course.  And then the

19   government can respond.  And then I will give you the last word,

20   Mr. Murrell.

21        MR. MURRELL:  I do have an exhibit I'd like to

22   introduce.  It is marked as Defense Exhibit Number 1.  It looks

23   like Mr. Baker scribbled on it when he was trying to write me a

24   note, but you can ignore the scribbling.

25        This is a statement of offense and a Plea Agreement in

1    the case of *United States versus Cleveland Grover Meredith, Jr.*

2    It's in the District of Columbia.  In my memorandum, I talked

3    about the sentences -- I think I will take this off.

4           It talked about the sentences imposed on those that

5    had attacked the Capitol.  This is a case that is very much like

6    that.  Mr. Grover, and I am reading from the government's

7    statement of the offense, had planned to be there on

8    January 6th.  Somehow didn't get there on time and got there the

9    night after the riots.  There, on the next day, in his hotel

10   room in Washington DC he sent a text message to a relative

11   saying he was thinking about heading over to Pelosi's speech and

12   putting a bullet in her noggin on live TV and the relative, who

13   was so alarmed and thought it was a threat, he contacted the

14   defendant's mother, who in turn contacted the FBI, and they

15   located Mr. Meredith.

16          When they arrested him they found he had a trailer,

17   which he had driven to Washington DC, and it was physically

18   present at the hotel.  The FBI found a Glock, which explains is

19   a 9-millimeter handgun, and a model IWI Tavor X95 rifle.

20          I looked it up and it says it is, IWI X95 is an

21   Israeli bull pub assault rifle designed and produced by Israel

22   Weapons Industries as part of the Tabor rifle family.  In

23   November 2009 the X95 was selected as the future standard weapon

24   of the Israeli infantry.  This was not a weapon, a .22 rifle

25   that was meant to look like an assault rifle.  This was the real

1   thing.  Also Mr. Washington [sic] had 2500 rounds of ammunition

2   and 10 large capacity ammunition feeding devices.  So, sure

3   enough he was convicted.  He entered a plea --

4               THE COURT:  Convicted of a threat.  The same offense?

5               MR. MURRELL:  Yes.  Same thing here.  And there was an

6   agreement and they have decided his guideline range is somewhere

7   between 6 to 12 and 12 to 18 months.

8               So I would offer this as Defendant's Exhibit Number 1

9   in support of our request for a below guidelines sentence.

10              THE COURT:  All right.

11              MR. MURRELL:  The Court has my sentencing memo, so I

12  don't think I need to belabor all of this.  But the essence of

13  it is, his offense falls outside the heartland of these

14  offenses.

15              His Call to Arms was aimed at a group that apparently

16  never existed.  It was conditioned upon events that were

17  unlikely to have ever occurred.  The likelihood of this mob

18  showing up and running over the -- running over the officers

19  seems to me pretty much non-existent.  And it was for,

20  objectively, a reason -- a good reason; he was defending the

21  Capitol.

22              That's what takes it outside of the heartland.  I

23  cited those six cases.  This case is nothing like those.  I

24  would suggest it's far more innocuous than the sort of threats

25  that you saw in the six cases that have been published since

1    2018.

2           These are specific threats.  Ugly, violent threats.

3    They were aimed at somebody -- a real person.  They weren't

4    conditioned on unlikely events.  And they certainly had no

5    legitimacy -- no legitimate reason for issuing the threats.

6    That's the heartland of offenses.  And I would suggest nothing

7    like Mr. Baker's.  So, that's the essence of it.

8           I would like to respond to the government's motion

9    about upward variance.  What they said is, "upward variances are

10   routinely applied in cases where the Section 3553(a) factors

11   justify them."

12          The fact is there are upward variances, and if you

13   look in the sentencing guidelines, in 2.2 percent of the cases.

14   They are extraordinarily rare.

15          In citing cases to support their claim that these

16   departures happen routinely, they cited one case:

17          *Rosales-Bruno,* an unlawful entry case.

18          They cited *Overstreet*, a possession of a firearm by a

19   convicted felon, under the Armed Career Criminal Act.

20          They cited *Earley*, which was a bank robbery case.

21          They cited *Shaw,* felon in possession of a firearm.

22          And *Turner,* some kind of scheme to steal $266,000 from

23   the post office.

24          None of the cases involve publishing a threat.  And I

25   think there is quite a contrast between the cases they relied on

1    and the six cases I cited which very much deal with -- that's

2    what the offense was.  It was publishing a threat.

3         I think the real problem with the government's

4    approach is that they take all these bombastic posts as real and

5    accurate.  They don't mention anything about George Soros.  And,

6    of course, that was one that was obviously meaningless,

7    nonsensical -- and -- but they want to zero in on some of these

8    others.

9         They made the same sort of mistake at the --

10        THE COURT:  But you would agree, there is a big range

11   here.  I think that's one of the things that makes this

12   difficult.  There are a lot of these memes, the Simpson's

13   post -- things that obviously are just sort of mocking people

14   who politically disagree with him.  But then there are other

15   very serious things; asking someone if they are willing to

16   assault a police officer.  The threats themselves here are very

17   serious.  You have the wanting to slay enemies.  We have someone

18   who, by all accounts, craves violence whether he said it to the

19   Tampa FBI agent or not, this is someone who spends his life

20   savings to go to Syria to shoot at enemies.

21        I think that takes it out of -- you are right.  This

22   isn't a typical case that's charged in the statute.  There is

23   really nothing typical about this case at all.

24        MR. MURRELL:  What I was saying is I think the

25   government, and maybe the Court as well, has made the same sort

1    of mistake they made at the detention center.

2              When Mr. Baker got out there, initially, they had what

3    they call a three-man hold.  Whenever they brought him to see me

4    they had him shackled to the nth degree, and they had three big

5    guards bringing him out.  Mr. Baker, who is 5-foot 3 and

6    135 pounds.  I don't know if they had been reading the

7    government's pleadings, or what, but they seemed to think he was

8    a real threat.

9              Frankly, from my standpoint, it looked a little silly;

10   these three big guards taking Mr. Baker out to visit me.

11             Well, over time -- and I told them, there was no need

12   for that and they didn't listen to me.

13             But over time they learned and they stopped doing

14   that.  He is in general population now.  They treat him just

15   like any other prisoner.  They found that he is not this wild,

16   dangerous man that you might get from reading some of these

17   posts.

18             He testified that he is not a big fellow and that he

19   learned a long time ago that sometimes the best defense was to

20   be aggressive, make yourself sound dangerous, and that's exactly

21   what he did in these posts.

22             And I think those that know him would know that there

23   wasn't anything to them.  You have got the letters I've sent you

24   and almost -- really, to a person, they say, he is not violent.

25   He is interesting, and interested in helping people.  Wants to

1    be a medic.  He is concerned about injustice.  He teaches yoga.

2    His persona on the Internet is just not the real Daniel Baker.

3    Took him awhile to --

4            THE COURT:  Let me stop you there.

5            I did read every single letter you submitted, and the

6    vast majority of them talked about his peaceful nature.  A lot

7    of them were people who didn't know except through this episode

8    here and have exchanged letters with him in the detention

9    center, and things like that.

10            It's one thing to say there is a persona issue and

11    it's just someone who is kind of hiding behind a computer screen

12    and talking big.  But, I mean, you saw the same video I did.

13    Isn't there a disconnect between the letters --

14            MR. MURRELL:  No, I would say --

15            THE COURT:  -- the letters that say he is a peaceful

16    person, who would never ever want to hurt anyone, and the person

17    with the thrill that I saw in that VICE video.  Isn't there a

18    disconnect there?

19            MR. MURRELL:  Well, I don't know there was any thrill.

20    And I think he has said it was hard on him and he suffered from

21    post traumatic stress disorder.

22            THE COURT:  I guess my point is that's not somebody

23    who is just talking big and you get them out and --

24            MR. MURRELL:  Well, he is like anybody else who serves

25    in the military, I would suggest.

1          Now, he took the extraordinary step of volunteering,

2    spending his own money to get out there -- and I said this

3    during the trial, and I will say it again, I would suggest that

4    was heroic.  That doesn't show he is violent.  He didn't have to

5    do that.  Most of us would never go out and do that.  But he

6    fought against ISIS, which by any definition was a terrorist

7    organization.  It was an enemy of the United States and he

8    risked his life.  He was on the frontline for two weeks.  And

9    did he do it because he felt like he needed to prove himself?

10   Did he do it because he felt like he had failed with the Army?

11   I suggest all that figures into it.  But I don't think it shows

12   he is any more violent than anyone else that ever served in the

13   military.

14         He is proud of what he did.  Again, I don't have any

15   trouble calling it heroic.

16         There was all this talk to begin with trying to tar

17   him with the PKK, and this was a terrorist organization.  Well,

18   I think we brought some testimony in to show that's really not

19   the case.  I think it's sort of resurfaced in the government's

20   sentencing memorandum here, but I think for the most part we

21   showed that there is a big difference between YPJ and the PKK.

22         So, again, I would suggest that doesn't show he is a

23   violent person.  Shows you that he has some deep beliefs and

24   that he believes in doing what he thinks is right.  I think

25   that's what it shows you.

1          You know, besides that, he is 34 years old.  He has

2     got two arrests and they both go back over a decade, if I

3     remember; one was driving without license, one was possession

4     paraphernalia.

5          There was never a claim that he has been in a fight.

6     That he has struck someone.  That he has battered someone.

7     That's not there because it hasn't happened.

8          So, again, I think there is been a fundamental

9     misreading about Mr. Baker.  And I understand it.  I mean, you

10    read those threats, and his posts on the Internet, sure, I can

11    see where people could come away with that.  But, as we all

12    know, you can't believe everything you read on the Internet.

13         They cited a couple of things -- a number of things,

14    really -- in their memo; one was this was unusual because he was

15    trying to get others to commit acts of violence against the

16    individuals who planned protests at the Florida Capitol complex.

17         To read some of the government's pleadings, and some

18    of their argument, the scheme was to go out there and slaughter

19    people that showed up protesting.  That's not what the Call to

20    Arms said.

21         What the Call to Arms said was we need to defend the

22    Capitol.  This is a coup.  It's not just Mr. Baker, you can read

23    all kinds of statements from politicians, right wing people,

24    left wing people, saying "this is a war."  He generally thought

25    that there was going to be an attack on the Capitol.

 1          One of the things we introduced into evidence was the

 2   CNN article; it talked about the threats made by the extremist

 3   and so on.  It was not his goal to go out there and shoot people

 4   that were protesting.  His goal was to defend the Capitol.

 5          They talk about, Well, the American public was tense

 6   and anxious during this time.  Well, he reacted to it just like

 7   everyone else had.  He didn't create this tension.  It was those

 8   that attacked the Capitol back on January 6.  He reacted to it

 9   and thought -- believed it enough to think that we needed to

10   defend the Capitol.

11          Talks about, Well, they've got 40 times the number of

12   threats.  You went ahead and increased the offense level by two,

13   but it seems to me whether he sent this to 40 of his friends, or

14   two of his friends, frankly, didn't make a lot of difference.

15   It was the same threat that was just repeated over and over

16   again.

17          Again, they claim he is dangerous, and to some extent

18   they base that on his service in Syria, but, again, I would

19   suggest that he's no more dangerous than anybody that's ever

20   served in the military.  And, again, what he did, I would

21   suggest, was heroic.

22          They talk about the Turkish pilots.  We've heard a lot

23   about that.  We talked about that earlier.  Again, it seems to

24   me it makes perfect sense.  This is the kind of wild claim he

25   would make because he wanted to go to the frontlines.  Again,

1    maybe the best evidence is he was back for 22 months.  Is there

2    any suggestion that he took a step towards harming anyone?  No,

3    there is no such evidence.

4         They cite his interest in anarchy.  Here again, they

5    misconstrued -- when I asked Mr. Baker on the stand about it, I

6    said most people think of anarchist as bomb-throwing

7    anarchist -- the adjective always precedes it.  And he

8    explained, no.  What he explained was, this is just his theory

9    about how government should be organized.  It should be more

10   direct participation by the citizens.  And that the citizens

11   should be deciding rather than the representatives how we run

12   the government.  None of that had to do with any threats of

13   violence or intent to overthrow the government.

14        Finally, we get this firing of the gun at Machine Gun

15   America.  And it is a tourist attraction.  In fact, I went

16   online and I looked it up.  Here is what it says, it says:

17   "Orlando's most thrilling attraction.  Feel the rush of power as

18   you take on the ultimate shooting experience at Machine Gun

19   America, Orlando's first and only automatic adrenaline

20   attraction.  Our mission is simple:  To provide each of our

21   guests with big thrills and unforgettable action, as well as a

22   bullet hole ridden target to take home as a souvenir.  You will

23   get the opportunity to shoot real machine guns and other world

24   class firearms, or square off on your own, in our virtual

25   reality arena for a totally new experience.  Choose your

1  favorite gun from our wide selection of premier firearms or go

2  for one of our themed shooting experiences for nonstop

3  excitement.  This is one adventure you don't want to miss."

4        And, of course, this is when he made the statement

5  about going back to Syria and the Turkish pilots with a big

6  smile on his face.

7        THE COURT:  And that's why I think the -- that

8  episode, to me, the comments were more concerning than the fact

9  that he --

10       MR. MURRELL:  Well, I understand.  But he made this at

11 a tourist attraction in Disney World.  And, again, I think

12 it's -- at some point you have to look at these things whether

13 he is talking about George Soros, or talking about these Turkish

14 pilots, and you look at his history --

15       THE COURT:  His history did include going over there

16 to --

17       MR. MURRELL:  Yes, to fight -- fight against the

18 enemies of the United States.  Apart from that, is there any

19 suggestion that he threatened anybody with a gun?  That he hit

20 anybody?  No.  There is no suggestion he has ever engaged in any

21 sort of violence.

22       Again, I think if you compare this to other cases, his

23 is on the innocuous scale.  I think you can make the kind of

24 mistake that they made at the detention center, and the

25 government made, with a three-man hold and three big guards

1     around him every time he moved.  But that's wrong; that's not an

2     accurate reading of Mr. Baker.

3             Again, if you compare his case to these others -- for

4     that matter, I said it, too, you should think about those that

5     attacked the Capitol.  And the probation officer suggested

6     that's a fair comparison.  I would suggest that it is too.

7     Those people didn't just write stuff and post it.  They took

8     action.  The one fellow that has been sentenced got an eight

9     month sentence.

10            THE COURT:  That was not for this offense.

11            MR. MURRELL:  Pardon?

12            THE COURT:  That --

13            MR. MURRELL:  That's not his offense, but I would

14    suggest what that fellow did was far more grave.  He entered the

15    Capitol.  He tried to disrupt the election process.  And he

16    entered the Capitol with goggles and latex gloves, suggesting

17    maybe he planned to do something.

18            I gave you the example there of the fellow that

19    threatened Nancy Pelosi with thousands of ammunition, a real

20    assault rifle, and they have agreed to a sentence of somewhere

21    between 6 to 12 or 18 to 24 months.

22            THE COURT:  He has not been sentenced but they have

23    agreed to a recommendation; is that what you are saying?

24            MR. MURRELL:  Yes.  There is an agreement that is

25    depending on whether the presence of these guns amounts to that

1   six level increase that Mr. Baker got for having a shotgun and

2   the .22.

3          THE COURT:  You're saying that's still an open issue

4   in this case?

5          MR. MURRELL:  Yes.  They said it would be 6 to 12

6   unless they hit him with that six level enhancement --

7          THE COURT:  That's a big difference.

8          MR. MURRELL:  -- 18 to 24, if they hit him with that

9   six level enhancement.  It's there.  I gave you the letter.

10          THE COURT:  Okay.

11          MR. MURRELL:  So, again, I think it is fair.  I think

12   that there is an equivalence between the two.  Some would say

13   that those that attacked the Capitol were on the right, and Mr.

14   Baker is on the left.  Those that attacked the Capitol, though,

15   actually did something beyond just posting a Call to Arms.

16          So, again, our position is if you take all of these

17   factors into account, a sentence significantly below the

18   guidelines would be appropriate.

19          Mr. Baker did want to address the Court.

20          THE COURT:  Yes, sir.  Whenever you're ready.

21          THE DEFENDANT:  I just wanted to say like three

22   sentences and now I want to say four because I am verbose and I

23   apologize.

24          THE COURT:  Take your time.

25          THE DEFENDANT:  As far as me being an extraordinarily

1  violent person, I sincerely believe in socially approved arenas

2  for this kind of behavior, such as war, you know, fighting

3  against the enemies of my country.  And I did sincerely believe

4  that something very bad was going to happen here and this is my

5  home that I want to defend.

6           As far as being a dangerous jiu jitsu person, I

7  believe in the arena of tournaments.  And I have often told my

8  friends that I wish all social disagreements that people resort

9  to violence would be resolved in a tournament in the same way

10 you see Israeli and Palestinian athletes fighting it out in the

11 Olympics.

12          Other than that, I accept full responsibility for my

13 behavior.  And, obviously, I won't be doing or saying anything

14 like that again.  And I am at the mercy of the Court.

15          MR. MURRELL:  Thank you.

16          THE COURT:  Thank you, Mr. Baker.

17          We will hear from Mr. Kunz and like I said, Mr.

18 Murrell, I will give you the last word and I will take a moment

19 to read this Exhibit 1 as well.

20          MR. KUNZ:  Your Honor, I know Mr. Murrell spent a lot

21 of time talking about the threats, and that this really wasn't a

22 threat, and what the defendant's plan was.  And, of course, the

23 best barometer we have, Judge, was the 12 citizens in the

24 community already made a determination that he issued true

25 threats on those two different occasions here, number one.

1              Judge, with respect to the circumstances, Mr. Murrell

2    has told the Court how proud he is and considers the defendant

3    to be a hero.  Well, this is the same defendant, Your Honor,

4    that got dishonorably discharged from the service when he

5    refused to go to Iraq to serve for the United States with the

6    rest of his group.  And he was dishonorably terminated from the

7    military, Judge.

8              What we see here, and why this case is totally

9    different from the case -- *Meredith* case that defense counsel

10   cited, was this is a case where -- the *Meredith* case had one

11   threat, one threat that was charged.  And it was one specific

12   threat and not multiple threats, Judge.

13             Here the indictment, of course, had on separate dates,

14   the 12th and 14th, separate threats that were made here.  And,

15   of course, as we presented and indicated to the Court, he

16   actually posted 87 times, Judge.

17             It's different than that case as well because unlike

18   that case, he was not soliciting other people to do anything,

19   although his threat was bad, Judge.  It was a threat.  We don't

20   dispute that.  Mr. Baker's case is not like many of the threat

21   cases that the government sees with an individual sitting in a

22   basement somewhere and posting stuff on the Internet and they

23   have no ability to carry it out and no background and experience

24   with respect to this.

25             This Call to Arms was a solicitation by the defendant

1    for violence.  He was actively involved with a continuation of

2    threats.  And notwithstanding his statement to the Court today

3    that he doesn't believe in violence, he wants people to

4    peaceably work out things, well, of course, that's not what he

5    would post.  He would post things to get people stirred up.

6    Talked about him being a sniper, how he can handle things as a

7    sniper, and go through all those other things.

8            Our feeling, Judge, is that an upward variance is

9    appropriate here for the reasons we cited in our motion.  One,

10   of course, is that unlike the *Meredith* case, he came in after

11   the riot, Judge, and he was not seeking concerted criminal

12   activity by other people.  Here he is attempting to recruit

13   others to commit acts of violence and the threat of concerted

14   criminal activity always is a higher danger to the community

15   than an individual acting alone.

16           The situation of the riot at the Capitol, Your Honor,

17   was, as the government indicated in its memorandum, a tense

18   situation.  And we are not saying the defendant created it, but

19   he certainly took advantage of it where he decided that it was a

20   situation such that it was an explosive situation that he

21   transmitted threats to solicit individuals to commit acts of

22   violence here, and it's a significant factor that the Court

23   should consider.  And, of course the guidelines, as we pointed

24   out, don't take that into account with respect to the nature of

25   the threat.

1    We have asked for the upward variance based on the

2    number of transmissions of these threats in this case.  And as

3    we indicated, this is 40 times the number that actually would

4    make it as calculated in the guidelines.  And, 87 separate

5    occasions, Judge, and it wasn't contemplated from the guidelines

6    someone who posts these threats 87 -- transmits them 87 times.

7    The other area, Judge, that we urge the upward

8    variance in this case is on the dangerousness of the defendant.

9    He has repeatedly, as the Court is well aware from the testimony

10    at trial, and the questions you asked counsel, he expressed an

11    interest in violence.  Endorsed violence as a means to advance

12    his beliefs, including stabbing, use of bombs, violent

13    revolution, taking up arms against the presidency, death to

14    America, slaying enemies, voting from the rooftop, sniper

15    rifles, murder, and support for anarchy.

16    Why is that important?  It's a factor, Your Honor, for

17    you to consider with respect to the dangerousness of this

18    defendant and what he may pose as a danger to the community

19    based on all of this conduct.

20    It's also, I think, important, Your Honor, that with

21    respect to this case, the defendant, in his threats, he expected

22    death to be the result of this event.  He indicated to -- he

23    wanted to inflict death on others, and he expected that his

24    military friends -- militant friends would also die in the

25    event.  And as he indicated in the Call to Arms, "If you are

1    afraid to die fighting the enemy then stay in bed and live."

2            The social media that he used to encourage and

3    instruct others to harm law enforcement officers, the Court has

4    already mentioned that, that's an important factor we think as

5    well.

6            And then again counsel has made a lot of to-do about

7    the YPG that he fought for, and everything else, but as we

8    indicated in our motion, the defendant himself told the FBI

9    agent, Denise Biehan, B-i-e-h-a-n, in March 2019, that when he

10   joined the YPG he expected PKK, which he acknowledged was a

11   terrorist organization, to be the same thing.

12           So, you know, we had -- Mr. Murrell spent a lot of

13   time with respect to they are different, they are different.

14   Even the defendant believed that they were really the same

15   thing.

16           And the training, and we brought all of that in, as

17   the Court is well aware, and he perceives himself as a killer,

18   Judge.  And this is a situation, Judge, where you have a person

19   who has gone overseas as a foreign fighter, and basically been

20   radicalized, and the return of a person such as that into the

21   community, he poses a pretty significant risk to the community

22   based on everything he has done.  And the Court has already

23   noted for defense counsel the situation with the machine gun

24   incident where he made his thoughts pretty clear.

25           THE COURT:  What was the statement there -- I thought

1    I had it here.  On that video -- do you recall?

2            MR. KUNZ:  Yes, sir.  He looked up and said, "I'm

3    coming back to Syria.  I'm going to shoot any Jihadis or Turks

4    that get into our way", and then he continued firing the

5    automatic weapon.

6            His own words, Your Honor, we think are important, and

7    his enjoyment of firing automatic weapons provide the Court with

8    unique insight into the defendant and his dangerousness and the

9    likelihood of violence in the future.

10            Your Honor, for all of those reasons that we put in

11   our motion, we think the Court -- it's totally appropriate for

12   the Court to consider an upward variance from the guideline

13   range -- the recommended guidelines range in this matter.

14            Counsel consistently just saying:  Well, he just

15   posted these things on the Internet.  It doesn't mean anything.

16   It does mean things, Your Honor.  And, you know, he criticized

17   the law enforcement's response -- and this was a quick response,

18   Your Honor.  Once they were aware of him posting these things,

19   within several days they ended up making an arrest because they

20   feared, once they learned all of the circumstances of this

21   person, it's different than someone who is in a basement of a

22   home, living at his mother's or grandmother's house, and is

23   postings things that he doesn't like about -- this is somebody

24   who was out there trying to purchase an AK-47 -- get one from a

25   friend.  He actually bought a replica of an AK47.  He had other

1    weapons, Judge --

2            THE COURT:  You had mentioned that before, trying to

3    buy one.  I know there was testimony about trying to buy a gun

4    from a friend's father.  You are saying that was an AK-47?

5            MR. KUNZ:  Yes.  The reference in evidence was in the

6    post "AK-47" specifically, was used.

7            THE COURT:  Okay.

8            MR. KUNZ:  That term.  And, of course, what he

9    purchased was a replica.  And, of course, Judge, I think you

10   heard as well that at the time his premises had no bed.  He was

11   apparently sleeping in a closet.  He has no funds but he got

12   some money, and what does he do with that money?  Doesn't buy

13   furniture or clothing or anything else.  He buys a weapon with

14   hollow point rounds.

15           We think all of that is very significant and we would

16   ask the Court, respectfully, Your Honor, to give a higher

17   sentence than the recommended guideline range.

18           THE COURT:  Okay.  Thank you, Mr. Kunz.

19           MR. MURRELL:  I heard Mr. Kunz say that his case was

20   not like these other cases because these other cases the

21   individuals didn't have the ability to carry out the threat.  I

22   think he is just dead wrong about that.  That case I gave you,

23   how many thousands of rounds of ammunition did the fellow have?

24   He didn't have a .22.  He had an assault rifle.  These other

25   cases I cited, yes, they had the ability to carry-out the

1    threats.  He is just dead wrong on that.

2              He is wrong too when he said that --

3         THE COURT:  Well, you are both right that there is not

4    a good analogue for this particular case.  This is a very

5    unusual set of circumstances.  I don't know that either one of

6    you is going to be able to point to something and say, Judge,

7    this is just like this case over here.  This is just -- this is

8    very unique.

9         MR. MURRELL:  Again, I agree, it's outside the

10   heartland, but I suppose what Mr. Kunz is saying is, Well, it's

11   a more serious case.  I am saying it's far less serious.

12             You know, here again, they continue to do this -- and

13   I don't know what I can do about it -- they continue to treat

14   like everything he said was true and that he meant everything he

15   said, but we never hear about George Soros.  That's the whole

16   thing.  You have this puzzle, these different pieces, and this

17   one piece, I think, tells you how much credibility you should

18   put in this stuff.  This claim about George Soros is at peace.

19   Had he really gotten money from George Soros to track down

20   people who had attacked the Capitol?  Of course not.

21        THE COURT:  You can make fun of your enemies and mock

22   your adversaries and also threaten them.  I don't see how the

23   fact that the George Soros thing was obviously not true means a

24   comment that, "I want to return to Syria and shoot more people"

25   is also true, particularly when he has testified that that's

1    what he wants to do.  I don't see those things as mutually

2    exclusive.

3              MR. MURRELL:  I think what it shows you is he is prone

4    to hyperbole.  He is prone to make claims that aren't factual.

5    And that's what I think it tells you.

6              When somebody makes all these posts, and some of them

7    are obviously ridiculous, I think that tells you something -- is

8    a pretty good suggestion that you can't put a lot of stock in

9    any of the posts.

10             Yes, he is serious.  He is passionate.  But, he is a

11   fellow that talks a big game.  And he is not the violent person

12   that again the government seems to think that he might be.

13             They said he got a dishonorable discharge.  He didn't.

14   He got discharged under general conditions.  And he did because

15   of what some of his fellow soldiers were talking about doing.

16   They were talking about committing war crimes.  Maybe he took

17   that too seriously.  I don't know, but that's why he left.  He

18   did not receive a dishonorable discharge.

19             THE COURT:  I think it was -- I think it was a

20   category that was categorized as less than honorable.

21             MR. MURRELL:  Less than -- that's right exactly.

22             THE COURT:  But it was for being AWOL.

23             MR. MURRELL:  That's exactly right.  But, again, he

24   did this not because he didn't want to fight for the United

25   States, but because of what his fellow soldiers were talking

1  about doing.  He just didn't feel like he could be a part of

2  that.

3         I heard Mr. Kunz say I was criticizing the officers.

4  I didn't criticize any officers when I was up here.  I don't

5  know where that came from.

6         I think the Court mentioned something, too, about the

7  dialogue that Mr. Baker had with somebody online about, "would

8  you be willing to assault an officer."  Here again, Mr. Baker

9  explained that he was trying to put this fellow off, trying to

10  test this fellow.  He didn't want anybody associating with him

11  that would assault the officers.

12         THE COURT:  That was -- that was his testimony.

13         MR. MURRELL:  Right.  So I don't know what really Mr.

14  Baker could do.  He has done his best to explain these things

15  and the government just rejects it out of hand.  But if you look

16  at his conduct, again, there is nothing in his background to

17  suggest he is violent.  And, again, I would suggest his trip to

18  Syria is to his credit and shows him to be someone that is --

19  believes in -- has morals and believes in standing up and

20  defending one's self.

21         As he said, he believes that these disputes should be

22  settled in the right arena.  One would be a war.  And he says

23  many disputes probably could be settled on the mats there at the

24  jiu jitsu place.

25         Again, I would suggest in the scheme of things we have

1    no real victims.  Nobody ever showed up to attack the Capitol.

2           Two, was it likely that anybody was going to overrun

3    the officers?  No, it was not likely.

4           And, three, it certainly is a legitimate concern --

5    there was a legitimate concern that people were going to attack

6    the Capitol.  All he wanted to do was defend the Capitol.

7           Those are the three reasons that take this out of the

8    heartland.  Those are the three reasons that show you this is

9    much less serious --

10          THE COURT:  Defend it how though?

11          MR. MURRELL:  Pardon?

12          THE COURT:  Defend it how?

13          MR. MURRELL:  He was trying to -- you just have to

14   read the statement of, or his Call to Arms.  He was asking for

15   people that were armed to come defend the Capitol.  And he said,

16   yes -- and this is probably not the smartest thing -- but he

17   said, yes, they were not going to do anything until they overran

18   the officers.  That's what it was conditioned upon, an event

19   that was, I would suggest, not going to happen.

20          So that's what makes this apart from the heartland.

21   Again, no real victims, conditioned upon unlikely events, and

22   what he wanted to do was defend the Capitol.  Not somebody who

23   wants to shoot Eric Holder because he is unhappy about being

24   sentenced to prison.  Not someone that wants to shoot Nancy

25   Pelosi because of her political views.  It's completely

1    different from that.

2          Again, our position is that this case is not -- is

3    outside the heartland.  It's outside the heartland because of

4    those reasons.  And I would ask the Court to impose a sentence

5    substantially below the guidelines, one consistent with the sort

6    of sentences that we are seeing in Washington DC for those who

7    have attacked the Capitol, or in this instance threatened Nancy

8    Pelosi.

9          THE COURT:  Thank you, Mr. Murrell.

10          I am going to take a minute and look at this document

11   here.

12          Y'all can be at ease if you like.

13          (Pause in proceedings.)

14          THE COURT:  As I read this agreement, Mr. Murrell, the

15   figures you were quoting were just application of the straight

16   guidelines, which would include acceptance of responsibility

17   that is not at issue here, and said either side could ask for a

18   variance.

19          I don't think this is that helpful in that regard, is

20   it?  I mean it's just saying he has a base level 12, which we

21   have here, and he may or may not have the plus six.

22          MR. MURRELL:  I would suggest if that fellow is

23   sentenced to eight months for threatening Nancy Pelosi.

24          THE COURT:  But, you are saying "if."  We don't know

25   what this --

1          MR. MURRELL:  Even if he is sentenced to 24 months, at

2   the top of the guidelines, for threatening Nancy Pelosi, and

3   showing up with thousands of rounds of ammunition, a real

4   assault rifle, I just don't see where there is any justification

5   to sentence Mr. Baker for anything more for this publication on

6   the Internet where nothing happened and there were no victims.

7          THE COURT:  Well, I don't think this is useful because

8   I mean, one, there is an acceptance of responsibility there, so

9   the guidelines are different.

10          And, two, he hasn't been sentenced.  And it says right

11   in here that either side can ask for a variance and the Court is

12   not bound by it.

13          Really he'd have the same guidelines that we would

14   have here if he didn't have the acceptance of responsibility,

15   other than the obstruction of justice and the number of threats,

16   which just doesn't apply here.

17          I appreciate the argument.  I don't think this

18   *Meredith* Plea Agreement is useful.

19          Give me one more second here.

20          I'm going announce the sentence and then I will

21   explain it and then I will impose it.

22          It is going to be within the guidelines.  It's going

23   to be 44 months as to each count.  That will be concurrent and

24   there will be three years of supervised release to follow.

25          I will explain that I am not imposing an upward

1    variance, which the government requested.  I am not imposing a

2    downward variance, which the defense requested.

3            Here is the explanation:  The defendant stands

4    convicted of two very serious crimes here, two very serious true

5    threats in interstate commerce.  The defense was they weren't

6    true threats.  The jury found they were true threats.

7            There was some discussion today about maybe they were

8    just innocuous.  I don't find they were innocuous at all.  I

9    find they are very serious and I find they imposed serious harm.

10           One thing that I think -- well, let me take a step

11   back.

12           As I have said before, this is very different than any

13   of the other cases.  I have looked at the cases that each of you

14   cited.  I have done some independent research.  It's just a very

15   unusual set of circumstances, but it's a very serious set of

16   circumstances.

17           One, the threats did divert law enforcement resources

18   at a time they were needed elsewhere.

19           I also think this is different than a lot of the cases

20   where someone is just making a threat to someone directly.  This

21   was open a Call to Arms.  It was a request to recruit others to

22   participate in this.  If he had had his way, there would have

23   been a lot of people down there in a recipe for disaster.

24           During trial it was said over and over again that

25   well, it only turned out to be him and his roommate.  That

1  obviously wasn't the intent or we would have never had these

2  documents in the first place.  He would have just made

3  arrangements with his roommate to be there.  So the fact that he

4  was out trying to recruit other people I think is significant.

5          Related to that is the fact that it was transmitted

6  over and over again.  I agree with the government, to some

7  extent, that the fact that it was 80 plus is materially worse

8  than if it were four or five, but I don't find that -- I don't

9  find that the facts justify an upward variance at any rate.  But

10  I do think that this is noteworthy and important that there were

11  so many transmissions of it.

12          I also find it's worse because of the willingness to

13  carry it out.  I think that was obviously discussed some earlier

14  in the context of the six point enhancement, but I do find there

15  was a willingness and an intent to carry it out.

16          At the end of the day, I do find this is a violent

17  person who seeks out violence, or celebrates violence.  This is

18  someone who spent money he didn't even have to go join a private

19  militia overseas.  We have seen all of the videos and the

20  statements in the trial.  And, Mr. Murrell, I agree with you

21  that a lot of them are things that plainly aren't serious, but

22  you can have things that aren't serious mixed in with a lot of

23  things that were very serious.  And a lot of those statements

24  were very serious including some of the ones we have talked

25  about today about assaulting police officers, about slaying

1  enemies, and things like that -- and obviously the threats are

2  significant.  The video that we saw -- both of the videos --

3  were significant.

4        So I have considered all of those posts.  I have

5  considered everything presented at trial and everything in the

6  presentence investigation report.  And I do find that this

7  defendant is a danger to society and that, I think, justifies

8  the sentence that I will impose here in a moment.

9        Another factor I considered was the manner in which

10  you conducted yourself, Mr. Baker, at the time of the arrest.  I

11  think that was, again -- put a lot of people at risk by not

12  complying, by not answering the door immediately.  I think that

13  was a factor -- not a significant factor among the other things

14  I am talking about, but it was something.

15        So I do think there is a need to protect the public.

16  I think that despite the lack of criminal history, although that

17  is a factor I will talk about in a minute, I have also

18  considered deterrence, both general and specific to this

19  defendant.

20        I do think there are people, I'm afraid, out there who

21  think they can make threats like this without any consequences.

22  I think it's important to have a sentence that will address

23  general deterrence and make sure that is not something that

24  continues.  But the biggest driver is I think the danger.

25        Why is it not a higher sentence?  The government has

1  requested a variance upward; one thing I considered is the lack

2  of criminal history -- significant criminal history.  There were

3  a couple of incidents.  But I have also considered the fact from

4  the time you returned from Syria there weren't incidents like

5  this.  This is --

6         We had sort of a confluence of a lot of difficult or

7  unusual factors going on that hopefully make it less likely that

8  something like this would happen again.  That's not to say that

9  he is not a danger, because I have already said he is, but this

10 does go to the extent of the need to protect the public.

11        I think it would be different if there were less time

12 in between those two events, but I do think that the 44 months

13 that I will impose will be sufficient to address that.

14        So I have considered everything said today.  I have

15 considered all arguments in the filings.  I have considered

16 everything in the presentence investigation report.  I do think

17 this is the appropriate sentence.

18        The three years of supervised release will follow.

19 That be as to each count concurrent, and it will include the

20 standard and mandatory conditions, and the conditions laid out

21 in the presentence investigation report including drug

22 treatment, mental health treatment -- I think those are

23 important and I think the defendant could benefit from both of

24 those.

25        We talked a lot of the guidelines and how the score

1   came out.  I will say that with respect to this case I would

2   have imposed the 44 months even if I hadn't agreed with you as

3   to the enhancements -- the plus six and both of the plus

4   two's -- the obstruction of justice, the more than two threats

5   and the intent to carry out -- because I do think that the 44

6   months is necessary to protect the public.

7           So even had I ruled differently as to those guidelines

8   issues, the 44 months is still the sentence I would have

9   imposed.

10          That's the sentence.  There will be no fine.  There

11  will be a $100 special assessment as to each count.

12          I will now impose the sentence unless -- oh, it will

13  also include the forfeiture that we have talked about earlier,

14  which will be everything sought in the government's motion

15  except for the last item, the .22 rifle.

16          Any reason the sentence cannot now be imposed, Mr.

17  Kunz?

18          MR. KUNZ:  No, Your Honor.

19          THE COURT:  Mr. Murrell?

20          MR. MURRELL:  No, sir.

21          THE COURT:  If you will please stand.

22          Sir, you have been adjudicated guilty of both counts

23  in the indictment.

24          I do find that the presentence investigation report is

25  accurate and the findings in it will be incorporated into the

 1    sentence.  We've talked specifically about paragraphs 32 and 33,

 2    as to the one with the FBI agent; that was 33.  I do find the

 3    agent's trial testimony credible and I find that the statement

 4    in paragraph 32 is correct.  33, we have addressed already and

 5    that I find is a correct statement of what the magistrate judge

 6    determined.

 7          Pursuant to the Sentencing Reform Act of 1984 and all

 8    amendments, it is the judgment of the Court that the defendant,

 9    Mr. Baker, be committed to the custody of the Bureau of Prisons

10    to be imprisoned for a term of 44 months as to each of the two

11    counts, counts one and two.  That will be concurrent.  So it

12    will be 44 months total.

13          This does address the seriousness of the offense and

14    the characteristics of this defendant.  It's my judgment that

15    this is sufficient but not greater than necessary to comply with

16    the statutorily defined purposes of sentencing.

17          I have considered all of the Section 3553(a) factors

18    in arriving at the sentence.  I talked about some of them but I

19    have considered all of them.

20          I find there is no ability to pay a fine so there will

21    be no fine, but there will be a $100 special assessment for each

22    count, for a total of $200.  That's under 18 USC 3013.

23          Upon release you will be placed on a term of

24    supervised release for three years as to each count.  Those will

25    be concurrent as well.  While on supervised release you must

1   comply with the mandatory conditions, the standard conditions,

2   and the special conditions that are laid out in the presentence

3   investigation report.

4          So, the total sentence is 44 months' imprisonment,

5   three years on supervised release, and a $200 special

6   assessment, in addition to the forfeiture that we've talked

7   about already.

8          I noted before that the 44 months would be the same

9   even if I had sided with the defendant on the guideline

10  objections.

11         Any objections to the sentence as imposed or the

12  manner in which it was imposed, Mr, Murrell, other than what you

13  have already addressed on the guidelines?

14         MR. MURRELL:  Yes, sir.  Our position is it's greater

15  than necessary to accomplish the goals of sentencing set out in

16  3553(a).

17         THE COURT:  Thank you.

18         Mr. Kunz, any objections?

19         MR. KUNZ:  No, Your Honor.

20         THE COURT:  Okay.  Mr. Baker, you have the right to

21  appeal the conviction that preceded this, and also today's

22  sentence.

23         Any appeal would have to be filed within 14 days of

24  the written judgment.  The judgment will come out in the next

25  couple of days.  Mr. Murrell can file a notice for you or the

1    clerk of court, if requested, will file one.

2              The important thing is that you understand the 14 day

3    deadline.  Do you understand that?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Okay.  If you can't afford a lawyer for

6    the appeal, one would be appointed for you.  If you can't afford

7    the cost of the appeal, you can apply to proceed without cost.

8              Any recommendation for any geography?

9              MR. MURRELL:  Yes, sir.  We ask the Court to consider

10   recommending that he serve his sentence at Coleman FCI; it's

11   sort of halfway between those he knows here in Tallahassee and

12   his family down in West Palm.

13             THE COURT:  Okay.  What I typically do, just so you

14   understand, Mr. Baker -- I can recommend, but the Bureau of

15   Prisons makes the ultimate determination.  I typically just do a

16   geography, because there is a lot of things that the Bureau of

17   Prisons take into consideration, one of them being where there

18   is availability, but also security levels and things like that.

19             Would you want me to say central Florida?

20             MR. MURRELL:  Yes, sir.

21             THE COURT:  I will recommend that you be housed in

22   central Florida.  Again, that's not up to me, ultimately, but I

23   will make that recommendation.

24             Is there anything further today, Mr. Kunz?

25             MR. KUNZ:  No, Your Honor.  Thank you, sir.

1          THE COURT:  Mr. Murrell?

2          MR. MURRELL:  No, sir.

3          THE COURT:  Mr. Baker, you will be remanded to

4    custody.

5          We are adjourned.

6       (Proceedings concluded at 2:44 PM on Tuesday, October 12,

7    2021.)

8                         * * * * * * * *

9          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
10   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
11   transcript.

12

13   /s/ Lisa C. Snyder                    11/23/2021

14   Lisa C. Snyder, RPR, CRR              Date
     Official U.S Court Reporter
15

16

17

18

19

20

21

22

23

24

25